## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 24-CR-20255-WPD/HUNT

**UNITED STATES OF AMERICA,**

**vs.**

**PATRICK BOYD and**
**CHARLES BOYD,**

**Defendants**.

_____/

## MOTION FOR AUTHORIZATION TO RELEASE MATERIAL
## SUBJECT TO THE CRIME-FRAUD EXCEPTION

The United States of America respectfully moves this Court for an order authorizing the

Filter Team[1] to release to the Government's Prosecution Team certain communications pursuant

to the crime-fraud exception to privilege.  As alleged in the Indictment, Defendants Patrick Boyd,

Charles Boyd, and Adam Brosius carried out a nationwide prescription drug diversion scheme.

[ECF No. 10].  Defendants Patrick Boyd and Charles Boyd were the owners of Safe Chain

Solutions LLC ("Safe Chain"), a wholesale distributor of pharmaceutical products.  Defendant

Adam Brosius was also a part owner of Safe Chain and owned and operated Worldwide Pharma

Sales Group, Inc., which had its own salesforce that helped Safe Chain sell adulterated,

misbranded, and diverted HIV drugs.

Between April 2020 and August 2021, Patrick Boyd, Charles Boyd, and Adam Brosius

purchased more than $90 million of heavily discounted and diverted HIV prescription drugs from

at least five black-market suppliers.  The Defendants subsequently sold these diverted HIV drugs

_____

[1] The Filter Team also is submitting a sealed supplement to this Motion *ex parte* from the
Prosecution Team (the "Filter Team *Ex Parte* Supp.").

to pharmacies throughout the country, along with falsified paperwork designed to make it appear as though the drugs had been acquired legitimately. Their pharmacy customers, in turn, dispensed the diverted HIV drugs to patients and billed health insurers for the diverted and non-reimbursable drugs. On numerous occasions, the bottles of purported HIV medication the Defendants distributed to pharmacies contained different drugs entirely, with at least one patient suffering adverse effects after taking a bipolar drug he mistakenly believed to be his prescribed HIV medication.

Throughout the alleged conspiracy, Patrick Boyd and Charles Boyd engaged counsel to maintain the façade that their HIV business was legitimate and justify continuing to sell the diverted HIV drugs over compliance's objections. As a result, communications between Patrick Boyd, Charles Boyd, Safe Chain personnel, and their lawyers are not protected from disclosure by the attorney-client privilege, the work product doctrine, or any other protection or privilege.[2] The instant Motion requests a finding that the crime-fraud exception applies to records relating to communications the Defendants and other Safe Chain personnel had with attorneys relating to the charged conduct during the alleged conspiracy period of April 2020 to August 2021.

As set forth below, the crime-fraud exception is applicable here because the Government satisfies the two-prong standard applied in this Circuit. *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345 (11th Cir. 2021) ((1) "a *prima facie* showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the

---

[2] The Prosecution Team understands that the Filter Team will attach relevant representative Exhibits in its supplemental filing; however, if the Court would like to review all materials subject to this Motion in chambers, the Filter Team will promptly provide them.

benefit of counsel's advice;" and (2) "the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.").

**First**, the Grand Jury has determined that probable cause supports the allegations in the Indictment that the Defendants carried out a widespread prescription drug diversion scheme that misled pharmacy customers, defrauded health insurers, and, most importantly, deceived vulnerable patients who received the illicit drugs.  While not necessary, the fact that Adam Brosius has pleaded guilty to Count 5 of the Indictment (conspiracy to commit wire fraud) and admitted to conspiring with Patrick Boyd and Charles Boyd to carry out the charged crimes further demonstrates that the Government has satisfied the first prong in the crime-fraud analysis.

