UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-CR-20255-WPD

UNITED STATES OF AMERICA

v.

PATRICK BOYD
          Defendant.
_____/

**Sentencing Memorandum and Motion For Variance**

Patrick Boyd, through counsel, respectfully files his Sentencing Memorandum and Motion

for Variance. In support, Mr. Boyd states:

The Pre-Sentence Reports recommendation of 1,032 months for a first time non-violent

offender underscores the need for a reasonable and just application of 18 U.S.C. 3553(a).

**History and Characteristics of Patrick Boyd**

Patrick Boyd is a 47 year old father with no prior criminal history. He has two minor

children, Durham Boyd, age 14 and Harper Boyd, age 16. (The two children live with their mother,

and Patrick supports them by contributing $7,500 per month and $22,000 per year for tuition.) Prior

to his incarceration, Patrick was heavily involved in his children's lives. Patrick was always there

for his son and daughter. Their lives revolved around homework, practices, and game days. Patrick

is the type of father who helps with homework, coaches their athletic teams and freely offers advice,

love and support. Patrick has been a positive influence not only on his own two children, but on

countless other young men and women throughout the years. When determining a just sentence,

please consider the positive impact Patrick has had on the numerous lives referenced in the following

1

excerpts from some of the many letters of support written on Patrick's behalf:



My names John Boyd, and am the proud father of Patrick Boyd. I am a veteran of the United States Coast Guard. and had a career as a camera man for NBC for 30 years I traveled on Air Force One on multiple occasions to cover various presidents all over the world My wife. Cheryl was a stay-at-home mom for the majority of Pat's childhood, ensuring she could provide our children with consistent care. emotional stability, and daily guidance during their most formative years. I retired from NBC 20 years ago, and we currently live about a mile from Patrick and his children.

Cheryl and I have had some significant health struggles over the past decade Cheryl's mobility became limited after back surgery 10 years ago. She relies on a walker to get around, and is no longer able to drive. After suffering a heart attack two years ago, Pat helped Cheryl while I was recovering.  I was away from home for over two months, and Pat would go over to help his mother take out the trash and make her coffee. The help she received from both of our boys allowed her to safely stay in our home during a very emotional time. Currently, I have kidney disease and need dialysis three times a week to stay healthy. Because of that, I rely on my family a lot for transportation, care, and support.

As his parent, I have had the opportunity to observe firsthand the kind of father he is. His children (ages 16 and 14) have always been a central priority in his life. He Is consistently present. involved. and committed to their well-being One of the clearest examples of this is the many years he spent coaching his son in football for the Talbot County Braves. This was not simply about the sport itself, but about

teaching discipline and teamwork. Through coaching, he spent many hours mentoring not only his own child but also other young athletes.

Your Honor, my wife and I are elderly and in declining health, and due to our age and physical limitations. we are no longer able to travel. Our son's presence In our lives is important to us, and we hold a sincere hope of being able to see him again during our lifetime. We acknowledge the seriousness of his convictions, but respectfully ask the Court to consider our circumstances and the significance of maintaining this family connection.

Pat's mom and dad



As a father of two, Pat has always spoken about his children as the most important part of his life. Even during this difficult period, his concern has remained focused on their well-being and the example he wishes he had set for them. I believe the weight of these consequences has had a profound effect on him, and that he understands the seriousness of his mistakes.

Kristen Clement, friend for over 30 years



I have had the privilege of coaching alongside Patrick Boyd for the last 6 years. During this time, I have witnesses firsthand the positive impact Patrick has had on the youth in our community. Patrick has been an inspiration and mentor to countless young athletes including my own son. He consistently has taught values that go far beyond the game of football-instilling good work ethic, responsibility and teamwork. His dedication has helped shape these kids into respectful hardworking individuals who understand the importance of integrity and perseverance.

Chris White, President of Talbot Braves Youth Football Organization

Pat has been a part of our extended family since he and my son Jason met in middle school. Pat and Justine were and are best friends. They were at the Boyd's house or at my house all of their growing up years. Pat is the very best kind of friend. He is supportive and always there for you. He has always worked hard and helped everyone. Pat and my son played sports together. Pat supported all his teammates with rides to school and practice. His parents John and Cheryl always had a meal ready for the kids that were in and out of their house, Cheryl and I were team booster Moms for the boys highschool. I saw first hand how Pat was there with help, money or a ride for his friends.