**Second**, Patrick Boyd and Charles Boyd used counsel to maintain the appearance that their HIV business was legitimate, justify repeatedly overruling compliance, and keep the gravy train of HIV profits rolling.  When interviewed, their own compliance director stated that she noticed major red flags with Safe Chain's very first supplier, Boulevard 9229 LLC ("Boulevard").  Those red flags, corroborated by documents, included that (a) Boulevard initially refused to provide the legally required T3s/pedigrees[3]; (b) she was unable to contact anyone at Boulevard when trying to obtain the required paperwork; (c) its listed location appeared to be an apartment complex in New York City; (d) the Boulevard contacts she later dealt with were "King Kimchi" and someone known only to her and the Defendants as Peter (no last name); and (e) she twice confirmed in September and October 2020 that the T3s/pedigrees eventually provided by "King Kimchi" and Peter were

---

[3] T3s, or pedigrees, were documents required to accompany the wholesale distribution of prescription drugs and consisted of transaction information, transaction history, and a transaction statement.  Indictment [ECF No. 10] ¶ 2.  These documents were critical to ensuring the integrity of the prescription drug supply chain; their purpose was to validate that the prescription drugs distributed by wholesalers were acquired legitimately, as opposed to through an illegal "buyback scheme" where criminals purchased bottles supposedly containing prescription HIV medication on the black market and then repackaged and resold them through the supply chain.  *Id.* ¶ 7.

falsified, an effort to conceal the illicit origin of the drugs.  During sworn deposition testimony, the compliance director testified, in substance, that due to all these red flags she recommended the Defendants stop buying HIV drugs from Boulevard, but they continued doing so anyway.  She raised the same concerns with subsequent black-market HIV vendors, with the same result. Throughout the Defendants' depositions, when asked *why* they continued buying steeply discounted HIV drugs from these suppliers after learning of all these obvious signs of diversion, the Defendants repeatedly asserted attorney-client privilege.  Each step along the way, the Defendants justified overruling compliance and continuing their lucrative HIV business by claiming legal approval, as confirmed by their sworn deposition testimony.  As a result, both prongs of the crime-fraud exception apply to these communications, which are highly probative of the Defendants' knowledge and intent—the most important and contested issue at trial.

For these reasons, and as set forth below, the Court should find that the crime-fraud exception applies to records relating to communications the Defendants and other Safe Chain personnel had with attorneys relating to the charged conduct during the alleged conspiracy period of April 2020 to August 2021.[4]

## **BACKGROUND**

### A.    **Procedural Background**

In July 2021, Gilead Sciences, as part of a Lanham Act lawsuit, sought an *ex parte* seizure order in the United States District Court for the Eastern District of New York against Safe Chain, the Defendants, Boulevard, and its straw owner.  On July 23, 2021, U.S. District Court Judge Rachel P. Kovner entered a seizure order directing that federal and local law enforcement officials assist

---

[4] If granted, the Filter Team will release the covered communications within its possession to the Prosecution Team.  Further, the Government may seek to subpoena related documents and interview the attorneys involved, as no operative privilege would attach to these communications.

Gilead and its counsel in executing a search and seizure of Safe Chain's Maryland and Utah offices for evidence of the Defendants' distribution of counterfeit Gilead-branded HIV medications. After seizing evidence from Safe Chain pursuant to the court's order, Gilead's attorneys and civil counsel for Safe Chain negotiated a procedure for screening out potentially privileged materials from the evidence Gilead's lawyers could review.

The Prosecution Team subsequently obtained much of this evidence, which had already been screened for potentially privileged materials using the parties' agreed-upon filter protocol. The Filter Team initially received these materials to confirm the agreed-upon privilege terms had been correctly applied and then released documents to the Prosecution Team that did not hit on any privilege search terms. Separately, prior to indictment, the Filter Team also obtained from Gilead documents that did hit on the agreed-upon search terms. After the Indictment was returned, in February 2025, the Filter Team produced potentially privileged materials in its possession to the defense for review and privilege assertion.

On April 29, 2025, the Prosecution Team and Filter Team conferred with defense counsel and reached an agreement that the defense would provide rolling privilege assertions to be completed no later than July 15, 2025, with the first privilege log due June 1, 2025.[5] On June 9, 2025, defense counsel produced only to the Filter Team a privilege log covering a portion of the potentially privileged documents. To date, after exchanges between the defense and the Filter Team and between the defense and Prosecution Team, defense counsel has refused to share its first privilege log with the Prosecution Team, citing no authority for their position. The Prosecution Team now moves for a finding that the crime-fraud exception applies in this case.