Jackie Forti, mother of Patrick's best friend from childhood

From a young age, Patrick showed exceptional qualities of determination and integrity. He was a committed student and athlete, demonstrating discipline, a strong sense of responsibility, and perseverance-traits that have defined him throughout his adulthood and continue to guide him today. Patrick is an outstanding friend and a deeply devoted family man. His family remains his foremost priority; he consistently

puts his wife, children and parents first, providing them with unwavering love, care, and support. He is particularly close with his parents and takes great responsibility in caring for them, ensuring their well-being with dedication and compassion.

Mackie Barch, friend for over 30 years

Patrick has consistently demonstrated integrity, responsibility, and compassion toward others. He is a devoted father who places his children's well-being, guidance, and moral development at the center of his life. His children look to him for stability, encouragement, and example, and he takes responsibility seriously in both words and actions. He is also a devoted son who maintains strong family ties and shows genuine care and respect for his parents and loved ones. Family responsibility is not an abstract idea to him-it is something he actively lives out through ongoing involvement and support.

Justin Barch, best friend for over 30 years

I ask the Court to consider Patrick Boyd's character, history and actions outside of this offense. Patrick had demonstrated responsibility and integrity with his family, including his parents, two children, and his friends. He has always taken ownership of his responsibilities and community involvement including raising money for charity and coaching his children's sports teams. Those who know Patrick Boyd recognize a hardworking, compassionate, supportive and dependable person-an excellent friend and incredible with my children. Patrick Boyd feels remorse and is committed to making better choices moving forward. He is a good person, and I am confident that, if given another chance, he will give back to the community.

Nicholas Assad, friend for over 30 years

I have watched [Patrick] raise his young children with a level of patience, consistency, and love that speaks volumes about his character. He is a parent who is on the sidelines, at the school events, helping with homework, and doing the everyday, unglamourous work that truly defines great fatherhood. His kids rely on him deeply, and he has always prioritized their emotional and physical well-being. As a friend, he has been the same steady, generous and loyal presence. He is the person who checks in, who helps when no one else is available, and who quietly does good without looking for recognition. Over the years, I have seen countless small but meaningful examples of his integrity; moments where he chose responsibility, kindness, and accountability even when it was difficult.

Jeremy Welsh, friend for over 20 years

I have known Patrick well for about ten years through our various overlapping involvements in the small community we live in...I have seen Pat being a good influence on other children in the community, coaching football and playing golf with teens, demonstrating good values and being a positive role model to them. I firmly believe that the behavior Pat has been convicted of is completely incongruent with who he is...

Kenneth Mann, father of two young women



Patrick is the kind of person whose enthusiasm for life is unmistakable. He is always laughing, always smiling, and his positive energy naturally draws people in. His joy is genuine and deeply rooted in gratitude for the people in his life, especially his family. As a father, Patrick is devoted and hands-on. He has two wonderful children-Harper and Durham-with whom he shares and exceptionally close bond, His commitment to their well being and development is evident in everything he does, He not only supports them emotionally and academically, but he also coaches Durham's football team, pouring countless hours into helping young athletes grow in confidence, skill, and sportsmanship. His players look up to him, his children adore him, and his leadership is grounded in patience, kindness, and a true passion for mentioning youth...Patrick Boyd is an individual of strong character, positivity and integrity. He is a devoted father, a joyful presence, and someone whose impact on those around him is consistently positive and meaningful.

Donald Stranahan, MD, FAAD

18 U.S.C. 3553(a) compels a Court to consider the history and characteristics of a defendant because we recognize that it would be a mistake to only consider the wrongdoing of a person when determining a just sentence.  Patrick Boyd has led an otherwise exemplary life. He is a wonderful father, a little league coach, a volunteer, a job creator and a good friend. 18 U.S.C. 3553(a) tells us that Patrick's life matters and that a person is more than the mistakes they have made. Safe Chain was a legitimate business. This is not a case where defendants establish companies in order to commit crimes. Safe Chain had been in business for years before Adam Brosius introduced the scheme obtaining reselling diverted preventive treatment products. Safe Chain was licensed by state boards all over the United States, they worked closely with the FDA and pharmacy boards, they employed dozens, paid their taxes and lived humble lives. There were no Lamborghinis in their garages, no lavish spending, no bundles of cash stuffed into suitcases and no criminal histories. The differences in the histories and characteristics of the similarly situated defendants is, to say the least, striking.  The letters presenting the life and deeds of Patrick are offered in the hope that the Court consider the positive aspects of Patrick Boyd's life when considering an appropriate sentence.

## Nature and Circumstances of the Offense

### Patrick Boyd's Role in the Conspiracy

Despite his elevated position at Safe Chain, Patrick Boyd had a minimal role in the conspiracies. Although holding the title of  "Managing Partner", Patrick Boyd's role in the conspiracy amounted to little more than overseeing the company's internal sales operation.[1] Given his limited position in the company, it is not surprising that Patrick Boyd:

---

[1]It should be noted that Patrick Boyd managed Safe Chain's internal sales force. He did not supervise or manage Adam Brosius's sales force which accounted for the vast majority of HIV sales.