---

[5] When asked whether they intend to assert an advice-of-counsel defense, defense counsel has not committed definitively to a position.

**B.** **The Grand Jury Found Probable Cause that Defendants Committed the Crimes Alleged in the Indictment and the Evidence Supports That Finding**

On June 18, 2024, the Grand Jury returned an indictment alleging that, between April 2020 and August 2021, the Defendants conspired to introduce misbranded and adulterated drugs into interstate commerce and to defraud the United States (Count 1); introduced misbranded drugs into interstate commerce (Counts 2-3); conspired to traffic in pre-retail medical products with false documentation (Count 4); conspired to commit wire fraud (Count 5); and committed wire fraud (Counts 6-8).   The Grand Jury also found probable cause to believe that the Defendants accomplished their crimes, in part, by distributing diverted prescription drugs accompanied by T3s/pedigrees they knew contained falsified information designed to conceal the illicit origin of the drugs.  It further found that the Defendants were made aware in August 2020 of instances in which the bottles they sold as HIV medication contained different drugs entirely; despite all this, the Defendants continued buying and selling HIV drugs from the same suppliers who sold them these diverted drugs at too good to be true prices.

In addition to the Grand Jury's probable cause findings, the trial evidence will show that the Defendants quickly learned that the drugs they bought and sold were illegally diverted. Immediately upon entering the HIV business and selling drugs sourced from Boulevard, they began receiving complaints from pharmacy customers about the medications received.  For example, on May 28, 2020, a sales representative forwarded a complaint from a pharmacy that it had received a bottle of HIV medication that was already opened and had "Albuterol Inhalation" written on the foil around the cap, as shown in the photo below.



The trial evidence will also show that Defendants Patrick Boyd and Charles Boyd were notified by email twice early in the conspiracy – on September 30, 2020, and again on October 9, 2020 – that the T3s/pedigrees provided by Boulevard were falsified, an attempt to conceal the illicit origin of the drugs.  Around this same time, on October 3, 2020, Charles Boyd received a complaint from a pharmacy that the Boulevard-sourced drugs Safe Chain sold had arrived in "suspicious packaging" and were "deemed as not meeting safety standards and may present risk for our patients."  That pharmacy attached a photo showing the disturbing condition in which it received the HIV drugs from the Defendants:



None of this deterred the Defendants; rather, they continued buying HIV drugs from Boulevard, accompanied by T3s/pedigrees they knew were falsified, and selling those drugs to pharmacy customers, along with the falsified paperwork, for another five months. And they did so despite their own compliance director's repeated objections. This pattern continued throughout the alleged conspiracy. In March and April 2021, the Defendants learned that two additional black-market suppliers had provided falsified T3s/pedigrees accompanying their sales of discounted HIV drugs; once again, the Defendants disregarded compliance and continued buying and selling HIV drugs from those suppliers as well. The Defendants concealed these facts from their pharmacy customers, health insurers, and patients. In total, the Defendants purchased and resold more than $90 million of diverted, misbranded, and adulterated HIV drugs.

Finally, as part of his guilty plea, Adam Brosius admitted that he, Patrick Boyd, and Charles Boyd "carried out a scheme to defraud pharmacy customers, their patients, and health care benefit

programs by knowingly distributing diverted prescription drugs with falsified T3s/pedigrees designed to conceal the true origin of the drugs." Agreed Factual Basis [ECF No. 65].