(1)      never spoke to Peter Khaim,

(2)      never negotiated purchase prices with any suppliers,

(3)      never expressly overruled a decision made by the compliance department,

(4)      never agreed on terms of any purchases,

(5)      never sent a fraudulent wire, and

(6)      never recruited anyone into the scheme.

In fact, Patrick Boyd's role was so minimal, that in the Pre-Sentence Report the only act that Patrick is alleged to have personally committed was to send a text message to Adam Brosius stating: "Spent two hours counting hiv woth (sic) the crew. This shits (sic) a mess." [PSI Paragraph 24 (2)]. Every other reference to Patrick in the PSI are simply conclusions lacking investigative or factual underpinning by the government. Consider the following example devoid of supporting facts: PSI Paragraph 21

> "Patrick Boyd...knowingly purchased from the HIV suppliers (sic) were obtained (sic) by the HIV drug suppliers primarily through unlawful diversion buy back schemes..."

Putting aside the any grammatical issues with this statement, there was no evidence introduced at trial that indicated that Patrick Boyd was personally involved with any purchases of HIV medications with the exception of once being tasked with speaking to someone in Puerto Rico because of his ability to speak Spanish. While it may be true that a co-conspirator is held responsible for the foreseeable acts of his co-conspirators, it is also true that the defendant should be sentenced based on his specific actions in the conspiracy rather than any implication of an exaggerated role. To the extent that the presentence report simply blurs the active responsibility of Patrick with that of Adam Brosuis and Charlie Boyd as though each had the same role and did the same things, that

8

is inaccurate. Considering Patrick's extremely limited role in the offense, a minimal role adjustment or a variance to reflect his limited role would be appropriate.

### The Unascertainable Loss

The PSI fails to articulate a clear basis for determining "loss" for purposes of a guideline calculation.  Instead, it simply states that Patrick Boyd is responsible for a loss of $92,800,000 which corresponds to a recommended increase of 24 levels pursuant to 2B1.1(b)(1)(M). [Paragraph 66]. Although no explanation is proffered, we can safely assume this number is based on the amounts paid to Safe Chain by pharmacies for the medicines the pharmacies purchased. Regardless of how the Court determine's loss after considering the arguments raised in the PSI objection [DE 269] as well as those adopted from Charlies Boyd's Objections and Memorandum [DE 268], when determining a reasonable sentence under 18 U.S.C. 3553(a), the Court may wish to consider how much the various entities involved in the case profited or lost as a result of wrongful conduct.

### Pharmacies

While it is true that in a very small number of cases pharmacies received incorrect medications in bottles, there is no indication that Patrick Boyd or his co-conspirators intended for that to occur. If the Court were to hold Patrick Boyd responsible for a loss related to pharmacies, the loss amount would be the amount of money they were forced to refund as a result of problems with the medication. Assuming that the pharmacies refunded the full amount of the medications, the "loss" amount would likely be less than $40,000.00. Pursuant to 2Bl.1, the loss amount would call for a 4 level increase. 2B1.1(b)(1)(C).

### Pharmacy Patients

Elsewhere, the PSI suggests that Patrick Boyd defrauded pharmacy patients. [Paragraph 21]

But 99% of the pharmacy patients received exactly what they paid for. They did not lose anything. If the Court were to hold Patrick Boyd responsible for a loss related to pharmacy patients, the loss amount would be $6,500 or less. Pursuant to 2B1.1, the loss amount would call for no increase. 2B1.1(b)(1)(A).

**Patrick Boyd's Profit**

According to Amanda Biggart (Chief Operating Officer of Safe Chain), the actual net profit realized from the sale of the HIV products to Safe Chain after all commissions, broker fees, pass through fees and GPO fees was approximately $965,597.21. Patrick Boyd's 25% share would have entitled him to a net profit of approximately $241,000.00 Pursuant to 2B1.1, a loss amount of $241,000.00 would result in an increase of 10 levels. 2Bl.l(b)(l)(F).

<u>**Similarly Situated Defendants**</u>

This is not the first or only case of diverted medications in the Southern District of Florida. We would ask the Court to consider the sentences received by the following similarly situated defendants:

<u>**Lazaro Hernandez**</u>

| | | |
|---|---|---|
| **(a)** | **loss:** | at least $232.8 million dollars |
| **(b)** | **sentence:** | 180 months |
| **(c)** | **distinguishing fact:** | extensive criminal history |

Schemes involving the re-distribution of HIV medications purchased "off the street" have proliferated throughout the United States over the past 10 years. Unfortunately, many of those cases are here in the SDFL. One of the reasons South Florida has seen so many of these cases is because of a man named Lazaro Hernandez.  Mr. Hernandez was charged in two different conspiracies both

of which involved diverted medications. *USA v Lazaro Hernandez*, 22-CR-60129-Singhal (S.D. Fla.