### C. The Defendants Enlisted Attorneys Throughout the Conspiracy to Further Their Criminal Conduct

That Patrick Boyd and Charles Boyd enlisted attorneys to further their criminal conduct and overrule compliance is evident from their civil depositions in the lawsuit filed against them by Gilead. To place their testimony in context, the below chart establishes the time periods during which Safe Chain purchased diverted HIV drugs from five black-market suppliers, as well as the amounts paid to each.

| Supplier (Location) | Time Period | Sales |
|---|---|---|
| Boulevard (New York) | May 2020 – March 2021 | $34.7 million |
| Gentek (Connecticut) | June 2020 – Jan. 2021 | $42.9 million |
| Rapid's Tex (Texas) | March 2021 – May 2021 | $3.7 million |
| Synergy Group Wholesalers (New Jersey) | March 2021 – July 2021 | $7.3 million |
| Omom Pharmaceuticals (California) | June 2021 – July 2021 | $3 million |
| **Total** | | **$91.6 million** |

By way of example, during Patrick Boyd and Charles Boyd's depositions, they testified as follows:[6]

- When asked what Safe Chain did when it learned from its compliance director on September 30, 2020, that the distributor listed on a Boulevard T3 responded by email that it never sold the product [to Boulevard] as reflected on the T3, Patrick Boyd testified: "I believe in all instances we contacted our legal time (sic), Frier Levitt."

- When asked why Safe Chain continued buying from Boulevard after compliance's September 30, 2020, email about Boulevard's falsified T3/pedigree, Patrick Boyd replied: "I believe we had come up with new SOPs, spoke to our counsel about what to do at that point in time, quarantined lots in question[]."

- When asked whether he would follow compliance's recommendation not to continue purchasing HIV product from a supplier, Patrick Boyd replied: "Generally and take it to

---

[6] The lengthy deposition transcripts are not attached to this Motion as exhibits but can be filed separately under seal if the Court would like to review them.

legal counsel." When questioned further on whether legal counsel could overrule compliance, Patrick Boyd replied: "If they have facts that we didn't have before."

- When asked about a complaint from a pharmacy that received wrong pills in a bottle labeled Biktarvy, and the fact that Safe Chain continued buying and selling drugs from the supplier of that bottle (Gentek), Patrick Boyd replied: "After we got that complaint, I believe that they had already contacted or sent it to Gilead. We went and got the advice of our counsel on what to do from there." When pressed on whether "[t]he advice you were seeking from your counsel was as to whether or not it would be lawful to continue" buying and selling Gentek product, Patrick Boyd's lawyer objected on attorney-client privilege grounds.

- When asked what steps Safe Chain took after learning of concerns with the validity of a T3 provided by another black-market supplier – Rapid's Tex – Patrick Boyd testified, "I would have consulted our consultant and our legal team about what next steps to take, and I don't recall exactly what those were."

- When asked, "Did you inquire with your consultants and legal team about the fact that Synergy [another black-market supplier] had sold you in one of its first shipments bottles of Biktarvy with the wrong inserts glued to the bottle," Patrick Boyd replied: "I believe we talked to our legal team after any incident or anything that we saw that didn't look normal to us."

- When asked, "What did you tell your lawyers about the concerns that were raised with regard to Synergy," Patrick Boyd's lawyer objected, asserting attorney-client privilege.

- When asked if he had ever heard of any other bottles Gilead had sold of Biktarvy containing the wrong pills inside, Charles Boyd replied: "That may be confidential, attorney-client confidentiality."

- When asked what Safe Chain did in response to complaints it received about Boulevard-sourced product, Charles Boyd replied: "We would always contact our compliance attorneys, you know, ask for counsel on what to do."

- Charles Boyd testified that, "Our legal counsel – our legal counsel talked to [the compliance director] consistently once these complaints started happening."

As their sworn testimony shows, each time the Defendants learned of the illicit nature of the HIV drugs supplied by their black-market suppliers, they contacted counsel and, in essence, used the attorney-client privilege to shield their criminal conduct from disclosure.

## LEGAL STANDARD

The attorney-client privilege encourages "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Protecting the privilege, however, comes at a significant cost to the truth-seeking function of the adversarial system. *United States v. Zolin*, 491 U.S. 554, 561-63 (1989). Accordingly, when a client abuses the system by consulting an attorney for the purpose of furthering fraudulent activity, the application of the attorney-client privilege is overcome by the "crime-fraud exception" and such information loses its protected status. *Id*; *see also In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987) ("The attorney-client privilege does not protect communications made in furtherance of a crime or fraud."). This exception also applies to materials for which the work product privilege would otherwise apply. *In re Sealed Search Warrant*, 11 F.4th 1235, 1249 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022).