2022) and *USA v Lazaro Hernandez*, 19-cr-20674-Gayles (S.D. Fla. 2019) According to AUSA

Frank Tamen,

**Mr. Hernandez's role was pretty close to being the most culpable because he was a major supplier of the diverted drugs the others were dealing in. Some portion of those drugs, after the inception and conspiracy, were provided by other persons that are subject to an ongoing investigation but he was the main man.**

**Initially, its Steven Costa whose name is on the indictment is still pending, who was   supplying the drugs to Salemi[2]  to Frank Alvarez [3] and Kadir Diaz[4]  and to the other participants. Mr. Costa was receiving his drugs from this defendant, Lazaro Hernandez.**

**In 2017, Mr. Costa went to prison on a different case that was brought down here from the Southern District of New York, at which point he introduced his co-conspirators to Mr. Hernandez, said here is my source of supply and you can start with him.**

**Basically, the most culpable of the other defendant's included Mohammed Slaemi, who was held responsible for $78 million worth of diverted drugs, as was Joshua Joles, and for the laundering the same amount of money, because all the money was laundered through a series of transactions. And since they were getting all of their supplies or substantially all of their supplies from Lazaro Hernandez, he should be held accountable, and they is an agreement that he will, in fact, be held accountable for the same dollar value, the same quantity.**

**So, he was involved in this conspiracy from its inception in 2013 until it was shut down when the government executed search warrants in May of 2019.**

---

[2]*USA v. Mohammad Salemi*, 19-cr-20674-Gayles, sentenced to 103 months [DE 262], reduced to 70 months [DE 848], then reduced to 86 months [DE 871] and finally reduced to 53 months on a Rule 35 motion [DE 1145].

[3]*USA v. Frank Alvarez*, 19-cr-20674-Gayles, sentence to 60 months [DE 213], reduced to 24 months on a Rule 35 motion [DE 852].

[4] *USA v Kadir Diaz*, 19-cr-20674-Gayles, sentenced to 87 months [214], reduced to 30 months on a Rule 35 motion. [DE 849].

*United States v Hernandez*, 19-cr-20674 [DE 761] (Sent. Tr.)(S.D. Fla. 2023)

According to the PSI, Lazaro Hernandez's re-distribution case is "related" to that of the Boyd's. In Paragraph 20, probation states: "Lazaro Roberto Hernandez introduced adulterated and misbranded drugs into interstate commerce by obtaining some of those drugs from Black Market Supplier, Gentek." [PSI paragraph 20]. In fact, Lazaro Hernandez (considered a "Kingpin" defendant by Gillead) was the leader and organizer of a vast buy-back and distribution scheme. In *USA v Hernandez*, 22-CR-60129, the government claimed that the Hernandez Conspiracy involved "at least $232.8 million dollars" - and amount of over twice the "loss" amount contemplated by probation for the Boyd's. Not only was Lazaro Hernandez's loss more than double the loss contemplated here, Hernandez had an extensive criminal history. Not only was he convicted of the two cases discussed above, he also had a prior of cocaine trafficking. In 1991, he was sentenced to 168 month, later reduced to 135 months for a conspiracy to possess with intent to distribute cocaine. *Transcript, Sentencing Hearing* 22-cr-60129 [DE 92]. He also had a armed robbery case from when he was a Juvenile which was not counted for criminal history.

*Transcript, Sentencing Hearing* 22-cr-20674 [DE 761, pg 27].

The "KINGPIN" defendant, with priors for armed robbery and cocaine trafficking who was sentenced to over ten years in prison back in 1991 was sentenced to 168 months in 22-cr-20674 concurrent with the 180 month sentence handed down in 22-cr-60129 [DE 102 Judgment].