When determining whether the exception applies, it is immaterial that the lawyer is innocent of any wrongful intent. "The privilege is the client's, so 'it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply.'" *D.O.T. Connectors, Inc. v. J.B. Nottingham & Co.*, No. 4:99CV311-WS, 2001 WL 34104927, at *1 (N.D. Fla. Jan. 23, 2001) (internal citation omitted). The exception therefore applies even where the attorney is unaware that his or her advice is sought in furtherance of criminal conduct. *In re Grand Jury Proceedings*, 517 F.2d 666 (5th Cir. 1975).

Courts apply a two-part test to determine whether the crime-fraud exception applies: "First, there must be a *prima facie* showing that the client was engaged in criminal or fraudulent conduct

11

when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice.  Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it."  *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345 (11th Cir. 2021); *see Zolin*, 491 U.S. 554.  The exception may be applied to disclose materials that reveal the existence of the crime "as well as efforts to conceal it."  *JTR Ents. v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017).

The *prima facie* standard "is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed."  *Schroeder*, 842 F.2d at 1226.  This *prima facie* showing need not rise to the level of proof necessary to show that a defendant is guilty of the crime charged.[7]  Once established, the burden of persuasion shifts to the privilege holder to rebut the *prima facie* showing which has already been made.  *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1307 (S.D. Fla. 2000).

## ARGUMENT

The Defendants carried out a widespread prescription diversion and fraud scheme in pursuit of easy money.  Each time they learned that a black-market supplier had provided falsified paperwork accompanying the steeply discounted HIV drugs they sold to the Defendants, they used

---

[7] *See In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (holding that the crime-fraud exception applied and stating that "[w]hile the targets of this investigation may have valid defenses that preclude indictment or conviction for fraud or criminal environmental violations, the existence of a potential defense does not mean that the district court reversibly erred."); *United States v. Cleveland*, No. Crim. A. 96-207, 1997 WL 232538, at *4 (E.D. La. May 8, 1997) ("A finding that the Government has made a *prima facie* showing that the relationship between attorney and client was intended to further illegal activity is not tantamount to a finding that the defendant is guilty."); *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988) (holding that the standard for the *prima facie* showing "is not whether the evidence supports a verdict but whether it calls for inquiry.").

advice of counsel as their rationale for continuing to purchase HIV drugs from the same suppliers; in other words, to further their criminal conduct. The Defendants' use of attorneys was intended to provide cover for their criminal conduct, to justify overruling compliance, and to continue pushing their sales team to sell the diverted HIV drugs. The Court should order that the crime-fraud exception applies and authorize the Filter Team to disclose records relating to communications the Defendants and other Safe Chain personnel had with attorneys relating to the charged conduct during the alleged conspiracy period of April 2020 to August 2021.

The two prongs of the prima facie showing, as well as the reasons they are satisfied in this case, are discussed in greater detail below.

## I.   THE GRAND JURY INDICTED DEFENDANTS FOR AN ONGOING CRIMINAL AND FRAUDULENT SCHEME

As noted above, the first prong of the two-part test to establish applicability of the crime-fraud exception is "satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Schroeder*, 842 F.2d at 1226. In other words, the moving party "must provide evidence, which has some foundation in fact, that would establish elements of some violation that was ongoing or about to happen." *United States v. Esformes*, No. 16-20549-CR, 2018 WL 5919517, at *14 (S.D. Fla. Nov. 13, 2018). When an action can be "reasonably construed" to be a criminal violation, the first part of the test is satisfied. *United States v. Mitchell*, No. 3:11-CR-248(S1)-J-34, 2013 WL 3808152, at *26 (M.D. Fla. July 22, 2013). Even prior to indictment, this standard presents a "low hurdle." *See In re Grand Jury Subpoena*, 2 F.4th at 1345 ("Rather, this *prima facie* showing must only 'have some foundation in fact,' and although 'mere allegations of criminality are insufficient,' the government may meet its burden by providing 'a good faith statement ... as to what evidence is before the grand jury.'"), *quoting Schroeder*, 842 F.2d at 1226.