**<u>Stephen Costa</u>**

    **(a)**    **loss:**        $77 million

    **(b)**    **sentence:**    168 months

    **(c)**    **distinguishing facts:** guilty plea, extensive criminal history

Stephen Costa was convicted of Conspiracy to traffic in medical products (medications) with false documents and money laundering. 19-cr-20674-Gayles According to Mr. Tamen,

> **With regards to the loss amount, Mr. Costa reported to prison for his prior offense, which is based in New York, approximately July of 2016.[5] The conspiracy started about early 2013 and continued until 2019. So, he was in prison for part of the offense conduct. However, he kept up some involvement in the conspiracy. He took deliberate acts to maintain its operation.**

> **Most directly, he introduced co-defendant Frank Alvarez to co-defendant Lazaro Hernandez, specifically to arrange for Hernandez to continue to supply diverted drugs to Alvarez because Lazaro Hernandez had been cast as main supplier at the time. So, this allowed the whole conspiracy to continue to operate for the next few years. And Mr. Costa, as specified in the indictment, overt acts and otherwise, continued to receive the benefits, some of the proceeds of the conspiracy.**

*AUSA, Fran Tamen Transcript Sentencing Hearing* 19-cr-20674-Gayles [DE 1133 pg 4].

Probation calculated Mr. Costa's "loss" at $77 million dollars placing him in the same bracket for loss calculations as the Boyds. He was sentenced to 168 months in prison. [DE 1129].

**Mohammad Mehdi Salemi**

    **(a)**    **loss:**                $78 Million

    **(b)**    **sentence:**        103 months

Mr. Salemi was convicted of Conspiracy to traffic in medical products (medicine) with false documentation. *USA v. Mohammad Salemi*, 19-cr-20674-Gayles Mr. Salemi's loss was determined to be $73,000,000 placing his loss amount in same category as the Boyd's. He was sentenced to 103 months [DE 262], which was reduced to 70 months [DE 848], then reduced to 66 months [DE 871] and finally reduced to 53 months on a Rule 35 motion [DE 1145].

---

[5]*USA v Costa*, 15-cr-21004-Altonaga (S.D. Fla 2015).

**Co-Defendant Adam Brosius**

    **(a)**    **loss:**                     between $25 million-$65 million

    **(b)**    **sentence:**             97 months

    **(c)**    **distinguishing fact:**  guilty plea, cooperation, prior health care fraud conviction

Adam Brosius was the leader, organizer and originator of the scheme to purchase and re-sell diverted medicines. Adam Brosius was the person who introduced the concept of buying HIV medications well below retail prices and re-selling them to pharmacies at less than the wholesale acquisition cost. Adam Brosius was the person that introduced each and every vendor/supplier to Safe Chain. Adam Brosius was the person that negotiated the purchase price of each bottle of medication. Adam Brosius was the person that set the price of what the medications would sell for. Adam Brosius, not Pat Boyd, was the person that managed the external sales force that actually sold the great majority of the medications. Adam Brosius, not Pat Boyd, was the person that trained the internal sales force on how to sell the medications. Adam Brosius was the person that set everything up so that he would make money on all sides of the equation. He demanded a brokerage fee for the purchase of the medications since he was the one who recruited the vendors, he demanded hefty commissions on the sale of the medications because he was the one who managed the outside sales team and trained the internal sales team. On top of his brokerage fees and commissions which likely totaled over seven million dollars, he owned 25% of all Safe Chain profits.

And almost all of Adam Brosius's wrongdoing occurred while he was awaiting trial on another healthcare fraud case in *USA v Brosius*, 20-cr-00578-MCA (District of New Jersey, 2020).

Despite the fact that the government was aware of Adam Brosius's oversized role in the conspiracy as well as his criminal history, they felt that a sentence of 97 months was an appropriate

punishment. While it is true that Mr. Brosius pled guilty and cooperated while Patrick Boyd exercised his right to a trial, that difference should not account for a difference of 77 years. The fact that the government asks for a sentence of 97 months for the true leader, organizer, manager and originator of the scheme, who has a prior for healthcare fraud and walked away with millions in profits and then asks for "a substantial prison term measured in decades" for Patrick, should cause the Court concern. Such a vast difference in sentences would clearly run afoul of the admonition that the Court consider *the need* to avoid unwarranted sentence disparities among defendant's who have been found guilty of similar conduct.

WHEREFORE, Patrick Boyd request that this honorable court consider a substantial variance measured in decades from the guideline sentencing range in order to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct. (To the extent that there are similarities between Charles and Patrick Boyd's conduct, Patrick Boyd adopts Charles Boyd's objections and comments to the Presentence Report as well as Objections and arguments presented in his sentencing memorandum and request for variance).

Respectfully submitted

/s/ William R. Barzee
William R. Barzee
Fla. Bar No. 0158720
40 NW 3rd Street, PH 1
Miami, FL 33128
Tel: (305) 374-3998
Fax: (305) 374-6668
WilliamBarzee@BarzeeFlores.com

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed this 12th day

of March, 2026, and was served to the parties in this case from that system.

<u>/s/ William R. Barzee</u>
William R. Barzee