Here, the allegations that the Defendants were engaged in ongoing criminal and fraudulent conduct during the entire time they communicated with attorneys does not merely have "some foundation" in fact that could hypothetically establish the elements of a criminal offense: the Grand Jury has already determined there is probable cause to believe the evidence meets these elements. At this stage of the case, therefore, the Court can rely on the findings made by the Grand Jury when it returned the eight-count Indictment against the Defendants, which describes the prescription drug diversion and fraud scheme and includes detailed manner and means allegations laying out the specifics of how they carried out the charged crimes. It has long been recognized that crimes alleged in an indictment may serve as the "crime" within the exception, particularly where the conduct charged in the indictment came during or after the attorney's advice bearing on that conduct. *See United States v. Gorski*, 807 F.3d 451, 461 (1st Cir. 2015) ("[T]he indictment provides a reasonable basis to believe [defendant] was engaged in criminal or fraudulent activity.").

The charges in the Indictment therefore satisfy the first prong of the crime-fraud analysis — the Defendants were engaged in criminal or fraudulent activity. The conspiracy alleged in Count One runs from April 2020 to August 2021. Indictment [ECF No. 10] at 5. Furthermore, even if the Indictment were not sufficient to meet this standard, Adam Brosius's guilty plea provides more than a *prima facie* basis to conclude that the Defendants intended to, and did, commit the crimes and fraud detailed in their Indictment. *See In re Grand Jury Subpoena,* 2 F.4th at 1345 (*citing In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)) (holding that the *prima facie* standard does not require the Government to "prove the existence of a crime or fraud beyond a reasonable doubt").

In his Agreed Factual Basis, Adam Brosius admitted that he, Patrick Boyd, and Charles Boyd "carried out a scheme to defraud pharmacy customers, their patients, and health care benefit programs by knowingly distributing diverted prescription drugs with falsified T3s/pedigrees

designed to conceal the true origin of the drugs."[8]   [ECF No. 65] at 3.   He admitted that the Defendants "purchased these diverted prescription drugs at steeply discounted prices, which they were aware was far below the pricing available for such drugs had they been acquired through legitimate and regulated channels of distribution and from distributors authorized by the drugs' manufacturers to distribute such drugs."  *Id.*  Consistent with the other evidence described above, Brosius admitted that, despite learning that Boulevard's T3s/pedigrees contained falsified information, the Defendants "continued purchasing diverted prescription drugs from Boulevard and reselling those drugs to customers along with falsified T3s/pedigrees."  *Id.*  He further admitted that he, Patrick Boyd, and Charles Boyd "were similarly made aware that the T3s/pedigrees provided by other Black-Market Suppliers contained falsified information, but continued purchasing diverted prescription drugs from those suppliers and reselling those drugs to customers along with falsified T3s/pedigrees."  *Id.* at 3-4.   Finally, Brosius admitted that the Defendants together "used the falsified information in the T3s/pedigrees to conceal the true origin of the diverted prescription drugs from Safe Chain's customers" and make "it appear as though these drugs had been acquired legitimately through the regulated supply chain."  *Id.*

## II.   DEFENDANTS' COMMUNICATIONS WITH ATTORNEYS WERE CLOSELY RELATED TO, AND IN FURTHERANCE OF, THE FRAUDULENT ACTIVITY FOR WHICH THEY WERE LATER INDICTED

To meet the second prong of the *prima facie* crime-fraud standard, the Government must show that the relevant communication is "related to" the criminal or fraudulent activity established under the first prong.  *Schroeder,* 842 F.2d at 1227; *see also United States v. Esformes*, No. 16-20549-CR, 2018 WL 5919517, at *14 (S.D. Fla. Nov. 13, 2018); *United States v. Cleckler*, 265 F.

---

[8] Brosius's negotiated plea agreement covers the time period of September 2020 through August 2021.

App'x 850, 853 (11th Cir. 2008); *In re Grand Jury*, 845 F.2d 896, 898 (11th Cir. 1988).  The

Eleventh Circuit has held that "the degree of relatedness required . . . should not be interpreted

restrictively."  *In re Grand Jury Subpoena*, 2 F. 4th at 1350.  Chief Judge Cecilia Altonaga recently

held that the crime-fraud exception applied under similar circumstances in another health care fraud

case brought by the Government, writing that the second prong "is satisfied by 'a showing that the

communication is related to the criminal or fraudulent activity established under the first prong."

*United States v. Stein*, No. 21-20321-CR, 2023 WL 2585033, at *14 (S.D. Fla. March 21, 2023)

(quoting *Schroeder*, 842 F.2d at 1227).

The communications at issue here directly relate to the criminal conduct alleged in the

Indictment.  At each point during his deposition when questioned as to why Safe Chain continued

buying HIV drugs from black-market suppliers after learning they had provided falsified

paperwork, bottles containing the wrong drugs, and bottles missing patient directions for use,

Patrick Boyd testified that they did so on or with the advice of attorneys.  *See supra* pp. 8-9.  He

testified that "in all instances we contacted our legal time (sic), Frier Levitt," and "we talked to our

legal team after any incident or anything that we saw that didn't look normal to us."  *See also* Filter

Team *Ex Parte* Supp.  Charles Boyd testified similarly, as described above.

At each stage of the conspiracy, upon learning of the illicit nature of the drugs they

purchased and resold, the Defendants claimed legal approval as the justification for overruling

compliance and continuing their criminal conduct.  During an interview and in her sworn testimony,

Safe Chain's compliance director stated that she repeatedly recommended that Safe Chain stop

buying drugs from Boulevard and the other black-market suppliers.  During her deposition, when

asked who made the decision to continue buying HIV drugs from Boulevard, she testified, "I did

not participate in the decision to make the ultimate decision of who vendor (sic) should be purchased

(sic), where we would purchase from, which vendors," and that it was the Defendants who made that decision.  When the Defendants were asked *why* they made that decision, they asserted privilege.

At another point during her deposition, the compliance director was asked about an email reply she sent on February 10, 2021, to an inspector with the California Board of Pharmacy who had requested an explanation of Safe Chain's "procedures to verify authenticity and drug chain security for all purchases and sales."  In her emailed response, the compliance director wrote, "[w]e verify our direct trading partners on both purchasing and sales transactions," which she explained meant verifying that the information supplied by a vendor in a T3/pedigree was accurate.  When asked why she failed to mention that Safe Chain had been unable to verify most or all of Boulevard's T3s and that she had similarly been unable to verify Gentek's T3s/pedigrees, she testified that this misleading email "was something discussed with Safe Chain's lawyers."

The Indictment, combined with the proffered evidence and sworn testimony of the Defendants and Safe Chain's compliance director, establishes a *prima facie* case that the Defendants were committing crimes while claiming to receive legal approval of the continuation of their criminal conduct.

The Eleventh Circuit's opinion in *United States v. Cleckler*, 265 Fed. Appx. 850 (11th Cir. 2008), provides an illustrative example.  In *Cleckler*, the Eleventh Circuit upheld a district court's crime-fraud determination where a defendant submitted fabricated documents through counsel to the IRS pursuant to counsel's effort to produce documents as part of an IRS appeal.  265 Fed. Appx. at 853-854.  The court found that the communications at issue were related to the fraudulent activity, as the defendant obtained counsel's assistance to further his fraudulent activity and to conceal his crime.  *Id.* Here, as in *Clerkler*, the Defendants utilized the services of attorneys to continue

perpetrating—and likely concealing—this fraud.  As their sworn deposition testimony establishes, when pressed on the illegal nature of their operations, the Defendants used the attorney-client privilege as a smokescreen to maintain the facial legitimacy of their scheme.  Together, there is more than a sufficient basis to find that Defendants intended to, and did, use the services of counsel to foster, further, and conceal their criminal scheme.  *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (The privilege ceases "when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act."); *see also Clark v. United States*, 289 U.S. 1, 15 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.  He must let the truth be told.").[9]

More recently, as noted above, Chief Judge Altonaga held that the crime-fraud exception applied to a defendant's communications with counsel regarding an indicted health care fraud scheme.  *See Stein*, No. 21-20321-CR, 2023 WL 2585033, (S.D. Fla. March 21, 2023).  In that case, the defendant asserted privilege over communications with counsel regarding a master services agreement ("MSA") with his co-conspirators, which formed the basis for the fraudulent scheme in that indictment.  *Id.* at 3.  In response to the Government's crime-fraud motion, the defendant argued variously that the indictment was insufficient to establish a *prima facie* showing of the first prong, and that the government must show a heightened degree of "relatedness" under the second prong.

---

[9] Defendants' offensive use of privilege in the civil litigation and defensive invocation in these proceedings reflects the improper use of privilege as both a sword and a shield.  Where a party selectively and intentionally introduces information and testimony into litigation regarding their reliance on counsel, "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."  *See* Fed. R. Evid. 502(a); Fed. R. Evid. 502(a) Advisory Committee Notes; *United States v. Nobles*, 422 U.S. 225, 239-240 (1975); *see also Chao v. Tyson Foods, Inc.*, 568 F.Supp.2d 1300, 1327–28 (N.D.Ala.2008) (quoting *Frontier Refining, Inc. v. Gorman–Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir.1998)) ("[A] litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion.").

*Id.* at 6-16.  In granting the Government's crime-fraud motion, Chief Judge Altonaga rejected both arguments, holding both (a) that the indictment alone satisfies the "low hurdle" of the first prong (*id.* at 6-9), and (b) meeting the Eleventh Circuit's "non-restrictive" standard of the second prong was "straightforward because the MSA Communications plainly 'relate[] to the [scheme] established under the first prong'" (*id.* at 14) (citing *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345, 1350 (11th Cir. 2021)).   Likewise, that facts here compel the straightforward conclusion that both prongs of the crime-fraud exception are met: (1) the Defendants were indicted for fraudulent conduct based upon a showing of probable cause and the other evidence described above, and (2) their own sworn statements, combined with the interview statements and testimony of their compliance director, show that they sought the advice of counsel related to and in furtherance of the same conduct alleged in the Indictment.

## CONCLUSION

The Government respectfully requests that the Court find that the crime-fraud exception applies to records relating to communications the Defendants and other Safe Chain personnel had with attorneys relating to the charged conduct during the alleged conspiracy period and authorize the Filter Team to release to the Prosecution Team those communications pursuant to the crime-fraud exception to privilege.

This the 20th day of June, 2025

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

LORINDA LARYEA, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:   */s/ Alexander Thor Pogozelski*

Alexander Thor Pogozelski
Assistant United States Attorney
Florida Special Bar No. A5502549
99 Northeast 4th Street
Miami, Florida 33132
Tel: (786) 649-5251
Email: Alexander.Pogozelski@usdoj.gov

*/s/ Jacqueline Zee DerOvanesian*
Jacqueline Zee DerOvanesian
Trial Attorney
Florida Bar No. 125662
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, D.C. 20005
Tel: (202) 285-9285
Email: Jacqueline.DerOvanesian@usdoj.gov

## **LOCAL RULE 88.9(a) CERTIFICATION**

On June 19, 2025, undersigned counsel conferred by email with counsel for the Defendants in a good faith effort to resolve the issues raised in the Motion.  Counsel for the Defendants represented that they oppose the Motion.

*/s/ Alexander Thor Pogozelski*
Alexander Thor Pogozelski

**<u>CERTIFICATE OF SERVICE</u>**

I, Alexander Thor Pogozelski, hereby certify that on June 20, 2025, I electronically filed

the foregoing document with the Clerk of the Court using CM/ECF.


<u>*/s/ Alexander Thor Pogozelski*    </u>
Alexander Thor Pogozelski