UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, — Fort Lauderdale, Florida

October 8, 2025

vs.

9:03 AM - 5:02 PM

PATRICK BOYD and CHARLES BOYD, — Volume X

Defendants. — Pages 1 to 323

---

# TRANSCRIPT OF JURY TRIAL
## BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
## UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:

William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:

Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| PETER KHAIM (CON'T) | |
| DIRECT EXAMINATION (con't) BY MR. POGOZELSKI: | 8 |
| CROSS-EXAMINATION BY MR. BARZEE: | 49 |
| CROSS-EXAMINATION BY MR. ZIMET: | 170 |


\- - -

# E X H I B I T S

\- - -


| Number | Description | Page |
|---|---|---|
| Government's No. 112 | Invoice | 12 |
| Government's No. 191 | Email | 34 |
| Government's No. 310 | Email | 17 |

(Call to the Order of the Court:)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

I guess we're missing two jurors.

Anything to come before the Court while we wait?

MR. POGOZELSKI: Yes, Your Honor. I was informed by the lawyer representing Peter Khaim, the inmate on the stand, that I guess he hasn't eaten anything since yesterday, and his lawyer had brought a bagel and some orange juice. And we would just request that --

THE COURT: It's okay with me if it's okay with the marshals.

THE MARSHAL: Your Honor, he was provided a Kosher meal from the facility. It's upstairs. It was open, but it hadn't been eaten. I don't know if it's a time factor, but he has what he needs from us. Because I have Kosher meals from the facility, I can't give him outside food, Your Honor.

THE COURT: When he comes in, we'll ask him if he's able to eat the meals that are being provided by the marshals.

MR. POGOZELSKI: Okay. Understood, Your Honor.

MR. ZIMET: Judge, while we have a few minutes, I spoke with the Government. We thought maybe at the end of the day, we can talk about where we are and where we think the finish line should be.

THE COURT: Okay.

MR. ZIMET: So we might get a better sense as to the ending.

THE COURT: Okay.

Mr. Khaim, you understand you're still under oath?

THE WITNESS: Yes.

THE COURT: And the marshals said that they have provided a Kosher meal for you.

THE WITNESS: No, they did not.

THE COURT: They said it's upstairs.

THE WITNESS: Upstairs where?

THE MARSHAL: Your Honor, I handed him the meal myself. I'm going to go get it right now if he wants to have it.

THE WITNESS: They did not provide me with my religious items I always wear all my life, and that made me cry yesterday -- in Broward County. And I told the marshals today in the morning -- I'm sorry to tell you this, Your Honor -- to tell them, the marshals. They say, "We have no time. We have to go to court. I'm sorry, and we'll take care of it later." That's what they said. That was their answer.

THE COURT: So where are your religious items?

THE WITNESS: I have no idea. They know better than me.

THE MARSHAL: Your Honor, we came this morning. We found this out, and we had to deal with Judge Smith. We're on furlough. We have no contractors. We're trying to locate his

top hat from BSO or talk to the agents because the agents had it.

THE WITNESS: The agents --

(Reporter requests one speaker at a time.)

THE MARSHAL: As soon as we find out where it's at, we will bring it to him.

THE COURT: Okay.

THE WITNESS: I told -- Broward County has it, and I told Broward County not to take it off from me because I wear it while even I sleep.

They said, "This is the policy -- for you to take it off; otherwise, we're going to take you, like as a baby, and put you in the cell."

I said, "Why are you doing this? This is a holiday season."

THE COURT: Hopefully, we'll get done with your testimony today and you will get back with your Kosher meals and your religious items.

I think I have a yamulke down in my car. Do you want my yamulke?

THE WITNESS: Yes, please. I need that.

THE COURT: We'll take a five-minute recess.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 9:06 AM to 9:11 AM, after which the following proceedings were had:)

THE COURT: We're back on the record.
Please be seated.
Counsel are present. The defendants are present.
Are we still waiting for the jurors? We've got everybody?
THE COURTROOM DEPUTY: They're all here.
THE COURT: Anything to come before the Court before we bring the jury in?
MR. POGOZELSKI: No, Your Honor.
MR. ZIMET: No, Your Honor.
MR. BARZEE: No, Your Honor.
THE COURT: Let's bring in the jury.
MR. POGOZELSKI: Oh, Your Honor, I forgot the food was coming.
THE COURT: Just keep it back there, and on the first break --
MR. POGOZELSKI: Okay.
THE COURT: -- Mr. Khaim can eat.
MR. POGOZELSKI: Okay.
THE MARSHAL: But he did eat something this morning.
THE WITNESS: I'm starving.
THE COURT SECURITY OFFICER: All rise.
(Jury enters.)
THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.
MR. ZIMET: Yes, sir.
MR. BARZEE: Yes, Your Honor.
THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?
All right. We may resume with the direct examination.
MR. POGOZELSKI: Thank you, Your Honor.
Thereupon,

**PETER KHAIM (CON'T),**

having been first duly sworn or affirmed, was examined and testified as follows:

**DIRECT EXAMINATION (con't)**

BY MR. POGOZELSKI:
Q. Good morning, Mr. Khaim.
A. Good morning, sir.
Q. Yesterday, I believe we left off talking about those -- that 584-page exhibit with all the Amsterdam Wellness, AmerisourceBergen T3s.
Do you recall --
A. Yes, sir.
Q. -- that?
A. Yes, sir.
MR. POGOZELSKI: And if I could just ask for you to wait for me to finish my question and then answer for the court

reporter.
BY MR. POGOZELSKI:
Q. And then how quickly these cheap HIV drugs were moving, and Safe Chain was selling? Do you remember that line of questioning?
A. Yes, sir.
Q. Okay. And then before that, we had been talking a bit about your New York indictments.
Do you remember that?
A. Yes, I do.
Q. Okay. Mr. Khaim, are you testifying here today in the hope that you might receive a more lenient sentence in those New York cases?
A. I would like to be able to reduce my sentence, but it's not up to me. It's up to the judge.
Q. Okay. And I think you had testified yesterday about cleaning the bottles at some point in time and maybe at some point in time, using a fluid of some sort.
Do you recall that?
A. Yes.
Q. Okay. What did you mean by the "fluid?" To clean or take off the patient labels?
A. It's a gas fluid.
Q. Okay. And was that something -- I think you had said "they" in the context of that question. But using the lighter

fluid, was that something that Mike Zangari had taught you to do or instructed you to do?
A. Yes.
Q. Okay. That wasn't Charles Boyd that did that?
A. No.
Q. Okay. I just wanted to clarify that part of your testimony.
And then in addition -- I know we went through the text messages you had with Charles Boyd and Adam Brosius in that group thread. But had you also been communicating, texting separately with Adam Brosius and Adam Brosius and Garrett Mellott?
A. Yes, sir.
Q. And was that during the time that you were selling these cheap HIV drugs from the street to Safe Chain?
A. Yes, sir.
Q. And it was during the time that Safe Chain was selling those cheap HIV drugs to pharmacies?
A. Yes, sir.
Q. Generally speaking, what did you and Adam Brosius, and then you, Adam Brosius, and Garrett talk about in those text messages?
A. Get more of those cheap HIV drugs, as much as possible.
Q. And get as much as possible of those cheap HIV drugs for who? For what company?

A. For Safe Chain Solutions.
Q. Okay. And for Safe Chain Solutions to do what with them?
A. To resell them to other pharmacies.
Q. All right. And in any of those communications -- well, let me back up.
Were those communications with just Adam Brosius or with just Adam Brosius and Garrett, were you talking a lot with them about T3s or pedigrees?
A. No.
Q. Was that mostly or almost exclusively with Charles Boyd?
A. Yes, sir.
Q. And that thread with Charles Boyd and Adam Brosius?
A. Yes, sir.
Q. Okay. And do you recall Adam Brosius telling you that the T3 pedigrees had to go through Charles Boyd?
A. Yes.
MR. POGOZELSKI: All right. So if we could turn back to Safe Chain, the main topic of your testimony today, and pull up for just the witness, I believe, what's marked as Government's Exhibit 112.
BY MR. POGOZELSKI:
Q. Do you see this document in front of you, Mr. Kimchi?
A. Yes, sir.
Q. All right. And is this about a Boulevard invoice that was sent to Safe Chain?

A. Yes, sir.
Q. And does it attach an invoice, as far as you can see, where there's an attachment?
A. Yes.
Q. All right.
MR. POGOZELSKI: At this time, the Government would move into evidence Government's Exhibit 112.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 112 will be received.
(Government's No. 112, Invoice, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Ishbay Shukurov, Mr. Khaim -- I think you testified about this yesterday, but who was Ishbay Shukurov?
A. She was the owner on the paper.
Q. Of?
A. Of Boulevard 9229 LLC.
Q. And then in this email here dated April 27th of 2020, he writes, "Please fined [sic] invoice on PDF file." And we go to the attachment.
A. Yes.
Q. Did the first sale from Boulevard of those street HIV drugs to Safe Chain -- was it this invoice or a different one?
A. This one.

Q. It was this one?
A. Yes.
Q. This one lists 200 Truvada. Is that what you recall being the first sale to Safe Chain?
A. That was a mistake. The quantity is supposed to be 20.
Q. 20?
A. 20.
Q. Okay. Somewhere around 20?
A. Yeah.
Q. Okay.
MR. POGOZELSKI: We can take that down.
BY MR. POGOZELSKI:
Q. And yesterday, we were looking through a variety of different versions of those falsified T3s and pedigrees. Do you recall that?
A. Yes.
Q. And that 584-page exhibit of the Amsterdam T3s?
A. Yes, sir.
Q. Did one of those versions of the false paperwork list InstaCare Pharmacy on them?
A. Yes.
Q. And did Abbie Divilio also confirm that that version was false at some point in time?
A. Yes.
MR. POGOZELSKI: All right. If we could show what's

already in evidence, Government's Exhibit 181.
BY MR. POGOZELSKI:
Q. And do you see here on October 2nd, Abbie Divilio writing to King Kimchi and Charles Boyd about the fact that the license for InstaCare had been discontinued since March of 2020 but the paperwork you provided had a sale about six months later? Do you see that part of the email here?
A. Yes.
Q. Okay. And this King Kimchi -- was that you receiving this email?
A. Yes.
Q. All right. And you see Abbie Divilio pointing out that six-month discrepancy and how the purchase could not have been made according to the false paperwork provided?
A. Yes.
Q. All right. And this is on October 2nd of 2020.
MR. POGOZELSKI: If we could take this down and pull up what's already into evidence, Government's Exhibit 435. And go to page 2.
BY MR. POGOZELSKI:
Q. Do you see here where Charles Boyd is writing to Abbie, "Hey, Boulevard is sending over T3s for Monday's shipment. We need to verify ASAP"?
A. Yes.
Q. And do you see where she says, "Are they going to be

sending over accurate information for the previous shipments?"
A. Yes.
Q. And what is Charles's response to that question?
A. "Thanks."
Q. Did you send over any accurate information at any point in time related to these cheap HIV drugs from the street that you sold to Safe Chain?
A. No, sir.
Q. And as far as you know, did Safe Chain then sell all of these cheap HIV drugs to pharmacies?
A. Yes, sir.
Q. And then if you see at the bottom, we were talking about InstaCare Pharmacy; that Abbie Divilio sends a photo to Charles Boyd here on October 1st, 2020.
MR. POGOZELSKI: If we go to the next page.
BY MR. POGOZELSKI:
Q. Is this the InstaCare Pharmacy that was listed on that falsified paperwork?
A. Yes, sir.
MR. POGOZELSKI: And if we could take this down and pull up what's already in evidence, Government's Exhibit -- I think it's 639. It should be the photograph of Boulevard.
BY MR. POGOZELSKI:
Q. Peter -- Mr. Khaim, is this where Boulevard 9229 LLC is located? Was located?

A. Yes.

MR. POGOZELSKI: We can take that down. And if we could pull up Government's Exhibit -- what's marked as Government's Exhibit 41 for demonstrative purposes, the summary of the phone records.

BY MR. POGOZELSKI:

Q. We were looking at some emails and messages October 1st, October 2nd. And do you see here on line 14, a call from Charles Boyd to Peter Khaim, Mr. King Kimchi, on October 2nd, that same day as one of the emails that we looked at?

A. Yes, sir. 3:57 p.m.

Q. All right. And how long does it say that phone call between you and Charles Boyd was on October 2nd, 2020?

A. Five minutes.

Q. And after that phone call with Charles Boyd on October 2nd, did you send, basically, some revised false paperwork over to Abbie Divilio?

A. Correct.

Q. All right.

MR. POGOZELSKI: And if we could show just the witness Government's Exhibit 310.

BY MR. POGOZELSKI:

Q. All right. Is this an email from you, sir, to compliance and Charles Boyd?

A. Yes, sir.

Q. Dated October 5th, 2020?
A. Yes, sir.
Q. And does it have an attachment?
A. Yes, sir.
MR. POGOZELSKI: All right. At this time, the Government moves into evidence Government's Exhibit 310.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 310 will be received.
(Government's No. 310, Email, was received in Evidence.)
MR. POGOZELSKI: Thank you, Your Honor.
Now, if we go to the next page.
BY MR. POGOZELSKI:
Q. After Abbie had been questioning you about the dates of purchase and InstaCare's license being discontinued, and you had that call with Charles Boyd on October 2nd, did you make some changes here in that InstaCare Pharmacy line --
A. Yes, sir.
Q. -- when she was questioning the dates? What did you do after that call with Charles Boyd?
A. I changed the date.
Q. And why did you -- why did you change that date after the call with Charles Boyd?
A. To look more accurate, more -- more -- more legitimate.
Q. For who?

A. For Safe Chain, for Charles Boyd, yeah.
Q. For Abbie Divilio?
A. For Abbie Divilio, compliance.
Q. Okay. And so it looks like the prior date was in 2020. This one is in 2018.
Did you backdate this?
A. Yes, I did.
Q. Okay. And was Charles Boyd on those emails that we looked at about the dates on these falsified T3s?
A. Yes, sir.
MR. POGOZELSKI: Now, if we can go back to Government's Exhibit 505, this should be the text chain with you, Charles Boyd, and Adam Brosius. And go to page 9. All right.
BY MR. POGOZELSKI:
Q. So remember, we were also talking yesterday, and you had testified about one page of an invoice you had sent after the prior falsified T3s.
Do you remember that?
A. Yes, sir.
Q. And then we see that the date you sent that invoice to Charles Boyd and Adam Brosius is October 6th of 2020. Do you see that?
A. Yes, sir.
Q. And the timestamp here 5:39 p.m.
A. Yes, sir.

MR. POGOZELSKI: If we could show this side-by-side with what's marked as Government's Exhibit 41. This is the demonstrative aid.

BY MR. POGOZELSKI:

Q. All right. So --

MR. POGOZELSKI: And go to page 2, actually.

BY MR. POGOZELSKI:

Q. Was there a phone call here, or did you have a phone call with Adam Brosius and Charles Boyd on October 6th prior to sending that invoice?

A. Yes, sir.

Q. All right. It's a 12-minute long.

Can you tell us generally what you recall about that phone call prior to sending the Amsterdam Wellness invoice to them?

A. We were talking about mostly about T3, how it has to be verified by -- by compliance. And we spoke about the funds that they need to pay me on time; and if -- and this -- we were talking about this T3, if it goes well, then we will do more business.

Q. When you say "goes well," what do you mean?

A. It has to go through compliance, through Abbie.

Q. And was Abbie Divilio on that phone call with you and Adam Brosius?

A. No, sir.

Q. And this invoice you sent in that text thread --

MR. POGOZELSKI: Let's go ahead and take the demonstrative aid down and just open the invoice and kind of flip it so we can all look at it. 505A, I think, is the flipped version.

BY MR. POGOZELSKI:

Q. All right. Mr. Khaim, is this that invoice? I know we saw the thumb or the little snapshot of it, but is this the invoice that you sent over?

A. Yes, I did.

Q. Where did you get this invoice?

A. One of the people who -- I asked him. I need an invoice to show to the buyers, the runners, from the -- either one of the runners. I would ask him, "I need some kind of invoice, that, you know, please get it so I could show it to the buyers. If we can't get some kind of invoice, it's going to be a problem."

And then he would go ahead and find an invoice like that --

Q. Okay.

A. -- I would provide him to Charles.

Q. And this invoice that you got and provided in the text thread to Adam Brosius and Charles Boyd, was that after the IPC version you had worked with Charles Boyd to make was confirmed as false?

A. Yes. IPC and Rochester, yes, both of them.

Q. Okay. And on this invoice, is this the one page of an invoice that you recall providing that was supposed to support

all those T3s listing Amerisource and Amsterdam Wellness Pharmacy?
A. Correct.
Q. And on this invoice, there's some pricing for these drugs here. Do you see that?
A. Yes.
Q. Biktarvy at 3000.
Is that the price at which you sold Biktarvy to the defendants' company, Safe Chain?
A. No.
Q. And do you recall what that price was? I know we looked at an invoice yesterday.
A. Biktarvy was $2,400.
Q. Okay. And this invoice here from Amerisource to Amsterdam at 3,000, is that, in your experience in the pharmacy business, the general pricing that Amerisource would sell Biktarvy at around that time period?
A. Yes, sir.
Q. Not $2,400?
A. No, no. No way.
Q. Not about 30 percent under WAC?
A. No way.
Q. Now this invoice used to support all those Amsterdam Wellness, Amerisource false T3s we talked about yesterday, it also lists a number of drugs here: Biktarvy, Descovy, Evotaz,

Genvoya, Odefsey -- I'm sorry, I don't know how to pronounce that.

A. Yes.

Q. Are those the only drugs that you sold for very cheap to Safe Chain?

A. Yes, sir.

Q. So you only sold Biktarvy, Descovy, you only sold these five drugs to Safe Chain?

A. No, I sold more than that.

Q. Okay. Did you sell Juluca, for example?

A. Juluca, Triumeq, Descovy, Harvoni. It's a big list there.

Q. Okay. So this invoice that was supposedly used to support all those fake T3s, do all those other drugs appear anywhere on this one page of the invoice?

A. Nowhere.

Q. Okay.

MR. POGOZELSKI: If we can go back to the text thread and go back to page 10. Do you see where -- and yeah, so sorry. This is my fault. Go back up a little bit. If we go back to the invoice page.

BY MR. POGOZELSKI:

Q. All right. Do you see where Charles Boyd writes, "Compliance said getting an invoice like this that matches your T3, that we are good."

Do you see that?

A. Yes, sir.

MR. POGOZELSKI: Now, if we could scroll down.

BY MR. POGOZELSKI:

Q. All right. Do you see where Charles Boyd says, "You can provide these?"

A. Yes.

Q. And what did you respond there?

A. "Not on all."

MR. POGOZELSKI: And then if we could keep going down.

BY MR. POGOZELSKI:

Q. Do you see where Charles Boyd says, "We need these for all future orders. Can you do that?"

A. Yes.

Q. All right. And what did you write in response to that?

A. "We'll try to do the best."

MR. POGOZELSKI: And if we can keep going.

BY MR. POGOZELSKI:

Q. And then what does Charles Boyd write there in this green message?

A. [As read:] "This is not about doing the best. This is a requirement by law. We need these or other, something similar, or they need to be able to get verified. I don't make the rules."

Q. Okay. Is this message that Charles Boyd sent in the text thread between you and him and Adam Brosius, was this long

after you had been selling these cheap HIV drugs to Safe Chain without any T3s or pedigrees at all?
A. Correct.
Q. And --
A. No T3s, no pedigrees, no invoices.
Q. Was this message that Charles Boyd sent after you had explained in emails and text messages calls that you had no paperwork to create a truthful T3 or pedigree?
A. Yes, no paperwork.
Q. And was it after Abbie Divilio had confirmed the IPC version to be false?
A. Correct.
Q. And we've been looking at some emails and text messages here.
Was there -- did you have any calls to Charles Boyd about this type of language in a text message?
A. No.
Q. Okay. At any point around this time, did you talk to Charles Boyd about him getting attorneys involved?
A. Yes.
Q. Okay. And can you tell us about that?
A. I mean, we start getting complaints, like open bottles stuff from other pharmacies. They be calling them and calling compliance, and compliance start digging into paperwork and everything to make sure everything is good on her end. And

that's when he start -- when he got counsel for this situations.

Q. Okay.

MR. POGOZELSKI: I know we've been going for a little bit, Your Honor, but I wonder if it might be a time to recess for the reasons we had discussed before.

THE COURT: We'll take a 10-minute recess. Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about ten minutes.

MR. POGOZELSKI: Thank you.

THE COURT SECURITY OFFICER: All rise.

MR. POGOZELSKI: Thank you, Your Honor.

(Jury exits.)

THE COURT: And if there's nothing else to come before the Court, we'll be in recess for ten minutes.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 9:37 AM to 9:46 AM, after which the following proceedings were had:)

THE COURT: Please be seated.

Back on the record.

Counsel are present. Both defendants are present.

While we wait for Mr. Khaim, anything to come before the Court?

MR. POGOZELSKI: Nothing from the Government, Your

Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

(Pause in proceedings.)

THE COURT: Let's bring in the jury.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

You may continue.

MR. POGOZELSKI: Thank you, Your Honor.

If we can pull back up the text thread that we were looking at between Peter, Adam Brosius, and Charles Boyd.

BY MR. POGOZELSKI:

Q. All right. So what is your response here to Charles Boyd after he writes this green text message?

A. "I got it. No problem."

MR. POGOZELSKI: Okay. And then if we go to page 12.

BY MR. POGOZELSKI:

Q. What did you write right here at the top?
A. "T3 will be perfect."
Q. And then Charles Boyd writes, "That's all we're asking for. If that can happen, we can do a lot of business, but it has to be done right."
And you respond, "Yes, got it."
MR. POGOZELSKI: And if we keep scrolling down, now we're on October 8th, Charles Boyd says he'll call you in an hour. And stop there.
BY MR. POGOZELSKI:
Q. And do you see where Adam Brosius writes, "Hi, Peter. I just got off with Charlie. He and Abbie have an easy-to-understand solution so we can start to order again. We will call you around 3:30, then place a purchase order."
Do you see that?
A. Yes, sir.
MR. POGOZELSKI: If we can show this side-by-side with Government's Exhibit 41 that we're using as a demonstrative aid for the purposes of this witness.
BY MR. POGOZELSKI:
Q. So on that date, do you see a -- so we're looking here at 3:30, October 8th.
Do you see here a Charles Boyd call to you around 3:51 on October 8th, and then you calling Charles Boyd back a minute later?

A. Yes.
Q. Do you remember what that call was about, generally?
A. Yeah, this is about the fake T3s, yeah.
Q. Okay.
MR. POGOZELSKI: And then if we go -- take down 41 and go to page 16 of the text thread.
BY MR. POGOZELSKI:
Q. So you're asking here on October 12th of Charles Boyd and Adam Brosius, "Hey, guys, when are we getting paid?"
Adam Brosius says, "Hi, Peter. Today banks are closed. You will be getting a wire tomorrow. I will get a total."
And what do you write here in response, down at the bottom?
A. "Thank you, Brother. Tomorrow you will get Biktarvy T3 for 120. Let me know if you interested on that."
Q. All right. When you say, "You'll get Biktarvy T3 for 120," what's the 120, if you recall? What's that reference to? The 120 of Biktarvy?
A. 120 Biktarvy, correct.
Q. Okay. And Adam Brosius wrote to you, I think we were looking at --
MR. POGOZELSKI: Actually, let's pull up Government's Exhibit 187. So these are 10/12 of 2020. Let's pull up what's already into evidence as Government's Exhibit 187.
BY MR. POGOZELSKI:
Q. Do you recall where Adam Brosius wrote to you -- we just

looked at those threads -- about a wire being sent for product on October 12th of 2020?
A. Yes.
MR. POGOZELSKI: Okay. And then, Mr. Khaim, just so everyone can hear you and the court reporter gets everything down, if I could just ask, I know you're -- you might want to angle the microphone --
THE WITNESS: Yes.
MR. POGOZELSKI: -- a little closer, and just try and speak slowly and clearly into the microphone. All right. Thank you.
BY MR. POGOZELSKI:
Q. So the same day as those texts about a wire, do you see this email here from someone at Gilead on October 9th confirming that the Rochester Drug version of the T3 was false?
A. Yes.
Q. All right. And the Rochester Drug version, was that the version you came up with Charles Boyd and Adam Brosius --
A. Correct.
Q. -- during that phone call?
A. Yes, sir.
MR. POGOZELSKI: All right. And sorry, sir, if you can allow me to finish my question before you answer.
BY MR. POGOZELSKI:
Q. And then, do you see where Abbie Divilio forwards that

confirmation of the Rochester version of the fake T3 to Charles Boyd and Pat Boyd on October 12th of 2020?
A. Yes.
Q. All right. And in those text messages, do you recall Adam Brosius writing to you that same day about sending you a wire?
A. Yes.
Q. Okay. Now, we had looked --
MR. POGOZELSKI: Actually, may I approach the witness and provide him a paper copy of Government's Exhibit, I believe it's 88?
THE COURT: Okay.
BY MR. POGOZELSKI:
Q. All right. So we were looking at -- that's Government's Exhibit 88.
Do you recall looking at that on your screen yesterday, the same version, just in paper copy?
A. Yes, sir.
Q. Okay. And so after the IPC version confirmed to be false, the Rochester version confirmed to be false, as reflected in this email here, are those the latest and greatest fake T3s and pedigrees?
A. Yes, sir.
Q. Are those the ones that list AmerisourceBergen and Amsterdam Wellness Pharmacy?

A. Yes, sir.
Q. And I think you had testified yesterday that you had told Charles Boyd that you got these drugs from closed-down pharmacies?
A. Pharmacy.
Q. Plural?
A. Yes.
Q. And you had testified yesterday about adding Stain RX in addition to, I believe, LPM, to try and make it seem more plausible?
A. Yes, sir.
Q. And in that exhibit in front of you, Government's Exhibit 88 if you flip through it, is there just one pharmacy listed on there?
A. Only one.
Q. And what pharmacy is that?
A. Amsterdam Wellness Pharmacy.
Q. And that thick binder of all those fake T3s, is that based on that one page of an invoice you sent to Charles Boyd and Safe Chain?
A. Correct.
MR. POGOZELSKI: Sorry. If you could speak into the microphone.
A. Correct.
BY MR. POGOZELSKI:

Q. Now, Mr. Khaim Kimchi, with those T3s, pedigrees, those fake ones there that you have in front of you, did compliance, Abbie Divilio, question those as well in some emails, as far as you recall?
A. No.
Q. Okay.
MR. POGOZELSKI: If we could pull up Government Exhibit 190.
BY MR. POGOZELSKI:
Q. Do you --
MR. POGOZELSKI: And this is already in evidence.
BY MR. POGOZELSKI:
Q. Do you see here, Mr. Kimchi, where someone in compliance writes, "Good afternoon. Do you have any additional information or documents that supports these purchases, invoices, or pedigrees from AmerisourceBergen or Amsterdam Wellness Pharmacy? I'm unable to get in contact or confirm with these facilities"?
Do you see that?
A. Yes.
Q. Okay. And then what do you write in response with Charles Boyd and Abbie Divilio copied on the email?
A. "No, I do not, but it's 100 percent no problem."
Q. Okay. So are you writing here that you do not have any other documents to support all of those T3s?

MR. ZIMET: Objection, Judge.
A. No, I don't.
THE COURT: Grounds?
MR. ZIMET: I'm sorry?
THE COURT: The grounds for your objection?
MR. ZIMET: Leading question. Asked and answered.
THE COURT: It's leading.
I sustain the objection.
BY MR. POGOZELSKI:
Q. All right. In response to the question about whether you have any additional information or documents supporting all these purchases from Amsterdam, what do you write copying Charles Boyd and Abbie Divilio?
MR. ZIMET: Objection. He just read it, Judge.
THE COURT: Sustained.
A. No, I do not have.
MR. POGOZELSKI: Sorry. When the judge sustains -- sorry. When the judge sustains, you have to just not answer. Okay?
THE WITNESS: Okay.
BY MR. POGOZELSKI:
Q. All right. Is that response similar to other texts, emails, or calls you had with Charles Boyd, where you told him you had no documents or paperwork to create truthful T3s?
A. Correct.

MR. POGOZELSKI: Now, if we could show just the witness Government's Exhibit 191.

BY MR. POGOZELSKI:

Q. Mr. Khaim, is this an email you sent to compliance on October 13, 2020?

Do you see that?

A. Yes.

MR. POGOZELSKI: All right. At this time, the Government moves into evidence Government's Exhibit 191.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 191 will be received.

(Government's No. 191, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Okay. Mr. King Kimchi, what did you write to compliance here?

Actually, let me back up?

Do you see where Abbie Divilio writes, "King, I appreciate your efforts. But please just understand, we have to be able to verify these transactions. If you think you could find something to support this, it would be greatly appreciated." Do you see that?

A. Yes, I do.

Q. And then she says, "Should you find something, please pass it on." Do you see that?

A. Yes, I do.
Q. What did you write in response?
A. "I only have what I have, and I sent one page of invoice to Charles."
Q. Is that the invoice, that one page of an invoice that we looked at, in that text thread?
A. Correct, sir.
MR. POGOZELSKI: Now, if we could go back or pull up Government's Exhibit 503. It's the text thread between you and Charles Boyd and go to page 60.
BY MR. POGOZELSKI:
Q. All right. So, Mr. Kimchi, do you see that this is the same -- these texts with Charles Boyd are also on October 13, 2020?
A. Yes, sir.
Q. Okay. And what does Charles Boyd write to you, Mr. Kimchi, here in that green message?
A. "Can you get us the AmerisourceBergen invoices."
Q. Okay. And what was -- what's your response here down at the bottom?
A. "I got only few pages. That's all."
Q. All right. And then if we could scroll down.
What does Charles Boyd respond to you, Mr. Kimchi?
A. "I'm talking to my counsel tomorrow to get an opinion on the T3s. We tried to verify but AmerisourceBergen will not

provide us details."
Q. Sorry. If we can go up a little bit, I think -- okay. Keep going. Keep going down.
And then you say, "No problem. Hopefully," and then he says, "Hopefully we can move forward, but having the invoices from them will really help."
Do you see that?
A. Yes, I do.
Q. All right. If we could keep scrolling down.
What did you write in response to Charles Boyd's text about having the invoices -- more invoices?
A. "I know, but I don't have. They closed the place."
Q. Okay. And what is Charles Boyd's response to you, King Kimchi?
A. "Gotcha."
Q. And these invoices that Charles Boyd was referencing here that he was saying was required, what did you write in response there about those required invoices?
A. "I know but I don't have --"
MR. ZIMET: Objection, Judge. He just read it two seconds ago. Asked and answered.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. All right.
MR. POGOZELSKI: Then if we go to Government's

Exhibit 204, which is already in evidence, and go to page 3. Sorry, it's not in that binder. It's going to be on your screen.

A. Okay.

BY MR. POGOZELSKI:

Q. So this is also October 13th of 2020.

And do you recall we were looking at those text messages where Charles Boyd said he would be talking to his counsel about the T3s?

A. Correct.

Q. All right. Now, in this .1 here in this email to Charles Boyd the same date that he's texting with you about that, do you see where he writes, "T3 requirements. We have tried to verify each transaction on the T3 and have had -- not have any luck with AmerisourceBergen. They refuse to provide us with any information. So I guess my question is, if we cannot verify the transaction, is it still okay to accept and sell the goods based off of the T3 info our supplier provides." Do you see that?

A. Correct.

Q. All right. Is there anything in that paragraph there about the false IPC T3?

MR. ZIMET: Objection, Judge. The paragraph speaks for itself.

THE COURT: Sustained.

BY MR. POGOZELSKI:
Q. This email that Charles Boyd sends to his counsel, is it long after you had been selling the cheap HIV drugs to Safe Chain without any T3s or pedigrees at all?
A. Correct.
Q. Is it after IPC confirmed that the IPC version that you and Charles Boyd worked together to create was false?
A. Correct.
Q. Was this email after?
A. No, it's after.
Q. Okay. And was this email October 13, 2020?
A. Yes.
Q. Was it also after? Sorry, you have to let me finish my question, sir.
A. Sorry.
Q. Was it after that Gilead email we just looked at confirming the Rochester version was false?
A. Yes.
Q. Okay.
MR. POGOZELSKI: We can take that down.
Now, if we could pull up on the screen here, Government's Exhibit 88 and go to page 506. I think this might have been where we left off yesterday. We were talking about the dates.
BY MR. POGOZELSKI:

Q. Do you see the name of the pharmacy listed here in the "sold to" column?
A. Yes.
Q. All right. What's the name of that pharmacy?
A. Pharma Quick LLC.
Q. Okay. And is this T3 here -- is this one of the many falsified T3s that you worked with Charles Boyd to create?
A. Correct.
MR. POGOZELSKI: And then if we could go to page 563.
BY MR. POGOZELSKI:
Q. Do you see here, Mr. Kimchi, that there is no date listed here for when you supposedly purchased this drug from the closed-down Amsterdam Wellness Pharmacy?
A. Correct, no date.
Q. All right. And then what are the dates listed for when Safe Chain bought this Genvoya from you?
It's that (indicating), right there.
A. 3/19/21.
Q. All right. And then what's the date listed under the sold-to to Global Express Pharmacy?
A. 3/19/21.
Q. All right. And then if we go to the next page, similarly, is there any date listed for when you supposedly bought these street HIV drugs from Amsterdam Wellness Pharmacy?
A. Correct.

Q. And date listed for when you -- when Safe Chain bought these cheap HIV drugs from the street from you?
A. Correct.
Q. What is the date there?
A. 3/19/21.
Q. And then what is the date listed for when, according to this T3, Safe Chain sold those cheap HIV drugs from the street to Global Express Pharmacy?
A. 3/19/21.
Q. All right.
MR. POGOZELSKI: And if we go to the next page, and the next page, and the next page, and the next page, and the next page, and the next page.
BY MR. POGOZELSKI:
Q. And we see that same pattern repeating itself?
A. Yes, sir.
MR. POGOZELSKI: Ext page. Next page. Next page. Next page. Next page. Next page. Okay. I won't go through all of it.
BY MR. POGOZELSKI:
Q. Now, that large exhibit, this one that we're looking at, all these falsified T3s with Amerisource and Amsterdam Wellness, were these associated with the cheap HIV drugs you sold to Safe Chain, basically from October until the end of March 2021?

A. Correct, sir.
Q. As far as you understood, did Safe Chain then sell those cheap HIV drugs from the street to pharmacies?
A. Correct, sir.
Q. Okay. Now, if we just go back in time a little bit -- we can take that down.
Mr. Khaim, around the time that you began your partnership with Safe Chain in selling all these cheap HIV drugs, did you also sell some of those drugs to another company for a short period of time?
A. Yes, sir.
Q. And was that through someone named Paul Roselle?
A. Yes, sir.
Q. Do you remember the name of the company?
A. I think it was Proven, P-R-O-V-E-N.
Q. And did Proven stop buying those cheap HIV drugs from you after some shorter -- relatively short period of time?
A. Yes, they did.
Q. And do you know if Proven reported you to the FDA or not?
A. I heard about it.
MR. ZIMET: Objection, Judge.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. Now, we talked about yesterday the 35-plus million dollars worth of these cheap HIV drugs you sold over an 11-month period

to Safe Chain.

How did your partnership with Safe Chain end? Tell us about how it ended. Why it ended?

MR. POGOZELSKI: And you have to speak into the microphone, sir.

A. It ended -- the only way it ended is because of the Gilead subpoena and getting -- wanting to get to know what their medications are coming from, that sold to the pharmacies and everything; and -- and first, it's most complaints was coming from the pharmacy, to Safe Chain.

And then the pharmacy would make the complaint to Gilead themselves. And that's how Gilead started their investigation into this scheme over the process, and -- and they eventually stopped buying, and they owed Boulevard a nice amount of money.

Q. Okay. So --

A. They wanted to finish the process with Gilead.

Q. Who is "they"?

A. The Safe Chain, Charles Boyd.

Q. Okay. Okay. Was that in late March of 2021?

A. Correct.

Q. And do you recall Abbie Divilio asking you for a copy of your wholesaler license much later, around that March, late March 2021 time period?

A. Yes. She made a phone call to me. I pick up the phone and she asked me, and I say we don't have that, and I just drop the

phone.

Q. Okay. Do you know what prompted the inquiry about the wholesaler license after 11 months of selling these cheap HIV drugs to Safe Chain?

A. The investigation.

Q. The Gilead investigation?

A. Correct.

Q. And do you know whether or not at that point, the Gilead investigation, Charles and Patrick Boyd had gotten more lawyers involved?

A. Yes.

Q. And do you know whether or not those lawyers were the ones who asked them to look up your wholesaler license?

MR. ZIMET: Objection, Judge. Hearsay.

THE COURT: It sounds like it's going to be hearsay.

BY MR. POGOZELSKI:

Q. Do you know whether or not that happened?

MR. POGOZELSKI: Is that objectionable, Your Honor?

MR. ZIMET: Same objection.

THE COURT: You can answer yes or no.

A. Yes.

BY MR. POGOZELSKI:

Q. Okay.

A. Any questions that they would have --

MR. POGOZELSKI: Sorry. I have to ask a question

before you can answer.
BY MR. POGOZELSKI:
Q. All right. So overall, your relationship with Safe Chain, the 11 months -- and we were talking about when it ended in March of 2021 -- do you remember having a phone call with Charles Boyd around that time, late March of 2021?
And you can take a look at the summary. I think there's sheets still in front of you if it would refresh your recollection. It should be the longer one with Charles Boyd on it, not just -- yeah.
A. Yes, I do.
Q. What's the date of the call you see on there?
A. There is the 3/30/21.
Q. How long was that call?
A. 17 minutes.
Q. Do you recall generally -- now, this was basically the end of your partnership with Safe Chain?
A. Yes.
Q. Do you recall generally what that 17-minute or so phone call was about?
A. Yes. We spoke about the situation of what was happening in the company, about the Gilead subpoenaing them, about everything, how it happened.
At that time, they owed me a couple of million dollars. 2.1. And I was asking for the funds; but -- but they -- as you

see, approved to the medicines are always sent to the pharmacy, already given to the pharmacists so they couldn't ship back the product to us.

Q. Who couldn't ship back the product to you?

A. Safe Chain.

Q. Okay. So the end of the relationship, you had a phone call and you testified that Safe Chain owed you about a couple of million dollars or so?

A. Yes, sir.

Q. And yesterday, you had testified about Safe Chain owing you about $1 million when you were selling the drugs without T3s. Do you recall that?

A. Yes.

Q. And you had testified about a phone call at that point about the lack of any T3s or pedigrees for months that Charles Boyd had told you he can't send the product back. They already sold it.

Is that the same thing that he told you on that March 30, 2021, call?

A. Yes.

Q. Okay.

A. They even -- they even, before even me sending the product, we already have the clients on reserve, that if they had some product they would call them and they would ship it to them right away.

Q. Okay. And is that the T3s, the falsified Amsterdam Wellness Pharmacy T3s, was that why we saw the same date listed, sold to Safe Chain and sold to the pharmacy on a lot of those?
A. Correct.
Q. The product moved very, very quickly?
A. Very quickly.
Q. Why?
A. Because it was very cheap.
MR. ZIMET: Excuse me. Asked and answered several times yesterday and today.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. All right. Mr. Kimchi, if we could -- I'll just use the Elmo to wrap things up. All right.
Mr. Kimchi, do you recall this being the first photo T3 you sent to Charles Boyd in a text message?
A. Yes, I do.
Q. All right. And was this after you had been selling those cheap HIV drugs to Safe Chain for some time?
A. Yes, sir.
Q. And after Safe Chain had been selling those same cheap HIV drugs to pharmacies for some time?
A. Yes, sir.
MR. ZIMET: Objection. This is asked and answered

several times already.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Mr. Kimchi, is this the version you sent to Charles Boyd after a phone call with him, after that last one?

MR. ZIMET: Objection, Judge. Same thing.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Mr. Kimchi, is this a false T3?

A. Yes, sir.

Q. Mr. Kimchi, is this the next false T3?

MR. ZIMET: Objection, Judge. Asked and answered.

THE COURT: You're not identifying the exhibit number. It looks to me like --

MR. POGOZELSKI: This is 505.

MR. ZIMET: It's from the exchange -- text exchange that was part, and then they took it out. It was sent back and forth, and that's what's been asked about several times before, Judge.

THE COURT: I'll sustain the objection.

BY MR. POGOZELSKI:

Q. Mr. Kimchi, did you ever provide any truthful T3s or pedigrees to Safe Chain during that 11-month relationship?

A. No, sir.

Q. Okay. And did Charles Boyd and Adam Brosius help you

create, make those false T3s?

A. Yes, sir.

MR. POGOZELSKI: No further questions.

THE COURT: All right.

Members of the jury, we'll take a 10-minute recess. Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about ten minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: If there's nothing else to come before the Court, we'll be in recess for ten minutes.

THE COURT SECURITY OFFICER: Remain standing.

(Off the record from 10:21 AM to 10:30 AM, after which the following proceedings were had:)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated. We are back on the record.

Counsel are present. Both defendants are present.

While we're waiting for Mr. Khaim to come in, anything to come before the Court?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: No, Your Honor.

MR. BARZEE: No.

THE COURT: Mr. Barzee, are you going to go first?

MR. BARZEE: Yes, sir.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Barzee, you may proceed.

CROSS-EXAMINATION

BY MR. BARZEE:

Q. Good morning.

A. Good morning.

Q. The prosecutor kept asking you questions, and he would refer to you as "Mr. Kim." Did you hear that?

A. Yes.

Q. That's not your name, is it?

A. Kimchi is not my name, but I did create an email -- considered that email with the name.

Q. Yeah. But that's not your real name. That's a fake name, isn't it?

A. Correct.
Q. And you just answered the prosecutor when he calls you by a fake name? You don't correct it and say, "That's not my name, sir"?
A. Because I did work with that name.
Q. Where are you from, Mr. -- tell me what your real name is.
A. Peter.
Q. And what's your last name, Peter?
A. Khaim.
Q. Khaim.
How do you spell that?
A. K-H-A-I-M.
Q. Is that your real name? What you were born with?
A. Yeah.
Q. All right. How many different names do you use?
A. In the business industry like this, like criminal business enterprise, you can use a hundred names if you'd like to.
Q. That's right. You can.
How many do you use in your criminal enterprises?
A. A few.
Q. How many --
A. One of the names is King Kimchi.
Q. How many is a few?
A. Four or five -- six different businesses, different names, yeah.

Q. When you say "business," you mean criminal enterprise?
A. Correct.
Q. More than six?
A. What's more than six?
Q. Seven.
A. What do you mean?
Q. Numbers.
A. About?
MR. POGOZELSKI: Objection, Your Honor.
BY MR. BARZEE:
Q. How many names?
THE COURT: Overruled.
BY MR. BARZEE:
Q. How many -- how many fake names do you use in these various criminal enterprises that you're involved in?
A. A few. Two, three, four, five.
Q. You're shrugging your shoulders.
A. Particular to this criminal enterprise with me and Charles Boyd and others -- with Adam Brosius and Mike Zangari, I did use one and my real name; so it's two.
Q. Okay. But that's not my question.
I'm still trying to get an answer as to how many different fake names have you used in various criminal enterprises.
A. One or two -- two -- two or three, yeah. I don't recall as of now, but I did -- I'm telling you what I used in this

criminal enterprise.
Q. But that's not my question. My --
MR. POGOZELSKI: Objection. Asked and answered. He did answer his question earlier.
MR. BARZEE: He hasn't answered it, Your Honor.
THE COURT: Well, he's given a range of numbers. Let's move on.
BY MR. BARZEE:
Q. Where were you born?
A. Uzbekistan, Russia.
Q. What is your immigration status in the United States?
A. United States citizen.
Q. When did you become a United States citizen?
A. More than ten years ago.
Q. How long have you been involved in criminal enterprises?
A. More than ten years ago.
Q. Have your attorneys advised you that, as a result of being involved in criminal enterprises from before you became a United States citizen, that you could be subject to deportation?
MR. POGOZELSKI: Objection, Your Honor. Calls for privileged communications with his attorneys.
THE COURT: I'll allow it.
Answer yes or no.
BY MR. BARZEE:

Q. Have you been advised that you could be deported from the United States back to Russia as a result of your involvement in your criminal enterprises, which preceded you becoming a United States citizen?
A. I never used an attorney.
Q. You what?
A. I never used an attorney for -- to become a citizen.
Q. Are you aware of the fact that you could be deported from the United States as a result of your criminal enterprises, which began prior to you becoming a United States citizen?
A. No, sir.
Q. Do you have any concerns about being deported from the United States and returned to Russia?
A. When -- when I was born, it was USSR, a Communist country. Now it's called Russia. So I'm not from Russia. I'm from USSR.
Q. Are you concerned about being deported to Russia?
A. Why would I be deported to Russia?
Q. Because you were committing crimes in the United States from before you even became a United States citizen and the United States has a right to deport criminal aliens from its country.

THE COURT: Let's keep it with the lawyer asking questions and Mr. Khaim answering questions.

And, again, the lawyer's questions aren't evidence.

BY MR. BARZEE:
Q. Are you concerned about being deported to Russia, formerly known as the USSR?
A. No, I'm not.
Q. You're not concerned about being drafted into a war in Russia?
A. No, I'm not.
Q. And is that because the United States has assured you -- these prosecutors have assured you or the prosecutors in New York have assured you -- that you won't be deported?
A. No.
Q. How long have you been in jail, Mr. Khaim?
A. Over a year.
Q. Over a year?
A. Yes.
Q. What is it like?
MR. POGOZELSKI: Your Honor, I would object to relevance.
THE COURT: Overruled.
A. I don't know how to explain how it's like.
As you see.
BY MR. BARZEE:
Q. I'm sorry?
A. As you see, with shackles.
MR. BARZEE: Your Honor, can I ask the witness to step

down so the jury can see what he's referring to?
THE COURT: No. He said he's got shackles on. That's good enough.
BY MR. BARZEE:
Q. Do you want to hold your hands up so we can see them?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: I don't think he's got cuffs on his hands.
BY MR. BARZEE:
Q. Are you wearing handcuffs?
A. Just like I said, as you see.
Q. I can't see. That's why I'm asking.
Would you raise them up so I can see it for a second?
A. Did you see me coming in?
THE COURT: Just raise up your hands, Mr. Khaim.
There's no handcuffs.
BY MR. BARZEE:
Q. No handcuffs, but you're hooked onto a chain around your waist?
A. Correct, sir.
Q. And you have a chain on your legs?
A. Correct, sir.
Q. And you didn't like the fact that I asked you to show that to us, did you?
A. No. It's just irrelevant to our proceedings.
Q. Well, is it irrelevant?

You don't want to be in jail, do you?
A. Nobody wants to be in jail.
Q. Have you been mistreated in jail?
A. What do you mean by that?
Q. I mean, have your rights been violated in jail?
MR. POGOZELSKI: Objection. Relevance.
THE COURT: Overruled.
BY MR. BARZEE:
Q. You don't like answering my questions, do you?
MR. POGOZELSKI: Objection. Argumentative. There's a language barrier. He's thinking.
MR. BARZEE: Oh, come on.
THE COURT: It's a pause. It's a fair question.
A. Not really.
BY MR. BARZEE:
Q. You understand my language, don't you?
A. I understand, yeah.
Not really.
Q. Not really, you don't understand me?
A. I do understand. I said not really about the rights. You just asked me a question; right?
Q. Yes. I asked if your rights have been violated in jail?
A. No, my rights was not violated.
Q. No?
A. No.

Q. Didn't I hear you complaining to the judge that you weren't given a Kosher meal this morning?
MR. POGOZELSKI: Objection, Your Honor.
A. This is only transactional moves, that's all.
BY MR. BARZEE:
Q. No, no. It's not -- it's not something that we're going to just brush by.
The first thing that happened this morning in this courtroom was you came in and you told the judge that your jailers or the marshals refused to give you a Kosher meal.
Isn't that what you told the judge?
A. Correct. But that was a transactional move. So it was a one-day, two-day thing, but originally in prison, no problems.
Q. But you came in this morning and you told the judge --
MR. POGOZELSKI: Objection.
BY MR. BARZEE:
Q. -- that they refused to give you a Kosher meal.
Yes or no?
A. They did not refuse to give me. It was a transactional move from one place to another place, as a movement.
If I would be there in person, they would give me everything I wanted. But coming here -- while coming here in that transition, there was a little issue with that.
Q. I'm not asking about a transition. I'm not asking you about what would happen if you weren't here and you were in a

different jail.

I'm asking you a very simple question, and I would just like you to answer yes or no. Did you come into court this morning and tell the judge, that, quote, "They haven't given me my Kosher meal"?

Yes or no?

A. Yes.

Q. That was a lie, wasn't it?

A. That was not a lie. I'll tell you. I'll explain. They give me, and I had -- did not took it because we had to come here by marshals because they had a lot of people picking up movement. So that's all.

MR. POGOZELSKI: Your Honor, I would object to this line of questioning. Relevance as to what happened before court. I think I see where it's going.

THE COURT: Overruled.

BY MR. BARZEE:

Q. When you walked into this courtroom, the first thing that happened was the judge reminded you that you were under oath. Do you remember that?

A. Yes, sir.

Q. The second thing that happened was you lied directly to the court and said that they did not give you a Kosher meal today; correct?

THE COURT: You've asked that, and he answered that.

Let's move on.
BY MR. BARZEE:
Q. Let me ask you a question, sir. Which is more important to you? Money or your freedom?
A. Freedom, of course.
Q. More important than even money?
A. Yes.
Q. And you love money; right?
A. Like everybody else.
Q. You think it's like everybody else?
A. Yes.
Q. You think your love, your desire, your quest for money -- you think we all feel that same way?
A. Yes. That's why we're working.
Q. But you do more than work for money, don't you?
A. People have investments that also do work for their money.
Q. You steal. You steal money?
THE COURT: That's a question. You can answer it yes or no.
A. Before I did wrong things and I took my responsibilities because of that.
BY MR. BARZEE:
Q. You didn't answer my question. You steal?
A. I did before.
Q. You did?

A. I took my responsibilities on that.
Q. When did you steal?
A. On my -- those prior two cases.
Q. Those are the only times that you stole?
A. Yes.
Q. Really?
A. Really.
Q. So the only times in your entire life that you have ever stolen something are the two times that you happened to have been caught?
A. And plus with the Charles Boyd and Safe Chain Solutions.
Q. So three times. So only those three?
A. Correct.
Q. Are you sure about that? You're under oath; right?
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Sustained.
MR. POGOZELSKI: Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Okay. What about cheating? Have you cheated people for money?
A. No.
Q. You never cheated anyone?
A. No.
MR. POGOZELSKI: Objection. Asked and answered. This

was covered in the stealing.

THE COURT: I think stealing and cheating is pretty close to the same thing. Sustained.

BY MR. BARZEE:

Q. You were paid about $35 million in this case?

A. Yes.

Q. And you had two prior cases that you have talked about in New York; correct?

A. Yes.

Q. And I think in one of those, you stole around 40 million?

A. I was involved in the conspiracy. That's what happened.

Q. And that's just something that happened?

A. That's what I'm saying.

Q. And in the other case, you stole around -- what? -- ten million?

A. Again, in that conspiracy I was involved, that's what happened.

Q. That just happened.

So it just so happens that you've stolen -- what? -- like about $100 million, ballpark?

A. There were a lot of people involved in that, just like we had involved a lot of people in this case.

Q. How much of that $100 million have you given back to the United States Government?

A. I'm still giving.

Q. How much of the $100 million that you cheated, stole, and thieved for have you given back to the United States of America?
A. I'm still giving.
Q. How much have you given back that you stole? $100 million, how much of it have you returned?
A. I don't have the concrete answer for that one.
Q. Well, give me a loose estimate. Did you give back 90 million?
A. I told you, I do not have an answer for that.
Q. Well, 50 million?
A. Again, I do not have an answer for that. I do not have a number.
Q. Well, have you given back any money to the United States of America of the $100 million that you've stolen?
A. Oh, yes.
Q. But you don't know how much?
A. No.
Q. In what way did you give it back to the government?
A. We're doing the strategy right now as we talk. We're trying to resolve the issue.
Q. Oh, you're trying to resolve the issue so you're --
A. Not resolve. Trying to pay -- make the payments to the government.
Q. You're trying to --

A. I did make payments.
Q. You've made payments?
A. Yes.
Q. Okay. So how many payments have you made to the United States of America?
A. I don't remember. I don't know exactly a number.
Q. Is it more than one?
MR. POGOZELSKI: Objection. Asked and answered multiple times. He said he doesn't know.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You mentioned a couple of cases in New York; correct?
A. Yes.
Q. I want to talk about those cases, if I may.
So let's talk about -- there's two cases, and they kind of overlap in time; correct?
A. Correct.
Q. And one was in the Southern District of New York in Manhattan, and the other one was the Eastern District of New York in Brooklyn; correct?
A. Correct.
Q. So the first one we'll talk about is the Southern District of New York case.
I believe on direct, when the prosecutor was speaking to you, you described the case in New York as bribery, healthcare

fraud, money laundering, conspiracy?
A. Correct.
Q. It was a little more complicated than that; right?
A. I'm not sure where you're coming from.
Q. Well, let's talk about it. When did that criminal enterprise in New York begin?
A. 2000. What do you mean by "begin"?
Q. When did you start committing the crime that you were convicted of in the Southern District of New York?
A. Exact date, I don't know.
Q. How about a year?
A. 2014, 2016.
Q. 2014. So that's what? About 11, 12 years ago, that criminal enterprise began?
A. Correct.
Q. Now, let me ask you a question. Before that criminal enterprise started in 2014, had you ever committed a crime?
A. No.
Q. No?
A. No.
Q. So your entire criminal history, you're testifying now under oath, began in 2014?
A. Correct.
Q. And for your very first crime, you pulled off a $40 million criminal scheme involving dozens of individuals, multiple

clinics all over New York?
A. Like I told you before, I was involved in that conspiracy, yes.
Q. Well, you were more than involved in it. Weren't you the leader of that conspiracy?
A. Involved -- consider involved. Leader or not leader, worker or not worker -- everybody's involved, involvement.
Q. You were sentenced as a leader and an organizer of a massive criminal enterprise that stole over $40 million from the citizens of New York and the United States, didn't you?
A. Not citizens of New York and the United States.
Q. No?
A. No.
Q. Who were you stealing all that money from?
A. Insurance companies.
Q. And you don't think we all -- everyone in this courtroom has to pay for that when you steal from insurance companies? You don't think that affects all of us?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Let's talk about what you actually did.
You conspired with a group of individuals to unlawfully own and run healthcare clinics and pharmacies located in the New York City area; correct?

A. Correct.
Q. So, back in 2014, your first entry into the criminal world -- and you were opening and controlling and running healthcare clinics and pharmacies; right?
A. Okay. So I would like to explain on that.
Q. Please.
A. In 2014, you're just putting your foot in the door. That takes time to build your business. That took a lot of time.
Q. And when did it begin?
A. 2000s, as you see in the paper.
Q. I'm asking you. When did the criminal enterprise begin if it wasn't in 2014?
A. Like you say, it started 2014, but it takes time to build the business.
Q. To build a legitimate business or a criminal business?
A. Criminal business.
Q. Right.
So when did you begin building the criminal business?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. When did this crime begin?
MR. POGOZELSKI: Objection.
THE COURT: Sustained.
BY MR. BARZEE:

Q. How many pharmacies did you open or control in the Southern District of New York before the start of this conspiracy in 2014?
A. That's the only crime we started doing, was the pharmacy in 2014. Not before.
Q. So you're saying now under oath that the first pharmacy that you ever opened was in 2014?
MR. POGOZELSKI: Objection to repeating this under oath. The jury understands he's under oath.
THE COURT: Sustained.
MR. POGOZELSKI: Improper.
BY MR. BARZEE:
Q. The first pharmacy you ever opened in your life was in 2014?
A. From that period of time, yes.
Q. Not from that period of time. Ever?
A. No. More. I did more, but I'm starting that from period. That's what I'm telling you.
You asked me before. I told you no, it was not before. We were starting from 2014.
Q. All right. Let's start over so we're clear.
When is the first time that you opened a pharmacy?
A. We started in 2014.
Q. When you say "we," who are you referring to?
A. With criminal organizations. With others.

Q. Any relatives of yours?
A. Yes.
Q. Who?
A. My cousin.
Q. What's your cousin's name?
A. Mr. Gulkarov.
Q. Can you spell the last name for us?
A. G-U-L-K-A-R-O-V.
Q. And --
A. And Mr. Alishayev.
Q. Spell the second name for us, please.
A. A-L-I-S-H-A-Y-E-V.
Q. Okay. So we have Cousin Gulkarov?
A. Correct.
Q. And the second individual, another cousin?
A. No. It's one of the coconspirators.
Q. Oh, I'm not asking about coconspirators. I'm asking about relatives of yours that are involved in the criminal enterprises.
A. Me and Gulkarov and my brother.
Q. Who is your brother?
A. Mr. Khaimov, K-H-A-I-M-O-V.
Q. K --
A. -- H-A-I-M-O-V.
Q. Why is your brother's last name different from yours?

A. I have changed it.
Q. When did you change your last name?
A. When I became a citizen.
Q. Why did you change your last name?
A. I changed it because I wanted to change.
Q. Yeah, but you had a reason for changing it. Why don't you tell us what the reason was.
A. The reason of changing my last name, it's -- when it was Soviet Union, we had to get that -- with the last name with "O-V" and I wanted to forget about where I came from, from Soviet Union; and that's why I change it.
I want to be more -- pronounced more easily, as my grandfather's name was Khaim.
Q. Whose idea was it to commit this crime in 2014? Was it your idea or your brother's idea or your cousin's idea?
A. Everybody's idea.
Q. Well, everybody had the idea at the same time?
A. Yeah. We just came up with the idea, and that's it. We went for it.
Q. But you had never committed a crime prior to this; right?
MR. POGOZELSKI: Objection.
A. Right.
MR. POGOZELSKI: Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:

Q. And one day, you guys are all just sitting around, and somebody says, "Hey, why don't we open up a bunch of pharmacies and healthcare clinics so we can rip off insurance companies for $40 million?"
A. The number -- you never know the number, how much it is. It took time to get to that.
Q. Yeah. I'm sure it did, and that's why I'm asking you how it happened.
Were you the leader and the organizer? Were you the mastermind of this?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Was your brother the mastermind? The criminal genius behind this scheme?
A. As I told you, it was all of us.
Q. You opened a series of pharmacies and a series of healthcare clinics; correct?
A. Correct.
Q. And then you personally went out and corrupted doctors in the New York area; correct?
A. Not personally. But with the conspiracy, it was everybody.
Q. But you spoke with doctors one-on-one. You personally spoke to them about what?
A. Again, we always work together speaking to doctors, telling

them what happened, telling them what to do, and how to do.
Q. And what did you tell the doctors?
A. Write prescriptions to the patients, send them to do the testing, send them to do the MRIs, to send the prescription to the pharmacy that we had, and so on.
Q. So -- so let's just make this clear. So you went to doctors' offices and you offered the doctors money, I would assume; correct?
A. Correct.
Q. How much money did you offer the doctors?
A. It depends on what he would order.
Q. What was the agreement? What was the deal?
A. If he would order, let's say, a compound medication that would cost, that would get him about $200, 150. It depends how much. It would be a billable item.
Q. So you went to the doctors, and you said, "Look, I will pay you money if you write false prescriptions to patients saying they need some kind of medicine"; correct?
A. Yes.
Q. And how many doctors did you convince to do this crime with you?
A. It was dozens of doctors. It was a lot of doctors.
Q. All over New York?
A. All over New York.
Q. How many doctors do you think -- you said dozens --

A. Right.
Q. -- that you spoke to personally?
A. Yeah.
Q. That you corrupted?
A. Didn't corrupt, but I guess if they took the choice, they did, yeah.
Q. And so the corrupt doctors at your direction would write fake prescriptions for patients for medical care that they did not need; correct?
A. I'm not sure if they need it or not, but they did write prescriptions. That's my main goal -- was for them to write prescriptions. I never told him whether he needs it or not need it but...
Q. So you think the patients needed the prescriptions?
A. I never saw the patient.
Q. You know that this was a fraud; right?
A. To a certain extent, yes.
Q. I mean, if the doctor is writing a prescription that somebody needs, that's not fraudulent, is it?
A. Correct. Some people need it. Some people didn't.
Q. All right.
A. Yeah.
Q. So the --
A. We -- I'm sorry to disrupt. You would have mixed people. You have good people and bad people. Business doesn't come

only bad. Business comes good too.
Q. And once the patients got these prescriptions for medical treatments and care and medicines that they didn't need, what would be the next step?
A. One more time.
Q. So -- so first you go to the doctors, dozens of doctors in the New York area, and you pay them all money to write fake prescriptions for patients; right?
A. Correct.
Q. And some of them maybe needed it, maybe not. There's good, and there's bad.
After that, what's the next step?
Now, the patient has a prescription in their hand, and then what happens?
A. They would deliver prescriptions to them, the medicine.
Q. The patient would do what?
A. We would deliver the medicine to the patient.
Q. Who delivered it?
A. The delivery company.
Q. Whose delivery company?
A. It depends what we use. Sometimes we use some guys, they're looking for work with the driver's license and the car. Sometimes we use a company. It depends.
Q. How would the patient know to try to fill the prescription at your pharmacy or your clinic?

A. We would call them. We would call the patient and say, "Hi, we have a prescription in our pharmacy prescribed by this doctor. We need to deliver." And they would tell us whether to bring it to their home or to the work address, or where they were located, it would be delivered.
Q. So I think you're talking about a different part of this criminal enterprise, and that's when you set up a call center?
A. Not -- no. This is -- I'm talking about particular pharmacy.
Q. Okay. Because part of this scam was you set up a call center; correct?
A. Correct.
Q. And you set up a call center, and then you bribed people to give you patient information; correct?
A. Yes, sir.
Q. To violate their privacy rights, their healthcare privacy rights; correct?
A. I can explain to you what happened in that.
Q. Oh, sure. Go ahead.
A. We would -- we would bribe 911 operators and the hospital workers, police officers to give us the people who was involved in the car accidents.
And then give just the name and phone number, and that would go to the call center as we set up. And those people would give them a call and speak to them, for them if they need

treatment, so they could go to the clinics we controlled.
Q. To the clinics that you controlled and to the pharmacies that you controlled?
A. Correct.
Q. And how many pharmacies did you control at that point?
A. There was one pharmacy, but eventually, I moved on to different aspects in the business.
Q. My question, sir, was how many pharmacies did you control at that time?
A. A dozen pharmacies.
Q. A dozen?
A. Yes.
Q. Are you aware of the fact that I have asked you that question five times and this is the first time that you have answered it and now the answer is a dozen?
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did you open a dozen pharmacies in your name or in other people's names?
A. Other people's names. I'm talking about this case in particular of the Eastern District, or are you referring to the Southern District?
Q. It doesn't even matter. Let's just say you opened dozens of pharmacies.

A. Okay.
Q. Okay.
A. Correct.
Q. So let's just talk about that for a second.
A. Correct.
Q. So this is back in 2014. You've opened dozens of pharmacies?
A. As I told you before, that took time to open those dozen pharmacies. Not right away.
Q. Okay. So it took time, but you ultimately --
A. It took years to get to that point, yes. Did I open with other conspirators? Yes, I did.
Q. They were yours?
A. Ours.
Q. You were the boss?
A. We're all equal. Just like in this conspiracy with Patrick Boyd and Adam Brosius and Mike Zangari, we're all in.
Q. Did you just mention Patrick Boyd's name?
A. Talking about Charles Boyd.
Q. Did you just say Patrick Boyd?
MR. POGOZELSKI: Objection. Argumentative. He just clarified.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You don't know Patrick Boyd, do you?

A. No, I don't.
Q. You've never spoken to Patrick Boyd?
A. No.
Q. You've never even met Patrick Boyd?
A. No.
Q. You've never emailed Patrick Boyd?
A. No.
Q. You never text messaged Patrick Boyd?
A. No. But I heard about him.
Q. You heard his name?
A. Correct.
Q. Let's go back to your dozens of pharmacies.
May we?
A. Sure.
Q. You and your coconspirators -- your brother, your cousin -- you controlled dozens of pharmacies in the New York area?
A. Yes.
Q. You knew the pharmacy business?
A. Yes.
Q. As far back as around 10 years ago?
A. Correct.
Q. Pharmacies were your thing, were they not?
A. Yes.
Q. And in order to pull off a $40 million fraud, you need to know how to make things look legitimate; right?

A. I still did not understand the question.
Q. What part of that question did you get lost in?
A. "Looked legitimate."
Q. Yes.
You know what "legitimate" means?
A. Yes, I do.
Q. Do you know what "look" means? The appearance of legitimacy?
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Sustained.
BY MR. BARZEE:
Q. So in order to pull off a fraud or a criminal enterprise like this, where you're going to steal $40 million, you need to know how to make it look legitimate. Make the pharmacies that you control, the dozens of, pharmacies, look legitimate; right?
A. Again, the main thing, like I told you before, there was not only bad or fake stuff was coming. It was both. It was good and bad came to the business, but I cannot tell you whether -- did I make it look legitimate? Whatever it was?
I guess, I don't know how to make it look legitimate because I got caught with it.
Q. Well, that's very clever, but let's talk about it for a second. All right?
A. Sure.
Q. In order to open a pharmacy, you can't just put up a sign

that says "Pete's Pharmacy"; right?
A. No.
Q. You need to make it look legitimate, which means you need to go out and apply for a license; right?
A. Right.
Q. All right. And so you applied for pharmacy licenses, dozens of pharmacy licenses in the New York area?
A. Yes.
Q. And each one of those licenses, each one of those dozens of pharmacy licenses was a lie; right?
A. It was what?
Q. A lie?
A. No.
Q. No?
A. No.
Q. Who owned those pharmacies? The dozen of pharmacies?
A. Other people.
Q. No. You owned them, and your brothers and your cousin.
Your criminal organization owned dozens of pharmacies; right?
A. Correct.
Q. They weren't in your name, though?
A. It was not. That's what I just said, yeah.
Q. So each license, each application was a lie, was it not?
A. It was controlled by me, but each person would be on their

name, they would get a small share of the pharmacy, yes.
Q. You would pay people to go along with the lie, but the point is you lied when each one of those pharmacies were opened; correct?
A. Each owner of that pharmacy would do a certain job to be -- of the owner and to get paid, yeah. They were on the percentage of that enterprise, yeah.
Q. Yeah, but each one was a lie because they aren't really the owners. You were?
A. They would be interested in being the owner to collect the money. They would be able to control the place, and we would tell them how to control it, yes.
Q. You would tell them how?
A. We would tell them.
Q. Because you guys were the bosses; right?
A. Okay.
Q. Is that fair?
A. Yeah.
Q. So then you'll agree with me, then, that each one of those was a lie. It was a way of lying to the New York Board of Pharmacy; correct?
A. I don't look at it like that.
Q. Well, you're claiming that they're owned by somebody else but the truth --
A. It would be one of the owners, and who would be actually

working in the pharmacy, yes. Yes.
Q. That would just be a nominee --
A. That's not a lie.
(Reporter requests one speaker at a time.)
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
MR. BARZEE: Your Honor, can I use the ELMO, please?
BY MR. BARZEE:
Q. So this is the name that you're going by today; correct?
A. Yes.
Q. And that's the name that you were given at birth?
A. Yes.
Q. And who is this person here?
A. That's my brother.
MR. POGOZELSKI: Your Honor, I just would like -- is this a demonstrative? It's not in evidence. I don't know what this is.
THE COURT: It's a demonstrative aid.
MR. POGOZELSKI: Okay. We would like to take a look at it before it's used and presented to the jury.
THE COURT: Okay.
MR. BARZEE: My hand looks horrible.
BY MR. BARZEE:
Q. All right. Who is this individual here?
A. My brother.

Q. Who is this person?
A. Owner of Boulevard 9229 LLC.
Q. So this person, Ishbay Shuhurov --
A. Yes.
Q. -- was the owner of Boulevard 92 -- what is it? 9229?
A. Yeah.
Q. Was he the real owner, or is he a make-believe owner?
A. He had some percentage in the business.
Q. Who was the owner of Boulevard 9229 -- or whatever it is?
A. One more time.
Q. Who owned Boulevard?
A. I did.
Q. Yeah.
A. Yeah.
Q. Yeah, so it's a lie to say he owned it. You used his name as the owner, but he's not the owner. You are; right?
A. I control, and he would get the share.
Q. How much did you give him? What share?
A. A share of the business.
Q. Yeah, what share? What percentage did he get?
A. It depends on how the business came.
Q. It would be up to you; right?
A. Right.
Q. Yeah, because you were the owner of Boulevard. Not somebody else.

You were; right?
A. Yeah.
MR. BARZEE: Can we bring up Exhibit 112, please? Previously admitted Government's Exhibit 112. No? Or maybe how about 111A? Sorry. There we go.
BY MR. BARZEE:
Q. Do you recognize this?
A. Oh, yes.
Q. This is the vendor intake application that you presented to Safe Chain; correct?
A. Correct.
Q. And this is how it all begins; right?
A. Right.
Q. And so for the contact name under accounts receivable, you put Ishbay S-H-U-C-A-R-O-V [sic]; correct?
A. Shukurov, yes.
Q. And that's the, quote-unquote, "owner" of Boulevard; right?
A. Correct.
Q. And then down below, there's a remittance payment preference to be paid by wire, and there's banking and account information on there; right?
A. Correct.
Q. And did you put the banking account information that was associated with Boulevard 9229?
A. Yes.

Q. I thought I heard you tell the Government that you changed the account number so that it would go to a different account when the money came in. Am I wrong?
A. Yes. Eventually, it would change.
Q. So these numbers here on this vendor intake application are a bank account that was controlled by you or controlled by Ishbay?
A. Ishbay.
Q. Really?
A. In the beginning, yes.
Q. When did you change it?
A. After a few transactions.
Q. Why?
A. With the Boyds.
Q. With the Boyds, plural?
A. With the Boyd, for the Safe Chain.
Q. With one Boyd?
A. Correct.
Q. Why did you change it?
A. Because the business was growing. It was too much involved, and I don't want anybody taking advantage.
Q. You were afraid that your criminal coconspirator was going to steal from you, so you decided to cut him out and change the bank account information to a bank account that you controlled exclusively; correct?

A. Correct.
Q. You've heard the term "no honor amongst thieves"?
A. No.
MR. BARZEE: Let's take that down. Actually, go back to that. I'm sorry. I just remembered something.
BY MR. BARZEE:
Q. So this exhibit, this Government's Exhibit 111A, has a lot of different pages to it. And it looks like the second page is a request for a taxpayer identification number; correct?
A. Correct.
Q. That reminds me, did you report all of these earnings to the IRS?
A. I'm not sure. We did have an accountant. I just don't recall.
We had a girl who was doing paperwork for us.
Q. Come on.
A. Me personally, I did.
Q. You did?
A. Yes.
Q. How much did you claim on income in 2020?
A. I paid millions of dollars in taxes, millions.
Q. My question, sir.
A. Over $5 million I paid taxes to the government in the few years I have been working with Boyds -- with Boyd. I'm sorry.
Q. My question, sir, was how much did you declare in 2020?

A. I don't remember, but I do remember paying.
Q. Well, let me ask you this: Did you declare all the money that you made in 2020 to the IRS? Yes or no?
A. All my taxes are accurate.
Q. They are?
A. They are accurate.
Q. So you're saying that you declared all of the criminal proceeds that you have made from 2014 to today? You've declared every penny of the criminal monies that you have acquired?
A. I just told you all my taxes are accurate, and that's why I was not indicted on tax evasion.
Q. You paid taxes this year?
A. No. Because I haven't made anything.
Q. Last year?
A. If I made anything, yes, I do.
Q. Did you make anything last year?
A. If I made something -- again, I do pay taxes.
Q. Sir, my question is did you make any money last year?
A. No.
Q. Last year was 2024. You made no money in 2024?
A. No money in 2024.
Q. Did you make any money in 2023?
A. I'm not sure.
Q. It was just a couple of years ago.

A. I don't have any paperwork to tell you yes or no. But every much [sic] money I made, I did pay taxes, and all my tax documents are very accurate.
Q. We're going to talk about the money you made in 2024 in a little bit. Okay?
A. No problem.
Q. Because it as it turns out, even after all this happened with Safe Chain, even after the lawsuit from Gilead, you continued selling this medicine that you got from the street; right?
You continued the criminal enterprise even after all of this happened. Even after the indictments, after the Gilead lawsuit, after the seizure, you continued selling Gilead HIV medicine that you acquired from another criminal enterprise; correct?
A. Again, I'm telling you right now, me personally, no.
Q. "You personally," meaning people were doing it on your behalf?
A. No. I just --
Q. No?
A. They be doing on their own.
Did I know people who were doing it? Yes. But me personally doing it? No.
Q. We'll discuss that later.
A. Sure.

Q. Now, this is something that you presented to Safe Chain; correct?
A. Not me personally, but the person who worked in --
Q. Who was that person?
A. A lady. A girl.
Q. What was her name?
A. I don't want to say it.
Q. Why?
A. Because I just don't want to say it.
Q. Well, you don't have a choice, sir. Who was it?
THE COURT: There's no objection. You have to answer it.
A. One of the ladies, she worked in our company, Nat.
BY MR. BARZEE:
Q. What's her last name?
A. I don't know her last name.
Q. What's her first name?
A. Nat. I call her Nat.
Q. That's not her real name, though?
A. I'm not sure.
Q. So you don't know what her name is?
A. That's how I know her.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:

Q. Why are you protecting her?
A. It's not about protecting. It's about I just don't want to say it.
Q. Why don't you want to say it?
A. I just don't want to say it.
Q. I understand you don't want to.
My question is why don't you want to? Why are you protecting this person? Are you scared?
A. No. She was under me, under my control. That's all.
Q. She was under your control?
A. Yeah. I told her do this, and she did it.
Q. Is she related to you?
A. No.
Q. Is she related to one of your coconspirators?
A. No.
Q. Did the Government ever ask you who she was?
A. No.
Q. So the Government never asked you who created this false document that you presented to Safe Chain?
A. They did ask me about this. And I told, just like I told you, her name was Nat, and that's it.
Q. And they never asked you a follow-up question about that?
A. No. And I told them that it was under my control.
Q. So you refused to tell the Government?
A. No. I told them how it is, and I told them that it was

under my control, and I told her what to do.
Q. And they accepted that?
A. Everybody should if I say this is me.
Q. If you say so.
A. Yes.
Q. Okay. So what did you tell her to do? Explain it to me.
A. To change it to wholesale -- to change the -- instead of pharmacy, to the registered wholesaler.
Q. And why did you tell her to change an official document that's issued by the New York State Board of Pharmacy?
A. To work with the Safe Chain Solutions.
Q. Why did you feel the need to create a forgery of an official document from the New York State Board of Pharmacy in order to work with Safe Chain?
A. One more time. I'm sorry.
Q. Why did you feel the need?
A. Because they been asking us -- I mean, not me personally. They ask Mike Zangari to get wholesale license, and that's how we come up with an idea to make this happen.
Q. So who came up with the idea to make this happen? You or Mike Zangari?
A. We both did.
Q. Together?
A. Correct.
Q. The same way you and your brothers together and your cousin

came up with the other criminal enterprise?

A. Correct.

Q. You knew that a pharmacy, if all you had was a pharmacy license, you knew that a pharmacy could not possibly sell large amounts of medicine to Safe Chain; correct?

A. Correct.

Q. The only way that Safe Chain could be buying large amounts of medicine would be if you were purporting to be a wholesaler; correct?

A. Correct.

Q. Because pharmacies can't sell lots of medicine. They can only sell a certain percentage of their product?

A. Correct.

Q. So this was done to trick Safe Chain into believing that you were a legitimate, registered wholesaler?

A. No, not to trick them.

Before we even send all the information to them, they must -- to verify each license, whether I send or they must go through the department of -- pharmacy board, New York State Pharmacy Board, they must check if we have a real license because even sometimes that you see from 2021, they still can be -- a license be revoked due to a different extent, paper.

Q. The reason that you forged this license or the reason you directed somebody under your control to forge this license was because you wanted Safe Chain to believe that you were a

registered wholesaler; correct?
A. Correct.
Q. All right. But you weren't; right?
A. I was not a wholesaler, no.
Q. So that's a deception. It's a lie; is it not?
A. Correct.
MR. BARZEE: We can take that down. Can I go to the Elmo, please.
BY MR. BARZEE:
Q. Alex Kim -- who is that?
A. That's me.
Q. When did you use the name Alex Kim?
A. From 2016 or '18, or -- I'm not exactly sure which year it was.
Q. You can't even remember anymore; right?
A. Yeah, I can remember, but I don't know exactly.
Q. What crime is Alex Kim associated with?
A. With selling drugs.
Q. With "seven draw"?
A. With selling drugs.
Q. Selling drugs?
A. Yes.
Q. To whom?
A. To different -- to Safe Chain and --
Q. Safe Chain?

A. -- and to different places.
Q. Let's try again.
Alex Kim -- that's a fake name; right?
A. Yes.
Q. That you used?
A. Yes.
Q. In order to commit crimes; correct?
A. Yes.
Q. You used it with Safe Chain?
A. Mostly, I used with King Kimchi with Safe Chain, and they know me as Peter.
Q. Let's try again.
Alex Kim -- does the name -- I mean, Alex -- yeah, Alex Kim is the name that you used in order to commit crimes; correct?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did you use it with Safe Chain?
You just said that you did, and I want to challenge you on that. Are you sure that you used the name Alex Kim with Safe Chain?
A. I'm just trying to think about that word that I used.
Q. Do you have a reasonable doubt as to whether or not you used the name Alex Kim with Safe Chain?

MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.
A. I don't remember, but I did use Alex Kim.
BY MR. BARZEE:
Q. With Safe Chain?
MR. POGOZELSKI: Objection. He just answered the question.
THE COURT: Sustained.
BY MR. BARZEE:
Q. I want to make sure I understand.
You're saying you have no memory of using that name with Safe Chain?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: One more time.
MR. BARZEE: Your Honor, it's not.
THE COURT: He hasn't answered it. You answer yes or no, and then you can explain your answer.
A. I did use Alex Kim.
BY MR. BARZEE:
Q. How did you use it with Safe Chain?
A. I -- as a -- as a seller. As a seller. As a seller to Safe Chain.
Q. What do you mean as a seller to Safe Chain? What are you talking about?
A. Like as a seller. As a seller of medication.

Q. How?
A. That's the only way that I use it. That's the -- that's the only thing. That's the only way that I can use it.
Q. But when you say "I used it as a seller of medication to Safe Chain," what does that mean?
Who did you use the name with? Let's try that.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Can you give me the name of an individual that you introduced yourself to as Alex Kim that's associated with Safe Chain?
A. That was on the email, if I remember that, but I don't remember where did the email come to.
Q. So you used it on an email that didn't go through?
A. No. I don't remember which email or to who I sent those emails.
Q. What were those emails about?
A. If I would see it, I would tell you, but I don't see it.
Q. Why were you pretending to be Alex Kim when you were sending those emails?
A. Just used -- just used the name. That's all.
Q. Did you use the name Alex Kim in some other criminal enterprise that you don't want to tell us about?
A. No.

Q. You didn't use it with Scripps?
A. Scripps?
Q. Yeah. Isn't that some other --
A. I never done business with anybody at Scripps.
Q. No?
Hold on. Maybe I'll find it after lunch. Give me a second. Hold on. We'll come back to it. I'll find it.
If you remember while you're up there, let me know.
A. Sure.
Q. Mike Zangari -- is that a real person, or is that you?
A. That's a real person.
Q. And where is Mike Zangari now?
A. Canada.
Q. I'm sorry?
A. Canada.
Q. Canada.
Is he free, or is he in prison?
A. I'm not sure.
Q. When was the last time that you spoke with him?
A. When I stopped doing business with Safe Chain.
Q. And that was when?
A. Is that a question?
Q. Yeah, I asked you when that was.
A. March 2021.
Q. Okay. Dhruv Ralhan? Real person?

A. Yes.
Q. Where is he now?
A. I'm not sure.
Q. King Kimchi -- that's you also?
A. Yes, sir.
Q. Oh, Q.
Do you watch Star Trek?
A. No.
Q. Where did you get "Q" from?
A. Q is one of the suppliers.
Q. Who is Q?
A. A supplier.
Q. Yeah, but who is he really?
A. A runner.
Q. He's a runner?
A. Yeah, we call him a runner.
Q. Well, let's talk about that because there's different terms.
There's the term "runner." There's the term "supplier" that you used.
Tell me exactly who Q was.
A. In the street, we call him a runner.
Q. Okay.
A. In real business world, we call him a supplier.
Q. All right. How many suppliers did you have?

A. A few.
Q. How many?
A. Four or five.
Q. What were their names?
A. Alex, Danny.
Q. Wait, wait, wait, wait, wait, wait. Slow down.
We have Q?
A. Are you talking about the -- he was the main person, so...
Q. Here. Let's start a list.
Suppliers.
I don't know how to spell; so I apologize.
The first one is Q?
A. Correct.
Q. And could you please tell us what his real name was, or you don't want to?
A. I don't want to.
Q. Why not?
A. I want to tell how I make business -- how I call him all the time. This is the way I call him. That's the only way that I want to tell.
Q. Did the prosecutor Alex ask you what Q's real name was?
A. Yes, they did.
Q. And when the United States prosecutors from the Department of Justice were meeting with you and they said to you sir, you have to be honest with us, tell us what Q's name is, what did

you say?
A. This is his name, real name, Q. That's what I said, just like I'm telling you today.
Q. All right. But that's a lie; right?
A. What? That's not a lie. We called him a Q. How is it a lie?
Q. It's a lie because that's not his real name. That's what you call him, and you just admitted that you didn't want to tell us what his real name was. That's why it's a lie.
A. If I would call him by a different name, I tell you his name is that --
Q. But --
A. -- but the way I call him and the way, if I called him on the phone, and I tell him -- "Hey, Q." That's the way I know him, as Q.
Q. Most respectfully, sir, that's not the question. Now you admitted --
A. That's my answer. His name is Q, sir.
Q. You've admitted that you don't want to tell us the truth about his name.
A. It's not about that. I know his name is Q. It's not about telling the truth or not. I'm telling the truth. His name is Q.
Q. So you refuse to tell us his real name?
MR. POGOZELSKI: Objection.

A. His name Q. I do not refuse. If I refuse, I wouldn't even tell you what his name is.
BY MR. BARZEE:
Q. Where does Q live?
A. New York.
Q. Q lives in South Florida, doesn't he?
A. I don't know.
Q. You're protecting the head of a criminal organization.
A. Again, all I know where he lives is in New York. I don't know anywhere else.
Maybe he travels, but I'm not sure.
Q. Are you afraid?
A. No, I'm not afraid.
Afraid of what?
Q. I don't know. Getting shanked in prison, maybe.
MR. POGOZELSKI: Objection, Your Honor.
A. No.
THE COURT: Again, the lawyers ask the questions. The witnesses answer them.
A. No, sir, I'm not afraid.
BY MR. BARZEE:
Q. Well, then why not just be honest and tell us who is he?
A. I'm telling you right now his name is the way I know. That's the way I will present it.
MR. POGOZELSKI: Objection. Asked and answered on this

line of questioning.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You're here to try to get out of prison early; right?

A. Like I told you -- I told in court yesterday with the prosecutor I signed an agreement. They still could indict me on this matter, but they cannot use my words against me.

Q. I'm going to try it again.

You're here because you're trying to get out of prison early, aren't you?

A. Again, I'm telling you it's not for me to decide. It's for the judge to decide.

Q. I didn't ask you who decides.

I asked you if you were here because you're trying to get out of prison early?

A. I'm here to tell the truth. That's all. I want to -- I want to tell the truth what happened in this conspiracy.

Q. That's a lie, isn't it?

A. That's not a lie.

Q. So you're not here because you're hoping to get out of prison early? You're just here because you feel like telling the truth and unburdening yourself?

A. Yes.

Q. So your lawyer is never going to request a judge or the prosecutor to let you out early?

A. They might. They could. Why not?
I would love to go home tomorrow. Why not? Everybody wants to be free from prison.
Q. But that's not your purpose in being here or in testifying?
A. No.
Q. You're here because you just want to answer questions?
A. Yeah. I'm here because I received a subpoena, and I want to answer the subpoena. That's all.
Q. You're here under a subpoena?
A. Yes.
MR. BARZEE: Your Honor, may I request a copy of the subpoena from the Government?
THE COURT: Let's ask questions.
BY MR. BARZEE:
Q. When did you receive the subpoena?
A. A month ago. A month or two ago.
Q. Did you have a discussion with your attorney about something called a Rule 35?
A. He explained to me briefly.
Q. Where is your attorney? He was here yesterday; right?
A. He's supposed to be here, yes. He was here today too.
Q. He sat through all your testimony yesterday; right?
A. Yes.
Q. He's an attorney from New York City?
A. And Florida.

Q. You paid for him to be here?
A. Yes.
Q. You paid for him to be here today?
A. Yes.
Q. Did he talk to you about a Rule 35?
A. They [sic] explained to me how it works but...
Q. Well, let's talk about that.
He explained to you that if you cooperate with the United States, that the prosecutors could decide on their own, if they wanted to, to ask the judge to reduce your sentence; correct?
MR. POGOZELSKI: Objection. It's mischaracterizing --
THE COURT: It wouldn't be this judge.
MR. BARZEE: I'm sorry?
THE COURT: It wouldn't be this judge.
MR. BARZEE: No, it would be a judge up in New York that sentenced you.
MR. POGOZELSKI: And objection. Not these prosecutors.
THE COURT: It wouldn't be these prosecutors either.
MR. BARZEE: Let me ask the question again now that I've been corrected -- and I apologize.
BY MR. BARZEE:
Q. Did he explain to you that the prosecutors in New York, at the request of the prosecutors in Miami, could ask the judge in New York to reduce your sentence and let you out of jail early?
A. Just like you said, they could. If I say the truth and

it's not a lie, yes. Maybe yes. Why not?
Q. Why not. And that's what you're hoping for; right?
A. Everybody is hoping for the best for themselves.
Q. That case in New York we're talking about, where you're hoping "why not" to get out of jail early on, that's the case with all of the different clinics and the dozens of pharmacies that you opened; correct?
A. Correct.
Q. And in that case, when you were arrested, you pled guilty; correct?
A. Yes. I took my responsibilities.
Q. You accepted responsibility for committing that crime; right?
A. Correct.
Q. And the reason you accepted responsibility is because you are an upright citizen, who felt the need to accept responsibility; correct?
A. Yes, I did.
Q. It wasn't because there was an avalanche of evidence against you and you would be convicted if you attempted to go to trial?
A. Correct.
Q. You just decided, "Okay, I'll plead guilty?"
A. Yes.
Q. And then the judge up there in New York asked the probation

officer to interview you; correct?
A. Yes.
Q. And the probation officer came and they interviewed you to ask you questions about your background and about your finances.
Do you remember that?
A. Yes.
Q. And you refused to answer their questions about money; isn't that true?
A. I didn't answer some questions.
Q. You refused to answer a lot more than you answered, didn't you?
A. With the counsel of attorney, yes.
Q. You pocketed $17.5 million in that case?
A. That's what it says, yes.
Q. And then when the probation office asked you, "Hey, Peter -- Hey, Kim -- Hey, Alex, where is that $17.5 million that you stole," you refused to answer?
A. Again, I was part of the conspiracy that did $17 million. Me, personally, I did not took [sic] $17 million, but being part of it, yes, that's what happened.
Q. The court found that you personally pocketed $17.5 million, didn't it?
A. Right.
Is that Southern District or Eastern District?

Q. You can't keep them straight, can you?
A. No. I'm asking you.
MR. POGOZELSKI: Objection. Argumentative.
(Simultaneous speakers.)
(Reporter requests one speaker at a time.)
BY MR. BARZEE:
Q. It's a Southern District of New York.
Do you want to see the documents where the judge said you were responsible solely for personally pocketing $17.5 million?
A. Yes. I saw it. I saw it before. I don't have to.
Q. All right.
A. I want to tell you on that --
Q. Please tell me.
A. -- everybody signed that plea agreement. Every individual who was pleading guilty -- it was the same number. There was no change to nobody.
Q. "Khaimov pocketed approximately $17.5 million in illegal proceeds over the course of the scheme and then laundered the money through four different mechanisms to hide his involvement."
True or false?
A. True.
Just like I explained to you, everybody had to sign this plea. It's not me just personally. Every other person who was in that particular conspiracy.

Q. And then when you decided to cleanse your soul and accept responsibility and plead guilty, the court's probation officer asked you, "Peter, what did you do with the 17.5 million?" And you refused to answer the question; correct?
A. Again, with consult of my attorney.
Q. I'm not asking you why. I'm asking you whether or not it happened.
Did you refuse to answer the Court's question about what you did with the money?
A. Again, I'm going to tell you again, with the consult with the attorney, that's what happened.
THE COURT: It would go a lot quicker if you say yes or no and then you can explain the answer.
BY MR. BARZEE:
Q. So you refused to answer -- I mean, you refused to answer the question about where the 17.5 million was?
A. I just --
Q. Yes or no, and then you can explain?
A. Yes. With the consult with my attorney, yes.
Q. Okay. And is that the same attorney that's here today or that was here yesterday?
A. No.
Q. A different attorney?
A. Yes.
Q. And by the way, that case you pled guilty with a different

attorney, that's a case where you were sentenced to 15 years in prison; right?
A. Yes, sir.
Q. And then even though you pled guilty and had a plea agreement, you then filed a notice of appeal; right?
A. Yes. Yes.
Q. What were you appealing?
A. My sentencing.
Q. Because you thought it was unjust?
A. Yes.
Q. What did you think you should get?
A. Like everybody else did. Some got seven. Some got ten. Some got five. Some got two.
Q. What would be an appropriate sentence for you?
A. About seven.
Q. Seven?
A. Yes.
Q. And so you filed a notice of appeal. And how is that going?
A. I don't know any update as of today.
Q. You have a different lawyer handling the appeal?
A. Yes.
Q. Is it the same lawyer that was here yesterday?
A. No.
Q. How many lawyers are currently representing you?

A. A few.
Q. You haven't worked since 2023, I think.
How do you have all this money to pay for all these attorneys? Are they doing it for free?
A. Community members are helping me out.
Q. I'm sorry. Say it again.
A. Community members are helping me out. My parents are helping me out.

THE COURT: Is this a good spot to take a break?

MR. BARZEE: I think it is, Your Honor, yes, sir.

THE WITNESS: Yes.

THE COURT: All right. Members of the jury, we're going to recess for lunch. Remember my admonition not to discuss the case or allow it to be discussed in your presence.

I'm going to ask you to come back at 1:00. So have a nice lunch. We'll see you back at 1:00.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: If there's nothing else to come before the Court, we'll be in recess until 1:00.

MR. BARZEE: Thank you, Your Honor.

(Off the record from 11:54 AM to 1:00 PM, after which the following proceedings were had:)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Mr. Khaim, do you understand you're still under oath?

THE WITNESS: Yes.

THE COURT: Anything to come before the Court before we bring in the jury?

MR. POGOZELSKI: Your Honor, I would just object to the extent defense counsel continues reading from a sentencing memorandum in the New York case as hearsay, what the prosecutors there wrote in the sentencing memorandum. He shouldn't be reading from that.

THE COURT: I don't know. Maybe there's some relevance to it or maybe there's some way it could come in. If he does something inappropriate, you object, and I'll rule on it.

MR. POGOZELSKI: Okay, Your Honor.

THE COURT: Anything further?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, Your Honor.

MR. BARZEE: No, Your Honor.

THE COURT: If we have all the jurors, let's bring them in.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. Mr. Barzee, you may continue.

MR. BARZEE: Thank you, Your Honor.

BY MR. BARZEE:

Q. Welcome back.

I think when we left off, one of the things that you had testified to was that the $35 million in proceeds that you received for the purchase of the medications you sold didn't all go to you personally; is that correct?

A. You talking about the black market medications, right?

Q. Yeah. That -- well, whatever the medications were that you sold to Safe Chain.

A. Right.

Q. You sold approximately $35 million worth of products to Safe Chain; correct?

A. Correct.

Q. Okay. And that $35 million, I think you testified, didn't go all to you?

A. It went to me, and then I distributed it to distributors who brought me the medicine.

Q. Okay. So to whom did you distribute it?

A. To suppliers. We'll call it "runners."

Q. You distributed $35 million to people that you call runners?
A. Not 35. But most of it went to where I bought the medications from, yeah.
Q. Which runner received the bulk of the money?
A. Usually, about 35 to 40 percent went to runners. I cannot tell you right now which one was the main -- the main person was Q.
Q. Q was the main person?
A. Main --
Q. Yeah.
A. -- bigger supplier. I'm talking about the main person.
MR. BARZEE: Can I get the ELMO, please.
BY MR. BARZEE:
Q. Now, I want to see if we can chart this out a little bit.
You have runners.
Approximately how many runners do you think were involved in your criminal enterprise?
A. About six, seven.
Q. Six or seven runners?
A. Yeah, six, seven.
Q. So we'll call it R Number 1, R Number 2, R Number 3, R Number 4, R Number 5, R Number 6, R Number 7.
And you're here to testify truthfully about your criminal involvement in this conspiracy; correct?

A. Yes, sir.
Q. And the runners were part of that conspiracy; correct?
A. Excuse me?
Q. The runners were part of your criminal conspiracy; correct?
A. Yes, yes.
Q. Okay. So Runner Number 1, what was his name?
A. Q.
Q. Runner Number 2?
A. We called him T.
Q. Runner Number 3?
A. Ton.
Q. Tom?
A. Ton, T-O-N.
Q. What's Ton's last name?
A. Are we going to do last names or we're going the names? Which one?
Q. I would love both. So let's start over.
A. I don't have last names for you today.
Q. I'm sorry?
A. I do not have the last name for you today.
Q. Okay.
How about R Number 4?
A. Dan, D-A-N.
Q. Dan?
A. Yes.

Q. Do we know a last name for Dan?
A. For you, I have only the first name. I mean, what they call it on the street, that's the way I know.
Q. R Number 5?
A. Ack.
Q. Last name for Ack?
THE COURT: He said he doesn't know the last names.
BY MR. BARZEE:
Q. Of any of them?
A. I might know some, but I just don't want to provide that today.
Q. Well --
THE COURT: It doesn't work that way. If you know the names, you've got to give them, unless there's an objection.
BY MR. BARZEE:
Q. Let's start over.
What's Q's last name? Identify him now for the Court.
You've already told us that you know who is he. You didn't want to tell us who he was. Now, the Court is ordering you to tell us.
Who is Q?
MR. POGOZELSKI: Objection, Your Honor. We covered this earlier. Relevance.
THE COURT: He's saying he knows some of the last names now. I don't know that it's relevant. He says he knows some

of the last names but he doesn't want to say now.

It doesn't work that way.

BY MR. BARZEE:

Q. Who is Q?

A. Hernandez is his last name.

Q. Hernandez?

A. Yes.

Q. Exactly.

And that's the brother of Lazaro Hernandez; correct?

A. Who?

Q. The brother of Lazaro Hernandez?

A. I don't know who is Lazaro Hernandez.

Q. Lazaro Hernandez is the person that Gilead identified as the kingpin defendant -- isn't he? -- in the lawsuit that you were a defendant in?

A. I don't know exactly who Lazaro Hernandez is. I never met him in person.

Q. I didn't ask you if you met him in person.

I'm saying the name Lazaro Hernandez, an individual from the Southern District of Florida here in Miami, who was named as a kingpin defendant by Gilead in the lawsuit that you are a defendant in.

You know that name, Lazaro Hernandez, do you not?

A. I understand who you're talking about, but I never know who that person is.

THE COURT: The question was is he the brother of Q?
THE WITNESS: Are you asking me a question, or are you telling me he's the brother?
THE COURT: That's a question.
Is he a brother of Q?
THE WITNESS: No, he's not.
BY MR. BARZEE:
Q. You met with these prosecutors on August 27th; correct?
A. Excuse me?
Q. You met with these two prosecutors on August 27th of this year, did you not?
A. August 27th?
Q. Would looking at the report of their interview with you refresh your memory?
MR. BARZEE: May I approach, Your Honor?
THE COURT: He's got to say it's going to refresh his memory.
A. I need to refresh my memory, yeah.
Okay. Yeah.
BY MR. BARZEE:
Q. And in that interview, you told these two prosecutors --
MR. POGOZELSKI: Objection, Your Honor. Reading from the interview report and not his statements. This was the subject of the motion in limine.
THE COURT: He can ask the question. He can't read

from the report.
Ask your question.
BY MR. BARZEE:
Q. You told these two prosecutors that you were dealing with somebody named Q; correct?
A. Yeah. I dealt. Not dealing. I dealt.
Q. And you told these prosecutors that Q was the brother of another individual; correct?
A. He has a brother, another individual, but not the person who you said before.
Q. Who is Q's brother?
A. Ton, Number 3.
Q. It's not the kingpin defendant Lazaro Hernandez?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. How about Runner Number 6?
A. What about him?
Q. What is his name, sir?
A. Tariq (phonetic).
Q. Tariq?
A. Tariq.
Q. Does Tariq have a last name?
A. I don't know his last name.
Q. How about Runner Number 7?

A. Number 7 was Al -- Alex.
Q. Does Alex have a last name?
A. I'm sure he has, but I don't know his last name.
Q. So you don't know Alex's last name. You don't know Tariq's last name. You know Ack last name, but you don't want to tell us?
A. I know most -- this guys: Number 3 and Number 1, mostly.
Q. Okay. So Number 1 we established --
A. Yes.
Q. -- we got Hernandez.
A. Number 3 is his brother.
Q. Say it again?
A. Number 3 is his brother.
Q. So somebody named Ton Hernandez?
A. Yes.
Yes.
Q. Where does Ton Hernandez live?
A. Ton.
Q. Where does he live?
A. What I know -- I never went in his home; so I don't know where he live at.
Q. How much money did you pay to Q?
A. I don't know exactly.
Q. Roughly? Ballpark?
A. Millions. That's what I can tell you.

Q. You don't know the guy -- millions?
A. Millions.
Q. Millions.
A. That's my answer.
Q. How did you pay him millions of dollars? How did you channel Runner Number 1 -- by the way, the runners are people that you claimed are out on the street, buying medicine from patients; correct?
A. Yeah.
Q. And bringing medicine in bags, and this guy made millions?
A. Exactly.
Q. All right.
A. Just the way that you just said it.
Q. How did you pay him?
A. Millions. That's what I know.
Q. In cash?
A. Cash, checks, different ways.
Q. How much cash?
A. It was a lot of cash. It was a lot. It was a lot.
Q. And you reported all that cash to the IRS, huh?
A. Yes, I did. You can get my tax returns.
Q. Okay. How much -- so millions. But we don't know how many millions?
A. Millions.
Q. How much did you pay to R2? T?

A. I never calculated how much I paid each individual.
Q. Ballpark.
A. I can't even answer that. I don't want to be a liar.
Q. Okay. So the only one out of these seven runners that you have any knowledge of paying any amount, knowledge of the amount that was paid is Q, and that answer is millions?
A. Millions.
Q. All right. Did you pay anybody else in association with this crime?
A. Everybody who you put on the chart.
Q. Okay. We just don't know how much?
A. I don't know the numbers, no.
Q. All right. Who else was paid?
A. Everybody.
Q. Who else that's not on this chart that got paid?
A. As a runner or --
Q. As anything. Who else got money?
A. Mike Zangari got money.
Q. Hold on. Let's do it one at a time.
A. Yeah.
Q. How much did Zangari get?
A. I also do not know the numbers.
Q. I'm sorry?
A. I don't recall the number.
Q. Is it also millions?

A. I cannot tell you exactly.
Q. Hundreds of thousands?
A. I know thousands, but I'm not sure about hundreds.
Q. Who else?
A. The IRS got paid.
Q. Who?
A. The IRS.
Q. Oh, the IRS. But they're not a criminal coconspirator, are they?
A. They're not. They're not, no. They're not. They got millions.
Q. Okay. Who else other than the IRS?
A. That's what -- I don't recall anybody else right now.
Q. Did Adam Brosius make any money from you? Did you pay him?
A. Personally, no.
Q. Did you pay somebody to pay Adam?
A. No.
Q. Are you sure about that?
A. Yeah. Yeah, I'm sure.
Q. Did you pay -- let's go through those names that I asked you about before.
How about Dhruv Ralhan? Did he get paid?
A. He was under Mike Zangari.
Q. Did you pay him anything?
A. Maybe there was some kind of, like -- I don't know -- a

couple of thousand here or there.
Q. Okay. So you did pay him a few thousand?
A. Yeah.
Q. What about --
A. Ishbay got paid.
Q. Who did?
A. Ishbay Shukurov got paid.
Q. How much did he get paid?
A. I also don't know the amounts.
The landlord got paid.
Q. Who?
A. The landlord.
Q. Was your landlord part of the criminal conspiracy?
A. You asked me who got paid. I'm telling you who got paid from that money.
Q. And I'm asking you whether or not your landlord was part of the criminal conspiracy?
A. No.
Q. All right. Why don't we confine it to people that were acting in a criminal capacity on your behalf.
Okay?
A. Okay.
Q. Adam Brosius told you to cut Zangari out of the deals; correct?
A. Right.

Q. Because you and Adam Brosius felt that Zangari was making too much money; right?

MR. POGOZELSKI: Objection about how someone felt.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You two discussed the fact that Zangari was making too much money, and so you decided to cut him out; right?

A. It's not about that. They were asking me to lower the pricing of the product that we sell to Safe Chain Solutions.

Q. Right.

A. And they were asking me, asking me to lower so they could make more money.

Q. When you say "they," who are you referring to?

A. Adam Brosius, Charles Boyd.

And so I had to tell him that, excuse me, I have Mike Zangari under my shoulder; that he's getting paid from me --

Q. Only --

A. And they never knew about that Mike Zangari was getting paid from me too. And they said you have -- and then what's his name? Adam said I got to call you back. I guess they were chatting with Charles and others to get involved in the situation of what happened.

And then he called me back and said you have to cut. We're taking care of him ourselves and lower the number. And that's

what happened.
Q. So you cut Zangari out of the deal?
A. Yes.
Q. You paid Dhruv Ralhan money?
A. After when Mike left, no.
Q. After what?
A. After Mike was cut out of the deal, no.
Q. What about before you cut out Mike, were you paying Dhruv?
MR. POGOZELSKI: Asked and answered, Your Honor.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Were you paying Adam Brosius?
A. No.
Q. Did you ever pay Charlie Boyd anything?
A. Personally, no.
Q. Did you ever pay Patrick Boyd anything?
A. No.
Q. Earlier we had talked about pharmacies that you had opened; correct? Do you remember that?
A. Correct.
Q. Now, I want to ask you the names of some pharmacies to see if it might refresh your memory as to whether or not you opened up these particular pharmacies.
Okay?
A. Sure.

Q. Spring RX?
A. Spring RX, correct.
Q. That was a pharmacy?
A. It refreshed my memory. Yes, it refreshed my memory.
Q. So that was a pharmacy that you owned and controlled?
A. Not only me. Part of the conspiracy, yes, you're correct.
Q. Part of your criminal organization?
A. Correct, yes.
Q. Zone Pharmacy?
A. Correct.
Q. GAF Pharmacy?
A. Correct.
Q. Monopaul (phonetically) Drugs?
A. Correct.
Q. We had already talked about LPM Pharmacy; correct?
A. Correct.
Q. Sterling Drugstore?
A. Correct.
Q. SEY Drugs?
A. Yes.
Q. JPRX?
A. Correct.
Q. Merrick RX?
A. Correct.
Q. IVS Pharmacy?

A. Correct.
Q. 1105 JTP LLC, Genome Pharmacy?
A. Correct.
Q. Malvina Drug Corporation?
A. Yes, sir.
Q. Merrick Wellness?
A. Yes, sir.
Q. So your memory is refreshed now to all of those?
A. Whenever you tell me the names, of course, it's refreshing.
Q. Okay. You've got a lot of experience in the pharmacy business?
A. Yes, sir, I do.
Q. You even talked on direct yesterday about purchasing medicines for your pharmacy from Cardinal; correct?
A. I did not personally purchase, but the pharmacy usually would purchase the medicine from Kinray, not Cardinal.
Q. Right. Before? The previous names?
A. Right.
Q. Each pharmacy that you controlled or that your criminal organization controlled had to have what's called a PIC; correct?
A. What's a PIC is?
Q. Pharmacist in control.
MR. ZIMET: In charge.
MR. BARZEE: In charge.

Thank you.

BY MR. BARZEE:

Q. Pharmacist in charge. It's a requirement from the board of pharmacy. Each pharmacy has to have a pharmacy -- a pharmacist in charge listed.

A. Supervisor of pharmacy, it's called.

Q. Yeah.

A. Yeah.

Q. Somebody with a license?

A. Correct.

Q. All right. So for each one of those pharmacies, you had to hire a pharmacist with a pharmacist's license?

A. Yes, sure.

Q. And did all -- were all of those pharmacists coconspirators in your criminal organization?

A. No.

Q. So you were duping the pharmacists?

A. What do you mean by "duping?" I don't understand.

Q. "Duping" means you were not being honest with them. They thought they were going to work at a legitimate pharmacy, filling prescriptions for the lady on the corner, but in truth, you were using them as a front for your criminal organization. That's duping.

A. No. They have been doing their work as how usual pharmacists would do the work -- distribute the drugs. No

pharmacy needs to know what I do with the funding of that pharmacy -- how I distribute or what I do with that, whether I'm money laundering or anything else. You don't tell that situation. As long as they do their job, that's all.
Q. Did you tell the Government that you didn't know what a T3 was until April or May of 2020?
A. Excuse me?
Q. Did you tell the Government -- did you tell these two prosecutors that you had no idea what a T3 was until April or May of 2020?
A. I really didn't have any idea what T3 was, until I was working with Safe Chain.
Q. Prior to working with Safe Chain, you had already established control over dozens of pharmacies?
A. Yes.
Q. You had hired pharmacists in charge of each one of those dozens of pharmacies?
A. Yes.
Q. You're the one who was controlling those pharmacies and making all the money?
A. Again, as finances about those pharmacies, yes; but as giving the drugs to the patient, no, that's not my job.
As of getting where the drugs come from, that wasn't my job also. That was their job. They're the ones who were purchasing and giving -- and giving medications to the people.

Q. So you want us to believe that the first time you ever heard that there was a legal requirement for T3s or pedigrees was in April or May of 2020?

MR. POGOZELSKI: Objection. Asked and answered. Argumentative.

THE COURT: Sustained.

BY MR. BARZEE:

Q. I want to ask you about some other businesses other than pharmacies.

A. Go ahead.

Q. Thank you.

A&P Holdings --

A. Yes.

Q. -- tell me what that is.

A. A construction company.

Q. Who owns or controls that construction company?

A. I do.

Q. And what did that construction company do?

A. Construction. What construction means.

Q. Well, construction usually means building things in a legitimate way, not a fence for criminal enterprise.

MR. POGOZELSKI: Objection. Argumentative.

THE COURT: Sustained.

BY MR. BARZEE:

Q. Did you use that A&P Holdings to commit crimes?

A. I would give money to that company from criminal enterprises, yes.
Q. To launder money?
A. Yes.
Q. So it wasn't just a construction company, was it?
A. I told you you do -- you know, it's like doing business in a gray area. I didn't do --
Q. Money laundering isn't a gray area, sir.
A. I understand that I did some business bad, some business --
Q. Yeah.
A. That's what I did, and that's why I'm paying the consequences.
Q. Okay. How about New Business Funding?
A. Right.
Q. Tell me about that.
A. There was a funding company to lend money to --
Q. Can you speak into the microphone, please?
A. That was a funding company to lend the money to the businesses.
Q. I'm sorry. Say it again slowly.
A. A lending company --
Q. A what company?
A. -- that funds the money to the businesses.
Q. Legitimate or criminal?
A. Criminal.

Q. Okay. K&L Consulting Inc?
A. Yes.
Q. Yes what?
A. It's a consulting group.
Q. Who did you consult?
A. Consulting company.
Consult doctors and pharmacies what to do.
Q. And you own this corporation?
A. Yeah.
Q. And so you owned a consulting corporation that would consult doctors and pharmacies, but you don't know what a T3 is?
A. No.
Q. What did you consult them on?
A. Like I told you before, what I did with the doctors, working for our -- for our clinics, and tell them what to prescribe the medicine to the patients.
Q. Legitimate?
A. No.
Q. Criminal?
A. Correct.
Q. So when you say it's for consulting, that's not true?
MR. POGOZELSKI: Objection. Argumentative. Asked and answered.
THE COURT: Sustained.

BY MR. BARZEE:
Q. Neptune Human Services? Does that ring a bell?
A. Yes.
Q. Is that a legitimate corporation that you opened that provided human services?
A. That was -- I did some work with -- for people -- homeless people in shelters. And that's how I created this company.
Q. So tell us about that. You did what for homeless people?
A. I helped them to get -- rent apartment.
Q. So you opened up a corporation to help homeless people rent apartments?
A. Yes.
Q. How did that work?
A. Just go around and whoever needed homes, I would go around and find them homes to rent, apartments.
Q. Well, you need money to rent an apartment; right?
A. That's the way they -- I would be in, like, a brokerage type of thing to find them homes, connect them with the programs.
Q. What programs?
A. It's called FHEPS programs out of New York.
Q. So this was a philanthropic endeavor that you decided to undertake?
A. Excuse me.
Q. This was a philanthropic endeavor that you decided to

undertake?
A. What does that mean?
Q. That means you decided to do this for the good of society, to help your community by helping homeless people get permanent housing?
A. Correct. Yeah, why not? And I did it, and I made some money on that too.
Q. Oh, you made money out of it?
A. Yeah.
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Overruled.
BY MR. BARZEE:
Q. How did you make money out of it?
A. As a broker. They pay you as a broker.
Q. Who paid you? The homeless people?
A. No. Like I told you, it's some kind of agency that you just --
Q. How much money did you make?
A. I made about one -- for one person, you make about $1,000.
Q. And how many did you house?
A. About 20 or 30 people. It wasn't big.
Q. So wait a second. That's big to me.
You made 20 or $30,000 helping homeless people find permanent housing?
A. It was only once 20 or 30,000. It wasn't easy work.

Q. It was all -- you got paid one time?
A. No. It's a thousand, thousand, thousand. It was a lot of work that needs to be done, and I quit it.
Q. Are you being truthful right now?
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Sustained.
MR. POGOZELSKI: Badgering the witness.
THE COURT: Sustained.
BY MR. BARZEE:
Q. New Business Resources -- was that a philanthropic endeavor as well?
A. If you want to call it that way, yes.
Q. Tell me: What did it do? Who did it help?
A. Open new businesses.
Q. I'm sorry?
A. Opening a new businesses. I'm saying like a new pharmacies. New clinics.
Q. So it was a corporation that you created?
A. Correct.
Q. To do what? To consult with other people who wanted to open pharmacies?
A. No. They would be under my umbrella. I would help them, and that's how we got paid.
Q. So you would teach people how to open pharmacies?
A. Not teach. All the pharmacies that you just told me, it

was under that -- all these businesses.
Q. Oh, so it wasn't legitimate. It was part of a criminal enterprise?
A. That's what I was saying, yes.
Q. Okay. So A&P Holdings is criminal. New Business, criminal. K&L, criminal. Neptune -- that was just to help homeless people. New Business Resources, criminal?
A. Yes.
Q. How about P&K Marketing?
A. I did some marketing.
Q. Oh, for who?
A. For the pharmacies.
Q. The pharmacies that I mentioned that you owned?
A. Correct.
Q. Why would you have to open up a corporation to do marketing for pharmacies that you already own?
A. So they could pay me money to my companies.
Q. So you could pay yourself?
A. Correct.
Q. Why did you need to pay yourself? If you already had the money, why would you have to --
A. It has to go through my company.
Q. Why?
A. That's how I did it.
Q. Because you were laundering proceeds of criminal activity;

right?
A. If you want to call it that way.
Q. Well, I want the truth.
A. That's what I say. I confirmed it. No?
Q. I guess.
A. That's it.
Q. So that wasn't a legitimate company. That was a criminal enterprise?
A. Correct.
Q. New Capital Resources -- what did that company do?
A. It's just similar as New Business Funding.
Q. Was it a legitimate corporation, sir, or was it just a shell for your criminal enterprises?
A. Correct.
Q. When you say "correct," that means yes?
A. Yes.
Q. ABEACQ LLC?
A. That wasn't my corporation.
Q. That's not yours?
A. No, that was not mine.
Q. Who owns that one?
A. It was somebody else.
Q. Who?
A. My brother.
Q. Ah-hah.

MR. POGOZELSKI: Object to the --

BY MR. BARZEE:

Q. Was that criminal as well?

A. I'm not sure. You got to ask him.

Q. We'll put a question mark on that one.

A. Okay.

Q. Do you know what it did? What that corporation did?

A. I told you I'm not sure. You have to ask him.

Q. Okay. How about Make It Happen Marketing?

A. That's not my corporation.

Q. No, but you paid that corporation over $1 million from Boulevard during the time frame that we're talking about, and I'm wondering why you gave them $1 million.

Could you tell us?

A. Yeah, sure.

Q. Tell us: Why did you give them a million dollars of your money?

A. To buy black market medications.

Q. So who controls Make It Happen Marketing?

A. Q.

Q. Ah.

MR. POGOZELSKI: I'm going to object to all these argumentative, commentary exasperations.

THE COURT: Sustained.

BY MR. BARZEE:

Q. In addition to all the consulting and the criminal organization, you also advised coconspirators on how to handle their lies to the United States; correct?
A. Incorrect.
Q. Incorrect?
Did you ever instruct a potential witness in a case not to talk to the feds?
A. I told him not to speak to anyone.
Q. Who -- who are you talking about?
A. Albert Alishayev.
Q. Hold on. That's a new name for me. Give it to me again.
A. Albert.
Q. Albert, last name?
A. A-L-I-S-H-A-Y-E-V.
Q. Is he related to you?
A. No.
Q. And why were you telling him not to talk to anybody?
A. I heard there was an investigation, and I just told him don't talk to nobody. That's all.
Q. You knew he was a cooperating witness?
A. I did not know at that time, no.
Q. You went to his house?
A. I did not went to his house in particular. I drove by his house, and I saw him, and I honked him for him to come, and that's all.

Q. You threatened him?
A. No, there was no threat.
Q. You had over half a dozen pharmacists in charge in all those different pharmacies; correct?
A. One more time.
Q. You had at least a dozen, maybe more, pharmacists in charge of each one of those pharmacies; correct?
A. Yes.
Q. And you told those pharmacists to lie to the FDA and to state inspectors?
A. No, I never told the pharmacists to lie.
Q. The pharmacists had to say that they worked at the pharmacy for 40 hours a week, but that wasn't true. You instructed them to lie to the FDA. They weren't there for 40 hours a weeks, were they?
A. They never had to lie to the FDA.
FDA would never ask you how many hours you work. Nobody would come and ask you how many hours you work. This was a pharmacist's choice if he worked. If he works, he works. If he doesn't want to work, he doesn't work.
Q. Let's talk about the money, the millions of dollars and where it went.
Okay?
A. Sure.
Q. You used money to pay your own personal expenses?

A. Yes.
Q. Mortgages?
A. Yes.
Q. On multiple properties?
A. Yes.
Q. Tuition for your children?
A. Yes.
Q. Mercedes-Benz?
A. Yes.
Q. You purchased multiple properties?
A. Yes.
Q. You renovated multiple --
A. Yes.
Q. -- properties?
409 Rockaway Avenue?
A. Yes.
Q. Do you still own that?
A. Yeah.
Q. You haven't given that to the United States?
A. No, just a lien on it. Yeah, not yet.
Q. What are you waiting for?
A. I'm in prison.
Q. So you're in prison. How many lawyers are currently on your payroll?
A. They're not on a payroll. Each case goes individual.

Q. How many lawyers are you currently paying under retainers?
A. They're all paid.
Q. How many lawyers are currently representing you in one way or another?
A. One.
Q. I'm sorry?
A. One -- two. But they're all paid.
Q. 3506 Neptune Avenue.
A. Yes.
Q. What is that? A house?
A. Yes.
Q. You own that?
A. Owned.
Q. Owned that, past tense?
A. Yes.
Q. You sold it?
A. Yes.
Q. For how much?
A. I don't remember. Seven something.
Q. Seven million?
A. Seven hundred something.
Q. 700,000.
What did you do with that 700,000?
A. Spent it.
Q. On what?

A. Personal.
Q. You have expensive taste.
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: Sustained.
BY MR. BARZEE:
Q. 3508 Neptune Avenue -- is that the house next door?
A. Yes.
Q. Do you still own that one?
A. No.
Q. Sold it?
A. Yes.
Q. How much?
A. I think it was three houses was sold for -- I'm not sure how much, but I had a partner in that. My partner took half, and I took half.
Q. Who was your partner?
A. A guy named Ariel.
Q. Ariel?
A. Yeah.
Q. Last name?
A. The last name starts with B, but I don't remember how to -- Beggin, something. I don't recall exactly.
Q. Did we talk about 3514 Neptune Avenue?
A. That's what I'm talking about, yes.
Q. So you owned that whole block, huh?

A. No, the block was a lot of houses. Only three of them.
Q. You owned a company called A&P Holdings?
A. Yes.
Q. Tell me about that company, A&P Holdings. What did that company do?
A. Construction.
Q. Oh, that was the construction company?
A. Yes, sir.
Q. How about something called Sign and Drive Auto GRP?
A. That was a guy who was doing cars -- something with cars.
Q. Okay. That's a guy who was doing something with cars, and did you have involvement with that guy or with the cars?
A. No. We just laundered the money through that entity.
Q. So that was someone that you were using as a money launderer?
A. Correct.
Q. Did you have any ownership interest in that company?
A. No.
Q. Did you control it?
A. No.
Q. You just used it?
A. Correct.
Q. Transport on Wheels?
A. Same thing.
Q. Same as Consulting and Trading Inc.?

A. Same thing.
Q. You recall the name of a law firm Wyszynski?
A. I know about that one, but I never used them.
Q. You never used that law firm?
A. No.
Q. How much money did you pay that law firm?
A. I just told you I never used them.
Q. I know you didn't use them, but you paid them over $150,000; didn't you?
A. That was a coconspirator in my case, they did.
Q. At your direction?
A. No.
Q. Why did your coconspirator pay a law firm $150,000?
A. There was their share. They wanted to do what they want, so they did that.
Q. How many police officers did you pay?
A. One.
Q. How many 911 operators did you pay?
A. Again, that wasn't my work procedures, but in my organization, that was people -- that's what they did.
Q. How many nurses did you pay?
A. The same thing.
Q. When did you stop selling HIV medicine that you were acquiring from Runner Number 1, 2, 3, 4, 5, and 6?
A. One more time.

Q. I'm sorry?
A. One more time.
Q. When did you stop selling Gilead HIV medicine that you were receiving from different runners? When did you give up your criminal activities?
A. About six to seven months.
Q. Let me help you with some dates, if I may.
A. Go ahead, yeah.
Q. In your case in the Eastern District of New York, you were sentenced on June 27th of 2024; correct?
A. Right.
Q. And in that case, the judge ordered you to pay $18 million in restitution; correct?
A. Yes.
Q. And by the way, that order of restitution -- the 18 million that the judge ordered you, do you remember who you were supposed to pay that to?
A. No.
Q. It's to Medicare, isn't it?
A. I don't know who to pay.
Q. Would looking at the order of restitution refresh your recollection as to who you're supposed to pay?
A. Yeah. My lawyer never told me -- never told me who to pay, how to pay.
Q. Medicare or Medicaid, earlier in your testimony you said,

"Oh, I stole from insurance companies."
A. Yeah.
Q. Not from the United States or not from citizens?
A. Right.
Q. Do you consider Medicaid and Medicare to be part of that insurance, or do you consider that to be a government program?
A. After that would happen, I understand that was a government. Before, I thought it was the insurance.
Q. Okay. So earlier when you testified that you stole from insurance, that wasn't true, was it?
A. No. Before when I was working, I thought it was insurance. That's why I was working with my coconspirators.
Q. Yeah, but --
A. Can I finish, please?
Q. Please. I'm sorry.
A. Then when I was arrested, I was understanding that it was coming from government insurance as Medicaid and Medicare.
Q. So this morning when you testified that you had stolen from insurance companies, you meant Medicaid and Medicare?
A. Correct, yes.
Q. Oh, okay. So that was June 27th of 2024?
A. Yes.
Q. And then in August 21st of 2024, you were ordered by the court in the Southern District of New York to pay $46 million in restitution; correct?

A. Correct.
Q. And right in the middle of those two --
A. Who do I have to pay for that one? For the 46 million?
Q. Why don't you check with your attorneys. Okay?
A. You told me about the Medicare. Now you cannot tell me about this one?
Q. Pay the court.
A. Huh?
Q. Just pay it directly to the court.
A. The court?
Q. Yes.
MR. POGOZELSKI: Objection. Argumentative.
A. Got it.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Right in the middle of all of that --
MR. POGOZELSKI: Objection to --
MR. BARZEE: I apologize.
BY MR. BARZEE:
Q. In the middle of all of that, on June 17th of 2024, you got sued for the second time by Gilead; correct?
A. Correct.
Q. And Gilead had sued you before as a result of the sales that you made to Safe Chain; right?
A. Correct. They sued me, but I was not a part of it. I was

not operating that place as where the suit was coming from.
Q. I'm sorry. Say that again, sir.
A. The second suit, I was not part of it.
Q. You were not part of what?
A. I was not part of it. I wasn't working at that time, but they did sue me, yes, you're right.
Q. But you're saying that the Gilead lawsuit that was filed right in the middle of these two criminal cases, that alleged that you were continuing to sell their HIV medicine, even after the first lawsuit in violation of court orders and in contempt of court, that you're innocent of that?
A. I told you again -- and the second suit, I was not working at that time. That was somebody else that was working. I was not working.
Q. So you didn't do any of the things that they alleged in that second lawsuit?
A. No. I did not work at that time, and they had no proof that I did work.
Q. Gilead got an order from a judge to go to your house and search your house?
A. Yeah, and they find nothing, and there was no proof that I was working. You're right about that, yeah.
Q. What are you looking at down there?
A. Nothing.
Q. Are you doing --

A. I want to look down.
Q. Okay.
A. Thank you.
Q. You said they didn't find anything?
A. No.
Q. Are you sure about that?
A. Yes.
Q. Didn't they recover $200,000 in cash stuffed in a suitcase that was hidden under a mattress?
A. That was wrong. You just tell me wrong. It was not under the mattress. It was in the kitchen cabinet.
Q. I apologize.
A. Yeah, you apologize. You say the wrong stuff. Tell the truth. You're in court.
Q. You're right.
A. Are you under oath?
Q. They found $200,000, not under a mattress. It was in a kitchen cabinet.
A. Yes. It was personal money.
Q. Personal as opposed to what?
A. Family money. Savings.
Q. Savings from what?
A. Savings.
Q. I heard savings.
A. That's it.

Q. Well, that's not it, sir. Where did the --
A. Family savings.
Q. Whose family?
A. My family.
Q. How did your family save $200,000?
A. It's irrelevant. It's family savings. My wife was working. I was working in my life, and that's our savings.
Q. Your wife filed an affidavit saying that she had no money.
A. Who?
Q. Your wife.
A. I did not.
Q. No. Okay, so --
A. Me, my wife, and others who live with me, that's considered my family. It's my money. It's my family's money. That's it. Thank you.
Q. Did you tell Prosecutor Alex or Prosecutor Jackie that you had $200,000 in cash hidden in your house?
MR. POGOZELSKI: Objection, Your Honor. To him pointing at us repeatedly throughout the questioning.
A. Again --
THE COURT: On those grounds, overruled.
A. Don't lie. Don't say "hide." I did not hide.
BY MR. BARZEE:
Q. Where was it?
A. I told you it was in the kitchen cabinet. It was not hide.

Q. Okay.
A. Don't say --
Q. All right.
A. -- hide.
Q. I won't say it.
A. Please, thank you.
Q. In the kitchen cabinet.
Did you tell the prosecutors that you were keeping $200,000 in cash in kitchen cabinets?
A. It was never a question.
Q. Did you reveal it to them?
A. No.
Q. Did you tell them about all of the crimes that you have confessed to today and yesterday?
A. Yes.
Q. They knew about all of this?
A. Yes.
Q. Now, it's my understanding that you have not been charged with any of this offense conduct related to the sale of all of these HIV medicines; is that correct?
A. As of today, no. But they could.
Q. They could what?
A. They could charge me.
Q. And if they did charge you, you would be looking at how much time?

A. I'm not sure.
Q. Did you talk to attorneys about it?
A. No. I don't even want to think about it.
Q. Well, is it fair to say that if you were convicted of dealing in all of this in a criminal case, you would be looking at, most likely, about 20 years in prison?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: If he knows.
MR. POGOZELSKI: He already said --
A. I'm not sure, sir.
BY MR. BARZEE:
Q. That sounds about right, though, doesn't it?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. And you haven't been charged at all?
A. For this case, no. Like I told you, they could charge me.
Q. You're hoping that they don't?
A. I hope so.
Q. And you're hoping that they don't charge you because you are helping them with their case against Patrick Boyd and Charles Boyd?
A. No, that's not correct. They could have charged me before.
Q. And why didn't they?
A. I have no idea.

Q. And so you're not here to curry favor with the Government in hopes of not getting charged. You're just here out of the goodness of your heart?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. Are you familiar with 65-16 Fleet Street?

A. Yes.

Q. What is that?

A. That used to be my house.

Q. When did you sell that house?

A. A while ago. While I was in prison.

Q. How is that possible? You sold a house while you were in prison? How did you do that?

A. My wife sold it.

Q. Your wife sold the house?

A. Yeah.

Q. How much did she sell it for?

A. I don't recall the number.

Q. It was about 4 million? 5 million?

MR. POGOZELSKI: Objection.

THE COURT: Sustained.

A. No, that was not 4 or 5 million.

BY MR. BARZEE:

Q. Okay. What was it?

A. It was, I don't know. It was one something.
Q. And so it was sold within the last year?
A. Yeah. Within the last year, yes.
Q. Was that house purchased with proceeds of criminal activity?
A. No.
Q. Where did the money for that house come from?
A. I worked in my life, savings.
Q. Doing what?
A. Family helpings.
Q. Well, prior to all of the criminal activity we've discussed --
A. Yes.
Q. -- my understanding is you were a taxi driver for about a year?
A. Yeah.
Q. A barber for about a year?
A. More than a year, barber. A couple of years.
Q. Two years?
A. Two years.
Q. And a coffee shop that didn't do that well?
A. I did some money. I saved some money, yeah.
Q. And that was back --
A. And I sold the coffee shop. I made money with that also, and that's how I put this together and put a down payment on

that house, yes.
Q. Those businesses -- taxi driver, barbershop guy, and coffee shop --
A. Yes.
Q. -- that was 15 years ago?
A. Yeah.
Q. When was this house purchased?
A. Over 15 years ago, yeah.
Q. B&O --
A. More than about -- I'll tell you, about eleven -- ten years. Go ahead.
Q. Eleven or ten years ago?
A. Eleven or maybe twelve. I'm not exactly. I can't tell you exactly the number.
Q. Well, you've already testified that the criminal enterprise began as early as 2013 or 2014; correct?
A. Don't say '13.
'14.
Q. '14.
A. Correct.
Q. You got it.
'14.
A. Yeah.
Q. So that's -- what? -- 11 years ago?
A. Correct.

Q. And you bought that house, 6516 Fleet Street, how many years ago?
A. 11 years ago -- 12 years ago.
Q. Twelve.
A. Yes.
Q. B&O Estates?
A. Yeah.
Q. "Yeah," what?
A. What about it?
Q. What is it?
A. It's a house.
Q. Did you buy that house?
A. Yeah.
Q. When did you buy that house?
A. I don't remember. I don't recall the date exactly.
Q. Roughly?
A. Five -- six years ago.
Q. How much did you pay for it?
A. About 2 million.
Q. And do you still own it?
A. Still own it as of Tuesday, yes.
Q. Why haven't you given it back to the Government?
A. We're working on it. Everything takes time.
Q. Okay.
A. Business to build, it takes time. Everything takes time.

Q. Okay. Is that 6936 Dartmouth Street?
A. Correct.
Q. How about 214 Jamaica LLC?
A. What about it?
Q. Tell me what it is.
A. It's a commercial space.
Q. How much is it worth?
A. Two point something million.
Q. Do you still own that?
A. Not me but somebody.
Q. Who?
A. My mom.
Q. So you used your own mother as a straw owner of properties that you purchased with illegal funds?
A. No. I gifted her.
Q. So you gave your mother a commercial property that you purchased with criminal proceeds?
A. Yes.
Q. Does your mother know that you bought that with criminal proceeds?
A. No, she doesn't.
Q. Are you going to give that back to the government?
A. We're talking about it.
Q. You're talking about?
A. We -- we're working on it. Like I told you that before,

we're working on it.
Q. Does that mean you're negotiating with the Government?
A. We're working on it.
Q. What does that mean, "working?" Tell me.
A. I have a Gilead case. We're working with Gilead. They we're working. It takes time for everything. Gilead wanted to take all the stuff. I have all the liens from the Gilead. How can I give it to the Government?
Q. Well, it's not yours; right? It's either Gilead's or the Government's; right?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Does your Mom know you're going to have to give that back?
MR. POGOZELSKI: Objection. Relevance.
THE COURT: Sustained.
BY MR. BARZEE:
Q. How about the Khaim Family Irrevocable Trust?
A. What about it?
Q. How much money is in there?
A. I have no idea.
Q. I'm sorry?
A. I don't know as of right now.
Q. What's the last amount that you could remember?
A. I don't recall it.

Q. Over one million?
MR. POGOZELSKI: Asked and answered, Your Honor.
THE COURT: Overruled.
A. I don't recall it.
BY MR. BARZEE:
Q. You don't remember if you have a million dollars in a trust?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
A. There's no money in the trust.
BY MR. BARZEE:
Q. It has no money, you're testifying?
MR. POGOZELSKI: Objection. Asked and answered.
A. It has the property --
THE COURT: I keep sustaining the objection, and he keeps answering.
Overruled.
BY MR. BARZEE:
Q. What did you say, Peter?
A. It has a trust under the property.
Q. Can you please speak into the microphone? Say it again so we can hear it.
A. It's a property owned under trust.
Q. It's a property.
A. Yes.

Q. What is the value of the property?
A. I don't know.
Q. Who lives in the property?
A. My family.
Q. What's the approximate value?
A. I have no idea.
Q. Over a million?
A. I'm not sure.
Q. Do you think it's over a million?
MR. POGOZELSKI: Asked and answered, Your Honor.
THE COURT: Sustained.
MR. POGOZELSKI: And if we could instruct the witness not to answer.
THE COURT: He keeps answering after I sustain objections.
BY MR. BARZEE:
Q. 91 PARL, LLC?
A. Yes.
Q. What is that?
A. A property.
Q. What's the value of that property?
A. I don't have an idea.
Q. You're the owner of it?
A. No.
Q. Who owns it?

A. My dad.
Q. But you control it?
A. No.
Q. So you're saying your father purchased that property?
A. Yes. I gifted him, and he controls it.
Q. So you purchased it, and you put it in your father's name. Is that what you're trying to say?
A. I gifted him. I purchase to gift him.
Q. Did you purchase it with illicit funds, or was that from the barbershop?
A. I don't remember as to how -- what kind of funds went in there. It was all mixed.
Q. First 63rd Drive property. Ring a bell?
A. No.
Q. You've never heard of that?
A. No.
Q. 91 Rego LLC?
A. Yes.
Q. What is that?
A. They're next to each other. Yes, I know about that.
Q. When you say "they are next to each other," what are you referring to?
A. They are right next to each other. It's a property right next to each other.
Q. 91 Rego LLC is next to what?

A. Next to Park.
Q. Next to 91 Park LLC?
A. Correct.
Q. And who owns 91 Rego LLC?
A. My dad.
Q. That's something that you purchased and put in your father's name?
A. Gifted, yes.
Q. Gifted.
The reason you're gifting all of these properties is so Gilead can't get their hands on it; isn't that true?
A. No. They're on -- they want to take it. Gilead wants to take it.
Q. Right. But the reason you put them in your family members' names is to shield them from Gilead so Gilead can't get at them?
A. Not really. No, not really.
Q. Not really?
A. No.
Q. Okay. 93 Everton LLC?
A. Yes. It's a small house.
Q. Who owns that small house?
A. My dad.
Q. How many houses did you give your father?
A. One house.

Q. I thought you just testified that you had given him 91 Rego LLC?
A. That's a commercial building.
Q. Oh, okay. So how many properties -- I should have asked. I'm sorry.
How many properties have you gifted your father?
A. About three.
Q. And how many properties did you gift your mother?
A. About two.
Q. And how many properties did you gift other members of your family?
A. One more time.
Q. How many other properties have you gifted to members of your family?
A. Just one.
Q. How about 407 and 409 Rockaway Avenue?
A. Yeah, that's mine.
Q. What are those?
A. Commercial.
Q. Who are they worth?
A. What are what?
Q. How much are they worth?
A. I have no idea.
Q. 3506 Neptune Boulevard.
A. Yes.

Q. What is that?
A. Neptune Boulevard -- I don't know what is that, Boulevard is.
Q. Well, do you recognize the number 3506 Neptune?
A. Yes, I do.
Q. In Brooklyn?
A. Yes.
Q. What is that?
A. It's a house that I told you that I sold.
Q. Oh, those are the other --
A. Right, right, right, right, right.
Q. -- addresses on Neptune.
So to date, how much money have you refunded to Medicare or Medicaid, insurance companies or Gilead altogether?
A. As of today, I don't know.
Q. Anything?
A. I did. But I do not know exactly the amount that was given to the Government or to the Gilead.
Q. Did you write a check to them?
A. I'm in prison. What check?
Q. How did you pay them?
A. Pay who?
Q. Either the Government? Insurance companies? Medicare? Medicaid or Gilead? I'm wondering if you have returned any of this money that you stole.

A. Yeah, we're working on it, as we're talking.
Q. I know we're working on it. You explained that to me, but that's not my question. I'm not asking if you're working on it.
I'm asking if you have actually given any of the money --
A. I told you --
(Reporter requests one speaker at a time.)
A. I told you yes, but I do not know the number.
BY MR. BARZEE:
Q. All right. And then I asked you a follow-up question, which was: In what format did you give that money? Did you write a check?
You said, "No, I'm in jail."
So how did you do it?
A. Somebody write a check, I guess.
Q. You guess?
MR. POGOZELSKI: Objection argumentative. Asked and answered.
THE COURT: Sustained.
All right. Members of the jury, we're going to take a ten-minute recess. Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about ten minutes.
THE COURT SECURITY OFFICER: All rise.
THE WITNESS: Thank you, sir. Thank you.

(Jury exits.)

THE COURT: And if there's nothing else to come before the Court, we'll be in recess for ten minutes.

THE WITNESS: Thank you, Your Honor.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 2:09 PM to 2:20 PM, after which the following proceedings were had:)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, Your Honor.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your

presence?

Mr. Barzee, you may continue.

MR. BARZEE: Thank you, Your Honor.

BY MR. BARZEE:

Q. Peter.

A. Yes.

Q. Are you with us?

A. Yeah.

Q. Would you consider yourself to be a cooperative witness in this matter?

MR. POGOZELSKI: Objection. Your Honor.

THE COURT: Sustained.

BY MR. BARZEE:

Q. How many times did Gilead search your properties?

A. Two times.

Q. And the first time that they searched, one of the things that they seized was one of your telephones; correct?

A. One of the times, yes.

Q. And you refused to give them the code to your telephone; correct?

A. Correct.

Q. And have the prosecutors asked you to give them the code to that telephone so the contents of the phone could be searched?

A. Which prosecutor?

Q. Any prosecutor.

A. Whenever they searched my home -- I mean, whenever they came, I didn't have any phones with me that time.
Q. The second time?
A. The second time, the first time.
Q. No, I'm asking the second time, did they seize the telephone?
A. Who seize the telephone?
Q. Did Gilead seize the telephone the second time your properties were searched by Gilead pursuant to a court order?
A. Okay.
Q. Did they seize your telephone?
A. Yes.
Q. Did you refuse to give them the code to open the telephone?
A. Yes.
Q. When you heard that Adam Brosius had been placed under arrest, did you go into your computer systems and start deleting all of the emails between you and Adam Brosius?
A. No, I did it before. Not with Adam Brosius, but in general. I did it before he was arrested.
Q. Why did you erase all of the emails between you and Adam Brosius prior to his arrest?
A. It has nothing do with his arrest. It has to do with Gilead.
Q. Okay. The question stands.
Why did you erase all of the emails between you and

Adam Brosius?
A. I don't want to give any information to Gilead.
Q. Well, we don't have that information now either, do we?
A. I have no idea what you have.
Q. Well, you erased the emails so the Government doesn't know what communications occurred between you and Adam Brosius; correct?
MR. POGOZELSKI: Objection. Asked and answered as to what the Government knows. Speculation.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You received a court order for you to go in and give a deposition in the matter of Gilead v. Peter Khaim, did you not?
MR. POGOZELSKI: Objection. Relevance to this extensive line of questioning on Gilead.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Do you think you deserve a reduction in your sentence and to get out of the jail early?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Do you think you deserve a reduction and to get out of the jail early based on your testimony you gave today?
A. It's not for me to decide.

Q. I'm not asking you that.
I'm asking whether or not you think you deserve it. Do you think it would be just for you to get a sentence reduction?
A. I don't know how to answer that question.
MR. BARZEE: Nothing further, Your Honor.
THE COURT: Mr. Zimet, cross.

CROSS-EXAMINATION

BY MR. ZIMET:
Q. Good afternoon, sir.
A. Good afternoon.
Q. They tell me I need to speak into the microphone. You'll do that also; right?
A. Yes.
Q. So September 11, 2024, is a pretty significant day in your life; was it not?
A. Yes, it is.
Q. And the reason --
MR. ZIMET: Speak into the microphone, okay, because otherwise --
THE WITNESS: People hear me. Don't worry about it.
THE COURT: The court reporter has to hear you.
BY MR. ZIMET:
Q. It's significant because that's the day that you entered a federal prison to begin serving your 16-year sentence; is that correct?

A. Yes, sir.
Q. And the prison you were assigned to was which prison?
A. Yes, sir.
Q. Which prison were you assigned to, sir?
A. Allenwood, Pennsylvania.
Q. And how long did you stay in Allenwood, Pennsylvania?
A. Five months.
Q. And you got transferred to another prison; is that correct?
A. Yes.
Q. And what prison were you transferred to then?
A. New Jersey, Fort Dix.
Q. And what type of prison is that?
A. No palm trees, that's for sure.
Q. I'm sorry?
A. No palm trees.
Q. No palm trees.
Is it a camp?
A. No. It's low.
Q. Low security means there's a fence around the prison?
A. Yes.
Q. And it's more security than what people have called, like, Camp Fed or something like that, which is much less secured; correct?
A. I'm not sure. I wasn't there.
Q. So when you started your 16-year prison sentence, you did

the calculations as to how much time you would likely serve; is that correct?
A. Everybody does.
Q. And you are one of the everybody that did that; correct?
A. Yes.
Q. And your calculations told you you would probably serve -- obviously, there's a whole bunch of different variables -- probably on a 16-year sentence, you will probably be serving 12 or 13 years; is that correct?
MR. POGOZELSKI: Objection.
A. Yes.
THE COURT: Overruled.
A. I'm not sure how you calculate it.
BY MR. ZIMET:
Q. Well, how did you calculate it, then?
A. How did you calculate it?
Q. I took 85 percent of 16 years, okay, which is the base to how you start.
A. Okay. And then --
Q. You're pretty good at math.
A. Okay.
Q. Correct?
And then other potential reductions that can come being in certain places, including being the RDAP program that you were in also.

A. Okay.
Q. That's how I got to the 12 or 13-year number.
A. And then what?
Q. How that's I got to 12 to 13 --
A. There's other programs you can do.
Q. I'm sorry?
A. There's other programs you can do.
Q. What was your anticipation as to how much time you would likely serve?
A. About eight, nine.
Q. Somewhat less than double-digit time, would that be fair to say, of your calculations?
A. It depends what crime you have. It depends.
Q. You know what crime you had. Crimes, plural; correct?
A. Crimes. It doesn't matter. In prison, when you get sentenced, it doesn't matter if you commit crime or crimes. It depends what points. It depends how you -- what other things you might do inside prison could also raise your numbers.
Q. So the bottom line is that there's a significant period of time, even in the best light, that you were looking at prison time as of September 11, 2024; is that correct?
A. One more time.
Q. A long time; correct?
A. It's a long time, sure.
Q. And prior to going into prison on September 11, 2024, you

had not offered any cooperation to the Government; is that correct?
A. No.
Q. You had offered cooperation to the Government?
A. No, no, did not.
Q. So what you talked about earlier today, that you wanted to come in and tell the truth because it's the right thing to do, that had not entered into your mind prior to September 11, 2024; is that correct?
A. Correct, yeah. But today, I want to do what I do. That's all.
Q. We'll get to that in a little bit.
A. Yes.
Q. But you were known as someone who was a standup guy, who wasn't going to testify against other people; is that correct?
MR. POGOZELSKI: Objection. As to what he was known -- how he was known.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You considered yourself a standup guy, who is not going to testify against other people that were involved in your criminal enterprise; correct?
A. I'm not sure how to answer that question.
Q. Did you believe you were a standup guy, who is not offering cooperation against any other people?

A. I just choose what I choose. And today, what I choose, I do what I choose. That's all.
Q. I understand what today is. I'm asking about September 11, 2024.
A. That's what I told you. I choose what I choose before, yeah.
Q. And before, prior to going to prison, your choice was not to be a cooperator?
MR. POGOZELSKI: Asked and answered, Your Honor.
BY MR. ZIMET:
Q. Is that correct?
THE COURT: Overruled.
BY MR. ZIMET:
Q. Please answer the question.
A. That's what I said.
Q. So in August of 2025, two federal prosecutors and an FBI agent showed up at Fort Dix Prison, at Fort Dix in New Jersey; is that correct?
A. Yeah.
Q. And you met with them on that date; correct?
A. Yes.
Q. And your lawyer was there with you?
A. Yes.
Q. At that meeting; is that correct?
A. Yes, sir.

Q. That was not a surprise to you, that they showed up to talk to you, is it?
A. I received a subpoena, and they came up, and that's it.
Q. You had a subpoena on that day? That's why they showed up? Is that your testimony?
A. I have a subpoena.
Q. We know there was a subpoena.
We are talking about that day in August of 2025 when that meeting took place. That was not a surprise to you that meeting was going to take place; is that correct?
A. I spoke to my lawyer, yeah, and they came, okay.
Q. You wanted that meeting to take place, did you not?
A. If I want to take a meeting, I would do it before.
Q. So as for that meeting, you had not wanted that meeting to take place?
A. I was --
Q. You had not requested it?
A. I was thinking about it.
Q. Well, did you request it prior to that date, to have a meeting with the Government?
A. No.
Q. So they requested to speak with you? Is that what happened?
A. Yes.
Q. You're sure of that?

A. Yeah.
Q. And to have that meeting, there had to be some ground rules; isn't that correct?
A. What's that?
Q. There had to be some ground rules for that meeting; is that correct?
A. What does that mean?
Q. Some protection that you needed at that meeting?
A. We weren't talking about protection yet.
Q. Well, you want to be protected that things that you said could not be used against you at that meeting; is that correct?
A. Like I told you, we were not talking about protection. We're just --
Q. Did you -- I'm sorry.
A. We just were talking about what was going on in the case.
Q. Well, part of what's going on is that you did not want to say anything that could ever be used against you; isn't that correct?
A. Yeah, of course.
Q. And to make sure that didn't happen, you had an agreement with the Government at that August meeting in Fort Dix that anything you said could not be used against you; isn't that correct?
A. At that time, I did not have any agreement.
Q. So anything you said at that meeting could be used against

you; is that correct?
A. I guess so.
Q. That was your understanding?
A. Yes.
Q. Was there any kind of document that was presented or any kind of statement that was made by the prosecutors before you started answering their questions?
A. It was a document that I signed for -- a cooperating document.
Q. Well, you signed a document for your testimony in this trial. I'm talking about Fort Dix in August. Was there another agreement as to that?
A. Just the cooperative agreement. I forgot what was the name of it.
Q. What was that -- I'm sorry.
A. It was a paper that I signed.
Q. And your understanding of that paper is that it gave you protection so --
A. No, it was no protection. It was just a signed agreement that I would say everything the truth, nothing but the truth.
THE COURT: You have to wait until he finishes the question before you start your answer.
BY MR. ZIMET:
Q. Okay? So let me finish the question first, and you can certainly answer with whatever answer you choose to give.

At that meeting in Fort Dix, was there not an agreement that anything you said at that meeting could not be used against you?
A. Not at that day.
Q. Okay. So with your understanding, anything you said at that meeting could forever be used against you at any proceeding; is that correct?
A. It could, yes.
Q. And you would have no legal right to challenge that because there was no agreement; is that right?
A. Yes.
Q. So at that meeting, you confessed, did you not, that you committed crimes in the Eastern District of New York as well as in the Southern District of New York?
A. Did I confess that I did the crimes? Yes.
Q. And that was the truth, was it not?
A. Yes.
Q. You committed those crimes; correct?
A. Yes.
Q. And certainly, during the course of that meeting, you were asked by the prosecutors, "Have you committed any other crimes besides the crimes you've already been sentenced to?"
Were you asked that question?
A. Yes, this crime, today.
Q. Were you asked about any other crimes besides, quote, "this

case?"

No?

You're shaking your head no?

A. There's only three crimes that I committed.

Q. You only committed three crimes?

A. Yes. Me and with others.

Q. I'm sorry?

A. Me with others, not only by myself.

Q. We'll get to that. Don't worry. We'll be able to talk about that in a little bit.

A. Yes.

Q. You did not hold back anything at that meeting in Fort Dix?

A. Huh?

Q. You didn't hold back any information at that meeting in Fort Dix, did you?

A. No.

Q. Are you sure?

A. One more time: I did not hold back any information.

Q. During the course of that meeting, you talked about this person named Q; isn't that correct?

A. In the first meeting, no.

Q. Did you not tell the prosecutors as well as the FBI agent who was there that you did not want to identify --

A. Who Q was, yeah.

Q. -- the true name of Q.

A. Yes.
MR. POGOZELSKI: Your Honor, I'm going to object to reading from the interview of a report that is not his own statements again.
THE COURT: What the lawyers say and their questions isn't evidence.
Overruled.
BY MR. ZIMET:
Q. So the answer to my question was that you, in fact, said that to the agents and the prosecutors that you did not want to identify who Q was; is that correct?
A. Correct.
Q. And they said, "Okay, we're not going to press you on that." Is that right?
A. That's it.
Q. When you said "that's it," is that yes to my question?
A. Yes, no pressure about that today. Maybe there would be later on, yes.
Q. Well --
A. But he's been identified in the Gilead case. I don't know why you're bringing him up in particular. I'm not sure, but okay.
Q. Well, I can't share the reason for my questions, but let me ask another question.
A. Go ahead.

Q. Okay. Between August of 2025, when you first met with the prosecutors, have they asked you again who Q was?
A. Yes.
Q. And when was that?
A. I don't know the date exactly.
Q. Prior to your testimony, they asked you who Q was, and you answered who Q was?
A. They told me his name right away, and I would say yes, that's him.
Q. In fact, you had that question and answer with the prosecutors before you testified today? Is that your answer?
A. They would tell me his name exactly, and I would just say yes, that's him. That's all.
Q. I apologize. I did not understand what your answer was.
A. They asked me who was Q?
Q. And your answer was, who is Q. What was your answer to the prosecutor?
A. My answer --
Q. Excuse me. Let me finish my question.
What was your answer to the prosecutors when they asked you after Fort Dix, but before you testified in court today, who Q was?
A. They asked me who Q was.
I did not tell them who was Q, but the following day, I remember that they had already come up with his name. So they

find out. They did the research.
Q. Did you just answer that at the meeting in Fort Dix you didn't remember who he was?
A. I did not told them who he was at the Fort Dix meeting.
Q. And you asked them, okay, not to -- not to press the issue as to who Q was; isn't that correct?
A. They did not press the issue.
Q. Did you not ask them -- did you not tell the prosecutors that you did not want to identify who Q was?
A. I did not identify, but when they came and told me his name, I told them that's him. That's it.
Q. So the prosecutors told you what Q's name was?
A. Yes.
Q. But you knew who he was in Fort Dix; did you not?
A. I didn't want to tell them. They came up and told themselves.
Q. And the reason you didn't want to tell them is that you wanted to protect him; is that correct?
A. Yes.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You did not want -- you did want to protect him; is that right?
A. Yeah, I want to protect everybody.

Q. You wanted to protect everybody?
A. Yes.
Q. Including yourself, correct?
A. I want to protect you, too. Go ahead, sir.
Q. Did you just say you want to protect me, too; is that right?
A. Go ahead. Let's answer the question.
Q. That's a question to you, sir. Did you just say that to me?
A. No.
Q. You didn't say that to me in front of this jury?
THE COURT: He did. So let's move on.
BY MR. ZIMET:
Q. So, sir, the reason you wanted to protect Q was because he was part of your criminal enterprise; isn't that correct?
A. Yes.
Q. And he was the source of these HIV drugs that you were selling to, among other entities, Safe Chain; isn't that correct?
A. Correct. I don't know about other entities he sold but he sold to me, and I would sell it to Safe Chain.
Q. And you wanted to protect him because he was your source; was he not?
A. I didn't have only one source. I had so many sources.
Q. He was your biggest source; correct?

A. That's the right question to ask, the biggest source.
Q. Being the biggest source, you wanted to protect the criminal enterprise that you were involved in with him; is that correct?
A. Correct.
Q. Because in criminal activity and, obviously, you've had a decade worth of that, from the testimony that we heard already, in criminal activity, you want to make money; correct?
A. Correct.
Q. You also don't want to get caught; isn't that correct?
A. It's not only me want to make money. It's everybody want to make money.
Q. We'll talk --
A. Not by myself. It was everybody who was involved with me, especially Charles Boyd and Adam Brosius and Mike Zangari, Dhruv, Garrett.
Q. Okay.
A. We all wanted to make money and more money.
Q. Are you finished, sir?
A. Yes.
Q. Let's answer the question I'm asking.
A. Go ahead.
Q. And they're very simple questions. They're basically yes or no questions that you can answer. If you need to explain yes or no answer, you're certainly free to do that.

A. Yes.
Q. You wanted to protect Q because you did not want him to get into trouble; is that correct?
A. Correct.
Q. And while you're involved in that criminal activity, you wanted to protect Q from any other person learning who Q was and what his role was in this conspiracy; isn't that correct?
A. One more time.
Q. You wanted to make sure that Q was protected from being -- was being protected from detection of being involved in this criminal conspiracy; isn't that correct?
A. "Detention?" What did you say about that word "detention?"
Q. Not detention. "Detection."
A. Detection.
Q. Didn't want to be detected?
A. Right.
Q. Right?
A. Yes.
Q. Because that would not be a good thing for Q if that happened; correct?
A. Correct.
Q. And it would also not be a very good thing for you either; correct?
A. Correct.
Q. Because if you were the causation or the source of Q being

found out by other people, that would not be very good for yourself; isn't that right?

A. Correct.

Q. And so you wanted to limit the people who could have any contact with Q; isn't that right?

A. Limit of contact? No, I just wanted --

Q. You just wanted it to be you? No one else, right, relating to the HIV drugs; right? And you wanted --

A. Before but not now. Before when we were --

Q. Until about 1:30 this afternoon, at least, you publicly said it; right?

MR. POGOZELSKI: Objection. Argumentative.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So when you had your participation in this criminal conspiracy, you also weren't anxious for yourself to be detected by any other people as being involved in this criminal conspiracy; isn't that correct?

A. Everybody knew I was involved.

Q. We'll talk about that as we go forward.

A. Right.

Q. You wanted to come out and say, "I'm Peter Khaim." If I'm mispronouncing, I apologize.

A. Okay.

Q. "I am involved in a criminal conspiracy" -- you were not

publicly saying that; correct?
A. No.
Q. That would be stupid to do that; correct?
A. Yes.
Q. You didn't want to do that. You wanted to do just the opposite, and that would be to insulate yourself from anyone knowing that you were involved in criminal activity; isn't that right?
A. Right.
Q. So you wanted to limit the people that had access to you; correct?
A. Yes.
Q. And you also wanted to limit the information that people had as far as what you were doing or not doing; isn't that correct?
A. Yes.
Q. Because that's part of --
A. Of business.
Q. -- criminal business of not being detected.
A. Right. Yes, you're right.
Q. And up to that point in 2020, you had been involved in a lot of criminal activity. You've talked about it earlier. And up to that point, you had a perfect record as far as not having been detected; isn't that correct?
A. I have been detected with the criminals, yeah. I mean, I

have been detected, yeah.

Why you say that?

Q. Well, your first charge was in the fall -- or, excuse me, in December --

A. Right.

Q. -- of 2020; is that correct?

A. Right.

Q. Up to that point, Peter Khaim, undetected as far his criminal activity; correct?

A. For four years, yeah. Four or six years, yeah. And then all of a sudden, I have been detected, yeah, you're right.

Q. And you had taken steps to prevent that from happening; isn't that correct?

A. If I would be perfect taking baby steps, it would happened at all. But I guess I wasn't good at it.

Q. But that didn't mean you weren't going to try and maintain yourself from being detected for the other crimes that you were involved in; isn't that correct?

A. It was open then. Like I told you, I wasn't great at it.

Q. Well, up to December of 2020, you had a perfect record of not being detected; isn't that correct?

A. Yes. For six years, yeah, and after, it was bad.

Q. And at that time, in December of 2020, you were involved in three criminal activities; isn't that correct?

A. Correct.

Q. We talked about the ones, okay, with the phony prescriptions for the phony pills; is that right?
A. Right.
Q. What kind of pills were those, by the way?
A. Which pills are you talking about?
Q. The one you got indicted for and pled guilty to?
A. Which one?
Q. The pills that were phony prescriptions for people who really didn't need them. Remember those?
A. You talking about the compounds? Which indictment are you talking about?
Q. I apologize, sir. I can't testify.
A. Okay.
Q. Were you indicted and pled guilty to having phony prescriptions written for pills for people who didn't need the pill that were then prescriptions --
A. Was it -- I'm sorry.
Q. -- prescriptions that were sent to one of many of your pharmacies --
A. That was --
Q. -- that were then processed, and then those pharmacies were paid by insurance companies and/or Medicare; is that correct?
A. Right. That was creams, regular creams.
Q. Those weren't pills?
A. It was a few pills, but not -- regular pills. Nothing

major.
Q. I don't understand what a "regular pill" is.
What type of pill for what type of ailment were you involved in, in that case, where you pled guilty?
A. I don't remember exactly what kind of pills. It was so many different products.
Q. Okay. Now, you got out on bond in that case; is that correct?
A. Yes.
Q. And the case was in the Southern District of New York or the Eastern District of New York?
A. Which case are you talking about?
Q. The one you got arrested for in December of 2020.
A. Eastern District.
Q. And you had certain restrictions that you had when you're out on bond; is that correct?
A. Restrictions? What kind of restrictions are you talking about?
Q. The first one at the top of the list is you can't commit any more crimes; correct?
A. I don't recall about that.
Q. Are you saying that it was your understanding, when you got all on bond from the Eastern District of New York, that there was no limitation on your activity that allowed you to commit crimes moving forward?

A. I don't -- I never read it. It goes to my counsel, who had all that paperwork.
Q. Didn't you sign the document for your bond that you wouldn't commit any more crimes?
A. I didn't read the bond. It was my counsel.
Q. So it's your lawyer that read it but not you? Is that your testimony?
A. I read it, but I had a hard understanding at that time.
Q. You couldn't understand English at that time?
A. I was -- go ahead. What's my next question?
Q. I want you to answer the question.
You said you couldn't understand English at that time. Is that your testimony.
A. I said I understand English, but I didn't pay attention to what I was signing.
Q. Because it wasn't important?
A. It wasn't important.
Q. And what you're saying wasn't important is a document that allowed you to be free, pending your case going to trial, and conditions that restricted what you can do and where you could go?
A. That's the restriction -- I remember where I can go. What I can do? I don't think there was a restriction on that.
Q. Well, that arrest in 2020 did not stop you from continuing to committing crimes, did it?

A. Right.
Q. Correct?
A. Excuse me?
Q. That arrest and those bond restrictions did not stop you from committing criminal activity; isn't that correct?
A. Correct.
Q. And the reason you didn't stop doing criminal activity is that you wanted to keep on making money; isn't that correct?
A. Yes.
Q. Because money to Peter Khaim is an extremely important thing. Especially in 2020; isn't that right?
A. It was important.
Q. And the amount of money you had -- excuse me, the amount of money that you were making, you wanted to make as much as you could; isn't that correct?
A. Like everybody else.
Q. Well, other people can be the judge of that.
From your perspective, though, you think everyone wants to make as much money as they can?
A. Yes. Like Charles Boyd and other coconspirators in our case, they wanted to make as much money, yes.
Q. And I appreciate you volunteering that when it's not part of the question.
A. Right.
Q. Okay? Let me ask you this question, sir: The millions and

millions of dollars you were making during that time period, from the three criminal different schemes you were involved in --
A. Right.
Q. -- how much money did you want to ultimately make?
A. I never thought about it.
Q. You never thought about how much you wanted to make?
A. Yes.
Q. You wanted to have as many nice thing as you could; is that right?
A. Yes.
Q. You wanted to hide your money so no one could find out where your money was; isn't that correct?
A. Not really.
Q. Well, isn't that why you laundered money?
A. Money -- to launder money is just to give kickbacks for the referral sources, yeah, but not hiding money, no.
Q. Well, you launder money because you want to put it somewhere where law enforcement or the Government can't find it?
MR. POGOZELSKI: Objection as to legally what money laundering is.
THE COURT: He's asking his state of mind.
Overruled.
BY MR. ZIMET:

Q. You can answer the question.
A. Go ahead.
Q. Do you remember the question?
A. No.
Q. The reason that you wanted to launder money is so that the money that you had illegally gained could not be found by the Government, by law enforcement, or by any other entity that could do harm to yourself; isn't that correct?
A. No, not really. If I want to hide money, I would do something else.
Q. Well, what you did do was try to take the money out of the country; is that correct?
A. Wrong.
Q. Did you not try to buy real estate outside of the country?
A. Wrong.
Q. Did you not try to buy real estate in the United States?
A. In the United States, I was buying real estate.
Q. And the --
A. I was not hiding the money.
Q. And the real estate that you bought was not in your name, was it?
A. It was not in my name.
Q. And the reason it was not in your name is you did not want the fact that you had purchased with illegal money to be detected by law enforcement; is that correct?

A. No. This is by consulting with my attorney, my real estate attorney, and that's what we did.
Q. Are you saying your attorney gave you advice how to hide the money?
A. Not hide the money. I would give it to my parents and to my family members. That's it.
Q. Are you saying that the advice that you're getting from your attorney was to find ways of putting the money in places that it could not detected?
MR. POGOZELSKI: Objection, Your Honor. It's going into privileged communications. It's not even clear which attorney he's talking about.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You can answer.
A. I would personally want to give to my close friend -- to my family. That's all.
Q. So --
A. If I wanted to hide money, I would do different things. I wouldn't buy real estate. I wouldn't do other things. I would do different things, but I did not do that.
Q. But you did --
A. I did file taxes, and I did purchase real estate the right way, the way a normal person would do, yeah.
I did criminal, but the way I did put the money, I did it

the right way.
Q. And you did plead guilty to money laundering, did you not?
A. Yes, I did.
Q. And that was doing with money the right way? Is that your testimony?
A. To launder money because we had to give a kickback to other people, cash, who was bringing black market medications to sell to Safe Chain Solutions. That's why we launder money.
Q. Well, you laundered money because you're giving it to people who were doing, according to your testimony, black market medications; is that right? The HIV medications?
A. Oh, yes.
Q. So let me ask you this, sir: We heard about the indictment in the Eastern District of New York, the Southern District of New York. None of those cases involved HIV medications or anything from the black market; isn't that correct?
A. Yes.
Q. So when you say the money laundering that you did related to the HIV drugs and money that was given for those drugs, that is inaccurate; is it not, sir?
A. Why you say that?
Q. You did just.
A. Why you say that? It's accurate. I laundered the money --
Q. That's what you --
A. -- to give out to people to give me the medications.

Q. That --
A. Cash, yes.
Q. That's not what you pled guilty to, sir, was it? Anything at all to do with any HIV medications?
A. I'm talking about this case. I'm not talking about --
Q. Well, I'm talking about what you pled guilty to. You haven't pled guilty to anything in this case, have you?
A. No.
Q. You haven't even been charged with anything in this case, have you?
A. No.
Q. It's almost five years since the last event took place in this case; correct?
A. Right.
Q. And you know there's a statute of limitations of five years, and you don't expect to even be charged in this case, do you?
A. I have no --
MR. POGOZELSKI: Objection.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Go ahead. Answer.
A. I have no idea how that works.
Q. You weren't concerned? The fact that you had not been charged for $35 million of healthcare fraud and had not been

charged, that that could possibly happen to you?
A. I have no idea how that works. I told you that before.
Q. That wasn't a worry of yours? That you had done all this criminality, hadn't been charged, and were hoping not to get charged?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So, at the meeting in New Jersey, you were asked the question about black market HIV drugs; correct?
A. Which New Jersey?
Q. Fort Dix?
A. With who?
Q. The agents?
A. Okay.
Q. Excuse me. The prosecutors and an FBI agent?
A. Okay.
Q. Correct?
A. Yes.
Q. FBI agent was taking notes during the course of the meeting?
A. Yes.
Q. Taking down what you said; correct?
A. What I say? One more time.
Q. Taking down the words that you were saying?

A. Yes.
Q. And trying to have an accurate record of what you were representing; is that correct?
A. Right.
Q. And you were hoping, from that meeting, you could move forward and potentially do something with the Government to cooperate, that could hopefully lead to a reduction of your sentence? Isn't that correct?
A. I was hoping, but I don't know if it's going to happen.
Q. Well, understand.
A. I have understandings. I'm hoping is one thing, but getting -- getting it done is two different things.
Q. That was several steps down the road.
This was Step Number 1, to meet with the agents, meet with the prosecutors, and see whether they were interested in your cooperation; isn't that correct?
A. I was just wanted to cooperate and tell the truth. That's all.
Q. Well, you were looking ultimately to get your sentence reduced, were you not?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. And you knew at that meeting that if the Government decided they didn't want to have any more communications with you, your

opportunity -- potential opportunity to get your sentence reduced would go down the tubes; correct?

MR. POGOZELSKI: Objection as to what he thought the Government knew or would decide.

THE COURT: Overruled.

BY MR. ZIMET:

Q. Go ahead. You can answer.

A. I have no idea what the Government would do.

Q. I understand you had no idea, but you knew that the Government wouldn't do anything unless they believed that you have something to offer them that could potentially lead to the reduction of your sentence; isn't that correct?

A. I have no idea what they would do.

Q. You have no idea what?

A. I would have no idea what would be happening in the future.

Q. Well, you have no idea what the future could end up, but you did know that the road you were starting on could lead, if everything worked out well for you, to having your sentence reduced? Isn't that correct?

A. It's not only that that was doing this. I just wanted to do the right thing for myself out of -- I want to be finished with everything. I just --

Q. So this was a cleansing process that you were going through?

A. Yeah, I want to be over this.

Q. You just want it to be over?
A. Yeah.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So at that first meeting, you were asked about individuals at Safe Chain; correct?
A. Yes.
Q. And at that meeting in Fort Dix, you wanted to provide as much information as you could that would be helpful to the Government?
A. The true information.
Q. I'm sorry?
A. The true information.
Q. As much truthful information?
A. Not truthful. "True" information.
Q. True information?
A. Correct.
Q. That you could to the Government; correct?
A. Whatever I know, I tell the truth, yes.
Q. And based on that, the Government invited you, by a subpoena, to come to testify at this trial; isn't that correct?
MR. POGOZELSKI: Objection as to characterizing a subpoena as an invitation.
THE COURT: Overruled.

It's cross-examination.
A. One more time.
BY MR. ZIMET:
Q. You got subpoenaed, sir; correct?
A. Yes.
Q. To come to this trial?
A. Yes.
Q. And to come to this trial to testify for the Government; correct?
A. Just to testify. I don't know for the Government, but yeah.
Q. Well, you knew the Government was going to call you as a witness, didn't you?
A. Right, yes.
Q. And besides Fort Dix, you met with the Government a whole bunch of times before you testified; correct?
A. Not a whole bunch of times.
Q. Multiple times.
A. Multiple time, but not a bunch. A bunch to me is considered ten. But multiple --
Q. Less than ten?
A. Thank you.
Q. More than five?
A. About five.
Q. And during those sessions, you went over your testimony

with the prosecutors; correct?
A. No. We just went over the documents that...
Q. Documents that you were shown?
A. Documents.
Q. Right?
A. Excuse me?
Q. Documents that you were shown; correct?
A. Yes.
Q. And you provided your answers to the questions they asked you before you came into the courtroom to testify; isn't that correct?
A. Who did this? Who did what? I tell the truth, yes.
Q. And one of the documents they showed me, which we saw earlier today and saw, I think, yesterday also, was the application that was made on behalf of Boulevard -- I'm calling it Boulevard -- I don't know -- 9, whatever it is?
A. Yes.
Q. Okay. Boulevard 9229 or whatever it is, okay, the application that was made to Safe Chain to become a vendor for Safe Chain; isn't that correct?
A. Yes.
Q. And you were aware of that application, were you not, when it was made?
A. Yes.
Q. In fact, you instructed an employee or a woman -- I think

you eventually said what her name is, I don't care at this point -- to create a fraudulent document to present to Safe Chain; correct?

MR. POGOZELSKI: Objection to the commentary, "I don't care what her name is."

MR. ZIMET: I'll withdraw that.

THE COURT: Okay.

BY MR. ZIMET:

Q. Can you answer the question?

Forget I said anything about I don't know what her name is.

Did you instruct a woman -- I think you said "girl," but a woman that was employed by you, okay, to create a false document?

MR. POGOZELSKI: Objection. Argumentative.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Which document are you talking about?

Q. Well, let's go backwards.

Wasn't there a fraudulent document presented to Safe Chain as part of the application process?

A. There was an application filled out, yes.

Q. And wasn't there a document, certification of licensing that was submitted with that application?

A. Yes. This is what makes me -- yes. Yes, okay.

Q. I know what you meant "this makes me" with your head.
A. There's so many fraudulent documents, I don't know which documents you're talking about. If you tell me exactly which document, licenses, or certifications.
Q. Fair enough.
A. Thank you.
Q. The fraudulent document that you instructed an employee to create --
A. Yes.
Q. -- that's the one I'm talking about.
A. Yes.
Q. We're on the same page as far as what that was?
A. Yes. It's the certificate of the pharmacy, yes.
Q. And you knew you needed to present that to Safe Chain because you wanted Safe Chain to believe that you had a license from the State of New York to be involved in the wholesale distribution of pharmaceutical drugs; correct?
A. That was between me and Mike Zangari.
Q. Did I ask anything about Mike Zangari?
A. No. You said, "By myself." I wasn't doing by myself everything. It was with the instruction it was teamwork.
Q. Okay.
A. I wasn't doing it just by myself. It doesn't come to my mind just like that make fake certifications.
Q. So you and Mike Zangari collaborated, worked together?

A. We worked together.
Q. And jointly you put your brains together and came up with this idea?
A. Correct.
Q. Is that your testimony?
A. Correct.
Q. Now, it wasn't Mike Zangari's employee that did it, the fake document; correct? Is that correct?
A. No.
Q. It was your employee that did it; correct?
A. Yes.
Q. And your employee does not take instructions from Mike Zangari, did she?
A. No.
Q. She takes instructions from you; isn't that correct?
A. Yes.
Q. And you had the ability to decide whether or not you wanted to get that instruction based upon the conversation that you had with Mike Zangari; is that right?
A. Yes.
Q. And you had the opportunity to say, "Wait a second. I don't want to get involved in fraudulent documents."
Did that not go through your mind at one point, sir?
A. Not at that point.
Q. And the reason it didn't go through your mind is because to

Peter Khaim, the most important thing at that point was making money; isn't that correct?

A. It was an opportunity to make money, yes.

Q. And what was my question, sir?

A. I answered it. It was an opportunity to make money, yes.

Q. The most important thing to Peter Khaim at that point was making money; isn't that correct?

A. It's not about the most important thing. It's about -- it was a lot of people involved, and everybody would be benefitting out of that. It's not just me personally. If it would be me personally, I would go out myself and go ahead and find these medications by myself.

I would go ahead and sell by myself to the pharmacies, create wholesale license, and do different things, if I would be just by myself.

Q. Well, you had --

A. I couldn't operate this by myself.

Q. Well, you had a big problem doing it by yourself because, number one, your company did not have a wholesale distribution license; correct?

Correct?

A. Okay. Let me rephrase that. It's very simple to open a company.

Q. Sir, what was my question?

Your company did not have a wholesale sales license; right?

A. Yes. I did not have, yes.
Q. So when you say it would be very easy to do that, to sell it to pharmacies, you couldn't do it because you didn't have the license; isn't that correct?
A. It's very easy to open them up, yes.
Q. The bottom line is you never got one, did you?
A. Never got one.
Q. As easy it was to get, you never got one. You created one that was false; correct?
A. Correct.
Q. And you knew without that, you could not do any business with Safe Chain; isn't that correct?
A. Yes. Even with that, you cannot do business with Safe Chain.
Q. What was my question, sir?
A. Yes, you're right.
Q. And so you were taking a chance that the fraudulent document that you're submitting to Safe Chain would not be detected as being a fraudulent document; isn't that correct?
A. Correct.
Q. You were hoping they wouldn't catch your lies that you had authorized to make in that fraudulent document; isn't that correct?
A. Not really. Their compliance officer could go ahead and open the computer and just go ahead into the pharmacy board and

take a look at the address and the pharmacy name and what license we had.

They did it later, after they had been already getting street, black market HIV drugs.

Q. Okay. And my question to you, sir, was what, before you volunteered all this other stuff?

A. I answered this question for you.

Q. You were taking a chance and hoping that Safe Chain would not detect the fraudulent document; isn't that correct?

A. They did detect it.

Q. In April of 2020, sir, when the application was made with the fraudulent document?

A. I understand --

Q. Is that when you were taking a chance and hoping they wouldn't detect it?

Yes or no, sir?

A. One more time, the question.

Q. Weren't you hoping, sir, in April of 2020, Safe Chain would not detect that you had submitted a fraudulent document to get approved as a vendor with Safe Chain?

Yes or no, sir?

A. I didn't -- it wasn't my main intentions.

If they want it, they want it. It wasn't like, pushing for it. We just send it once, and they took it, and that's it. We're ready for business.

Q. So you had no concern that they would reject it? If they do, they do; if they don't, they don't. That was your mindset?
A. Yes.
Q. But they did accept it; correct?
A. I was working in the other field. It was fine. It wasn't -- could have made the money other way.
Q. Well --
A. So it went this way, so a few ways.
Q. It was a door that could be opened, in your mind, in April of 2020, to make tens of millions of dollars; isn't that correct?
A. I never knew that it would go this route.
Q. I'm sorry?
A. I would never knew that it would go this route.
Q. Well, you were hoping it would be successful, did you not?
A. Like every other every person in business, everybody want to be successful in their business.
Q. But in this business, you wanted to be successful doing something based on fraudulent application; isn't that correct?
A. Again, the application was not fraudulent, but the certificate, you're saying, was fraudulent, yes.
Q. Wasn't the certificate part of the application, sir?
A. Okay.
Q. Is that yes?
A. I'm not sure. It was separate. It was sent separate. I'm

not sure how it went down that time.
Q. So you testified yesterday that about Charles Boyd; correct?
A. Yes.
MR. ZIMET: I don't want to interrupt whatever you're doing.
THE WITNESS: Go ahead. I'm listening.
BY MR. ZIMET:
Q. You never met Charles Boyd in person, did you?
A. Never.
Q. In fact, other than the prosecutor pointing to him yesterday, you wouldn't even know he was in the courtroom; is that correct?
A. Yes.
Q. So -- and that was intentional that you never met him in person; is that correct?
MR. POGOZELSKI: Objection.
THE COURT: Overruled.
A. What do you mean by "intentional?"
BY MR. ZIMET:
Q. You didn't want to meet him in person, did you?
A. Why not? We was making business together. Why shouldn't I met him?
Q. Because you wanted to hide who you really were; isn't that correct?

A. No, sir.
Q. Did you ever give him your last name?
A. Excuse me?
Q. Did you ever give Charles Boyd your last name?
A. No, he never asked.
Q. You never said, "My name is Peter Khaim. Nice to meet you, Charlie Boyd"?
A. Yeah. My name is Peter, that's how I presented by Mike Zangari and Adam Brosius.
Q. In fact, you assumed another name? This King Kimchi; right?
A. It was an email I created, yes.
Q. Under an assumed identity; is that correct?
A. Correct.
Q. And you wanted to have that assumed identity because you did not want anyone to know what you were doing behind the scenes with these T3s and other documents; isn't that correct?
A. Not really.
Q. Not really?
A. No.
Q. So King Kimchi was not necessary for anything?
A. They send emails with King Kimchi with my first name. What are you talking about?
Q. What I'm talking about is the fact that you created King Kimchi. No one at Safe Chain would ever know anything about

the name unless that was presented to them by you; isn't that correct?

A. Yeah, Peter --

Q. Isn't that correct, sir?

A. It says my name.

(Reporter requests one speaker at a time.)

A. This is Peter, by Charles Boyd, this is -- send this, please contact him.

So why would I hide my identity? There was no hiding. It was just me. I just created that email. That's it.

BY MR. ZIMET:

Q. So I don't recall it yesterday, but maybe you have a better memory than I do.

Do you recall any document being shown to you where you reveal to Charlie Boyd or to Adam Brosius that "I'm using a fake name of King Kimchi, but this is really Peter who's using that fake name?"

A. No.

Q. Never existed, did it?

A. No.

Q. Never even said to Charlie Boyd; correct?

A. No.

Q. Never even said to Adam Brosius; is that correct?

A. Yes. But they had a great idea that was me.

Q. So they had it, in your mind, a great idea that it was you?

A. Yes.
Q. And that's your testimony?
A. It wasn't -- it wasn't intentional to do that it wasn't me. It was me. I was the one who sent the emails from there, to their email, back-and-forth.
He says, "This is my name. Meet this guy. Meet Peter. Meet that." Of course, that's me.
Q. Let me see if we can understand your thought process, and, obviously, you can explain it.
You thought by creating a false name, that would lead Charlie Boyd and Adam Brosius to know that that was really you who was talking? Is that your testimony?
A. My testimony is --
Q. No, no, no. You have to answer yes or no to that first, and then you can explain your answer, sir.
A. One more time.
Q. By creating a false identity and not revealing that to Charlie Boyd and Adam Brosius --
A. No, you're wrong.
THE COURT: You've got to wait until the attorney is finished his question.
The court reporter can't take down two people talking at once. You interrupt the question, and the lawyer has got to ask the question again. You don't answer the question.
I have been telling you, "Answer yes or no and then

explain." You just give your answer and interject extraneous things that the lawyer has to now pursue.

If you just wait for him to finish, answer yes or no, and then you can explain.

A. One more time.

BY MR. ZIMET:

Q. By creating the false name and false identity of King Kimchi, when it was really you, you thought you were telling Adam Brosius and Charlie Boyd that King Kimchi was not a real person, that it was you impersonating a person; is that correct?

A. I just created that. No, that's incorrect.

Q. You never told Charles Boyd that you were, in fact, King Kimchi; correct?

A. No, never.

Q. And that was intentional on your part; correct?

A. No. If that would be intentional, I would never tell my real name. First of all, I would present a different name from the beginning of this -- of this criminal activity.

Q. Well, actually the reason you created King Kimchi was to give the impression that you had someone who was actually knowing what they're doing that was creating T3s; isn't that correct?

A. Not really.

Q. Well, the question asked for a yes-or-no answer. "Not

really" --
A. No.
Q. No? Not at all?
A. Not at all.
Q. Let's go back to the beginning.
When did you first have any contact with Charlie Boyd?
A. It was in -- well, when we start working.
Q. Start working in April of 2020. You're saying you had contact with Charlie Boyd in April 2020?
A. No. I was saying I was working. Starting in April, I was speaking to Mike Zangari, and then Mike Zangari introduced me to Adam Brosius. I don't remember exactly whether it was March or -- March or end of April. I don't know exactly the date.
If you would show me the text message, I probably would remember. Exactly the date, I don't know.
Q. I'm not asking exactly the date. When month-wise was your first contact with Charlie Boyd?
A. I don't know exactly the date.
Q. Well, was it not until July or August of 2020?
A. About August.
Q. August?
A. August.
MR. BARZEE: Your Honor, the witness appears to be reading from documents.
THE WITNESS: Which documents? I'm not reading

anything from the documents.

MR. BARZEE: Can I ask that the documents be taken away from the witness during his testimony?

THE COURT: I don't know what documents they are.

MR. BARZEE: I don't either, but he's sitting there reading things while he's giving answers.

THE WITNESS: Yeah, I'm giving the right answers. There's no documents.

What documents is here?

MR. BARZEE: It has to be done on the record, Your Honor. I've asked that the documents be taken away from the witness.

THE COURT: There's no reason for the documents to be there --

MR. ZIMET: May I approach, Judge?

THE COURT: -- so you can retrieve them.

So what's the piece of paper, Mr. Zimet?

MR. ZIMET: I'm sorry?

THE COURT: What's the document?

MR. ZIMET: Government's Exhibit 41, a copy of it, which I think is a demonstrative aid.

THE COURT: Right. Okay.

MR. ZIMET: And the second page is without an exhibit number.

THE COURT: All right.

MR. ZIMET: And I think this is the pedigree book. It's GX88.

THE COURT: Okay.

MR. ZIMET: I'm going to return it to the Government.

MR. BARZEE: Thank you, Your Honor.

MR. ZIMET: I'll put it on top of their Pamper's box.

BY MR. ZIMET:

Q. I don't want to be rude. When I talk to somebody, I should talk to them when we are looking at each other.

A. I'm paying attention.

Q. You're looking down; so I want to make sure that we are communicating.

A. Yeah, yeah. You are communicating. Don't worry.

Q. And if you're doing something else you need to do --

A. No, I'm just -- this is the way I am.

Q. Okay.

A. But I do pay attention.

Q. So you think it was August of 2020 when you had your first contact with Charles Boyd; correct?

A. This is just -- yeah.

Q. Not in April? Not in May. Not in June? Not in July? Correct?

A. Yeah.

Q. Is that yes?

I can't hear when you have --

A. Yes, yes, yes.
Q. So the first communication you had with Charles Boyd related to T3s or pedigrees; correct?
A. Yes.
Q. And you were aware before that time that the Safe Chain office that was involved in evaluating documents and evaluating whether the procedures were being done correctly had asked to see T3s From Boulevard; correct?
A. Correct.
Q. In fact, there's a document, I think, that was shown to you yesterday, Government's Exhibit 119.
MR. ZIMET: Go to page 2, please, at the bottom.
BY MR. ZIMET:
Q. Do you see the bottom of that page, sir, Abbie Divilio?
A. You're talking about July 8th?
Q. July 8th; correct.
Do you see that?
A. Okay.
Q. Do you remember being shown that yesterday?
A. Okay.
Q. Do you?
A. Yes.
Q. And what does it relate to?
A. Subject to Boulevard 9229 T3.
Q. Okay. And it's being sent to Jenna Mellott?

A. Excuse me?
Q. It's being sent to Jenna Mellott; correct?
A. Yes.
Q. Do you know who she is?
A. No.
Q. Never heard of her?
A. No.
Q. Do you know who Pharma Sales is?
A. Pharma Sales was -- what is his name? -- Adam.
Q. Okay. And I think you spoke yesterday about another Mellott; is that correct?
A. Another who?
Q. Another person whose last name was Mellott, M-E-L-L-O-T-T. You don't recall that?
A. No, I never spoken about that.
Q. You never spoke about another Mellott yesterday in your testimony?
A. No. I need to know the first name. Who are you talking about?
Q. Compliance at Safe Chain and to Charles Boyd?
A. Yes.
Q. Subject matter is Boulevard 9229 T3s?
A. Right.
Q. "A few weeks ago --" and this was July 8, so that would be sometime in June -- "I asked for contact information for

someone at Boulevard 9229 regarding T3s.

"They have not provided any T3 information to us, and our T3s to our customers will need to be updated with the information about where these HIV medications are coming from. This could potentially create a huge backlog of work for us, and I would like to avoid that. I'm not sure who to contact there about this issue. Could someone please assist?"

A. Yeah, I could read that, yeah.

Q. And you're aware of that at the time in July that requests were being made to Boulevard to require T3s?

A. Who made that request?

Q. Abbie Divilio. You know who she is?

A. Yeah. But to who?

Q. She made a request to contact Boulevard, find out who to contact to make that request?

A. Okay. But did they contact Boulevard at that time?

Q. Do you know they were asking for T3s?

A. No.

Q. Didn't have any idea about that at all?

A. No. Were not even in these emails.

Q. Let's scroll up a little bit.

This is from -- up a little bit more.

"Dhruv and Mike, please talk to Abbie. We need to figure out a solution. Thanks."

That was from Adam Brosius, was it not?

A. I guess, yeah.
Q. And Adam Brosius is someone who you did know at that time, did you not?
A. Adam Brosius what?
Q. Adam Brosius was a person who you knew at that point; isn't that correct?
A. Yes.
Q. Adam Brosius was the one who had a relationship with Mike Zangari to discuss moving forward with transactions involving Safe Chain and Boulevard; isn't that correct?
A. Correct.
Q. "Yes?"
A. One more time. I'm sorry.
Q. Mike Zangari was the person from Boulevard, okay, that you had designated to be the point person to have communications with Adam Brosius, who is the point person for Safe Chain; isn't that correct?
A. No. They were already -- he was already at the point, but I never -- he chose the one to be. He would never give me a contact between -- between -- between Charles and me.
We would just talk together. They would never give me the contact information. And then when it took place, more problems, then they would.
Q. Sir, I have no idea what you just testified to. The question to you was --

A. At that time -- at that time, they were -- Mike and Adam would never give me any information what was going on between them, but they needed T3s or not. So that's why I'm not here.

Q. Because Mike Zangari was the front person for Boulevard at that point in any kind of communications with Safe Chain; isn't that correct?

A. Yeah. But I did not made him the main person. He choose himself to be.

Q. Well, it's your company, sir; correct?

A. I understand, but I cannot make a person make contact. If I want -- he's the one who doesn't want to -- didn't want to share that information.

Q. Sir, are you saying that Mike Zangari never contacted you and said there's an issue because Safe Chain wants T3s?

A. Correct.

Q. That never happened?

A. Correct.

Q. Okay.

A. With the time it did, with the time.

Q. I'm sorry?

A. When it had more issues, then they did.

Q. Okay.

THE COURT: Mr. Zimet, is this a good spot to take a break?

MR. ZIMET: Can I just ask one more question about this

document, sir?

THE COURT: Okay.

MR. ZIMET: Skip the train of thought because otherwise, ten minutes from now, I'll have no train of thought at all.

BY MR. ZIMET:

Q. Mike Zangari? Mike Zingo --

A. Zangari.

Q. -- "Mike Zingo from." Do you see that?

A. Yes.

Q. July 9th at 8:15 p.m. to Adam Brosius, Abbie Divilio, Dhruv Ralhan, Charles Boyd, Garrett Mellott. Does that name sound familiar now?

A. Yes.

Q. That's the other Mellott?

A. Garrett Mellott. Garrett, I know.

Q. "Re: Boulevard 9229 T3s.

"Hi Abbie. I sent email to Boulevard asking them to reach out to you for the below. Sorry I can't help as I just work as consultant."

That was on July 9, 2020; correct?

A. Correct.

MR. ZIMET: Judge, this would be a perfect time.

THE COURT: All right. Members of the jury, we're going to take a ten-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence.

We'll see you back in the jury room in about ten minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: If there's nothing else to come before the Court, we will be in recess for ten minutes.

MR. ZIMET: I have a matter, if the witness can be excused.

THE COURT: Okay.

You can go ahead and take Mr. Khaim back.

(Witness exits.)

MR. ZIMET: Judge, we would make the following specific Brady demands: That if the Government is aware of communications, which the witness denied having or claimed having taken place, that he informed the Government of who this Q person was in sessions prior to testifying, which would make his testimony inaccurate or false; that they revealed that if there were not conversations like that, which he alluded to, Number one.

The second one is that if the Government is aware of any current criminal investigation relating to this witness's activities after the termination of this conspiracy, where he claims nothing else was happening, he was not doing anything,

wasn't involved in any illegal T3 activities, if there's any open investigation that relates to that, we demand information relating to that as Brady.

THE COURT: Mr. Pogozelski?

MR. POGOZELSKI: Yes, Your Honor. As it relates to Q, he would not reveal his identity to us in that first meeting. There was a suggestion we could figure it out ourselves, just look at the Gilead complaint.

We looked at the Gilead complaint. We saw Quan Hernandez, and then we said, "So it's Quan Hernandez." That's what happened with Q.

He didn't tell us. We figured it out. And, you know, he kind of -- he clearly wanted to protect him, but at least he said it was in the Gilead complaint. So that's consistent with his testimony.

THE COURT: I think it's consistent with his testimony. How about the second part?

MR. POGOZELSKI: I think the second part was --

THE COURT: Any criminal investigations.

MR. POGOZELSKI: As of what time period? I'm sorry. What was the exact demand again, Bruce?

MR. ZIMET: Any time period from 2021, July 2021 to the present.

MR. POGOZELSKI: I personally am not -- I mean, he was indicted in SDNY in 2022. So certainly, there was an

investigation going on then.

MR. ZIMET: Let me refine it as to HIV drugs and not as to anything else.

MR. POGOZELSKI: There was an investigation into Scripps. I don't believe that Boulevard 9229 was involved with Scripps. I'm not aware of a specific criminal investigation at least --

THE COURT: Check with your agents.

MR. POGOZELSKI: Okay.

MR. ZIMET: Judge, just to complete the colloquy, it's not whether this prosecutor knows. It's whether the Government is involved in any investigations; so it's extended beyond just the knowledge of this individual prosecutor.

THE COURT: I understand. But he's in the middle of trial. He can't sit there and find out what every prosecutor in the United States might be looking into.

MR. ZIMET: Well --

THE COURT: If he can inquire of his agents, then report back if there's anything favorable. Beyond that, I think you've had a field day with this witness cross-examining him; so I don't know that any pending investigations that he's not aware of is going to make a difference in the case.

MR. ZIMET: It might lead to information that we can cross-examine and impeach what his testimony is; that he's been a good boy, doing only legal things.

THE COURT: You've impeached him on so many things that I don't know that one more level of impeachment is going to make a difference.

The jury is either going to believe him because there's corroborating testimony or they're going to reject his testimony.

And we'll be in recess.

(Off the record from 3:31 PM to 3:42 PM, after which the following proceedings were had:)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Mr. Khaim is present.

Anything to bring before the Court before we bring the jury in?

MR. POGOZELSKI: Your Honor, we did have the agents run -- well, I guess I shouldn't say this in front of the witness. We can address it later -- what happened, the questioning, the demands that the defense made.

THE COURT: Let's hear it now in case it's going to impact the cross.

MR. POGOZELSKI: All right. So the answer is no, no open investigations, as far as we can tell.

THE COURT: Okay. Let's bring the jury in.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Zimet, you may continue.

MR. ZIMET: Thank you.

Put Government's Exhibit 119 back up there, please.

BY MR. ZIMET:

Q. Before the break, we had a response from Mike Zangari, Mike Zingo. "Hi, Abbie, I sent an email to Boulevard asking them to reach out to you for the above. Sorry I can't help as I just work as a consultant."

Did I read that correctly, sir?

A. Yes.

Q. Did Mike Zangari reach out to you to tell you that there was an issue with T3s from Safe Chain?

A. I don't recall that.

Q. You're not saying it didn't happen. You just don't remember?

A. It did not happen.

Q. I'm sorry?

A. It did not happen at that time, July 9, 2020.
Q. And the reason you know it didn't happen is what, sir?
A. Because they didn't want me to be introduced to Charles Boyd and to Safe Chain Solutions. That's why.
Q. This has nothing to do with Charles Boyd, does it?
A. Yeah. He's in the email. He's the main person.
Q. It has to do with getting in contact with Boulevard so they respond for their obligations for T3s; isn't that correct?
A. That's what it means, but just...
Q. And you're Boulevard, aren't you?
A. I am Boulevard. But if I would have this understanding earlier, I would ask them what T3 was, but I had no idea what T3 was, especially at that time in July.
Q. July of 2020, your testimony to this jury is that you had no idea what a T3 was?
A. Yes.
Q. Even though you had been in the pharmaceutical -- you had pharmacies for all those years?
A. Yes.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So at what point did you learn -- or let me ask it this way: Who did you first ask what is a T3?
A. Mike Zangari.

Q. And when did you ask him that?
A. About -- when they approached me about the T3, we need this document, pedigree. And he would explain, and then they would ask, okay, Mr. Charles Boyd and Adam Brosius would like to talk to you about the T3 paperwork.
I said okay. And that's how I understand what T3 was, from that time.
Q. Are you sure you didn't have a conversation with Mr. Zangari in April or May of 2020 concerning T3s?
A. Yes.
Q. It did not happen then?
A. No.
Q. Did you tell the agents when you were interviewed?
A. Yes.
Q. On September 1st -- excuse me, on August 27, 2025?
A. Say what?
Q. That Zangari had conversations with you in May or June -- excuse me, April or May of 2020 concerning T3s?
A. We were not talking about T3s. We were trying to get more product to sell it to Safe Chain. This is what the model, main focus was.
Q. And their main focus was getting a T3 because you guys had not complied with your obligations; is that correct?
A. Again, I was not involved in this conversation. As you see, I'm not there.

Q. And it's fair to say --
A. If I would be there, I would know what was going on, and I would do something about it.
Q. You were in charge of Boulevard in July of 2020; correct?
A. One more time.
Q. July of 2020 --
A. Yes.
Q. -- you were in charge of Boulevard?
A. Yes.
Q. It was your company?
A. Yes.
Q. You had no employees other than yourself; correct?
A. I had one girl.
Q. You had the girl who created the false document?
A. Yes.
Q. So it's a false document girl and you at Boulevard; correct?
A. Yes.
Q. So any email coming to Boulevard, you would have the ability to see -- open up and see and read; isn't that correct?
A. Yeah.
Do you have any emails regarding Boulevard?
Q. "I sent email to Boulevard asking them to reach out to you for the below."
A. Yeah.

Q. You never saw that email from Mr. Zangari?
MR. POGOZELSKI: Objection.
THE COURT: Overruled.
A. Not on 9/20 -- not on July 9/20.
BY MR. ZIMET:
Q. How about July 10th, 2020?
A. I don't remember.
Q. Well, you and Zangari communicated by email; correct?
A. Mostly by phone calls.
Q. And you used certain apps that are not the traditional, like Verizon Communication, if that's an app, or whatever it is.
You had something called WhatsApp that you used all the time, didn't you?
A. Yes.
Q. And WhatsApp is something that -- it disappears after a certain number of days; correct?
A. Not always. It depends how you set up the WhatsApp. You can set it up to disappear or not set up to not disappear.
Q. And your WhatsApp has never been produced to the government; is that correct?
A. No.
Q. It has been produced to the Government?
A. No, not really.
It was produced, a document between me talking to Charles

Boyd and Adam Brosius and other people, but particularly to this, no.

Q. Let's go back a second, sir.

You suggest in your answer that you spoke on WhatsApp with Charles Boyd.

A. I spoke to Mike on WhatsApp, but we have not spoken about this particular involvement the T3. That they're looking for, T3. That's what I said.

Q. Just so it's clear: You never had one conversation at all with Charles Boyd on WhatsApp; isn't that correct, sir?

A. No.

Q. It's not correct?

A. We did not spoke [sic].

Q. You used WhatsApp with Zangari; correct?

A. Yes.

Q. You used WhatsApp with Brosius; correct?

A. Yes.

Q. You used WhatsApp with Garrett Mellott; correct?

A. Yeah.

Q. But never with Charles Boyd; correct?

A. No, yeah.

Q. You saw the telephone records that were introduced?

A. Yes.

Q. First one is sometime in August; correct?

A. Yes.

Q. So nothing in the months before that; correct?
A. No.
Q. It's because you didn't have any telephone conversations with Charles Boyd before that; correct?
A. No.
Q. Now, nothing was done on behalf of Boulevard to produce any T3s to Safe Chain until sometime in August of 2020; is that correct?
A. Correct.
Q. And that was your choice; correct?
A. No.
Q. It was something that you didn't know you had an obligation to do?
A. I didn't know that we had to provide T3s.
Q. Well --
A. Like, I see this on the email. I never saw this email that they needed the T3s.
Q. Let's go up.
A. If they would need it, they would -- I'm sure Adam or Charles Boyd would contact Adam so they could be in touch with me, but they never did.
Q. So compliance from Safe Chain responds Friday, April 10th -- excuse me, July 10, 2020. "Thank you, Mike. If I don't hear from them, are you the best person to contact, or is there someone there you might suggest?"

A. Yeah, I see that.
Q. And included in the people on that is Mike Zingo, Adam Brosius, cc's Dhruv Ralhan.
Who's he?
A. Who's who?
Q. Dhruv, D-H-R-U-V. R-A-L-H-A-N.
A. He's -- they work together with Mike Zangari.
Q. And you knew him at that point, did you not?
A. Yes.
Q. He was someone that you were working with to make money; correct?
A. Correct. But never got this email. Never -- I was never involved in this conversation that they had.
Q. Your name is not on the email; but is it your testimony, sir, that Dhruv Ralhan, Mike Zangari, Mr. Mellott, Ms. Mellott never contacted you concerning Boulevard T3s?
Is that your testimony, sir?
A. Yeah, they never contact me in regards to this.
Q. And certainly, if you had been contacted, you would have gotten into action; correct?
A. Correct.
Q. Yes?
A. If somebody contact me from Safe Chain, I will take an action, but they never did.
Q. So the only reason --

A. No one contacted me.
Q. They --
A. They should have contacted me.
Q. The only reason that Boulevard didn't do T3s is because the people who could have benefitted from them never contacted you; is that your testimony, sir?
A. That's what it looks like, yes.
Q. Do you have any explanation why these people who would have benefitted never contacted you, according to your testimony, at least?
MR. POGOZELSKI: Objection. Speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Now, were you trying, sir, at some point, to ignore any request to produce T3s because you didn't want to have to do the work?
A. No, sir.
Q. Well, you knew that the pills that you were sending to Safe Chain were from the black market; isn't that correct?
A. Yes.
Q. You had not revealed that to Safe Chain?
A. No.
Q. In fact, you never revealed that to Safe Chain; correct?
A. I don't want anybody going behind my back and buy it from my -- my connect [sic].

Q. Well, you also didn't want to expose the fact that you were involved in criminal activity; isn't that correct?
A. Not really, no.
Q. Not really?
A. No.
Q. I'm sorry. Go ahead. Finish.
A. No. I -- I did what I did.
Q. Well, we know you did what you did. But the question is, sir, the reason you did is because you did not want to reveal that, in fact, what you were trying to sell to Safe Chain were black market pills; isn't that correct?
A. It was obvious on that day it was coming from black market.
Q. I'm sorry?
A. It was obvious on that day that it was coming from black market.
Q. Well, it's obvious to you because you knew it, okay? But certainly, you never said one word of that to any -- to Charlie Boyd or anyone else from Safe Chain; is that correct?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Answer, please.
A. We've been working --
Q. Excuse me. Answer yes or no, sir.
A. One more time, the question.

Q. You never said anything to people at Safe Chain that the pills that you were selling from Boulevard were black market pills; isn't that correct?
A. No, sir.
Q. So you never said it at all; correct?
A. No.
Q. Because you did not want to expose the fact that you were involved in criminal activity?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Now, you would agree that what we talked about earlier, by revealing that information, that would, in essence, open up the fact of your criminal conspiracy; correct?
A. No. I had a feeling they would go behind my back and just be introduced by other people, who would sell to them for cheaper price than me.
Q. So you had a feeling that the --
A. That's what the business is. It's all about cutting the third person. The more you cut, the more money you make.
Q. So let's --
THE COURT: You have to stop interrupting the lawyer. You can't give an answer, and then when the lawyer starts the question, you remember something else that you want to say and just blurt it out. You just have to wait until the lawyer

stops.

BY MR. ZIMET:

Q. Okay?

A. Yeah.

Q. So your thought process was if you reveal the fact that these were black market pills, Safe Chain would go to somebody else to get other black market pills? Is that your testimony?

A. Yes. Not other. Mine. Especially my contacts.

Q. Especially your contacts?

A. My contacts. My referral base, yes.

Q. That you were keeping secret; isn't that correct?

A. Yes, I was keeping secret because that's the way in business.

Q. You mumbled at the end. I couldn't hear what you said.

A. I said, "That's the way the business runs. You don't tell everything."

Q. Not the identity or source, because they had no way of knowing your source because you weren't revealing your source?

A. They had a real idea where the source would come.

Q. I'm sorry?

A. I said, "They had an idea what the real source are."

Q. They had a real idea what the real source was?

A. A real idea where --

Q. -- the source comes from?

So they know it was Q. Is that your testimony?

A. Not exactly Q --
Q. But --
A. -- but they had an idea it's coming from the street.
THE COURT: Let's do it this way.
Mr. Zimet, you ask a question, and then I'll tell you when you can answer, Mr. Khaim.
THE WITNESS: Okay.
BY MR. ZIMET:
Q. In fact, you weren't saying it was black market pills. You are saying that these were legitimate pills coming from pharmacies that, in fact, were either closing down, going bankrupt, having financial issues, because this was in the middle of COVID; isn't that correct?
THE COURT: Now, you can answer.
A. Not really.
THE COURT: Next question.
BY MR. ZIMET:
Q. You never said that to anyone from Safe Chain?
A. I only said it was coming from closed pharmacy. Not say about that they had financial issues or any other.
THE COURT: Next question.
BY MR. ZIMET:
Q. And when you said "closed pharmacies," you meant pharmacies that were no longer in business and were getting rid of what they had on stock; is that correct?

A. Correct.

THE COURT: Next question.

BY MR. ZIMET:

Q. That is something quite different than black market pills that were coming from the street; isn't that correct?

A. Correct.

Q. And you wanted Safe Chain people to believe that the pills they were receiving were legitimate pills; isn't that correct?

A. Correct.

Q. And you did everything you could to promote or foster that belief; isn't that correct?

A. No, sir.

MR. POGOZELSKI: Objection. He should specify who he's talking about.

THE COURT: Overruled.

You can answer the question.

A. No, sir.

BY MR. ZIMET:

Q. You did not try to say that to Safe Chain that these were, in fact --

A. No.

Q. -- these were, in fact, legitimate pills from pharmacies that you had acquired during COVID?

A. That's what I said. They're coming from closed pharmacy. That's it.

Q. So --

THE COURT: Next question.

BY MR. ZIMET:

Q. -- you were told sometime in August of 2020 that Safe Chain was insisting that Boulevard provide T3s for all the past transactions from April to that time in August as well as any new transactions; correct?

A. Yes.

MR. POGOZELSKI: Objection as to who the "you," who told him.

THE COURT: Overruled.

You can answer.

A. One more time.

BY MR. ZIMET:

Q. You learned in August of 2020 that Safe Chain was insisting that Boulevard produce all T3s for all transactions that had occurred from April until August of 2020; isn't that correct?

A. Yes.

THE COURT: Next question.

BY MR. ZIMET:

Q. Even after you learned that, "you" being Boulevard, did not produce any T3s; isn't that correct?

A. Yes. I did not produce, and they would still keep buying it --

Q. About --

A. -- without T3s.

THE COURT: Next question.

BY MR. ZIMET:

Q. As a matter of fact, it was only when Charles Boyd said, "We're stopping any dealing with Boulevard until you start producing T3s," did you address the issue of production of T3s; isn't that correct?

A. It's not about stopping. It's about they wanted to get the T3s, but they still wanted to work.

THE COURT: You have to answer yes or no, and then explain the answer.

Repeat the question.

BY MR. ZIMET:

Q. It was what Safe Chain communicated to you, being Boulevard, that they were not going to go forward, Safe Chain, with any transactions until Boulevard produced T3s for the transactions that had taken place from April into August of 2020?

A. Correct.

Q. In fact, what happened was Safe Chain -- Charles Boyd -- said, "We're not going to pay you any money that's owed to you until you start producing these T3s"; is that correct?

A. There was not -- that was not the reason.

THE COURT: You have to answer yes or no, and then you can explain.

A. Yes. But the main reason was, of that, is that they already sold those drugs to the pharmacy as a previous -- we saw it on the documents of the T3 on the same day they would buy, and the same day they would sell.

So they had -- they just didn't want to pay me because of the T3, but the product already sold.

THE COURT: Next question.

BY MR. ZIMET:

Q. Wasn't there an email that was sent by Adam Brosius saying, basically, or saying, "We have what he described as a Catch-22. Boulevard does not want to produce T3s. Safe Chain is not going to pay for any HIV drugs until Boulevard starts producing T3s"?

Wasn't that specifically sent out in an email, which you had seen and read?

A. Which email?

Q. Do you recall seeing an email that said that, sir?

A. Which email? Can you remind my memory, please?

Q. Do you recall seeing an email that said that about the Catch-22, sir?

THE COURT: You can answer yes or no.

A. I don't remember that email.

THE COURT: Okay.

BY MR. ZIMET:

Q. There came a point in which you decided, from Boulevard,

that you would start producing pedigrees or T3s; is that correct?
A. Yes.
Q. And when you started -- when you made that decision, you informed Safe Chain that because you had mainly been in the pharmacy business and not in the wholesale distribution business for very long, you needed guidance as far as how to do a T3; isn't that correct?
A. Correct. But not only guidance. It's about teaching me how do this because I have no idea what a T3 was.
Q. And, in fact, Charles Boyd offered to you to have contact with the entity or company that worked on T3s for Safe Chain so that Boulevard could hire the same company to produce their T3s? "Their" being Boulevard's T3s; isn't that correct?
A. She would introduce me to one of the persons; correct.
Q. And that person's first name was Sameer; isn't that correct?
A. Correct.
Q. But you decided that you did not want to use Sameer; isn't that correct?
A. Wrong.
Q. You hired Sameer?
A. I wanted to hire Sameer.
Q. Did you hire Sameer? Yes or no?
A. I did not hire Sameer, but I wanted to, but he was busy

with other things.
Q. So you have communications with him where you say, "I want to hire you," and he said, "I'm too busy to do that work"?
A. Yes.
Q. And you've seen those?
A. No. We had a phone conversations.
I was calling him so many times, and he would reject my phone calls. And that's how we were talking between me and Charles, and that's it.
Q. Between?
A. Between me and Charles.
Q. How about you and Sameer?
A. I spoke only once and twice. He was too busy to picking up the phones on me.
Q. Let me ask --
A. He was too busy to work with me.
Q. You had a telephone conversation with him; correct?
A. Yes.
Q. During that telephone conversation, he told you he was too business to do work with Boulevard? Is that your testimony?
A. Yes. He was busy. He never came up to work with me. I wanted to hire him. Sure, I wanted to hire him.
Q. And then you respond to Charles Boyd and said, "Well, thanks for offering Sameer, but he's too busy. Is there anyone else you could suggest?"

You did that, did you not, sir?
A. I didn't send a text message. Maybe I would say in the phone conversation, yeah.
Q. The truth is you never did that at all, sir, did you?
A. I was speaking to Charles.
Q. The truth is you never did that at all? Requesting someone else if Sameer was too busy to do the T3s; isn't that correct, sir?
A. Yes.
Q. And so then you decided that you were going to tell Safe Chain that you were going to use your own compliance person, this person, King Kimchi, who was going to do the T3s; isn't that correct?
A. That was me.
Q. You told Safe Chain that you were going to use King Kimchi to do the T3s; isn't that correct?
A. No. I just told him I would do it myself, and he would explain to me how to do it, and that's why I took my own position.
Q. And that's why you created the name King Kimchi, a false name, who's really you, to go forward with these T3s?
MR. POGOZELSKI: Objection. Asked --
MR. ZIMET: Can I finish?
MR. POGOZELSKI: Yes.
BY MR. ZIMET:

Q. Is that your testimony, sir?

MR. POGOZELSKI: Objection. Asked and answered. Covered at length.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Now, when did you tell Charlie Boyd that you were King Kimchi?

MR. POGOZELSKI: Objection. Again, asked and answered.

THE COURT: I don't think he ever told him.

Sustained.

BY MR. ZIMET:

Q. Did you ever tell Charlie Boyd that you were King Kimchi?

MR. POGOZELSKI: Objection. The same reason.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So we saw emails of King Kimchi sending to Safe Chain that he wanted information; correct?

A. Yes. That was me, though.

Q. And you were asking for information because you were going to be preparing the T3s; correct?

A. Yes. False T3s, yes.

Q. And you knew what information you needed to ask for in order to prepare the T3s; correct?

A. I didn't ask. I just asked for information what was sold to them. That's all.

Q. That you were what?
A. I would ask them information what was sold to them, to the Safe Chain, so I could get the information to create those T3s.
Q. So you wanted to create the T3s by documentation of what you had sold to Safe Chain; is that correct?
A. I would create the T3s of what was sold to Safe Chain. Yeah, I didn't have any information, yes.
Q. Well, you had the information because you had sold it, had you not?
A. I did not.
Q. You didn't keep records of things you sold to Safe Chain?
A. No.
Q. You didn't have purchase orders?
A. No.
Q. You never had a purchase order for any of the HIV drugs that you sold to Safe Chain prior to August of 2020?
A. He had purchase orders. But on a purchase order, there is no lot numbers and expiration date on the medication that was sold to Safe Chain.
Q. So you knew you needed all that information; correct?
A. They would explain to me, yeah, about moving forward about the T3 and the information that needed to be on it.
Q. And you did not want to provide any documentation to Safe Chain concerning those transactions; isn't that correct?
A. It's not about providing. It's about not having. I didn't

have any documents to provide.
Q. And the reason you had no documents to provide is because you were getting all of the drugs from the black market where there was no documentation, and you did not want Safe Chain to know what was, in fact, happening; isn't that correct, sir?
A. No, sir.
Q. You had transactions with pharmacies. You're claiming you're getting these HIV drugs from pharmacies. That was your story, at least; correct?
A. I told the story, yes.
Q. Which was a lie; correct?
A. It's not a lie. That's just the way -- I don't want to reveal all my secrets to my business.
Q. So when you don't want to reveal a secret about a business and you say something different than what it really was, in Peter's mind, that's not a lie? Is that your testimony?
A. Right.
Q. So you begin filling out T3s; correct?
A. Yes.
Q. And you were telling Safe Chain that what you're filling out in the T3s was correct information, based on transactions that you actually had; is that correct?
A. No.
Q. You were telling that what you were providing in T3s were lies?

A. The first couple of T3s was wrong, and they would teach me how to do it.
Q. Well, what was my question to you, sir?
A. That's what I said, it was wrong.
Q. Were you telling Safe Chain that the information that you were providing on the T3s were lies?
MR. POGOZELSKI: Objection, Your Honor. Clarify as to who at Safe Chain?
THE COURT: Overruled.
BY MR. ZIMET:
Q. Go ahead, answer.
A. One more time, sir.
Q. Were you telling Safe Chain that the information you were provided on the T3s, that you were providing to them was lies -- or were lies? Bad grammar.
A. I would tell them that this was a purchase from a closed-down pharmacy, correct.
Q. And that was false; correct?
A. False.
Q. And you knew it was false when you put it on the T3; isn't that correct?
A. Yes, it was false.
Q. And you didn't tell Safe Chain that you were, in fact, providing them with false T3s; correct?
A. Correct.

Q. You were hoping they would miss it, just like they missed the certification of licensing as a wholesale pharmacy, okay, when you sent in your application to get approved as a vendor for Safe Chain; is that right?
A. Right, but they never missed.
Q. You hoped that they were sloppy and didn't catch on to the lies you were doing; correct?
A. Not about that, no.
Q. Well, isn't that the same kind of lies you used in the two cases that you ultimately got convicted of? By providing false information to people to deceive them so you can make money?
A. No, that was different -- different conspiracies.
Q. Same concept of lying to get money; isn't that correct, sir?
A. No, sir. I did lie but...
Q. You did lie, but it wasn't to get money?
A. We was creating those T3s together. We were lying together to Abbie to go through Safe Chain compliance.
Not just by myself. When you say "you, you, you," you're coming to me personally, but it just wasn't me.
Q. I'm asking about you.
A. Right.
Q. Okay.
A. Both of us.
Q. That you, okay, in charge, decided that the documents with

lies on it would be sent to Safe Chain; isn't that correct?
A. Again, I was not the only one who decide that.
Q. I'm not asking whether you're the only one.
I'm asking you weren't you the person who made the determination that lies were going to be submitted on T3s to Safe Chain?
A. One more time, sir.
Q. You're the boss at Boulevard; correct?
A. Yes.
Q. You could say something can go out or not go out; correct?
A. Yes.
Q. You're the ultimate gatekeeper; right?
A. Right.
Q. You made the decision that T3s with the false information could be sent to Safe Chain; correct?
A. Yes. But I was not the only one who did T3s. That's the way I was explained, that's the way I was doing it.
Q. And one of the explanations you gave, when it turned out to be false information, is that there was a mistake that was being made from Boulevard; isn't that correct?
A. Right.
Q. You had an excuse for why the document had something that was false; correct?
A. Who had excuse?
Q. You at Boulevard; correct?

A. Didn't have the excuse. They're the ones who said this was a mistake; so we was trying to fix it.
Q. And you are trying to explain how that mistake took place; isn't that correct, sir?
A. No. They told me it was a mistake, and they guided me how it's supposed to look like.
Q. They guided you how to fix the mistake?
A. Yes.
Q. Isn't it true that you told them why and how that mistake took place?
A. The information was given, and they told me how to put it. That's all.
Q. They told you that what you had sent was unacceptable; isn't that correct?
A. What's unacceptable?
Q. The false information on the T3.
A. Yes.
Q. And they said, "Unless you give us information we can verify, we're not going to go forward with the transaction with Boulevard"; isn't that correct?
A. Then why they did?
Q. I'm sorry?
A. While it was happening, transactions.
Q. And they started trying to verify because once you started with the T3s that you had -- that you needed to send to try to

catch up, they discovered information in there that was inaccurate; correct?

MR. POGOZELSKI: Objection as to who "they" are.

THE COURT: Overruled.

BY MR. ZIMET:

Q. Isn't that correct?

A. One more time.

Q. Isn't it correct, sir, that once you started to produce T3s to satisfy the backlog of T3s that had not been sent, Safe Chain compliance identified inaccuracies and informed Boulevard of those inaccuracies?

A. They didn't inform Boulevard directly. They would inform Charles Boyd.

Q. So Safe Chain informed Charles?

A. Talking about just what you said; that Abbie, the compliance officer, informed them, and then he would inform me.

Q. So Boulevard did get informed; correct?

A. From Charles, yes.

Q. From Charles, from Abbie, from whoever it was, Boulevard learned that Safe Chain had uncovered inaccurate information; isn't that correct?

MR. POGOZELSKI: Objection. Asked and answered. Argumentative.

THE COURT: Overruled.

A. One more time.

BY MR. ZIMET:

Q. Whether it was from Abbie Divilio, Charles Boyd, or anyone else from Safe Chain, Boulevard was informed that the T3s that they were beginning to send to catch up on the backlog contained inaccurate information; isn't that correct, sir?

A. They were looking into it. They were -- it was inaccurate information, yes, you're right.

Q. So the answer to my question is "yes?"

A. Yes.

Q. Remember the judge's instruction about questions and answers?

A. Yes.

Q. Let's try to stick to that.

Okay?

A. Okay.

Q. Once Boulevard learned that Safe Chain had identified inaccuracies, Boulevard submitted other T3s which supposedly had accurate information; isn't that correct?

A. There was never accurate information.

THE COURT: You have to answer yes or no.

A. No.

BY MR. ZIMET:

Q. Boulevard did not resubmit or submit new T3s with what they were claiming was accurate information?

A. Yes.

Q. And then when we got to September of 2020, there's another occasion where Boulevard -- excuse me, Safe Chain stopped doing business with Boulevard; isn't that correct?
A. For some time, yes.
Q. Because Safe Chain was not satisfied with what Boulevard was doing and producing to Safe Chain; is that correct?
MR. POGOZELSKI: Objection as to what company -- whether he knew what the company was satisfied with.
THE COURT: Overruled.
A. One more time.
BY MR. ZIMET:
Q. Late September/October of 2020, Safe Chain stopped doing business with Boulevard; is that true?
A. For some time, yeah.
Q. And the reason provided to Boulevard for the stoppage of business with Boulevard is because concern with what was being presented by Boulevard to Safe Chain concerning the T3s; isn't that correct?
A. Basically, yes.
Q. And then what happened at Safe Chain is that there's a change of policy -- is that correct? -- in October of 2020?
A. I'm not sure. What was the change in what kind of policy?
Q. The change in policy was that instead of approving a T3 once the product had been delivered to Safe Chain, Safe Chain required to get the T3 before the transaction was consummated.

In other words, unless the T3 met approval, there would be no transaction.
Isn't that what happened, sir?
MR. POGOZELSKI: Objection. He's testifying. The witness said he didn't know anything about a policy.
THE COURT: Overruled.
A. I'm not sure how was the policy with them. They never told me about their policies.
BY MR. ZIMET:
Q. Well, you did not learn, as the head of Boulevard, that Safe Chain was not going to do any purchase order until the T3 was approved first?
A. No, sir.
Q. You never knew that happened?
A. They would ask me for the T3 upfront, but I didn't know that there was that policy.
Q. So, as far as you were concerned, at least your testimony to the jury today, that the Safe Chain policy concerning T3s never changed the entire time you're doing business with them; is that correct?
A. They were never -- I don't even know they even had a policy.
Q. Did they not have a practice as to how they were doing business with Boulevard?
A. I have no idea. I never was there.

Q. Well, you did -- you did $34 million of business with Safe Chain; is that correct?
A. Yes.
Q. You never knew what the procedures were in doing that business? Is that your testimony, sir?
A. Yes.
Q. Well, they demanded T3s, did they not?
A. Eventually, they did. Not in the beginning.
Q. They demanded T3s, didn't they, sir?
Yes or no?
A. Eventually, they did, yes.
Q. And they demanded all T3s that hadn't come with the product to then be updated and any backlog be updated; isn't that correct?
A. Which part are you talking about? Sold without T3s? Is that the part?
Q. You don't understand the question?
A. That's what -- I'm trying to understand the question.
Q. The T3S from Boulevard to Safe Chain, they demanded that those would be -- the backlog would be updated so there no longer would be a backlog; isn't that correct, sir?
A. I guess.
Q. You guess?
You know that, don't you, sir?
Don't you?

A. They were asking, and I was doing it, yeah.
Q. So they wanted the backlog to be eliminated; isn't that correct?
That was the practice, wasn't it?
A. I have no idea, sir, what they did. I only know they bought it without T3.
THE COURT: Next question.
BY MR. ZIMET:
Q. Now, let's go back a second.
Let's go back to New Jersey for just a second.
Actually, go forward to New Jersey but back in the questioning.
Didn't you sign an agreement with the Government before you gave your interview in New Jersey?
A. Which agreement?
Q. At Fort Dix with the prosecutor and the FBI agent.
A. Which agreement?
Q. Didn't you sign an agreement with the Government? Yes or no?
A. I understand, but which agreement are we talking about?
THE COURT: The one at Fort Dix.
BY MR. ZIMET:
Q. In Fort Dix.
THE COURT: In August.
A. There was some kind of agreement. That was a cooperation

agreement.

BY MR. ZIMET:

Q. A cooperation agreement. So you remember signing one?

A. It was, yeah.

Q. And isn't it correct that prior to that agreement that was signed, the cooperation agreement, you or through your attorney indicated that you were interested in providing information concerning criminal activity, which you were aware of; is that correct?

A. One more time.

Before I signed?

Q. Yeah.

Communication that had been made to the Government that you were interested in cooperating; isn't that correct?

A. Yeah.

Q. Is that a yes?

A. Yes.

Q. You do remember that, do you not?

A. Yeah.

Q. And wasn't that part of the cooperation agreement that you signed in the Fort Dix meeting?

A. Yes.

Q. Now, you also signed a document before your testimony here in front of this jury; isn't that correct?

A. Yes, sir.

Q. And in that agreement, you question -- or even before that agreement, you question whether an exchange for you providing truthful, complete, and accurate information and testimony in this matter, the prosecutors handling the two sentencing cases will file motions for reduction of your sentence pursuant to Federal Rules of Criminal Procedure; isn't that correct?
A. Yes, sir.
Q. And so what you were doing, in coming here and testifying, is hoping and wanting that the prosecutors here in Florida would go to the prosecutors in New York and see if they can ask the judge to reduce your sentence; isn't that correct?
A. I'm not sure how that works, but they did not promise me anything.
THE COURT: The question was whether you were hoping for it.
A. I was hoping.
BY MR ZIMET:
Q. And in order for that to get started, the prosecutors here in Florida would need to take the first step to contact the prosecutors in New York; isn't that correct?
A. I'm not sure how that transactions works.
Q. Didn't you read a document that explains that transaction, sir?
A. I read it, but I'm not sure how that works -- the logistics. I'm not sure how that works.

Q. Is that in the agreement itself, sir?
A. Yes.
Q. So you read it. Did you sign it? You did sign the agreement, didn't you?
A. Yeah, I did.
Q. It was on October the 7th, 2025?
A. Yes.
Q. What's today's date?
A. Today is --
THE COURT: The 8th.
A. -- the 8th.
BY MR. ZIMET:
Q. So you signed it yesterday?
A. Yes.
Q. And you do remember what you signed yesterday, do you not?
A. Yes.
Q. And as you're testifying here today, that is still your hope that that happens?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Now, you said yesterday that Charles Boyd instructed you how to lie on a T3; is that correct?
A. Yes. And I said it here today too.
Q. I'm sorry?

A. And I said this today too. Not lie. To instruct me how to do the T3 and to put the stuff so it could go through Abbie, to compliance, so we can do more business, yes.
Q. So what he was instructing you to do was how to correctly fill out a T3 form; isn't that correct?
A. Not only instruction. Telling me to put information that I didn't even know about.
Q. Well, he wasn't making up information and telling you to do certain things, was he?
A. I have no idea what he --
Q. He wasn't telling you what names to put into the T3. He was telling you where the names that you supposedly had should be placed; isn't that correct?
A. No.
Q. That's not correct?
A. He would give me a name to put on, like McKesson.
Q. He would give you a name of someone you never did business with to put on some T3s? Is that your testimony, sir?
A. That's what I did.
Q. Which name did he tell you to put on a T3 that he knew was false?
A. McKesson. McKesson is a wholesaler. That's what I did in one of the T3s.
Q. Did you not tell him that McKesson was the source of these drugs?

A. I did not tell him anything. He gave me one of the highlighted T3s, and I made a copy and put it in there.
Q. What he gave you a copy of was a T3 with another client, another instance, which McKesson was there -- correct? -- on the document? Isn't that correct?
A. He gave --
Q. Isn't that correct, sir?
A. Yes. He gave me the information. Then I made a copy and put it and gave it to him.
Q. He never, ever, sir, told you that you should put McKesson onto the document that you were creating; isn't that correct, sir?
A. He didn't tell me anything. He just gave me the paper, and I put that information.
Q. My question to you, sir, was he never told you to put the name McKesson on the T3 you were preparing; isn't that correct, sir?
A. He didn't tell me anything. He just provided me the paper.
Q. So it would be incorrect to say that he told you to put McKesson on the T3 that was being created; isn't that correct, sir?
A. He just provided me it.
Q. What was my question, sir?
Answer yes or no, please.
A. One more time, sir.

Q. Isn't it correct that he never told you to falsely put McKesson on a T3 that was coming from Boulevard? Isn't that correct, sir?
A. He meant that, to put it.
Q. He what?
A. He meant to tell me to put that information.
Q. So, in your mind, you say because he told you, "This is an old T3 from another case," that he did that and meant you to put a false entry onto a T3? Is that your testimony, sir?
A. That's what I believe that he did, and that's what I put. If he had any problems, he would let me know that it was an issue, and we would take it out and put something else.
Q. Wasn't that presented to you, sir, as an example of what a T3 should look like?
A. If it would be an example, he would call me and let me know. We would be in contact back and forth.
Q. That's exactly what the conversation was -- that this was an example. Isn't that correct, sir?
A. I don't recall that.
Q. Well, sir, you're a graduate of St. John's. You're a college graduate. You know what's being communicated on a conversation.
He never said to you, "Put McKesson onto this T3"; isn't that correct?
MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.
BY MR. ZIMET:
Q. And it was your impression that it was not an example that he was providing to you? Is that what your testimony was?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Now, you said that in your testimony yesterday that there were instances where you used the same pharmacy to put onto a T3; is that correct?
A. Yes.
Q. And that was false; is that right?
A. It was false.
Q. You weren't told to do that by Charlie Boyd or anyone at Safe Chain; is that correct?
A. Correct.
Q. You did that on your own; correct?
A. I did that on my own, and they were okay with it.
Q. And it passed through compliance; isn't that correct?
A. Yes. First, I would send it to him. And if he was okay, then he would tell me to pass it through compliance, correct.
Q. Actually, what he said to you was, "These don't come to me. They need to go directly to compliance"; isn't that correct?
A. No.
Q. Isn't it correct that compliance had the final say whether

any T3 was approved or not?

MR. POGOZELSKI: Objection. It requires speculation.

THE COURT: Sustained.

BY MR. ZIMET:

Q. From your knowledge, from your working with Safe Chain, isn't it correct that it was communicated to you that compliance had the final say whether any T3 was approved or not?

A. Yes. But he would look at it before he's sending it to compliance.

Q. And that's because you sent them to him beforehand? Is that your testimony?

A. I would send him before, and then he would tell me to send it to compliance, if he would approve it.

Q. So you're saying before it went to compliance, he needed to approve it? Is that your testimony?

A. Yes.

Q. And what do you base that on?

A. One more time.

Q. What do you base that answer on?

A. Based on if he would be okay, usually, they would call me back and tell me this is good or not good.

Q. So there's -- I'm sorry.

A. Yeah, he told me if this is the -- he's okay with this T3 or not, and then he would tell me to send it to

compliance afterward.
Q. So he would call you and tell you that; correct?
A. No. A text message or something.
Q. So there would be a record of that communication each time there's a T3; is that correct?
A. Not each time. There was a few times. The beginning was the problem.
Q. So at the beginning, there was a problem? Is that your testimony?
A. Yes. The beginning of the creation of the T3s, yes.
Q. But after that, it went to compliance without going through Charles Boyd's vision or approval; isn't that correct?
A. Yes.
Q. And that meant that Abbie Divilio was the gatekeeper of whether something was approved or not; isn't that correct?
MR. POGOZELSKI: Objection. Asked and answered. Speculation.
THE COURT: Overruled.
A. Would she approve it? She would always be in communication with Charles Boyd.
BY MR. ZIMET:
Q. And that's because when she spoke with Charles Boyd, you were part of that conversation? Is that your testimony, sir?
A. No.
Q. You're just throwing that out without any substance behind

that; isn't that correct, sir?

MR. POGOZELSKI: Objection. Argumentative.

THE COURT: Overruled.

A. Anything happens in that company, it would go to Charles Boyd.

BY MR. ZIMET:

Q. And you're basing that on how much -- how many times were you ever at Safe Chain?

A. Excuse me?

Q. How many times were you ever at Safe Chain?

A. Zero.

Q. So you've never been at Safe Chain?

A. No.

Q. But your testimony is everything that she approved would go through Charles Boyd? That's your testimony?

A. Yes.

Q. Now, you had conversations with Adam Brosius on a regular basis, did you not?

A. Not on a regular basis. Whatever he needed me and whenever he needed product.

Q. When he asked you on your travels to various pharmacies to see what drugs might be available?

A. One more time.

Q. As a matter of fact, you really weren't traveling to various pharmacies to find drugs; correct?

A. Me?
Q. Yes.
A. No.
Q. And he knew about that because you had told him that's something that you were doing; isn't that correct?
A. No.
Q. Do you remember having a conversation with Adam Brosius on October 22nd, 2020, where he asked you, "Peter, during your travels, talking to pharmacies that are going out of business, can you see if they have certain products?"
A. That, I remember, yes.
Q. So you did?
A. That particular event, because he needed some product.
Q. And he knew you were going around to pharmacies because you had told him that; isn't that correct?
A. Correct.
Q. Which was another lie on your part; isn't that correct?
A. I just didn't want my -- I didn't want to give him all the information where I get the product from. The truth, they know.
Q. I'm sorry? What was the last part of that answer?
A. I did not want to give the information, where I get the product from, from my sources.
Q. So you didn't want to tell the truth?
A. It's not about the truth. You just don't want to give the

information.

Q. Well, you gave false information?

A. If I would give the true -- not about true. If I give that information, they would copy or go behind my back and buy that.

Q. Isn't it correct, sir, that you also had a conversation on October 2nd with Adam Brosius, where Adam Brosius tells you that all of the -- "All of the T3 stuff is up to Charlie and Abbie?" Isn't that correct, sir?

A. Just like I told before.

MR. POGOZELSKI: Your Honor --

BY MR. ZIMET:

Q. Actually, what you told before was it's all up to Char- --

THE COURT: Hold on.

MR. ZIMET: I'm sorry.

THE COURT: Is there an objection?

MR. POGOZELSKI: Yeah. I'd like to know what Mr. Zimet is reading from. It's seems like something not in evidence. I don't know what he's reading from.

THE COURT: He can ask whatever questions he wants. The questions aren't evidence. The witness's answers are evidence.

The record is not reflecting that he's reading from something. He hasn't indicated he's reading from something. He's asking a leading question on cross-examination.

You may proceed, Mr. Zimet.

BY MR. ZIMET:
Q. In fact, that's different than what you answered when the prosecutor asked you questions. You said it was only up to Charlie, and you didn't include Abbie in the approval of the T3 stuff; isn't that correct?
A. Like I told before, first, it would go to Charles, and then it would go to Abbie. If Charles approve, then it goes to Abbie. I would never have direct contact with Abbie.
I would have direct contact with Charles, and eventually, he would give in the email, and for me to send the T3s to her.
Q. Isn't it -- I'm sorry. Go ahead, finish. My bad.
A. Meaning that I never spoke to her. I just spoke to her once on the phone, and that's it, for a few -- couple -- for a minute or so, and that's it.
Q. The question is --
A. Most likely, she would contact Charles, and Charles would contact me, and that's why I said everything would go through Charles.
THE COURT: Next question.
BY MR. ZIMET:
Q. The correct answer is it went through Charles and Abbie; isn't that correct?
A. From my side, it was mostly Charles. Charles -- he would contact Abbie. If she was okay, then everything would be okay.
Q. When you earlier answered the question on direct

examination, you did not include Abbie in your answer. Isn't that correct, sir?

A. No.

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: The jury will rely on their own recollection of what the testimony was.

Next question.

BY MR. ZIMET:

Q. Now, after you were arrested in the New York case in December of 2020, you had communication with Adam Brosius, did you not?

A. Yes.

Q. In fact, prior to that time, you actually met with Adam Brosius; isn't that correct?

A. Yes.

Q. You had a face-to-face meeting --

A. I had only one meeting with him.

Q. You had a face-to-face meeting with Adam Brosius; correct?

A. Yes. Once, yeah.

Q. When you revealed your real name to Adam Brosius; isn't that correct?

A. He knew my name before.

Q. He knew your full name before that?

A. Yeah.

Q. I knew it was Peter, last name?

A. Khaim.
Q. When did he learn that?
A. I have no idea.
Q. Well, did you --
A. I never told him my last name. Nobody ever asked my last name.
Q. Well, if he never asked your last name, when did you tell him your last name?
A. When people ask my last name, I would tell, but nobody did. Why would I tell?
Q. So when you met him in person, I assume you shook hands?
A. That's what normal people do, yes.
Q. And you're a normal person; right?
A. Yes.
Q. And you shook hands, and you said, "I'm Peter Khaim"; right?
A. I just said, "I'm Peter." I didn't say, "Khaim."
Q. If I'm mispronouncing it, I apologize. I'm not --
A. That's fine.
Q. -- intentionally doing that.
A. I understand.
Q. So you had a discussion with Adam Brosius, and he and you discussed the fact that you were both under indictment; isn't that correct?
A. No.

Q. You didn't discuss the fact that he was under indictment like you?
A. No.
Q. Isn't it correct that you and he discussed plans moving forward to do business together?
A. We spoke about doing business, just like we're doing business -- business with him, business with Safe Chain, yeah. Just like that. That's it. Nothing -- nothing else.
Q. And he wanted to do business away from Safe Chain if possible; isn't that correct?
A. I'm not sure about that.
Q. Well, did you not have conversations about that with Adam Brosius?
A. At the end.
Q. I'm sorry?
A. At the end.
Q. At the end you did?
A. At the end, after -- after Safe Chain was stop dealing with me, and also I stop dealing with everybody else.
Q. In fact, Safe Chain stopped dealing with you when they uncovered the fact that you had submitted a false certification of being licensed in the State of New York as a wholesale distributor; isn't that correct?
A. No.
Q. That never happened?

A. No. They stop working because they had Gilead problems.
Q. They had Gilead what?
A. Gilead problems. Gilead subpoena or civil actions.
Q. Well, isn't it correct that you were confronted with the fact, by Safe Chain, that the certification that you had presented was not authentic; isn't that correct?
A. One more time.
Q. You were confronted by Safe Chain with the fact that the certification that you had submitted, that your girl had created because you instructed her to, that that had been uncovered by Safe Chain? Isn't that correct?
A. Abbie called me and asked me if I had a wholesaler license, and that's it. That's what happened. And then they learned in the investigation, I guess, that I didn't have any wholesale license.
Q. They learned what you presented as a wholesale license was fraudulent; isn't that correct?
A. I'm not sure.
Q. We've talked about this a whole bunch. It was fraudulent; right?
A. Okay.
Q. And in the spring of 2021, they found out that they had been misled by what you had been submitted in April of 2020; correct?
A. I'm not sure about that, if they were misled.

Q. But you would agree that if you had been honest with Safe Chain in 2020, you would not have been approved as a vendor with Safe Chain?

MR. POGOZELSKI: Objection. It requires speculation.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So did you apologize to Charlie Boyd when this was found out?

A. No. I never spoke to him after.

Q. You didn't think it was necessary to apologize to him?

A. For what? Everybody was in it together.

Q. I'm sorry?

A. We were all in it together.

Q. You didn't want to apologize to him that you had misled his company as far as your certification?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Now, that meant that you could no longer do business with Safe Chain; correct?

A. Who?

Q. Boulevard could. It stopped, did it not?

A. It stopped, correct.

Q. But that didn't mean that Peter was out of the HIV business; is that correct?

A. I don't know how to explain that.
Q. Well, I can give a snippet response, but I'm not allowed to.
You continued in the HIV business after Safe Chain terminated you; isn't that correct?
A. Yes.
Q. Because you wanted to keep on making money; correct?
A. Not about that. Whoever not asking T3s, that I would do business with, yeah.
Q. So your goal was to do business with entities that did not demand T3s; correct?
A. It was not entity. It was people who needed it, and I would give it to them. It was not -- it wasn't like Safe Chain.
Q. You wanted to keep making money with black market HIV pills; is that correct?
A. Not really.
Q. Isn't that what you were selling when you kept --
A. Mostly, I stopped --
THE COURT: Next question.
BY MR. ZIMET:
Q. Isn't it correct when you kept doing business after Safe Chain terminated you -- "you" being Boulevard -- that you wanted to keep making money with black market HIV pills?
MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Overruled.

Yes or no?

A. No, sir.

BY MR. ZIMET:

Q. So is your testimony that you stopped making any money from HIV black market pills after Safe Chain terminated you?

A. We made some afterwards for a month or two, but that was it. It was the end of it.

Q. So you finished --

A. After we finished, after Gilead came -- came and they gave us a subpoena and everything else, lawsuit.

Q. So after --

A. Gilead.

Q. -- after you terminated business --

A. I don't know how long exactly it took between me stopping with Safe Chain and Gilead lawsuit?

Q. I think you testified earlier that --

THE COURT: Mr. Khaim, you have to wait until he asks a question. You can't interrupt in the middle of a question because you think of something else that you want to add.

THE WITNESS: I'm sorry.

THE COURT: Next question.

BY MR. ZIMET:

Q. Gilead has accused you of still being involved in the HIV black market business in 2022 and 2023; isn't that correct?

A. They had a lawsuit, yes.
Q. And they named you as being a participant with several other entities in a continuation of the HIV black market business; is that correct?
A. Yes. I was the -- I was one of them, but I'm not everybody. They thought I was everybody, but it wasn't the truth.
Q. So you're one of many?
A. One of the many, yes.
Q. And so you have been in the HIV business with other people --
A. That's --
Q. -- in 2022 and 2023; is that correct?
A. I stopped selling HIV drugs after Gilead had civil action against me, on the first civil action. And on the second one, I did not.
Q. So --
A. I wasn't involved in that one.
Q. So the accusation that Gilead has made recently that you continue to be involved with Gilead products in the HIV black market in 2023 -- 2022 and 2023 is false? Is that your testimony?
A. Yes.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.

A. Yes.
BY MR. ZIMET:
Q. So you have -- so have you been involved in any kind of -- well, let me ask it this way: How have you been employed since July of 2021?
A. Excuse me?
Q. How have you been employed since July of 2021?
A. Have I ever been the employed from that time?
I don't understand your question.
Please can you --
Q. How have you been employed since July of 2021?
You testified September 11, 2024, you entered prison at Allenwood?
A. Yes.
Q. Three years prior to that, that would be July of 2021.
A. Yes.
Q. Between that time and September 11, 2024 --
A. Yes.
Q. -- the question is how were you employed during that time period?
A. I wasn't employed.
Q. You were unemployed?
A. I was employed by whoever was doing business with the Safe Chain.
You're talking about after the Safe Chain or before? '21.

It was '21, I was dealing with Safe Chain.
Q. July of '21, okay, you testify that your business with Safe Chain ended in '21.
A. Right, right.
Q. Correct?
A. Yes.
Q. So my question is following that termination of business, when Safe Chain cut you off, how were you employed between that time and September 11, 2024?
A. I was doing different stuff. I was doing the real estate business. I was doing different stuff.
Q. What type of different stuff were you doing?
A. I'm talking about real estate, construction. I did different -- different business.
Q. With the companies that were described during Mr. Barzee's testimony as companies that were dirty, involved in illegal activity?
A. Yeah. From A&P Holdings, yeah. I was doing business on that.
Q. Illegal activities with them; correct?
A. Not at that time. Not after July 2021.
Q. So after that, you turned legal with everything that you were doing? Is that your testimony?
A. Right.
Q. Now, when you were first meeting with the agents and the

prosecutors in Fort Dix, did they ask you to tell them what lies, if any, you had given to anyone at Safe Chain when you were working with them?
A. I don't remember about how I would answer. It was the question or not. I don't recall that question.
Q. So you don't know whether you were asked that question or not by the Government?
A. One more time. Can you repeat that question, please?
Q. Of course. I'll try to do it slowly.
A. Please.
Q. When you met at Fort Dix in August of 2025 with the Government --
A. Yes.
Q. -- were you asked to tell the Government, while you were working with Safe Chain, what lies you had told to anyone or any individuals at Safe Chain?
A. I wouldn't tell them exactly where the drugs was coming from.
Q. My question was were you asked that question, sir? Yes or no?
A. I don't remember that question.
Q. Why didn't you tell the jury today the lies that you told when you were working with Safe Chain between April of 2020 and March of 2021, when you were terminated?
MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. ZIMET:

Q. During the time period that you were being debriefed, the five or six times prior to the testimony today, were you shown documents by the Government in which you had made false statements to anyone at Safe Chain?

A. What kind of false statements are you talking about? Any false statements?

Q. Yes.

A. I didn't tell them where the drugs come from. That's all.

Q. You also didn't tell them the type of drugs they were; correct?

A. They knew what type of drugs they were.

Q. Being black market drugs?

A. That's what I'm talking about.

Q. Who the source of the black market drugs were?

A. The source, where it's coming from, yeah. But they had -- can I explain?

Q. Of course.

A. But did they have an idea, yes, where the drugs come from, especially the way it was shipped, without information how to take the medications.

Q. And that's your opinion; correct?

A. It's not an opinion. It's how a normal person would say, like, one of the company I tried to work with, called Proven,

he just stopped working with me.
Q. And that's, in your mind, what you think was in their mind; isn't that correct?
A. In their mind that these drugs were coming from a nonlegal source.
Q. What was the question to you, sir?
A. That's incorrect.
Q. I'm sorry?
A. That's incorrect.
Q. What's incorrect?
A. The question you asked. I said no.
Q. Now, when you had conversations with Charlie Boyd that you saw in that sheet that was presented to you the summary of calls -- do you recall that document?
A. Yes.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
BY MR. ZIMET:
Q. These are the 21 calls between you and Charlie Boyd; correct?
A. Yes.
Q. Many of them one-minute calls?
A. Many of them are one-minute calls.
Q. And, generally speaking, a one-minute call is when there's no conversations. There's just an answering machine or

something like that?
A. Not always.
Q. Sometimes?
A. I'm not -- I don't -- most of the time, he would talk.
Q. So what happened on -- let's just look at Call Number 17.
A. Okay.
Q. What was that call about?
A. Most of our calls was about T3s.
Q. The question to you, sir, is what was Call Number 17 about?
A. T3s.
Q. And what was said?
A. Transactional, T3s, Track and Trace document.
Q. What was said?
A. T3s, Track and Trace is a document.
Q. And that was the conversation.
A. Mostly, yes.
Q. Do you remember who said what and what the topic of conversation was besides T3s and transactions?
A. We were talking about when I was going to get some funds, and he was talking about when he's going to get the T3s documents.
Q. The truth is these calls took place for three, four years ago; correct?
A. Yeah.
Q. The truth is you don't remember the specifics of any of

these calls; is that correct?
A. No, I remember. We've been talking. The only thing I would talk to him about was business. Nothing else. About T3 documents and about the money and when would I get paid, and he would ask when the shipment would go out. That's it.
Q. So it was business?
A. Business.
Q. It wasn't personal; correct?
A. It was not personal.
Q. It wasn't you telling him how much you appreciate him or anything like that?
A. No.
Q. That's something that -- you did have appreciation for some other people in this matter; isn't that correct?
A. No.
Q. How about Adam Brosius? Did you tell him how much you liked him?
A. No.
Q. How good it was to work with him?
A. Never told him.
Q. How about Dhruv Ralhan? Same thing? Same question.
A. No.
THE COURT: Is this a good spot to break, Mr. Zimet?
MR. ZIMET: Yes, sir.
THE COURT: All right. Members of the jury, we're

going to go ahead and recess for about ten days.

Remember my admonition not to discuss the case or allow it to be discussed in your presence.

I'm going to ask you to come back Monday the 20th at 9:00, and we'll see everybody back there. Have a nice break.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Again, Mr. Khaim, during the break in your testimony, you're not allowed to discuss your testimony with anyone, and the marshals will bring you back Monday the 20th at 9:00.

THE WITNESS: Thank you, Your Honor.

THE COURT: You want to talk about scheduling?

MR. ZIMET: Yeah, I think we can have a brief conversation.

I think the Government indicated to me earlier that they thought maybe by the end of the week we come back or shortly into the week thereafter, they would be able to rest.

MR. POGOZELSKI: That's correct. Depending on how much more cross there is of this witness, we are anticipating, obviously -- I'll just wait for the witness to leave.

(Witness exits.)

MR. POGOZELSKI: We're anticipating, obviously, Ms. Divilio resuming her testimony. And then in addition to Ms. Divilio, probably about two or three more witnesses. And

recognizing that the days are just a little bit shorter, we do intend and hope to rest that week, with just a few witnesses left.

THE COURT: Hopefully, we're going to keep twelve warm bodies and finish the case.

MR. ZIMET: Judge, I have a November 8th week prepaid vacation. I just want to bring it to the attention of the court. Hopefully, we don't have to deal with that issue.

THE COURT: I hope so because I don't know that we're going to keep 12 jurors till November the 8th anyway, but hopefully, we can get everything wrapped up before then.

All right. We'll be in recess.

MR. ZIMET: Thank you, Judge.

MR. BARZEE: Your Honor, we may have one other thing.

MR. ZIMET: So, Judge, Safe Chain is closing down, and there's some personal items that are at Safe Chain that we -- there was a no contact order for them, for the defendants to go there.

We wanted to ore tenus request permission of the Court -- we can do it with a short order -- that they be allowed to go there to retrieve any personal property, to itemize what that is, and certainly provide the Government with a list of what things they're taking.

MR. POGOZELSKI: Yeah, that sounds fine, as long as there's no contact with any potential witnesses in this case,

of course.

THE COURT: Why don't you guys come up with an agreed order, and I'll sign it.

MR. ZIMET: Thank you, Your Honor.

MR. BARZEE: Thank you, Your Honor.

(Trial was concluded at 5:02 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/9/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$1,000** [1] - 133:19
**$100** [5] - 61:20, 61:23, 62:1, 62:5, 62:15
**$150,000** [2] - 144:9, 144:13
**$17** [2] - 105:19, 105:20
**$18** [1] - 145:12
**$2,400** [2] - 21:13, 21:19
**$200** [1] - 71:14
**$200,000** [5] - 149:8, 149:17, 150:5, 150:17, 151:8
**$30,000** [1] - 133:23
**$34** [1] - 261:1
**$35** [6] - 61:5, 111:10, 111:17, 111:20, 112:1, 198:25
**$40** [5] - 64:24, 65:9, 70:4, 77:24, 78:13
**$46** [1] - 146:24

## '

**'13** [1] - 155:17
**'14** [3] - 155:18, 155:19, 155:22
**'18** [1] - 92:13
**'21** [4] - 284:25, 285:1, 285:2, 285:3

## /

**/s/Patricia** [1] - 293:14

## 1

**1** [13] - 1:8, 1:19, 37:11, 45:11, 112:22, 113:6, 118:7, 118:8, 119:6, 137:11, 137:13, 144:24, 200:14
**10** [3] - 22:18, 77:20, 236:23
**10-minute** [2] - 25:7, 48:5
**10/12** [1] - 28:22
**10/9/2025** [1] - 293:14
**100** [1] - 32:23
**10:21** [1] - 48:14
**10:30** [1] - 48:14
**10th** [2] - 234:6, 236:23
**11** [13] - 43:3, 44:4, 64:13, 155:24, 156:3, 170:14, 173:21, 173:25, 174:8, 175:3, 284:12, 284:17, 285:9
**11-month** [2] - 41:25, 47:23
**1105** [1] - 126:2
**111A** [2] - 83:5, 85:7
**112** [7] - 3:10, 11:20, 12:7, 12:10, 12:11, 83:3, 83:4
**119** [2] - 220:11, 230:11
**11:54** [1] - 109:22
**12** [8] - 3:10, 26:24, 64:13, 156:3, 172:8, 173:2, 173:4, 292:10
**12-minute** [1] - 19:12
**120** [5] - 28:14, 28:15, 28:16, 28:17, 28:18
**12th** [3] - 28:8, 29:2, 30:2
**13** [5] - 34:5, 35:13, 38:11, 172:9, 173:4
**13-year** [1] - 173:2
**13th** [1] - 37:6
**14** [1] - 16:8
**15** [3] - 108:1, 155:5, 155:8
**150** [1] - 71:14
**16** [2] - 28:6, 172:17
**16-year** [3] - 170:24, 171:25, 172:8
**17** [4] - 3:12, 44:15, 289:5, 289:9
**17-minute** [1] - 44:19
**17.5** [7] - 105:14, 105:17, 105:22, 106:9, 106:17, 107:3, 107:16
**170** [1] - 3:4
**17th** [1] - 147:20
**18** [1] - 145:15
**181** [1] - 14:1
**187** [2] - 28:22, 28:23
**190** [1] - 32:8
**191** [5] - 3:11, 34:2, 34:9, 34:12, 34:13
**1:00** [4] - 109:15, 109:16, 109:20, 109:22
**1:30** [1] - 187:10
**1st** [3] - 15:14, 16:7, 232:15

## 2

**2** [7] - 14:19, 19:6, 112:22, 113:8, 144:24, 156:19, 220:12
**2.1** [1] - 44:25
**20** [8] - 13:5, 13:6, 13:7, 13:8, 133:21, 133:23, 133:25, 152:6
**200** [1] - 13:3
**2000** [1] - 64:7
**2000s** [1] - 66:10
**2013** [1] - 155:16
**2014** [18] - 64:12, 64:13, 64:17, 64:22, 66:2, 66:7, 66:12, 66:13, 67:3, 67:5, 67:7, 67:14, 67:20, 67:23, 69:14, 76:6, 86:8, 155:16
**2016** [2] - 64:12, 92:13
**2018** [1] - 18:5
**2020** [58] - 12:19, 14:5, 14:16, 15:14, 16:13, 17:1, 18:4, 18:21, 28:22, 29:2, 30:2, 34:5, 35:14, 37:6, 38:11, 85:20, 85:25, 86:3, 128:6, 128:10, 129:3, 188:21, 189:6, 189:20, 189:23, 191:13, 192:24, 193:11, 210:11, 210:18, 211:10, 217:8, 217:9, 217:19, 219:18, 225:21, 231:1, 231:14, 232:9, 232:18, 233:4, 233:6, 234:6, 236:7, 236:23, 244:4, 244:15, 244:17, 245:18, 251:16, 259:1, 259:12, 259:21, 273:8, 276:10, 279:23, 280:2, 286:23
**2021** [17] - 40:25, 42:19, 42:23, 44:5, 44:6, 45:19, 91:21, 96:24, 227:22, 279:22, 284:5, 284:7, 284:11, 284:15, 285:21, 286:24
**2022** [4] - 227:25, 282:25, 283:13, 283:21
**2023** [6] - 86:23, 109:2, 282:25, 283:13, 283:21
**2024** [16] - 86:21, 86:22, 87:4, 145:10, 146:21, 146:23, 147:20, 170:14, 173:21, 173:25, 174:9, 175:4, 284:12, 284:17, 285:9
**2025** [7] - 1:5, 175:16, 176:8, 182:1, 232:15, 265:6, 286:11
**204** [1] - 37:1
**20th** [2] - 291:4, 291:10
**21** [1] - 288:19
**214** [1] - 157:3
**21st** [1] - 146:23
**22nd** [1] - 273:8
**24-cr-20255** [1] - 1:2
**27** [1] - 232:15
**27th** [6] - 12:19, 116:8, 116:10, 116:12, 145:10, 146:21
**299** [1] - 293:17
**2:09** [1] - 166:6
**2:20** [1] - 166:6
**2nd** [8] - 14:3, 14:16, 16:8, 16:9, 16:13, 16:15, 17:16, 274:6

## 3

**3** [8] - 37:1, 112:22, 113:10, 117:12, 118:7, 118:11, 118:13, 144:24
**3,000** [1] - 21:15
**3/19/21** [4] - 39:18, 39:21, 40:5, 40:9
**3/30/21** [1] - 44:13
**30** [3] - 21:21, 45:18, 133:21
**30,000** [1] - 133:25
**3000** [1] - 21:7
**310** [5] - 3:12, 16:21, 17:6, 17:9, 17:10
**33128** [1] - 1:19
**33132** [1] - 1:16
**33301** [2] - 1:22, 293:18
**34** [1] - 3:11
**35** [4] - 102:18, 103:5, 112:3, 112:6
**35-plus** [1] - 41:24
**3506** [3] - 141:8, 163:24, 164:4
**3508** [1] - 142:6
**3514** [1] - 142:23
**3:30** [2] - 27:14, 27:22
**3:31** [1] - 229:8
**3:42** [1] - 229:8
**3:51** [1] - 27:23
**3:57** [1] - 16:11
**3rd** [1] - 1:19

## 4

**4** [5] - 112:23, 113:22, 144:24, 153:20, 153:23
**40** [5] - 1:19, 61:10, 112:6, 139:13, 139:14
**407** [1] - 163:16
**409** [2] - 140:15, 163:16
**41** [5] - 16:4, 19:2, 27:18, 28:5, 218:20
**435** [1] - 14:18
**46** [1] - 147:3
**49** [1] - 3:4
**4th** [1] - 1:15

## 5

**5** [6] - 85:23, 112:23, 114:4, 144:24, 153:20, 153:23
**50** [1] - 62:11
**503** [1] - 35:9
**505** [2] - 18:12, 47:15
**505A** [1] - 20:3
**506** [1] - 38:22
**563** [1] - 39:9
**584-page** [2] - 8:18, 13:17
**5:02** [2] - 1:6, 293:6
**5:39** [1] - 18:24
**5th** [1] - 17:1

## 6

**6** [4] - 1:22, 112:23, 117:17, 144:24
**60** [1] - 35:10
**633** [1] - 1:22
**639** [1] - 15:22
**63rd** [1] - 161:13
**65-16** [1] - 153:7
**6516** [1] - 156:1
**6936** [1] - 157:1
**6th** [2] - 18:21, 19:9

## 7

**7** [3] - 112:23, 117:25, 118:1
**700,000** [2] - 141:22, 141:23

**7th** [1] - 265:6

## 8

**8** [3] - 1:5, 3:3, 221:24
**85** [1] - 172:17
**88** [4] - 30:11, 30:15, 31:13, 38:22
**8:15** [1] - 225:11
**8th** [9] - 27:8, 27:22, 27:24, 220:15, 220:16, 265:10, 265:11, 292:6, 292:10

## 9

**9** [4] - 18:13, 204:16, 225:21, 231:1
**9/20** [2] - 234:4
**90** [1] - 62:8
**91** [6] - 160:17, 161:17, 161:25, 162:2, 162:4, 163:1
**911** [2] - 74:20, 144:18
**92** [1] - 82:5
**9229** [12] - 12:18, 15:24, 82:2, 82:5, 82:9, 83:24, 204:18, 220:24, 221:22, 222:1, 225:17, 228:5
**93** [1] - 162:20
**99** [1] - 1:15
**9:00** [2] - 291:5, 291:11
**9:03** [1] - 1:6
**9:06** [1] - 6:24
**9:11** [1] - 6:24
**9:37** [1] - 25:18
**9:46** [1] - 25:18
**9th** [2] - 29:14, 225:11

## A

**A&P** [6] - 129:12, 129:25, 135:5, 143:2, 143:4, 285:18
**A-L-I-S-H-A-Y-E-V** [2] - 68:12, 138:14
**Abbie** [40] - 13:22, 14:3, 14:12, 14:21, 15:13, 16:17, 17:14, 18:2, 18:3, 19:21, 19:22, 24:10, 27:12, 29:25, 32:3, 32:22, 33:13, 34:18, 42:21, 220:14, 222:12, 222:23, 225:11, 225:18, 230:14, 254:18, 257:15, 257:19, 258:2, 266:2, 271:14, 274:8, 275:4, 275:7, 275:8, 275:21, 275:24, 276:1, 279:12
**ABEACQ** [1] - 136:17
**ability** [2] - 207:17, 233:20
**able** [7] - 4:19, 9:14, 23:22, 34:19, 80:11, 180:9, 291:18
**above-entitled** [1] - 293:12
**accept** [4] - 37:17, 104:16, 107:1, 211:4
**accepted** [3] - 90:2, 104:12, 104:15
**access** [1] - 188:10
**accidents** [1] - 74:22
**according** [4] - 14:14, 40:6, 197:10, 238:9
**account** [7] - 83:20, 83:23, 84:2, 84:6, 84:24
**accountant** [1] - 85:13
**accounts** [1] - 83:14
**accurate** [14] - 15:1, 15:5, 17:24, 86:4, 86:6, 86:11, 87:3, 197:23, 200:2, 258:18, 258:19, 258:24, 264:3, 293:11
**accusation** [1] - 283:19
**accused** [1] - 282:24
**Ack** [3] - 114:5, 114:6, 118:5
**acquired** [3] - 86:10, 87:14, 243:23
**acquiring** [1] - 144:24
**acting** [1] - 122:20
**action** [4] - 237:20, 237:24, 283:14, 283:15
**actions** [1] - 279:3
**activities** [5] - 145:5, 189:24, 226:24, 227:1, 285:20
**activity** [17] - 135:25, 154:5, 154:11, 185:6, 185:8, 186:5, 188:7, 188:22, 189:9, 191:24, 193:5, 193:7, 216:19, 239:2, 240:8, 263:8, 285:17
**Adam** [73] - 10:9, 10:11, 10:20, 10:21, 11:6, 11:7, 11:12, 11:14, 18:13, 18:21, 19:9, 19:23, 20:20, 23:25, 26:19, 27:11, 28:9, 28:10, 28:19, 28:25, 29:18, 30:5, 47:25, 51:19, 76:17, 121:14, 121:16, 122:23, 123:1, 123:14, 123:21, 124:12, 168:15, 168:17, 168:18, 168:21, 169:1, 169:6, 185:15, 213:9, 214:15, 214:23, 215:11, 215:18, 216:9, 217:12, 221:9, 222:25, 223:2, 223:4, 223:5, 223:8, 223:16, 224:1, 225:11, 232:4, 235:1, 236:19, 236:20, 237:2, 246:9, 272:17, 273:7, 274:6, 276:10, 276:13, 276:18, 276:20, 277:22, 278:12, 290:16
**add** [1] - 282:20
**adding** [1] - 31:8
**addition** [4] - 10:8, 31:9, 138:1, 291:24
**additional** [2] - 32:14, 33:11
**address** [4] - 74:4, 210:1, 229:17, 245:6
**addresses** [1] - 164:12
**admitted** [4] - 83:4, 99:8, 99:17, 99:19
**admonition** [12] - 8:4, 25:8, 26:13, 48:6, 49:10, 109:13, 111:2, 165:21, 166:24, 226:1, 230:6, 291:2
**advantage** [1] - 84:21
**advice** [2] - 196:3, 196:7
**advised** [3] - 52:17, 53:1, 138:2
**affects** [1] - 65:18
**affidavit** [1] - 150:8
**affirmed** [1] - 8:11
**afraid** [5] - 84:22, 100:12, 100:13, 100:14, 100:20
**afternoon** [4] - 32:14, 170:9, 170:10, 187:10
**afterwards** [1] - 282:7
**agency** [1] - 133:16
**agent** [5] - 175:17, 180:22, 199:16, 199:20, 262:16
**agents** [11] - 6:1, 6:3, 181:10, 199:14, 200:14, 228:8, 228:18, 229:15, 232:13, 285:25
**ago** [19] - 36:21, 52:14, 52:16, 64:13, 77:20, 86:25, 102:16, 153:12, 155:5, 155:8, 155:12, 155:24, 156:2, 156:3, 156:17, 221:24, 289:23
**agree** [3] - 80:19, 240:12, 280:1
**agreed** [1] - 293:2
**agreement** [26] - 71:12, 101:6, 106:14, 108:5, 177:20, 177:24, 178:12, 178:13, 178:19, 179:1, 179:10, 262:13, 262:15, 262:17, 262:18, 262:20, 262:25, 263:1, 263:3, 263:5, 263:6, 263:20, 264:1, 264:2, 265:1, 265:4
**ahead** [24] - 20:1, 20:16, 74:19, 129:10, 145:8, 155:11, 181:25, 184:4, 184:7, 185:22, 192:10, 195:2, 198:22, 201:7, 208:11, 208:13, 209:24, 209:25, 212:7, 226:12, 239:6, 253:11, 275:11, 291:1
**aid** [5] - 19:3, 20:2, 27:18, 81:18, 218:21
**ailment** [1] - 191:3
**Al** [1] - 118:1
**Albert** [3] - 138:10, 138:12, 138:13
**Alex** [20] - 92:10, 92:12, 92:17, 93:3, 93:13, 93:21, 93:25, 94:3, 94:18, 95:11, 95:20, 95:23, 98:5, 98:21, 105:17, 118:1, 118:2, 150:16
**Alex's** [1] - 118:4
**Alexander** [1] - 1:13
**aliens** [1] - 53:21
**Alishayev** [2] - 68:10, 138:10
**alleged** [2] - 148:8, 148:15
**Allenwood** [3] - 171:5, 171:6, 284:13
**allow** [14] - 8:5, 25:8, 26:14, 29:23, 48:6, 49:11, 52:23, 109:14, 111:3, 165:22, 166:25, 226:1, 230:7, 291:2
**allowed** [5] - 191:24, 192:19, 281:2, 291:9, 292:21
**alluded** [1] - 226:20
**almost** [2] - 11:10, 198:12
**altogether** [1] - 164:14
**AM** [8] - 1:6, 6:24, 25:18, 48:14, 109:22
**America** [3] - 62:3, 62:15, 63:5
**AMERICA** [1] - 1:4
**Amerisource** [5] - 21:1, 21:14, 21:16, 21:24, 40:22
**AmerisourceBergen** [6] - 8:19, 30:24, 32:16, 35:18, 35:25, 37:15
**amount** [7] - 42:14, 120:5, 120:6, 158:24, 164:17, 193:13
**amounts** [3] - 91:5, 91:7, 122:9
**Amsterdam** [14] - 8:18, 13:17, 19:14, 21:1, 21:14, 21:23, 30:25, 31:17, 32:16, 33:12, 39:13, 39:24, 40:22, 46:1
**angle** [1] - 29:7
**answer** [90] - 5:19, 8:25, 29:23, 33:18, 43:20, 44:1, 51:22, 52:4, 52:24, 58:3, 59:18, 59:23, 62:7, 62:10, 62:12, 75:15, 88:11, 94:16, 94:17, 99:18, 100:19, 102:6, 102:8, 105:8, 105:10, 105:11,

105:18, 107:4, 107:8, 107:13, 107:15, 119:4, 120:3, 120:6, 160:13, 170:4, 174:23, 175:14, 178:22, 178:25, 181:9, 182:10, 182:11, 182:14, 182:16, 182:18, 182:20, 183:2, 184:7, 185:21, 185:24, 185:25, 192:11, 195:1, 196:15, 198:22, 201:7, 205:9, 205:17, 215:14, 215:15, 215:24, 216:1, 216:3, 216:25, 229:21, 235:4, 239:22, 239:24, 240:23, 242:6, 242:14, 243:16, 244:12, 245:10, 245:11, 245:24, 246:21, 253:11, 258:8, 258:20, 267:24, 270:20, 273:21, 275:21, 276:1, 286:4
**Answer** [1] - 215:25
**answered** [64] - 33:6, 36:21, 46:10, 46:25, 47:12, 50:2, 52:3, 52:5, 58:25, 60:17, 60:25, 63:8, 66:19, 69:23, 70:11, 75:15, 81:5, 88:23, 93:16, 94:1, 94:6, 94:13, 94:16, 95:7, 100:25, 105:11, 117:14, 124:9, 129:4, 131:24, 152:13, 153:4, 158:11, 159:2, 159:8, 159:13, 160:10, 165:18, 169:8, 175:9, 182:7, 183:20, 199:6, 200:21, 202:3, 208:5, 210:7, 231:20, 239:19, 240:9, 250:2, 250:8, 257:22, 265:19, 268:25, 269:5, 271:16, 275:2, 275:25, 276:4, 280:16, 281:25, 283:24, 286:25
**answering** [6] - 53:24, 56:9, 159:16, 160:14, 178:7, 288:25
**answers** [5] - 204:9, 218:6, 218:7, 258:11, 274:20
**anticipating** [2] - 291:20, 291:23
**anticipation** [1] - 173:8
**anxious** [1] - 187:16
**anyway** [1] - 292:10
**apartment** [2] - 132:9, 132:16
**apartments** [2] - 132:11, 132:15
**apologize** [12] - 98:11, 103:20, 147:18, 149:12, 149:13, 182:14, 187:23, 190:12, 277:18, 280:7, 280:10, 280:14
**app** [1] - 234:11
**appeal** [3] - 108:5, 108:18, 108:21
**appealing** [1] - 108:7
**appear** [1] - 22:13
**appearance** [1] - 78:7
**APPEARANCES** [1] - 1:11
**application** [14] - 79:24, 83:9, 84:5, 204:15, 204:19, 204:22, 205:21, 205:22, 205:24, 210:11, 211:19, 211:20, 211:22, 254:3
**applied** [1] - 79:6
**apply** [1] - 79:4
**appreciate** [3] - 34:18, 193:22, 290:10
**appreciated** [1] - 34:21
**appreciation** [1] - 290:13
**approach** [4] - 30:9, 116:15, 218:15, 288:16
**approached** [1] - 232:2
**appropriate** [1] - 108:14
**approval** [3] - 260:1, 271:12, 275:4
**approve** [4] - 270:14, 270:16, 271:19, 275:7
**approved** [9] - 45:1, 210:20, 254:3, 260:12, 270:1, 270:7, 271:15, 272:14, 280:2
**approving** [1] - 259:23
**approximate** [1] - 160:5
**apps** [1] - 234:10
**April** [20] - 12:19, 128:6, 128:9, 129:3, 210:11, 210:18, 211:10, 217:8, 217:9, 217:10, 217:13, 219:21, 232:9, 232:18, 236:23, 244:6, 244:17, 245:17, 279:23, 286:23
**area** [7] - 65:25, 70:21, 73:7, 77:16, 79:7, 130:7, 130:8
**argumentative** [18] - 56:10, 60:15, 75:16, 76:21, 78:9, 106:3, 129:5, 129:22, 131:23, 133:10, 134:5, 137:23, 147:12, 165:17, 187:12, 205:14, 257:23, 272:2
**Ariel** [2] - 142:17, 142:18
**arrest** [5] - 168:16, 168:21, 168:22, 192:24, 193:4
**arrested** [5] - 104:9, 146:16, 168:19, 191:13, 276:9
**ASAP** [1] - 14:23
**aspects** [1] - 75:7
**assigned** [2] - 171:2, 171:4
**assist** [1] - 222:7
**Assistant** [1] - 1:14
**associated** [4] - 40:23, 83:24, 92:17, 95:11
**association** [1] - 120:8
**assume** [2] - 71:8, 277:11
**assumed** [3] - 213:10, 213:13, 213:15
**assured** [3] - 54:8, 54:9, 54:10
**attach** [1] - 12:2
**attachment** [3] - 12:3, 12:21, 17:3
**attempted** [1] - 104:20
**attention** [4] - 192:14, 219:10, 219:17, 292:7
**attorney** [19] - 53:5, 53:7, 102:17, 102:20, 102:24, 105:13, 107:5, 107:11, 107:19, 107:20, 107:23, 108:1, 196:1, 196:2, 196:3, 196:8, 196:12, 215:20, 263:7
**attorneys** [6] - 24:19, 52:17, 52:22, 109:4, 147:4, 152:2
**Attorneys** [1] - 1:15
**August** [25] - 116:8, 116:10, 116:12, 146:23, 175:16, 176:8, 177:21, 178:11, 182:1, 217:19, 217:20, 217:21, 217:22, 219:18, 232:15, 235:24, 236:7, 244:4, 244:6, 244:15, 244:17, 245:17, 251:16, 262:24, 286:11
**authentic** [1] - 279:6
**authorized** [1] - 209:22
**Auto** [1] - 143:9
**available** [1] - 272:22
**avalanche** [1] - 104:19
**Avenue** [5] - 140:15, 141:8, 142:6, 142:23, 163:16
**avoid** [1] - 222:6
**aware** [10] - 53:8, 75:13, 204:22, 220:5, 222:9, 226:15, 226:22, 228:6, 228:22, 263:8

## B

**B&O** [2] - 155:9, 156:6
**baby** [2] - 6:12, 189:14
**back-and-forth** [1] - 215:5
**backdate** [1] - 18:6
**background** [1] - 105:4
**backlog** [7] - 222:5, 257:9, 258:4, 261:13, 261:20, 261:21, 262:2
**backwards** [1] - 205:19
**bad** [9] - 72:25, 73:1, 73:11, 78:17, 78:18, 130:9, 189:22, 253:15, 275:11
**badgering** [1] - 134:7
**bagel** [1] - 4:9
**bags** [1] - 119:10
**BAILEY** [2] - 2:2, 293:15
**Bailey** [1] - 293:14
**Bailey-Entin** [1] - 293:14
**BAILEY-ENTIN** [2] - 2:2, 293:15
**ballpark** [3] - 61:20, 118:24, 120:2
**bank** [3] - 84:6, 84:24
**banking** [2] - 83:20, 83:23
**bankrupt** [1] - 242:12
**banks** [1] - 28:10
**barber** [2] - 154:17, 154:18
**barbershop** [2] - 155:2, 161:10
**barrier** [1] - 56:11
**Barzee** [6] - 1:17, 1:18, 49:1, 49:13, 111:5, 167:2
**BARZEE** [132] - 3:4, 7:11, 8:3, 12:9, 17:8, 26:3, 26:12, 34:11, 48:25, 49:2, 49:9, 49:15, 51:10, 51:13, 52:5, 52:8, 52:25, 54:1, 54:22, 54:25, 55:4, 55:8, 55:16, 56:8, 56:12, 56:15, 57:5, 57:16, 58:17, 59:2, 59:22, 60:19, 61:4, 63:11, 65:21, 66:21, 66:25, 67:12, 69:25, 70:13, 75:18, 76:24, 78:11, 81:7, 81:8, 81:22, 81:23, 83:3, 83:6, 85:4, 85:6, 88:14, 88:25, 92:7, 92:9, 93:18, 94:4, 94:9, 94:15, 94:19, 95:9, 100:3, 100:21, 101:3, 102:11, 102:14, 103:13, 103:15, 103:19, 103:21, 106:6, 107:14, 109:10, 109:21, 110:17, 111:1, 111:6, 111:7, 112:13, 112:14, 114:8, 114:15, 115:3, 116:7,

116:15, 116:20, 117:3, 117:16, 123:5, 124:11, 126:25, 127:2, 129:7, 129:24, 132:1, 133:12, 134:9, 137:2, 137:25, 142:5, 147:15, 147:18, 147:19, 150:23, 152:11, 152:15, 153:6, 153:24, 158:13, 158:17, 159:5, 159:11, 159:18, 160:16, 165:9, 166:14, 166:23, 167:3, 167:4, 167:13, 169:11, 169:17, 169:22, 170:5, 217:23, 218:2, 218:5, 218:10, 219:5, 230:5, 292:14, 293:5
**Barzee's** [1] - 285:15
**base** [4] - 172:17, 241:10, 270:18, 270:20
**based** [8] - 31:18, 37:18, 169:24, 202:21, 207:18, 211:19, 252:21, 270:21
**basing** [1] - 272:7
**basis** [2] - 272:18, 272:19
**became** [3] - 52:18, 53:20, 69:3
**become** [3] - 52:13, 53:7, 204:19
**becoming** [2] - 53:3, 53:10
**BEFORE** [1] - 1:10
**beforehand** [1] - 270:11
**began** [5] - 41:7, 53:10, 64:14, 64:22, 155:16
**Beggin** [1] - 142:22
**begin** [8] - 64:6, 64:7, 66:9, 66:11, 66:18, 66:22, 170:24, 252:18
**beginning** [8] - 84:10, 216:19, 217:5, 258:4, 261:8, 271:6, 271:8, 271:10
**begins** [1] - 83:12
**behalf** [4] - 87:18, 122:20, 204:15, 236:6
**behind** [6] - 70:15, 213:16, 238:24, 240:15, 271:25, 274:4
**belief** [1] - 243:11
**bell** [2] - 132:2, 161:13
**below** [3] - 83:19, 225:19, 233:24
**benefitted** [2] - 238:5, 238:9
**benefitting** [1] - 208:10
**Benz** [1] - 140:8
**best** [5] - 23:15, 23:20, 104:3, 173:20, 236:24
**better** [3] - 5:1, 5:21, 214:12
**between** [23] - 16:13, 23:25, 26:19, 35:9, 168:17, 168:20, 168:25, 169:6, 182:1, 206:18, 223:20, 224:2, 234:25, 248:8, 248:10, 248:11, 282:15, 284:17, 285:8, 286:23, 288:19
**beyond** [2] - 228:12, 228:19
**big** [4] - 22:11, 133:21, 133:22, 208:18
**bigger** [1] - 112:12
**biggest** [3] - 184:25, 185:1, 185:2
**Biktarvy** [10] - 21:7, 21:8, 21:13, 21:16, 21:25, 22:7, 28:13, 28:15, 28:17, 28:18
**billable** [1] - 71:15
**binder** [2] - 31:18, 37:2
**birth** [1] - 81:11
**bit** [12] - 9:7, 22:19, 25:5, 36:2, 41:5, 87:5, 112:15, 174:12, 180:10, 222:21, 222:22, 292:1
**black** [25] - 111:13, 137:18, 197:7, 197:10, 197:16, 199:10, 210:4, 238:19, 239:11, 239:12, 239:14, 240:2, 241:6, 241:7, 242:9, 243:4, 252:3, 281:15, 281:24, 282:6, 282:25, 283:3, 283:20, 287:14, 287:16
**block** [2] - 142:25, 143:1
**blurt** [1] - 240:25
**board** [3] - 91:19, 127:3, 209:25
**Board** [4] - 80:20, 90:10, 90:13, 91:20
**bodies** [1] - 292:5
**bond** [6] - 191:7, 191:16, 191:23, 192:3, 192:5, 193:4
**book** [1] - 219:1
**born** [3] - 50:13, 52:9, 53:14
**boss** [2] - 76:15, 255:8
**bosses** [1] - 80:15
**bottles** [2] - 9:17, 24:22
**bottom** [7] - 15:12, 28:12, 35:20, 173:19, 209:6, 220:12, 220:14
**bought** [8] - 39:16, 39:23, 40:1, 112:3, 156:1, 157:19, 195:20, 262:6
**Boulevard** [85] - 11:24, 12:18, 12:23, 14:22, 15:22, 15:24, 42:14, 82:2, 82:5, 82:9, 82:11, 82:24, 83:17, 83:24, 137:12, 163:24, 164:2, 204:15, 204:16, 204:18, 220:8, 220:24, 221:22, 222:1, 222:10, 222:14, 222:16, 223:10, 223:14, 224:4, 225:17, 225:18, 228:5, 230:14, 231:7, 231:10, 231:11, 233:4, 233:8, 233:16, 233:19, 233:22, 233:23, 236:6, 237:16, 238:4, 240:2, 244:5, 244:16, 244:21, 245:5, 245:15, 245:16, 246:11, 246:12, 246:25, 247:13, 248:20, 255:8, 255:20, 255:25, 256:20, 257:10, 257:12, 257:17, 257:19, 258:3, 258:16, 258:17, 258:23, 259:2, 259:3, 259:5, 259:13, 259:15, 259:16, 259:17, 260:10, 260:24, 261:19, 268:2, 280:22, 281:23, 293:17
**Boulevard's** [1] - 247:14
**box** [1] - 219:6
**boy** [1] - 228:25
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [128] - 10:4, 10:9, 11:10, 11:12, 11:15, 14:4, 14:21, 15:14, 16:9, 16:13, 16:15, 16:24, 17:16, 17:20, 17:23, 18:1, 18:8, 18:13, 18:21, 19:9, 20:20, 20:21, 22:22, 23:4, 23:11, 23:18, 23:24, 24:6, 24:15, 24:19, 26:19, 26:21, 27:3, 27:8, 27:23, 27:24, 28:8, 29:18, 30:2, 31:3, 31:19, 32:22, 33:13, 33:23, 35:10, 35:13, 35:16, 35:23, 36:16, 37:8, 37:12, 38:2, 38:7, 39:7, 42:18, 43:9, 44:6, 44:9, 45:16, 46:17, 47:4, 47:25, 51:19, 60:11, 76:17, 76:19, 76:20, 76:25, 77:2, 77:4, 77:6, 77:8, 84:16, 84:17, 85:24, 123:14, 124:14, 124:16, 152:21, 152:22, 185:15, 193:20, 212:2, 212:9, 213:4, 213:7, 214:7, 214:15, 214:21, 215:11, 215:18, 216:9, 216:13, 217:6, 217:9, 217:17, 219:19, 220:2, 221:20, 225:12, 231:4, 231:5, 232:4, 235:1, 235:5, 235:10, 235:20, 236:4, 236:20, 239:18, 245:4, 245:20, 247:11, 248:23, 250:6, 250:12, 257:13, 258:2, 265:22, 269:14, 271:20, 271:22, 272:5, 272:15, 280:7, 288:12, 288:19
**Boyd's** [4] - 36:10, 36:13, 76:18, 271:12
**Boyds** [3] - 84:14, 84:15, 85:24
**Brady** [2] - 226:15, 227:3
**brains** [1] - 207:2
**break** [7] - 7:16, 109:9, 224:24, 230:13, 290:23, 291:5, 291:8
**bribe** [1] - 74:20
**bribed** [1] - 74:13
**bribery** [1] - 63:25
**brief** [1] - 291:14
**briefly** [1] - 102:19
**bring** [15] - 6:6, 7:8, 7:12, 26:5, 74:4, 83:3, 110:4, 110:18, 166:10, 166:16, 229:13, 229:23, 291:10, 292:7
**bringing** [3] - 119:10, 181:21, 197:7
**broker** [2] - 133:14
**brokerage** [1] - 132:17
**Brooklyn** [2] - 63:20, 164:6
**Brosius** [68] - 10:9, 10:11, 10:20, 10:21, 11:6, 11:7, 11:12, 11:14, 18:13, 18:21, 19:9, 19:23, 20:20, 23:25, 26:19, 27:11, 28:9, 28:10, 28:19, 28:25, 29:18, 30:5, 47:25, 51:19, 76:17, 121:14, 122:23, 123:1, 123:14, 124:12, 168:15, 168:17, 168:18, 168:21, 169:1, 169:6, 185:15, 213:9, 214:15, 214:23, 215:11, 215:18, 216:9, 217:12, 222:25, 223:2, 223:4, 223:5, 223:8, 223:16, 225:11, 232:4, 235:1, 235:16, 237:3, 246:9, 272:17, 273:7,

274:6, 276:10, 276:14, 276:18, 276:20, 277:22, 278:13, 290:16
**Brother** [1] - 28:13
**brother** [17] - 68:20, 68:21, 70:14, 77:15, 81:14, 81:25, 115:9, 115:11, 116:1, 116:3, 116:5, 117:7, 117:9, 117:11, 118:11, 118:13, 136:24
**brother's** [2] - 68:25, 69:15
**brothers** [2] - 79:18, 90:25
**brought** [2] - 4:9, 111:23
**Broward** [4] - 5:15, 6:8, 6:9, 293:17
**Bruce** [2] - 1:21, 227:21
**brush** [1] - 57:7
**BSO** [1] - 6:1
**build** [4] - 66:8, 66:13, 66:15, 156:25
**building** [3] - 66:18, 129:20, 163:3
**bulk** [1] - 112:5
**bunch** [7] - 70:2, 172:7, 203:16, 203:17, 203:19, 279:19
**business** [83] - 19:19, 21:15, 27:4, 50:16, 51:1, 66:8, 66:14, 66:15, 66:16, 66:18, 72:25, 73:1, 75:7, 77:18, 78:18, 82:8, 82:19, 82:21, 84:20, 96:4, 96:20, 97:24, 98:18, 126:11, 130:6, 130:9, 156:25, 188:18, 188:19, 209:11, 209:13, 210:25, 211:16, 211:17, 211:18, 212:22, 240:19, 241:13, 241:15, 242:24, 247:6, 247:7, 248:20, 252:13, 252:14, 259:3, 259:13, 259:16, 260:19, 260:24, 261:1, 261:5, 266:3, 266:17, 273:9, 278:5, 278:6, 278:7, 278:9, 280:19, 280:25, 281:4, 281:9, 281:10, 281:22, 282:14, 282:25, 283:4, 283:10, 284:23, 285:2, 285:7, 285:11, 285:14, 285:18, 290:3, 290:6, 290:7
**Business** [5] - 130:13, 134:10, 135:5, 135:7, 136:11
**businesses** [8] - 50:24, 129:8, 130:19, 130:23, 134:14, 134:16, 135:1, 155:2
**busy** [7] - 247:25, 248:3, 248:13, 248:16, 248:21, 248:24, 249:7
**but..** [3] - 72:13, 103:6, 254:15
**buy** [9] - 137:18, 156:12, 156:14, 195:14, 195:16, 196:20, 238:24, 246:4, 274:4
**buyers** [2] - 20:12, 20:14
**buying** [6] - 41:16, 42:14, 91:7, 119:7, 195:17, 244:23
**BY** [223] - 2:1, 3:3, 3:4, 3:4, 8:14, 9:2, 11:21, 12:13, 13:12, 14:2, 14:20, 15:16, 15:23, 16:6, 16:22, 17:13, 18:14, 19:4, 19:7, 20:5, 22:21, 23:3, 23:10, 23:17, 26:20, 26:25, 27:10, 27:20, 28:7, 28:24, 29:12, 29:24, 30:13, 31:25, 32:9, 32:12, 33:9, 33:21, 34:3, 34:14, 35:11, 36:23, 37:5, 38:1, 38:25, 39:10, 40:14, 40:20, 41:23, 43:16, 43:22, 44:2, 46:13, 47:3, 47:8, 47:21, 49:15, 51:10, 51:13, 52:8, 52:25, 54:1, 54:22, 55:4, 55:8, 55:16, 56:8, 56:15, 57:5, 57:16, 58:17, 59:2, 59:22, 60:19, 61:4, 63:11, 65:21, 66:21, 66:25, 67:12, 69:25, 70:13, 75:18, 76:24, 78:11, 81:8, 81:23, 83:6, 85:6, 88:14, 88:25, 92:9, 93:18, 94:4, 94:9, 94:19, 95:9, 100:3, 100:21, 101:3, 102:14, 103:21, 106:6, 107:14, 111:7, 112:14, 114:8, 114:15, 115:3, 116:7, 116:20, 117:3, 117:16, 123:5, 124:11, 127:2, 129:7, 129:24, 132:1, 133:12, 134:9, 137:2, 137:25, 142:5, 147:15, 147:19, 150:23, 152:11, 152:15, 153:6, 153:24, 158:13, 158:17, 159:5, 159:11, 159:18, 160:16, 165:9, 167:4, 167:13, 169:11, 169:17, 169:22, 170:8, 170:22, 172:14, 174:19, 175:10, 175:13, 178:23, 181:8, 183:22, 184:13, 187:14, 194:25, 196:14, 198:21, 199:8, 200:23, 201:6, 202:5, 203:3, 205:8, 205:16, 212:8, 212:20, 214:11, 216:6, 219:7, 220:13, 225:6, 230:12, 231:22, 234:5, 238:13, 239:21, 240:11, 241:2, 242:8, 242:17, 242:22, 243:3, 243:18, 244:3, 244:14, 244:20, 245:3, 245:13, 246:8, 246:24, 249:25, 250:5, 250:11, 250:15, 253:10, 257:5, 258:1, 258:22, 259:11, 260:9, 262:8, 262:22, 263:2, 264:17, 265:12, 265:21, 269:2, 269:7, 270:4, 271:21, 272:6, 274:11, 275:1, 275:20, 276:8, 280:6, 280:18, 281:21, 282:4, 282:23, 284:2, 287:2, 288:18

## C

**cabinet** [4] - 149:11, 149:18, 150:25, 151:7
**cabinets** [1] - 151:9
**calculate** [3] - 172:13, 172:15, 172:16
**calculated** [1] - 120:1
**calculations** [3] - 172:1, 172:6, 173:12
**camp** [1] - 171:17
**Camp** [1] - 171:22
**Canada** [3] - 96:13, 96:15, 96:16
**cannot** [8] - 37:17, 78:18, 101:7, 112:6, 121:1, 147:5, 209:13, 224:10
**capacity** [1] - 122:20
**Capital** [1] - 136:10
**car** [3] - 6:19, 73:22, 74:22
**Cardinal** [2] - 126:14, 126:16
**care** [6] - 5:18, 72:8, 73:3, 123:25, 205:1, 205:5
**cars** [4] - 143:10, 143:11, 143:12
**case** [54] - 8:5, 25:8, 26:14, 48:6, 49:11, 61:5, 61:14, 61:22, 63:23, 63:25, 75:21, 104:4, 104:5, 104:9, 105:14, 107:25, 108:1, 109:14, 110:7, 111:3, 138:6, 140:25, 144:10, 145:9, 145:12, 152:5, 152:17, 152:21, 158:5, 165:22, 166:25, 177:15, 180:1, 181:20, 191:4, 191:7, 191:10, 191:12, 192:19, 193:21, 198:5, 198:7, 198:9, 198:13, 198:16, 226:1, 228:22, 229:19, 230:7, 268:8, 276:9, 291:2, 292:5, 292:25
**CASE** [1] - 1:2
**cases** [10] - 9:13, 60:3, 61:7, 63:12, 63:14, 63:15, 148:8, 197:15, 254:10, 264:4
**cash** [10] - 119:16, 119:17, 119:18, 119:19, 119:20, 149:8, 150:17, 151:9, 197:7, 198:2
**catch** [4] - 209:21, 254:6, 257:1, 258:4
**Catch-22** [2] - 246:10, 246:20
**caught** [3] - 60:10, 78:21, 185:10
**causation** [1] - 186:25
**cc's** [1] - 237:3
**cell** [1] - 6:13
**center** [4] - 74:7, 74:11, 74:13, 74:24
**certain** [9] - 72:17, 80:5, 91:12, 172:24, 191:15, 234:10, 234:17, 266:9, 273:10
**certainly** [7] - 178:25, 179:20, 185:25, 227:25, 237:19, 239:17, 292:22
**certificate** [3] - 206:13, 211:21, 211:22
**certification** [6] - 205:23, 254:2, 278:21, 279:5, 279:9, 280:15
**certifications** [2] - 206:4, 206:24
**certify** [1] - 293:10
**chain** [3] - 18:12, 55:17, 55:20
**Chain** [188] - 9:4, 10:15, 10:17, 11:1, 11:2, 11:18, 11:25, 12:24, 13:4, 15:7, 15:9, 18:1, 21:9, 22:5, 22:8, 24:1, 31:20, 38:4, 39:16, 40:1, 40:7, 40:24, 41:2, 41:8, 42:1, 42:2, 42:10, 42:18, 43:4, 44:3, 44:17, 45:5, 45:7, 45:10, 46:3, 46:20, 46:22, 47:23, 60:11, 83:10, 84:16, 87:8, 88:1, 89:19, 90:11, 90:14,

91:5, 91:7, 91:14, 91:25, 92:24, 92:25, 93:9, 93:10, 93:19, 93:22, 93:25, 94:5, 94:12, 94:20, 94:22, 94:23, 95:5, 95:12, 96:20, 111:15, 111:18, 123:9, 128:12, 128:13, 147:24, 184:18, 184:21, 197:8, 202:7, 204:19, 204:20, 205:3, 205:20, 206:14, 206:15, 209:12, 209:14, 209:18, 210:8, 210:18, 210:20, 213:25, 220:5, 221:20, 223:10, 223:16, 224:5, 224:14, 230:20, 231:4, 232:20, 236:7, 236:22, 237:23, 238:19, 238:21, 238:23, 239:10, 239:18, 240:1, 241:6, 242:18, 243:7, 243:19, 244:4, 244:15, 245:14, 245:15, 245:20, 246:11, 247:5, 247:12, 249:11, 249:15, 250:16, 251:3, 251:5, 251:6, 251:11, 251:16, 251:19, 251:24, 252:4, 252:20, 253:5, 253:8, 253:13, 253:23, 254:4, 254:18, 255:1, 255:6, 255:15, 257:10, 257:14, 257:20, 258:3, 258:16, 259:2, 259:5, 259:6, 259:12, 259:17, 259:20, 259:24, 260:11, 260:18, 261:2, 261:19, 269:15, 270:5, 272:8, 272:10, 272:12, 278:7, 278:9, 278:18, 278:20, 279:5, 279:8, 279:11, 280:2, 280:3, 280:20, 281:4, 281:14, 281:23, 282:6, 282:16, 284:24, 284:25, 285:1, 285:3, 285:8, 286:2, 286:15, 286:16, 286:23, 287:6, 292:15, 292:16

**challenge** [2] - 93:20, 179:9

**chance** [3] - 209:17, 210:8, 210:14

**change** [16] - 17:22, 69:2, 69:4, 69:5, 69:11, 84:4, 84:11, 84:19, 84:23, 90:7, 90:9, 106:16, 259:21, 259:22, 259:23

**changed** [5] - 17:21, 69:1, 69:5, 84:1, 260:19

**changes** [1] - 17:17

**changing** [2] - 69:6, 69:8

**channel** [1] - 119:6

**Char** [1] - 274:12

**characterizing** [1] - 202:23

**charge** [15] - 126:24, 126:25, 127:3, 127:5, 128:16, 139:3, 139:6, 151:23, 151:24, 152:17, 152:20, 189:3, 233:4, 233:8, 254:25

**charged** [10] - 151:18, 152:16, 152:23, 153:2, 198:9, 198:16, 198:25, 199:1, 199:4, 199:5

**Charles** [120] - 10:4, 10:9, 11:10, 11:12, 11:15, 14:4, 14:21, 15:14, 16:9, 16:13, 16:15, 16:24, 17:16, 17:20, 17:23, 18:1, 18:8, 18:13, 18:21, 19:9, 20:18, 20:20, 20:21, 22:22, 23:4, 23:11, 23:18, 23:24, 24:6, 24:15, 24:19, 26:19, 26:21, 27:3, 27:8, 27:23, 27:24, 28:8, 29:18, 30:1, 31:3, 31:19, 32:21, 33:13, 33:23, 35:4, 35:10, 35:13, 35:16, 35:23, 36:10, 36:13, 36:16, 37:8, 37:12, 38:2, 38:7, 39:7, 42:18, 43:9, 44:6, 44:9, 45:16, 46:17, 47:4, 47:25, 51:19, 60:11, 76:19, 123:14, 123:22, 152:22, 185:15, 193:20, 212:2, 212:9, 213:4, 214:7, 216:13, 219:19, 220:2, 221:20, 223:20, 225:12, 231:3, 231:5, 232:4, 234:25, 235:5, 235:10, 235:20, 236:4, 236:20, 245:4, 245:20, 247:11, 248:9, 248:11, 248:23, 249:5, 257:13, 257:14, 257:18, 257:19, 258:2, 265:22, 271:12, 271:20, 271:22, 272:4, 272:15, 275:6, 275:7, 275:9, 275:16, 275:18, 275:21, 275:23

**CHARLES** [2] - 1:7, 1:21

**Charles's** [1] - 15:3

**Charlie** [20] - 27:12, 124:14, 213:7, 214:15, 214:21, 215:11, 215:18, 216:9, 217:6, 217:9, 217:17, 239:17, 250:6, 250:12, 269:14, 274:7, 275:4, 280:7, 288:12, 288:19

**chart** [3] - 112:15, 120:10, 120:15

**chatting** [1] - 123:22

**cheap** [21] - 9:3, 10:15, 10:18, 10:23, 10:24, 15:6, 15:10, 22:4, 24:1, 38:3, 40:2, 40:7, 40:23, 41:3, 41:8, 41:16, 41:25, 43:3, 46:9, 46:20, 46:22

**cheaper** [1] - 240:17

**cheated** [3] - 60:20, 60:23, 62:1

**cheating** [2] - 60:20, 61:2

**check** [7] - 91:20, 147:4, 164:19, 164:20, 165:12, 165:15, 228:8

**checks** [1] - 119:17

**children** [1] - 140:6

**choice** [5] - 72:5, 88:10, 139:19, 175:7, 236:10

**choose** [8] - 175:1, 175:2, 175:5, 178:25, 224:7

**chose** [1] - 223:19

**citizen** [9] - 52:12, 52:13, 52:19, 53:4, 53:7, 53:10, 53:20, 69:3, 104:16

**citizens** [3] - 65:10, 65:11, 146:3

**City** [2] - 65:25, 102:24

**civil** [3] - 279:3, 283:14, 283:15

**claim** [1] - 85:20

**claimed** [2] - 119:7, 226:16

**claiming** [3] - 80:23, 252:7, 258:24

**claims** [1] - 226:25

**clarified** [1] - 76:22

**clarify** [2] - 10:6, 253:7

**clean** [1] - 9:21

**cleaning** [1] - 9:17

**cleanse** [1] - 107:1

**cleansing** [1] - 201:23

**clear** [4] - 67:21, 71:6, 196:11, 235:9

**clearly** [2] - 29:10, 227:13

**clever** [1] - 78:22

**client** [1] - 267:3

**clients** [1] - 45:23

**clinic** [1] - 73:25

**clinics** [10] - 65:1, 65:24, 66:4, 70:3, 70:18, 75:1, 75:2, 104:6, 131:16, 134:17

**close** [2] - 61:3, 196:16

**closed** [8] - 28:10, 31:3, 36:12, 39:13, 242:19, 242:23, 243:24, 253:17

**closed-down** [3] - 31:3, 39:13, 253:17

**closer** [1] - 29:9

**closing** [2] - 242:11, 292:15

**coconspirator** [4] - 84:22, 121:8, 144:10, 144:13

**coconspirators** [8] - 68:16, 68:17, 77:15, 89:14, 127:14, 138:2, 146:12, 193:20

**code** [3] - 167:19, 167:22, 168:13

**coffee** [3] - 154:21, 154:24, 155:2

**collaborated** [1] - 206:25

**collect** [1] - 80:10

**college** [1] - 268:21

**colloquy** [1] - 228:10

**column** [1] - 39:2

**coming** [25] - 7:14, 42:8, 42:9, 55:13, 57:22, 64:4, 78:17, 146:17, 148:1, 222:4, 233:19, 239:12, 239:14, 242:3, 242:10, 242:19, 243:5, 243:24, 254:20, 264:8, 268:2, 286:17, 287:17, 288:4

**commentary** [2] - 137:23, 205:4

**commercial** [4] - 157:6, 157:16, 163:3, 163:19

**commit** [8] - 69:14, 93:7, 93:14, 129:25, 173:16, 191:19, 191:24, 192:4

**committed** [7] - 64:17, 69:20, 179:13, 179:18, 179:21, 180:4, 180:5

**committing** [5] - 53:19, 64:8, 104:12, 192:25, 193:5

**communicated** [4] - 234:8, 245:14, 268:21, 270:6

**communicating** [3] - 10:10, 219:12, 219:13

**communication** [5] - 220:2, 263:13, 271:4, 271:19, 276:10

**Communication** [1] - 234:11

**communications** [10] - 11:4, 11:6, 52:22, 169:6, 196:11, 200:25, 223:15, 224:5, 226:16, 248:2

**Communist** [1] - 53:14

**community** [3] - 109:5, 109:7, 133:4
**companies** [11] - 65:15, 65:17, 70:3, 135:17, 146:1, 146:19, 164:14, 164:23, 190:22, 285:15, 285:16
**company** [40] - 10:25, 21:9, 41:9, 41:14, 44:22, 73:19, 73:20, 73:23, 88:13, 129:15, 129:16, 129:18, 130:1, 130:5, 130:16, 130:18, 130:21, 130:22, 131:6, 132:7, 135:22, 136:7, 136:10, 143:2, 143:4, 143:5, 143:7, 143:17, 208:19, 208:23, 208:25, 224:9, 233:10, 247:12, 247:13, 259:7, 259:8, 272:4, 280:15, 287:25
**complaining** [1] - 57:1
**complaint** [4] - 42:11, 227:8, 227:9, 227:14
**complaints** [2] - 24:22, 42:9
**complete** [2] - 228:10, 264:3
**compliance** [28] - 16:23, 18:3, 19:16, 19:21, 24:24, 32:2, 32:13, 34:4, 34:15, 209:24, 221:20, 236:22, 249:11, 254:18, 257:10, 257:16, 266:3, 269:19, 269:21, 269:23, 269:25, 270:7, 270:10, 270:14, 270:15, 271:1, 271:11
**Compliance** [1] - 22:23
**complicated** [1] - 64:3
**complied** [1] - 232:23
**compound** [1] - 71:13
**compounds** [1] - 190:10
**computer** [2] - 168:16, 209:25
**CON'T** [2] - 3:3, 8:10
**con't** [2] - 3:3, 8:13
**concede** [6] - 7:24, 26:8, 49:5, 110:22, 166:19, 230:1
**concept** [1] - 254:13
**concern** [2] - 211:1, 259:16
**concerned** [5] - 53:17, 54:2, 54:5, 198:24, 260:17
**concerning** [7] - 232:9, 232:18, 237:16, 251:24, 259:17, 260:18, 263:8
**concerns** [1] - 53:12
**concluded** [1] - 293:6
**concrete** [1] - 62:7
**conditions** [1] - 192:20
**conduct** [1] - 151:19
**confess** [1] - 179:15
**confessed** [2] - 151:14, 179:12
**confine** [1] - 122:19
**confirm** [2] - 13:22, 32:17
**confirmation** [1] - 30:1
**confirmed** [6] - 20:21, 24:10, 30:19, 30:20, 38:6, 136:4
**confirming** [2] - 29:15, 38:16
**confronted** [2] - 279:4, 279:8
**connect** [2] - 132:18, 238:25
**consequences** [1] - 130:12
**consider** [4] - 65:6, 146:5, 146:6, 167:9
**considered** [4] - 49:23, 150:13, 174:20, 203:20
**consistent** [2] - 227:14, 227:16
**conspiracies** [1] - 254:12
**conspiracy** [24] - 61:11, 61:16, 64:1, 65:2, 65:5, 67:2, 70:22, 76:16, 101:17, 105:19, 106:25, 112:25, 113:2, 113:4, 122:13, 122:17, 125:6, 186:7, 186:11, 187:16, 187:18, 187:25, 226:24, 240:14
**conspirators** [1] - 76:12
**conspired** [1] - 65:23
**construction** [10] - 129:15, 129:16, 129:18, 129:19, 129:20, 130:5, 143:6, 143:7, 285:13
**consult** [8] - 107:5, 107:10, 107:19, 131:5, 131:7, 131:11, 131:14, 134:20
**consultant** [2] - 225:20, 230:16
**Consulting** [2] - 131:1, 143:25
**consulting** [6] - 131:4, 131:6, 131:10, 131:22, 138:1, 196:1
**consummated** [1] - 259:25
**contact** [32] - 32:17, 83:14, 187:5, 187:6, 214:8, 217:6, 217:9, 217:17, 219:19, 221:25, 222:6, 222:14, 222:15, 222:16, 223:20, 223:22, 224:10, 231:7, 236:20, 236:24, 237:18, 237:23, 247:11, 264:19, 268:16, 275:8, 275:9, 275:16, 275:17, 275:24, 292:17, 292:25
**contacted** [7] - 224:13, 237:16, 237:19, 238:1, 238:3, 238:5, 238:9
**contacts** [3] - 241:8, 241:9, 241:10
**contained** [1] - 258:5
**contempt** [1] - 148:10
**contents** [1] - 167:23
**context** [1] - 9:25
**continuation** [1] - 283:3
**continue** [5] - 26:16, 111:5, 167:2, 230:9, 283:20
**continued** [4] - 87:9, 87:11, 87:13, 281:4
**continues** [1] - 110:6
**continuing** [2] - 148:9, 192:24
**contractors** [1] - 5:25
**control** [16] - 67:1, 75:5, 75:8, 78:15, 80:11, 80:12, 82:17, 89:9, 89:10, 89:23, 90:1, 91:24, 126:23, 128:14, 143:19, 161:2
**controlled** [11] - 75:1, 75:2, 75:3, 77:16, 79:25, 84:6, 84:24, 125:5, 126:19, 126:20
**controlling** [2] - 66:3, 128:19
**controls** [3] - 129:16, 137:19, 161:5
**conversation** [16] - 207:18, 232:8, 232:24, 235:9, 237:13, 248:17, 248:19, 249:3, 268:17, 268:22, 271:23, 273:7, 274:5, 289:15, 289:18, 291:15
**conversations** [8] - 226:20, 232:17, 236:3, 248:6, 272:17, 278:12, 288:12, 288:25
**convicted** [4] - 64:9, 104:20, 152:4, 254:10
**convince** [1] - 71:20
**cooperate** [3] - 103:8, 200:7, 200:17
**cooperating** [3] - 138:20, 178:8, 263:14
**cooperation** [8] - 174:1, 174:4, 174:25, 200:16, 262:25, 263:3, 263:6, 263:20
**cooperative** [2] - 167:9, 178:13
**cooperator** [1] - 175:8
**copied** [1] - 32:22
**copy** [9] - 30:10, 30:17, 42:21, 102:11, 218:20, 267:2, 267:3, 267:8, 274:4
**copying** [1] - 33:12
**corner** [1] - 127:21
**Corporation** [1] - 126:4
**corporation** [11] - 131:8, 131:10, 132:4, 132:10, 134:18, 135:15, 136:12, 136:18, 137:7, 137:10, 137:11
**correct** [502] - 16:18, 21:3, 24:3, 24:12, 28:18, 29:19, 31:21, 31:24, 33:25, 35:7, 37:10, 37:20, 38:5, 38:8, 39:8, 39:14, 39:25, 40:3, 41:1, 41:4, 42:20, 43:7, 46:5, 50:1, 50:3, 51:2, 55:19, 55:21, 57:12, 58:24, 60:13, 61:8, 63:12, 63:16, 63:17, 63:20, 63:21, 64:2, 64:15, 64:23, 65:25, 66:1, 68:14, 70:18, 70:19, 70:21, 71:8, 71:9, 71:18, 72:9, 72:20, 73:9, 74:11, 74:12, 74:14, 74:17, 75:4, 76:3, 76:5, 77:11, 77:21, 79:21, 80:4, 80:21, 81:9, 83:10, 83:11, 83:15, 83:18, 83:22, 84:18, 84:25, 85:1, 85:9, 85:10, 87:15, 88:2, 90:24, 91:2, 91:5, 91:6, 91:9, 91:10, 91:13, 92:1, 92:2, 92:6, 93:7, 93:15, 98:13, 103:10, 104:7, 104:8, 104:10, 104:14, 104:17, 104:22, 105:1, 107:4, 111:12, 111:18, 111:19, 112:25, 113:2, 113:4, 115:9, 116:8, 117:5, 117:8, 119:8, 122:24, 124:19, 124:20, 125:2, 125:6, 125:8, 125:10, 125:12, 125:14, 125:15, 125:16, 125:18, 125:22, 125:24, 126:1, 126:3, 126:14, 126:21, 127:10, 131:21, 133:6, 134:19, 135:14, 135:19, 136:9, 136:14, 136:15, 138:3, 139:4, 139:7, 143:16, 143:22, 145:10, 145:13, 146:20, 146:25, 147:1, 147:21, 147:22, 147:25,

151:20, 152:23, 155:16, 155:20, 155:25, 157:2, 162:3, 167:17, 167:20, 167:21, 169:7, 170:25, 171:8, 171:23, 172:2, 172:4, 172:9, 172:22, 173:14, 173:21, 173:23, 174:2, 174:9, 174:10, 174:15, 174:22, 175:11, 175:18, 175:20, 175:24, 176:10, 177:3, 177:6, 177:11, 177:18, 177:23, 178:1, 179:7, 179:18, 180:20, 181:11, 181:12, 183:6, 183:18, 184:3, 184:15, 184:19, 184:20, 184:25, 185:4, 185:5, 185:8, 185:9, 185:10, 186:3, 186:4, 186:7, 186:11, 186:20, 186:21, 186:23, 186:24, 187:3, 187:18, 188:1, 188:3, 188:11, 188:15, 188:24, 189:6, 189:9, 189:13, 189:18, 189:21, 189:24, 189:25, 190:22, 191:8, 191:16, 191:20, 193:2, 193:5, 193:6, 193:8, 193:15, 194:13, 195:8, 195:12, 195:25, 197:16, 198:13, 199:10, 199:18, 199:23, 200:3, 200:8, 200:16, 201:2, 201:12, 201:19, 202:7, 202:18, 202:19, 202:22, 203:4, 203:9, 203:16, 204:1, 204:7, 204:11, 204:20, 205:3, 206:17, 207:4, 207:6, 207:8, 207:10, 207:15, 208:2, 208:7, 208:20, 208:21, 209:4, 209:9, 209:10, 209:12, 209:19, 209:20, 209:23, 210:9, 211:4, 211:11, 211:19, 212:3, 212:13, 212:16, 212:25, 213:13, 213:14, 213:17, 214:2, 214:4, 214:21, 214:23, 216:11, 216:14, 216:16, 216:23, 219:19, 219:22, 220:3, 220:8, 220:9, 220:16, 221:2, 221:11, 223:6, 223:10, 223:11, 223:17, 224:6, 224:9, 224:15, 224:17, 225:21, 225:22, 231:8, 232:23, 233:4, 233:12, 233:17, 233:20, 234:8, 234:17, 234:21, 235:10, 235:12, 235:14, 235:16, 235:18, 235:20, 235:24, 236:1, 236:4, 236:8, 236:9, 236:10, 237:11, 237:12, 237:20, 237:21, 238:19, 238:23, 239:2, 239:11, 239:18, 240:3, 240:5, 240:14, 241:11, 242:13, 242:25, 243:1, 243:5, 243:6, 243:8, 243:9, 243:11, 244:7, 244:17, 244:22, 245:7, 245:19, 245:22, 247:2, 247:8, 247:9, 247:14, 247:15, 247:17, 247:18, 247:20, 248:17, 249:7, 249:13, 249:16, 250:17, 250:20, 250:23, 251:5, 251:20, 251:24, 252:5, 252:9, 252:11, 252:18, 252:21, 252:22, 253:17, 253:18, 253:21, 253:24, 253:25, 254:7, 254:13, 255:1, 255:8, 255:10, 255:15, 255:20, 255:23, 255:25, 256:4, 256:14, 256:20, 257:2, 257:6, 257:8, 257:17, 257:21, 258:5, 258:18, 259:3, 259:6, 259:18, 259:21, 260:20, 261:2, 261:14, 261:21, 262:3, 263:5, 263:9, 263:14, 263:24, 264:6, 264:11, 264:20, 265:23, 266:5, 266:13, 266:15, 267:4, 267:5, 267:7, 267:11, 267:16, 267:20, 268:1, 268:3, 268:18, 268:24, 269:10, 269:15, 269:16, 269:17, 269:19, 269:21, 269:23, 269:25, 270:6, 271:2, 271:5, 271:12, 271:15, 272:1, 272:25, 273:5, 273:15, 273:16, 273:17, 274:5, 274:8, 275:5, 275:21, 275:22, 276:2, 276:14, 276:18, 276:21, 277:24, 278:4, 278:10, 278:23, 279:4, 279:6, 279:11, 279:17, 279:24, 280:20, 280:23, 280:25, 281:5, 281:7, 281:11, 281:16, 281:22, 282:25, 283:4, 283:13, 285:5, 285:20, 287:12, 287:23, 288:3, 288:20, 289:23, 290:1, 290:8, 290:14, 291:19

**corrected** [1] - 103:20

**correctly** [3] - 220:7, 230:17, 266:4

**corroborating** [1] - 229:5

**corrupt** [2] - 72:5, 72:7

**corrupted** [2] - 70:20, 72:4

**cost** [1] - 71:14

**counsel** [21] - 4:3, 7:3, 7:24, 25:1, 25:22, 26:8, 35:24, 37:8, 38:2, 48:19, 49:5, 105:13, 109:25, 110:6, 110:22, 166:9, 166:19, 192:1, 192:5, 229:11, 230:1

**country** [4] - 53:14, 53:22, 195:12, 195:14

**County** [3] - 5:15, 6:8, 6:9

**couple** [8] - 44:24, 45:7, 63:12, 86:25, 122:1, 154:18, 253:1, 275:13

**course** [11] - 59:5, 106:18, 126:9, 177:19, 179:20, 180:19, 199:20, 215:7, 286:9, 287:19, 293:1

**Court** [20] - 2:3, 2:4, 4:1, 4:5, 7:7, 25:16, 25:24, 48:12, 48:21, 109:20, 110:3, 114:17, 114:19, 166:3, 166:10, 226:8, 229:13, 292:20, 293:15, 293:16

**COURT** [269] - 1:1, 4:2, 4:11, 4:18, 4:25, 5:3, 5:6, 5:9, 5:20, 6:7, 6:16, 6:22, 6:23, 7:1, 7:7, 7:12, 7:15, 7:18, 7:22, 7:24, 8:4, 12:10, 17:9, 25:7, 25:12, 25:15, 25:17, 25:20, 26:5, 26:6, 26:8, 26:13, 30:12, 33:3, 33:5, 33:7, 33:15, 34:12, 36:22, 37:25, 41:22, 43:15, 43:20, 46:12, 47:2, 47:7, 47:13, 47:20, 48:4, 48:9, 48:11, 48:13, 48:16, 48:17, 49:1, 49:3, 49:5, 49:10, 51:12, 52:6, 52:23, 53:23, 54:19, 55:2, 55:7, 55:14, 56:7, 56:13, 58:16, 58:25, 59:18, 60:16, 60:18, 61:2, 63:10, 65:20, 66:20, 66:24, 67:10, 69:24, 70:12, 75:17, 76:23, 78:10, 81:6, 81:18, 81:21, 88:11, 88:24, 93:17, 94:2, 94:8, 94:14, 94:16, 95:8, 100:18, 101:2, 102:13, 103:12, 103:14, 103:18, 107:12, 109:9, 109:12, 109:17, 109:19, 109:24, 110:3, 110:10, 110:14, 110:18, 110:20, 110:22, 111:2, 114:7, 114:13, 114:24, 116:1, 116:4, 116:16, 116:25, 117:15, 123:4, 124:10, 129:6, 129:23, 131:25, 133:11, 134:6, 134:8, 137:24, 142:4, 147:14, 150:21, 152:8, 152:14, 153:5, 153:22, 158:12, 158:16, 159:3, 159:9, 159:15, 160:11, 160:14, 165:19, 165:24, 166:2, 166:5, 166:8, 166:15, 166:17, 166:19, 166:24, 167:12, 169:10, 169:16, 169:21, 170:6, 170:21, 172:12, 174:18, 175:12, 178:21, 181:5, 183:21, 184:12, 187:13, 194:23, 196:13, 198:20, 199:7, 200:22, 201:5, 202:4, 202:25, 205:7, 205:15, 212:18, 215:20, 218:4, 218:13, 218:16, 218:19, 218:22, 218:25, 219:3, 224:23, 225:2, 225:24, 226:5, 226:7, 226:11, 227:4, 227:16, 227:19, 228:8, 228:14, 228:18, 229:1, 229:10, 229:19, 229:23, 229:24, 230:1, 230:6, 231:21, 234:3, 238:12, 239:20, 240:10, 240:22,

242:4, 242:14, 242:16, 242:21, 243:2, 243:15, 244:2, 244:11, 244:19, 245:2, 245:10, 245:24, 246:7, 246:21, 246:23, 250:4, 250:9, 250:14, 253:9, 257:4, 257:24, 258:20, 259:9, 260:6, 262:7, 262:21, 262:24, 264:14, 265:10, 265:20, 269:1, 269:6, 270:3, 271:18, 272:3, 274:13, 274:15, 274:19, 275:19, 276:5, 280:5, 280:17, 281:20, 282:1, 282:18, 282:22, 283:25, 287:1, 288:17, 290:23, 290:25, 291:6, 291:8, 291:13, 292:4, 292:9, 293:2
**court** [21] - 5:18, 8:25, 29:5, 58:3, 58:15, 58:23, 101:5, 105:22, 146:24, 147:7, 147:9, 147:10, 148:10, 148:11, 149:14, 168:9, 169:12, 170:21, 182:21, 215:22, 292:8
**court's** [1] - 107:2
**Court's** [1] - 107:8
**Courthouse** [1] - 293:17
**COURTROOM** [1] - 7:6
**courtroom** [5] - 57:9, 58:18, 65:16, 204:10, 212:12
**cousin** [5] - 68:4, 68:15, 77:15, 79:18, 90:25
**Cousin** [1] - 68:13
**cousin's** [2] - 68:5, 69:15
**covered** [3] - 61:1, 114:22, 250:3
**COVID** [2] - 242:13, 243:23
**creams** [2] - 190:23
**create** [15] - 24:8, 33:24, 38:7, 39:7, 48:1, 49:22, 90:12, 205:2, 205:12, 206:8, 208:14, 222:5, 251:3, 251:4, 251:6
**created** [13] - 89:18, 132:7, 134:18, 209:8, 213:12, 213:24, 214:10, 216:12, 216:20, 233:14, 249:20, 267:20, 279:10
**creating** [6] - 215:10, 215:17, 216:7, 216:22, 254:17, 267:11
**creation** [1] - 271:10
**crime** [15] - 64:8, 64:17, 64:24, 66:22, 67:4, 69:14, 69:20, 71:20, 92:17, 104:12, 120:9, 173:13, 173:14, 173:16, 179:24
**crimes** [21] - 53:19, 93:7, 93:14, 129:25, 151:13, 173:14, 173:15, 173:16, 179:13, 179:15, 179:18, 179:21, 179:22, 179:25, 180:4, 180:5, 189:17, 191:20, 191:25, 192:4, 192:25
**criminal** [98] - 50:16, 50:19, 51:1, 51:15, 51:18, 51:23, 52:1, 52:15, 52:18, 53:3, 53:9, 53:21, 64:5, 64:14, 64:16, 64:21, 64:25, 65:9, 66:2, 66:11, 66:15, 66:16, 66:18, 67:25, 68:18, 70:14, 74:7, 78:12, 79:19, 84:22, 86:7, 86:9, 87:11, 87:14, 91:1, 95:23, 100:8, 112:18, 112:24, 113:4, 121:8, 122:13, 122:17, 122:20, 125:7, 126:19, 127:15, 127:22, 129:21, 130:1, 130:24, 130:25, 131:20, 135:2, 135:5, 135:6, 135:7, 135:25, 136:7, 136:13, 137:3, 138:1, 145:5, 148:8, 152:5, 154:4, 154:11, 155:15, 157:17, 157:19, 174:22, 184:15, 185:3, 185:6, 185:8, 186:5, 186:11, 187:15, 187:17, 187:25, 188:7, 188:19, 188:22, 189:9, 189:24, 193:5, 193:7, 194:2, 196:25, 216:19, 226:23, 227:19, 228:6, 239:2, 240:8, 240:14, 263:8
**Criminal** [1] - 264:6
**criminality** [1] - 199:4
**criminals** [1] - 188:25
**CROSS** [4] - 3:4, 3:4, 49:14, 170:7
**cross** [7] - 170:6, 203:1, 228:20, 228:24, 229:20, 274:24, 291:20
**cross-examination** [2] - 203:1, 274:24
**CROSS-EXAMINATION** [4] - 3:4, 3:4, 49:14, 170:7
**cross-examine** [1] - 228:24
**cross-examining** [1] - 228:20
**cry** [1] - 5:14
**cuffs** [1] - 55:7
**current** [1] - 226:23
**curry** [1] - 153:1
**customers** [1] - 222:3
**cut** [9] - 84:23, 122:23, 123:7, 123:24, 124:2, 124:7, 124:8, 240:20, 285:8
**cutting** [1] - 240:19

## D

**D-A-N** [1] - 113:23
**D-H-R-U-V** [1] - 237:6
**dad** [3] - 161:1, 162:5, 162:23
**Dan** [3] - 113:23, 113:24, 114:1
**Danny** [1] - 98:5
**Dartmouth** [1] - 157:1
**DATE** [1] - 293:14
**date** [27] - 17:21, 17:22, 18:4, 18:20, 27:21, 37:12, 39:11, 39:14, 39:19, 39:23, 40:1, 40:4, 40:6, 44:12, 46:2, 64:10, 156:15, 164:13, 175:20, 176:19, 182:5, 217:13, 217:15, 217:16, 217:18, 251:18, 265:8
**dated** [2] - 12:19, 17:1
**dates** [6] - 17:14, 17:19, 18:9, 38:24, 39:15, 145:7
**days** [3] - 234:17, 291:1, 292:1
**deal** [5] - 5:24, 71:12, 124:2, 124:7, 292:8
**dealing** [8] - 117:4, 117:6, 152:5, 245:5, 278:18, 278:19, 278:20, 285:1
**deals** [1] - 122:23
**dealt** [2] - 117:6
**debriefed** [1] - 287:3
**decade** [1] - 185:7
**deceive** [1] - 254:11
**December** [5] - 189:4, 189:20, 189:23, 191:13, 276:10
**deception** [1] - 92:5
**decide** [7] - 101:11, 101:12, 103:9, 169:25, 201:4, 207:17, 255:2
**decided** [12] - 84:23, 104:23, 107:1, 123:7, 132:22, 132:25, 133:3, 200:24, 246:25, 247:19, 249:10, 254:25
**decides** [1] - 101:13
**decision** [2] - 247:4, 255:14
**declare** [2] - 85:25, 86:2
**declared** [2] - 86:7, 86:9
**DEFENDANT** [2] - 1:17, 1:21
**defendant** [5] - 115:14, 115:15, 115:21, 115:22, 117:13
**defendants** [8] - 4:3, 7:3, 25:22, 48:19, 109:25, 166:9, 229:11, 292:17
**Defendants** [1] - 1:8
**defendants'** [1] - 21:9
**defense** [2] - 110:6, 229:18
**deleting** [1] - 168:17
**deliver** [3] - 73:15, 73:17, 74:3
**delivered** [3] - 73:18, 74:5, 259:24
**delivery** [2] - 73:19, 73:20
**demand** [3] - 227:2, 227:21, 281:11
**demanded** [4] - 261:7, 261:9, 261:12, 261:19
**demands** [2] - 226:15, 229:18
**demonstrative** [7] - 16:4, 19:3, 20:2, 27:18, 81:16, 81:18, 218:21
**denied** [1] - 226:16
**Department** [1] - 98:23
**department** [1] - 91:19
**deport** [1] - 53:21
**deportation** [1] - 52:20
**deported** [7] - 53:1, 53:8, 53:12, 53:17, 53:18, 54:2, 54:10
**deposition** [1] - 169:13
**DEPUTY** [1] - 7:6
**DerOvanesian** [1] - 1:13
**Descovy** [3] - 21:25, 22:7, 22:11
**described** [3] - 63:25, 246:10, 285:15
**Description** [1] - 3:9
**deserve** [3] - 169:18, 169:23, 170:2
**designated** [1] - 223:15
**desire** [1] - 59:12
**details** [1] - 36:1
**detect** [4] - 210:9, 210:10, 210:15, 210:19
**detected** [12] - 186:15, 187:17, 188:19, 188:24, 188:25, 189:1, 189:11, 189:17, 189:21, 195:25, 196:9, 209:19
**detection** [3] - 186:10, 186:13, 186:14
**detention** [3] - 186:12, 186:13
**determination** [1] -

255:5
**Dhruv** [11] - 96:25, 121:22, 124:4, 124:8, 185:16, 222:23, 225:12, 237:3, 237:6, 237:15, 290:21
**difference** [2] - 228:22, 229:3
**different** [43] - 12:24, 13:14, 50:15, 50:24, 51:22, 58:1, 68:25, 74:6, 75:7, 84:2, 85:8, 91:22, 92:24, 93:1, 97:17, 99:10, 104:6, 106:19, 107:23, 107:25, 108:21, 119:17, 139:4, 145:4, 172:7, 191:6, 194:2, 196:19, 196:21, 200:12, 208:14, 216:18, 243:4, 252:15, 254:12, 275:2, 285:10, 285:11, 285:12, 285:14
**digging** [1] - 24:24
**digit** [1] - 173:11
**Dimitrouleas** [1] - 2:3
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas/Hunt** [1] - 1:2
**direct** [6] - 8:7, 63:24, 126:13, 275:8, 275:9, 275:25
**DIRECT** [2] - 3:3, 8:13
**directed** [1] - 91:24
**direction** [2] - 72:7, 144:11
**directly** [4] - 58:22, 147:9, 257:12, 269:23
**dirty** [1] - 285:16
**disappear** [2] - 234:19
**disappears** [1] - 234:16
**discontinued** [2] - 14:5, 17:15
**discovered** [1] - 257:1
**discrepancy** [1] - 14:13
**discuss** [16] - 8:5, 25:8, 26:14, 48:6, 49:11, 87:24, 109:14, 111:3, 165:21, 166:25, 223:9, 226:1, 230:7, 278:1, 291:2, 291:9
**discussed** [17] - 8:5, 25:6, 25:8, 26:14, 48:7, 49:11, 109:14, 111:3, 123:6, 154:12, 165:22, 166:25, 226:2, 230:7, 277:23, 278:4, 291:3
**discussion** [2] - 102:17, 277:22
**disrupt** [1] - 72:24
**distribute** [3] - 111:24, 127:25, 128:2
**distributed** [2] - 111:22, 112:1
**distribution** [3] - 206:17, 208:19, 247:6
**distributor** [1] - 278:23
**distributors** [1] - 111:22
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [24] - 2:4, 63:18, 63:19, 63:22, 64:9, 67:2, 75:22, 75:23, 105:25, 106:7, 115:20, 145:9, 146:24, 179:13, 179:14, 191:10, 191:11, 191:14, 191:23, 197:14, 293:16, 293:16
**Divilio** [22] - 13:22, 14:3, 14:12, 15:13, 16:17, 18:2, 18:3, 19:22, 24:10, 29:25, 32:3, 32:22, 33:13, 34:18, 42:21, 220:14, 222:12, 225:11, 258:2, 271:14, 291:24, 291:25
**DIVISION** [1] - 1:2
**Dix** [21] - 171:11, 175:17, 177:21, 178:11, 179:1, 180:12, 180:15, 182:21, 183:2, 183:4, 183:14, 199:12, 202:9, 203:15, 262:16, 262:21, 262:23, 263:21, 286:1, 286:11
**doctor** [2] - 72:18, 74:3
**doctors** [17] - 70:20, 70:23, 70:25, 71:2, 71:7, 71:10, 71:16, 71:20, 71:22, 71:25, 72:7, 73:6, 131:7, 131:11, 131:15
**doctors'** [1] - 71:7
**document** [40] - 11:22, 89:19, 90:9, 90:13, 178:5, 178:8, 178:9, 178:10, 192:3, 192:18, 205:2, 205:13, 205:18, 205:20, 205:23, 206:4, 206:7, 207:8, 209:18, 209:19, 209:22, 210:9, 210:12, 210:19, 214:14, 218:19, 220:10, 225:1, 232:3, 233:14, 233:16, 234:25, 255:22, 263:23, 264:22, 267:5, 267:11, 288:14, 289:12, 289:14
**documentation** [3] - 251:4, 251:23, 252:4
**documents** [32] - 32:15, 32:25, 33:11, 33:24, 87:3, 106:8, 204:2, 204:3, 204:4, 204:7, 204:13, 206:2, 206:3, 207:22, 213:17, 217:24, 217:25, 218:1, 218:2, 218:4, 218:8, 218:9, 218:11, 218:13, 220:6, 246:3, 252:1, 252:2, 254:25, 287:5, 289:21, 290:4
**dollars** [10] - 41:24, 44:24, 45:8, 85:21, 119:5, 137:16, 139:21, 159:6, 194:1, 211:10
**done** [10] - 6:16, 27:5, 91:14, 96:4, 134:3, 199:3, 200:12, 218:10, 220:7, 236:6
**door** [3] - 66:7, 142:6, 211:9
**double** [1] - 173:11
**double-digit** [1] - 173:11
**doubt** [1] - 93:24
**down** [38] - 6:19, 13:11, 14:17, 15:20, 16:2, 20:2, 23:2, 23:9, 27:7, 28:5, 28:12, 29:6, 31:3, 35:19, 35:22, 36:3, 36:9, 38:20, 39:13, 41:6, 55:1, 83:19, 85:4, 92:7, 98:6, 148:23, 149:1, 154:25, 199:23, 199:25, 200:13, 201:2, 212:1, 215:22, 219:11, 242:11, 253:17, 292:15
**dozen** [8] - 75:10, 75:11, 75:15, 75:19, 76:8, 79:16, 139:3, 139:6
**dozens** [15] - 64:25, 71:22, 71:25, 73:6, 75:24, 76:6, 77:12, 77:16, 78:15, 79:7, 79:9, 79:19, 104:6, 128:14, 128:17
**drafted** [1] - 54:5
**draw** [1] - 92:19
**Drive** [2] - 143:9, 161:13
**driver** [2] - 154:14, 155:2
**driver's** [1] - 73:22
**drop** [1] - 42:25
**drove** [1] - 138:23
**drug** [1] - 39:12
**Drug** [3] - 29:15, 29:17, 126:4
**drugs** [60] - 9:3, 10:15, 10:18, 10:23, 10:24, 12:23, 15:6, 15:10, 21:4, 21:25, 22:4, 22:8, 22:13, 24:1, 31:3, 38:3, 39:24, 40:2, 40:7, 40:23, 41:3, 41:8, 41:9, 41:16, 41:25, 43:4, 45:11, 46:20, 46:23, 92:18, 92:20, 92:21, 127:25, 128:22, 128:23, 184:17, 187:8, 197:19, 199:10, 206:17, 210:4, 228:2, 246:2, 246:12, 251:15, 252:3, 252:8, 266:25, 272:22, 272:25, 283:14, 286:17, 287:10, 287:11, 287:13, 287:14, 287:16, 287:20, 288:4
**Drugs** [2] - 125:13, 125:19
**Drugstore** [1] - 125:17
**due** [1] - 91:22
**duly** [1] - 8:11
**duping** [4] - 127:17, 127:18, 127:19, 127:23
**during** [18] - 10:14, 10:17, 29:20, 47:23, 137:12, 179:20, 180:19, 194:1, 199:20, 203:25, 218:3, 243:23, 248:19, 273:8, 284:19, 285:15, 287:3, 291:8

## E

**early** [10] - 101:4, 101:10, 101:15, 101:21, 101:25, 103:24, 104:5, 155:16, 169:19, 169:24
**earnings** [1] - 85:11
**easily** [1] - 69:12
**East** [1] - 293:17
**Eastern** [9] - 63:19, 75:22, 105:25, 145:9, 179:13, 191:11, 191:14, 191:23, 197:14
**easy** [5] - 27:13, 133:25, 209:2, 209:5, 209:8
**easy-to-understand** [1] - 27:13
**eat** [3] - 4:19, 7:18, 7:20
**eaten** [2] - 4:8, 4:15
**efforts** [1] - 34:19
**eight** [1] - 173:10
**either** [9] - 20:12, 103:18, 158:9, 164:23, 169:3, 186:22, 218:5, 229:4, 242:11
**eleven** [3] - 155:10, 155:12, 155:13
**eliminated** [1] - 262:2
**Elmo** [2] - 46:15, 92:8
**ELMO** [2] - 81:7, 112:13
**Email** [4] - 3:11, 3:12, 17:10, 34:13
**email** [41] - 12:19, 14:7, 14:10, 16:23, 29:14, 30:21, 32:22, 34:4, 37:11, 38:2,

38:9, 38:11, 38:16, 49:22, 49:23, 95:13, 95:14, 95:15, 95:16, 213:12, 214:10, 215:5, 225:18, 230:14, 231:6, 233:19, 233:23, 234:1, 234:8, 236:16, 237:12, 237:14, 246:9, 246:14, 246:16, 246:17, 246:18, 246:19, 246:22, 275:10
**emailed** [1] - 77:6
**emails** [19] - 16:7, 16:10, 18:8, 24:7, 24:13, 32:3, 33:23, 95:17, 95:18, 95:21, 168:17, 168:20, 168:25, 169:5, 213:22, 215:4, 222:20, 233:22, 250:16
**employed** [9] - 205:12, 284:4, 284:7, 284:8, 284:11, 284:19, 284:21, 284:23, 285:8
**employee** [5] - 204:25, 206:7, 207:7, 207:10, 207:12
**employees** [1] - 233:12
**end** [15] - 4:22, 24:25, 40:24, 42:2, 44:16, 45:6, 201:16, 217:13, 241:14, 278:14, 278:16, 278:17, 278:18, 282:8, 291:17
**endeavor** [3] - 132:22, 132:25, 134:10
**ended** [6] - 42:3, 42:6, 44:4, 285:3
**ending** [1] - 5:2
**enforcement** [3] - 194:19, 195:7, 195:25
**English** [3] - 192:9, 192:12, 192:14
**entered** [3] - 170:23, 174:8, 284:12
**enterprise** [24] - 50:17, 51:1, 51:18, 52:1, 64:6, 64:14, 64:17, 65:9, 66:11, 74:7, 78:12, 80:7, 87:11, 87:14, 91:1, 95:24, 112:18, 129:21, 135:3, 136:8, 155:15, 174:22, 184:15, 185:3
**enterprises** [10] - 50:19, 51:15, 51:23, 52:15, 52:18, 53:3, 53:9, 68:19, 130:2, 136:13
**enters** [6] - 7:23, 26:7, 49:4, 110:21, 166:18, 229:25
**ENTIN** [2] - 2:2, 293:15
**Entin** [1] - 293:14
**entire** [3] - 60:8, 64:21, 260:19
**entities** [4] - 184:18, 184:20, 281:10, 283:3
**entitled** [1] - 293:12
**entity** [4] - 143:13, 195:7, 247:12, 281:12
**entry** [2] - 66:2, 268:9
**equal** [1] - 76:16
**erase** [2] - 168:20, 168:25
**erased** [1] - 169:5
**especially** [6] - 185:15, 193:11, 231:13, 241:8, 241:9, 287:21
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**essence** [1] - 240:13
**established** [2] - 118:8, 128:14
**estate** [9] - 195:14, 195:16, 195:17, 195:20, 196:1, 196:20, 196:23, 285:10, 285:13
**Estates** [1] - 156:6
**estimate** [1] - 62:8
**evaluating** [2] - 220:6
**evasion** [1] - 86:12
**event** [2] - 198:12, 273:13
**eventually** [7] - 42:13, 75:6, 84:4, 205:1, 261:8, 261:11, 275:9
**Everton** [1] - 162:20
**evidence** [16] - 12:7, 14:1, 14:18, 15:21, 17:6, 28:23, 32:11, 34:9, 37:1, 53:25, 81:16, 104:19, 181:6, 274:17, 274:20, 274:21
**Evidence** [3] - 12:12, 17:10, 34:13
**Evotaz** [1] - 21:25
**exact** [2] - 64:10, 227:21
**exactly** [27] - 63:6, 92:13, 92:16, 97:21, 115:8, 115:16, 118:23, 119:11, 121:1, 142:22, 155:13, 155:14, 156:15, 164:17, 182:5, 182:12, 191:5, 206:3, 217:12, 217:13, 217:15, 217:16, 217:18, 242:1, 268:17, 282:15, 286:17
**examination** [4] - 8:7, 203:1, 274:24, 276:1
**EXAMINATION** [6] - 3:3, 3:4, 3:4, 8:13, 49:14, 170:7
**examine** [1] - 228:24
**examined** [1] - 8:11
**examining** [1] - 228:20
**example** [5] - 22:10, 268:13, 268:15, 268:18, 269:3
**exasperations** [1] - 137:23
**exchange** [3] - 47:16, 264:2
**exclusively** [2] - 11:10, 84:25
**excuse** [24] - 46:10, 113:3, 116:9, 123:15, 128:7, 132:24, 182:19, 189:3, 193:3, 193:13, 199:16, 204:6, 213:3, 221:1, 232:15, 232:18, 236:23, 239:24, 255:22, 255:24, 256:1, 259:2, 272:9, 284:6
**excused** [1] - 226:10
**Exhibit** [29] - 11:20, 12:7, 14:1, 14:18, 15:21, 16:3, 16:4, 16:21, 17:6, 18:12, 19:2, 27:18, 28:22, 28:23, 30:10, 30:15, 31:13, 32:8, 34:2, 34:9, 35:9, 37:1, 38:22, 83:3, 83:4, 85:7, 218:20, 220:11, 230:11
**exhibit** [7] - 8:18, 13:17, 31:12, 40:21, 47:13, 85:7, 218:23
**existed** [1] - 214:19
**exits** [8] - 25:14, 48:10, 109:18, 166:1, 226:6, 226:13, 291:7, 291:22
**expect** [1] - 198:16
**expenses** [1] - 139:25
**expensive** [1] - 142:2
**experience** [2] - 21:15, 126:10
**expiration** [1] - 251:18
**explain** [22] - 54:20, 58:9, 66:5, 74:18, 90:6, 94:17, 103:22, 107:13, 107:18, 185:24, 215:9, 215:15, 216:1, 216:4, 232:3, 245:11, 245:25, 249:18, 251:21, 256:3, 281:1, 287:18
**explained** [7] - 24:7, 102:19, 103:6, 103:8, 106:23, 165:2, 255:17
**explains** [1] - 264:22
**explanation** [1] - 238:8
**explanations** [1] - 255:18
**expose** [2] - 239:1, 240:7
**Express** [2] - 39:20, 40:8
**ext** [1] - 40:17
**extended** [1] - 228:12
**extensive** [1] - 169:15
**extent** [3] - 72:17, 91:22, 110:6
**extraneous** [1] - 216:1
**extremely** [1] - 193:10

**F**

**face** [4] - 276:16, 276:18
**face-to-face** [2] - 276:16, 276:18
**facilities** [1] - 32:18
**facility** [2] - 4:14, 4:17
**fact** [39] - 14:4, 53:8, 55:22, 75:13, 123:6, 181:9, 182:10, 195:24, 198:24, 204:25, 212:11, 213:10, 213:24, 216:13, 220:10, 238:23, 239:1, 239:10, 240:7, 240:14, 241:5, 242:9, 242:11, 243:20, 243:22, 245:4, 245:20, 247:11, 252:5, 253:23, 272:24, 275:2, 276:13, 277:23, 278:1, 278:20, 278:21, 279:5, 279:8
**factor** [1] - 4:15
**fair** [6] - 56:13, 80:17, 152:4, 173:11, 206:5, 233:1
**fake** [18] - 22:13, 28:3, 30:1, 30:21, 31:18, 32:2, 49:24, 50:3, 51:14, 51:23, 72:8, 73:7, 78:17, 93:3, 206:24, 207:8, 214:16, 214:17
**fall** [1] - 189:3
**false** [50] - 13:19, 13:23, 14:14, 16:16, 20:22, 21:24, 24:11, 29:15, 30:19, 30:20, 37:22, 38:7, 38:17, 47:9, 47:11, 48:1, 71:17, 89:18, 106:21, 205:12, 209:9, 215:10, 215:17, 216:7, 226:19, 233:14, 233:16, 249:20, 250:21, 253:18, 253:19, 253:20, 253:22, 253:24, 254:10, 255:14, 255:19, 255:23, 256:16, 266:21, 268:9, 269:12, 269:13, 274:2, 278:21, 283:21, 287:5, 287:7, 287:8
**falsely** [1] - 268:1
**falsified** [7] - 13:14, 15:18, 18:9, 18:17, 39:7, 40:22, 46:1
**familiar** [2] - 153:7, 225:13
**Family** [1] - 158:18
**family** [14] - 149:21, 150:2, 150:3, 150:4, 150:5, 150:6,

150:14, 154:10, 160:4, 162:14, 163:11, 163:14, 196:6, 196:17
**family's** [1] - 150:14
**far** [13] - 12:2, 15:9, 32:3, 41:2, 77:20, 188:14, 188:23, 189:8, 206:12, 229:22, 247:7, 260:17, 280:15
**father** [3] - 161:4, 162:24, 163:6
**father's** [2] - 161:6, 162:7
**fault** [1] - 22:19
**favor** [1] - 153:1
**favorable** [1] - 228:19
**FBI** [5] - 175:16, 180:22, 199:16, 199:20, 262:16
**FDA** [5] - 41:19, 139:9, 139:14, 139:16, 139:17
**Fed** [1] - 171:22
**Federal** [3] - 1:22, 264:6, 293:17
**federal** [2] - 170:24, 175:16
**feds** [1] - 138:7
**felt** [3] - 104:16, 123:1, 123:3
**fence** [2] - 129:21, 171:19
**few** [16] - 4:21, 35:21, 50:20, 50:23, 51:16, 84:12, 85:23, 98:1, 109:1, 122:2, 190:25, 211:8, 221:24, 271:6, 275:13, 292:2
**FHEPS** [1] - 132:21
**field** [2] - 211:5, 228:20
**figure** [2] - 222:23, 227:7
**figured** [1] - 227:12
**file** [3] - 12:20, 196:23, 264:5
**filed** [4] - 108:5, 108:18, 148:7, 150:8
**fill** [2] - 73:24, 266:5
**filled** [1] - 205:22
**filling** [3] - 127:21, 252:18, 252:20
**final** [2] - 269:25, 270:7
**finances** [2] - 105:5, 128:21
**financial** [2] - 242:12, 242:20
**fine** [3] - 211:5, 277:19, 292:24
**fined** [1] - 12:20
**finish** [13] - 4:23, 8:25, 29:23, 38:13, 42:16, 146:14, 178:24, 182:19, 216:3, 239:6, 249:23, 275:11, 292:5
**finished** [5] - 185:19, 201:21, 215:21, 282:9, 282:10
**finishes** [1] - 178:21
**firm** [4] - 144:2, 144:4, 144:6, 144:13
**First** [1] - 161:13
**first** [49] - 7:15, 8:11, 12:23, 13:4, 42:9, 46:16, 49:1, 57:8, 58:18, 63:22, 64:24, 66:2, 67:6, 67:13, 67:22, 73:6, 75:14, 88:17, 98:12, 114:2, 129:1, 148:10, 167:16, 168:4, 178:24, 180:21, 182:1, 189:3, 191:19, 202:6, 213:22, 215:14, 216:18, 217:6, 217:17, 219:18, 220:2, 221:18, 227:6, 231:24, 235:24, 247:16, 253:1, 260:12, 264:19, 269:20, 275:6, 283:15, 285:25
**five** [15] - 6:22, 16:14, 22:8, 50:24, 51:16, 75:14, 98:3, 108:13, 156:17, 171:7, 198:12, 198:15, 203:23, 203:24, 287:4
**five-minute** [1] - 6:22
**fix** [2] - 256:2, 256:7
**Fl** [1] - 1:22
**Fleet** [2] - 153:7, 156:1
**flip** [2] - 20:3, 31:13
**flipped** [1] - 20:4
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [11] - 1:4, 1:16, 1:19, 1:22, 100:6, 102:25, 115:20, 264:9, 264:19, 293:16, 293:18
**fluid** [4] - 9:18, 9:21, 9:23, 10:1
**focus** [2] - 232:21, 232:22
**follow** [8] - 8:4, 26:13, 49:10, 89:22, 111:2, 165:10, 166:24, 230:6
**follow-up** [2] - 89:22, 165:10
**following** [9] - 6:25, 25:19, 48:15, 109:23, 166:7, 182:24, 226:14, 229:9, 285:7
**follows** [1] - 8:12
**food** [2] - 4:17, 7:13
**foot** [1] - 66:7
**FOR** [3] - 1:13, 1:17, 1:21
**foregoing** [1] - 293:10
**forever** [1] - 179:6
**forge** [1] - 91:24
**forged** [1] - 91:23
**forgery** [1] - 90:12
**forget** [2] - 69:10, 205:10
**forgot** [2] - 7:13, 178:13
**form** [1] - 266:5
**format** [1] - 165:11
**formerly** [1] - 54:2
**FORT** [1] - 1:2
**Fort** [24] - 1:4, 1:22, 171:11, 175:17, 177:21, 178:11, 179:1, 180:12, 180:15, 182:21, 183:2, 183:4, 183:14, 199:12, 202:9, 203:15, 262:16, 262:21, 262:23, 263:21, 286:1, 286:11, 293:18
**forth** [3] - 47:18, 215:5, 268:16
**forward** [11] - 36:5, 187:20, 191:25, 200:6, 223:9, 245:15, 249:21, 251:21, 256:19, 262:11, 278:5
**forwards** [1] - 29:25
**foster** [1] - 243:10
**four** [7] - 50:24, 51:16, 98:3, 106:19, 189:10, 289:22
**FPR** [2] - 2:2, 293:15
**frame** [1] - 137:12
**fraud** [5] - 64:1, 72:16, 77:24, 78:12, 198:25
**fraudulent** [17] - 72:19, 205:2, 205:20, 206:2, 206:7, 207:22, 209:17, 209:19, 209:22, 210:9, 210:12, 210:19, 211:19, 211:20, 211:21, 279:17, 279:19
**free** [5] - 96:17, 102:3, 109:4, 185:25, 192:19
**freedom** [2] - 59:4, 59:5
**Friday** [1] - 236:22
**friend** [1] - 196:16
**front** [9] - 11:22, 31:12, 32:2, 44:8, 127:22, 184:11, 224:4, 229:16, 263:24
**full** [1] - 276:23
**funding** [3] - 128:1, 130:16, 130:18
**Funding** [2] - 130:13, 136:11
**funds** [7] - 19:16, 44:25, 130:23, 157:14, 161:9, 161:11, 289:19
**furlough** [1] - 5:25
**future** [3] - 23:12, 201:15, 201:16

## G

**G-U-L-K-A-R-O-V** [1] - 68:8
**GAF** [1] - 125:11
**gained** [1] - 195:6
**Garrett** [8] - 10:11, 10:21, 11:7, 185:16, 225:12, 225:16, 235:18
**gas** [1] - 9:23
**gatekeeper** [2] - 255:12, 271:14
**general** [2] - 21:16, 168:19
**generally** [6] - 10:20, 19:13, 28:2, 44:16, 44:19, 288:24
**genius** [1] - 70:14
**Genome** [1] - 126:2
**Genvoya** [2] - 22:1, 39:16
**gift** [3] - 161:8, 163:8, 163:10
**gifted** [7] - 157:15, 161:5, 161:8, 162:8, 162:9, 163:6, 163:13
**gifting** [1] - 162:10
**Gilead** [52] - 29:14, 38:16, 42:6, 42:11, 42:12, 42:16, 43:6, 43:8, 44:22, 87:8, 87:12, 87:13, 115:13, 115:21, 145:3, 147:21, 147:23, 148:7, 148:19, 158:5, 158:6, 158:7, 162:11, 162:12, 162:15, 164:14, 164:18, 164:24, 167:14, 168:8, 168:9, 168:23, 169:2, 169:13, 169:15, 181:20, 227:8, 227:9, 227:14, 279:1, 279:2, 279:3, 282:10, 282:13, 282:16, 282:24, 283:14, 283:19, 283:20
**Gilead's** [1] - 158:9
**girl** [7] - 85:15, 88:5, 205:11, 233:13, 233:14, 233:16, 279:9
**given** [17] - 45:2, 52:6, 57:2, 58:4, 61:23, 62:2, 62:5, 62:14, 81:11, 140:19, 156:22, 163:1, 164:17, 165:5, 197:19, 256:11, 286:2
**Global** [2] - 39:20, 40:8
**goal** [2] - 72:11, 281:10
**goodness** [1] - 153:3
**goods** [1] - 37:18
**gotcha** [1] - 36:15
**GOVERNMENT** [1] - 1:13
**government** [8] - 62:19, 62:24, 85:23, 146:6, 146:8, 146:17, 157:22, 234:21
**Government** [56] - 4:22, 12:6, 17:6, 25:25, 32:7, 34:9, 48:22, 61:24, 84:1,

89:16, 89:18, 89:24, 102:12, 128:5, 128:8, 153:1, 156:22, 158:2, 158:8, 164:18, 164:23, 169:5, 169:9, 174:1, 174:4, 176:20, 177:21, 194:19, 195:7, 200:6, 200:24, 201:4, 201:8, 201:10, 202:11, 202:19, 202:21, 203:8, 203:10, 203:12, 203:15, 219:4, 226:15, 226:17, 226:22, 228:11, 234:23, 262:13, 262:18, 263:13, 286:7, 286:12, 286:14, 287:5, 291:16, 292:22
**Government's** [34] - 3:10, 3:11, 3:12, 11:20, 12:7, 12:11, 14:1, 14:18, 15:21, 16:3, 16:4, 16:21, 17:6, 17:10, 18:11, 19:2, 27:18, 28:21, 28:23, 30:10, 30:14, 31:12, 34:2, 34:9, 34:13, 35:9, 36:25, 38:22, 83:4, 85:7, 158:10, 218:20, 220:11, 230:11
**graduate** [2] - 268:20, 268:21
**grammar** [1] - 253:15
**grandfather's** [1] - 69:13
**gray** [2] - 130:7, 130:8
**great** [3] - 189:19, 214:24, 214:25
**greatest** [1] - 30:21
**greatly** [1] - 34:21
**green** [3] - 23:18, 26:22, 35:17
**ground** [2] - 177:2, 177:5
**grounds** [3] - 33:3, 33:5, 150:21
**group** [3] - 10:10, 65:23, 131:4
**growing** [1] - 84:20
**GRP** [1] - 143:9
**guess** [16] - 4:4, 4:8, 37:16, 72:5, 78:20, 123:21, 136:5, 165:15, 165:16, 178:2, 189:15, 223:1, 229:16, 261:22, 261:23, 279:14
**guidance** [2] - 247:7, 247:9
**guided** [2] - 256:5, 256:7
**guilty** [13] - 104:9, 104:23, 106:15, 107:2, 107:25, 108:4, 190:6, 190:14, 191:4, 197:2, 198:3, 198:6, 198:7
**Gulkarov** [3] - 68:6, 68:13, 68:20
**guy** [11] - 119:1, 119:10, 142:17, 143:10, 143:11, 143:12, 155:2, 174:14, 174:20, 174:24, 215:6
**guys** [7] - 28:9, 70:1, 73:21, 80:15, 118:7, 232:22, 293:2
**GX88** [1] - 219:2

**H**

**H-A-I-M-O-V** [1] - 68:24
**hah** [1] - 136:25
**half** [3] - 139:3, 142:14, 142:15
**hand** [2] - 73:13, 81:22
**handcuffs** [3] - 55:9, 55:15, 55:17
**handed** [1] - 5:11
**handle** [1] - 138:2
**handling** [2] - 108:21, 264:4
**hands** [6] - 55:5, 55:7, 55:14, 162:11, 277:11, 277:15
**hard** [1] - 192:8
**harm** [1] - 195:8
**Harvoni** [1] - 22:11
**hat** [1] - 6:1
**head** [4] - 100:8, 180:3, 206:1, 260:10
**healthcare** [7] - 63:25, 65:24, 66:4, 70:3, 70:18, 74:16, 198:25
**hear** [10] - 29:5, 49:19, 57:1, 159:22, 170:20, 170:21, 219:25, 229:19, 236:24, 241:14
**heard** [13] - 41:20, 77:9, 77:10, 84:1, 85:2, 129:2, 138:18, 149:24, 161:15, 168:15, 185:7, 197:13, 221:6
**hearsay** [3] - 43:14, 43:15, 110:7
**heart** [1] - 153:3
**help** [10] - 36:6, 47:25, 132:10, 133:4, 134:13, 134:22, 135:6, 145:7, 225:19, 230:15
**helped** [1] - 132:9
**helpful** [1] - 202:10
**helping** [6] - 109:5, 109:7, 109:8, 133:4, 133:23, 152:21
**helpings** [1] - 154:10
**hereby** [1] - 293:10
**Hernandez** [15] - 115:5, 115:6, 115:9, 115:11, 115:12, 115:13, 115:16, 115:19, 115:23, 117:13, 118:10, 118:14, 118:17, 227:10
**Hi** [3] - 27:11, 28:10, 74:2
**hi** [2] - 225:18, 230:14
**hidden** [2] - 149:9, 150:17
**hide** [12] - 106:19, 150:22, 150:25, 151:4, 194:12, 195:9, 196:3, 196:5, 196:19, 212:24, 214:9
**hiding** [3] - 194:17, 195:19, 214:9
**highlighted** [1] - 267:2
**Highway** [1] - 1:22
**himself** [1] - 224:8
**hire** [8] - 127:12, 247:13, 247:23, 247:24, 247:25, 248:3, 248:22
**hired** [2] - 128:16, 247:22
**history** [1] - 64:21
**HIV** [49] - 9:3, 10:15, 10:18, 10:23, 10:24, 12:23, 15:6, 15:10, 24:1, 38:3, 39:24, 40:2, 40:7, 40:23, 41:3, 41:8, 41:16, 41:25, 43:3, 46:20, 46:22, 87:13, 144:23, 145:3, 148:9, 151:20, 184:17, 187:8, 197:11, 197:15, 197:19, 198:4, 199:10, 210:4, 222:4, 228:2, 246:12, 251:15, 252:8, 280:24, 281:4, 281:15, 281:24, 282:6, 282:24, 283:3, 283:10, 283:14, 283:20
**hold** [9] - 55:5, 96:6, 96:7, 120:19, 138:11, 180:12, 180:14, 180:18, 274:13
**Holdings** [6] - 129:12, 129:25, 135:5, 143:2, 143:4, 285:18
**holiday** [1] - 6:14
**home** [4] - 74:4, 102:2, 118:20, 168:1
**homeless** [7] - 132:6, 132:8, 132:10, 133:4, 133:15, 133:23, 135:7
**homes** [3] - 132:14, 132:15, 132:18
**honest** [4] - 98:25, 100:22, 127:19, 280:1
**honked** [1] - 138:24
**Honor** [86] - 4:6, 4:13, 4:17, 4:20, 5:11, 5:16, 5:23, 7:9, 7:10, 7:11, 7:13, 8:1, 8:3, 8:8, 17:11, 25:5, 25:13, 26:1, 26:3, 26:10, 26:12, 26:17, 43:18, 48:23, 48:24, 49:7, 49:9, 51:9, 52:5, 52:21, 54:17, 54:25, 55:6, 57:3, 58:13, 65:19, 81:7, 81:15, 94:15, 100:16, 102:11, 109:10, 109:21, 110:5, 110:13, 110:15, 110:16, 110:17, 110:24, 111:1, 111:6, 114:22, 116:15, 116:22, 124:9, 142:3, 150:18, 152:7, 159:2, 160:10, 166:4, 166:12, 166:13, 166:14, 166:21, 166:23, 167:3, 167:11, 169:20, 170:5, 175:9, 181:2, 196:10, 217:23, 218:11, 219:5, 227:5, 229:15, 230:3, 230:5, 253:7, 274:10, 291:12, 292:14, 293:4, 293:5
**honor** [1] - 85:2
**HONORABLE** [1] - 1:10
**Honorable** [1] - 2:3
**hooked** [1] - 55:17
**hope** [5] - 9:11, 152:19, 265:18, 292:2, 292:9
**hoped** [1] - 254:6
**Hopefully** [1] - 36:5
**hopefully** [6] - 6:16, 36:4, 200:7, 292:4, 292:8, 292:11
**hopes** [1] - 153:2
**hoping** [19] - 101:20, 104:2, 104:3, 104:5, 152:18, 152:20, 199:4, 200:5, 200:9, 200:11, 209:21, 210:8, 210:14, 210:18, 211:15, 254:1, 264:9, 264:14, 264:16
**horrible** [1] - 81:22
**hospital** [1] - 74:20
**hour** [1] - 27:9
**hours** [4] - 139:13, 139:14, 139:17, 139:18
**house** [25] - 133:20, 138:22, 138:23, 138:24, 141:10, 142:6, 148:19, 148:20, 150:17, 153:10, 153:11, 153:13, 153:16, 154:4, 154:7, 155:1, 155:7, 156:1, 156:11, 156:12, 156:14, 162:21, 162:22, 162:25, 164:9
**houses** [3] - 142:13, 143:1, 162:24
**housing** [2] - 133:5, 133:24
**huge** [1] - 222:5
**Human** [1] - 132:2
**human** [1] - 132:5
**hundred** [2] - 50:17,

141:21
**hundreds** [2] - 121:2, 121:3

**I**

**idea** [44] - 5:21, 69:14, 69:15, 69:16, 69:17, 69:18, 90:19, 90:20, 128:9, 128:11, 152:25, 158:21, 160:6, 160:22, 163:23, 169:4, 198:23, 199:2, 201:8, 201:9, 201:13, 201:14, 201:15, 201:16, 207:3, 214:24, 214:25, 222:19, 223:24, 231:12, 231:15, 241:19, 241:21, 241:22, 241:23, 242:3, 247:10, 260:25, 262:5, 266:10, 277:3, 287:20
**identification** [1] - 85:9
**identified** [4] - 115:13, 181:20, 257:10, 258:16
**identify** [5] - 114:17, 180:23, 181:11, 183:9, 183:10
**identifying** [1] - 47:13
**identity** [7] - 213:13, 213:15, 214:9, 215:17, 216:7, 227:6, 241:17
**ignore** [1] - 238:14
**illegal** [6] - 106:17, 157:14, 195:24, 227:1, 285:16, 285:20
**illegally** [1] - 195:6
**illicit** [1] - 161:9
**immigration** [1] - 52:11
**impact** [1] - 229:20
**impeach** [1] - 228:24
**impeached** [1] - 229:1
**impeachment** [1] - 229:2
**impersonating** [1] - 216:10
**important** [10] - 59:3, 59:6, 192:16, 192:17, 192:18, 193:10, 193:12, 208:1, 208:6, 208:8
**impression** [2] - 216:21, 269:3
**improper** [1] - 67:11
**inaccuracies** [3] - 257:10, 257:11, 258:17
**inaccurate** [6] - 197:20, 226:19, 257:2, 257:20, 258:5, 258:6
**inappropriate** [1] - 110:12
**Inc** [2] - 131:1, 143:25
**include** [2] - 275:4, 276:1
**included** [1] - 237:2
**including** [2] - 172:24, 184:3
**income** [1] - 85:20
**incorrect** [7] - 138:4, 138:5, 216:12, 267:19, 288:7, 288:9, 288:10
**indicated** [3] - 263:7, 274:23, 291:16
**indicating** [1] - 39:17
**indict** [1] - 101:6
**indicted** [4] - 86:12, 190:6, 190:14, 227:25
**indictment** [4] - 190:10, 197:13, 277:23, 278:1
**indictments** [2] - 9:8, 87:12
**individual** [10] - 68:15, 81:24, 95:10, 106:14, 115:19, 117:8, 117:9, 120:1, 140:25, 228:13
**individuals** [4] - 64:25, 65:23, 202:6, 286:16
**industry** [1] - 50:16
**info** [1] - 37:18
**inform** [3] - 257:12, 257:16
**information** [69] - 15:1, 15:5, 32:15, 33:11, 37:16, 74:14, 83:21, 83:23, 84:24, 91:17, 169:2, 169:3, 180:14, 180:18, 188:13, 202:10, 202:12, 202:14, 202:15, 202:16, 202:17, 221:25, 222:2, 222:4, 223:22, 224:2, 224:12, 227:2, 228:23, 240:13, 250:17, 250:19, 250:22, 250:24, 251:2, 251:3, 251:7, 251:8, 251:20, 251:22, 252:21, 253:5, 253:13, 254:11, 255:14, 255:19, 256:11, 256:16, 256:18, 257:1, 257:20, 258:5, 258:7, 258:18, 258:19, 258:24, 263:8, 264:3, 266:6, 266:8, 267:8, 267:14, 268:6, 273:19, 273:22, 274:1, 274:2, 274:4, 287:21
**informed** [8] - 4:6, 226:17, 247:5, 257:10, 257:14, 257:16, 257:17, 258:3
**inmate** [1] - 4:7
**innocent** [1] - 148:11
**inquire** [1] - 228:18
**inquiry** [1] - 43:2
**inside** [1] - 173:18
**insisting** [2] - 244:5, 244:15
**inspectors** [1] - 139:10
**InstaCare** [5] - 13:20, 14:5, 15:13, 15:17, 17:17
**InstaCare's** [1] - 17:15
**instance** [1] - 267:4
**instances** [1] - 269:9
**instead** [2] - 90:7, 259:23
**instruct** [4] - 138:6, 160:12, 205:11, 266:1
**instructed** [6] - 10:2, 139:13, 204:25, 206:7, 265:22, 279:10
**instructing** [1] - 266:4
**instruction** [4] - 206:21, 207:18, 258:10, 266:6
**instructions** [2] - 207:12, 207:15
**insulate** [1] - 188:6
**insurance** [13] - 65:15, 65:17, 70:3, 146:1, 146:6, 146:8, 146:10, 146:11, 146:17, 146:19, 164:14, 164:23, 190:22
**intake** [2] - 83:9, 84:5
**intend** [1] - 292:2
**intentional** [5] - 212:15, 212:19, 215:3, 216:16, 216:17
**intentionally** [1] - 277:20
**intentions** [1] - 210:22
**interest** [1] - 143:17
**interested** [5] - 28:14, 80:10, 200:15, 263:7, 263:14
**interject** [1] - 216:1
**interrupt** [3] - 212:5, 215:23, 282:19
**interrupting** [1] - 240:22
**interview** [6] - 105:1, 116:13, 116:21, 116:23, 181:3, 262:14
**interviewed** [2] - 105:3, 232:13
**introduce** [1] - 247:15
**introduced** [5] - 95:11, 217:11, 231:3, 235:22, 240:16
**investigation** [11] - 42:12, 43:5, 43:6, 43:9, 138:18, 226:23, 227:2, 228:1, 228:4, 228:6, 279:14
**investigations** [4] - 227:19, 228:12, 228:21, 229:22
**investments** [1] - 59:16
**invitation** [1] - 202:24
**invited** [1] - 202:21
**Invoice** [2] - 3:10, 12:11
**invoice** [32] - 11:24, 12:2, 12:20, 12:24, 18:16, 18:20, 19:10, 19:14, 19:25, 20:2, 20:6, 20:7, 20:10, 20:11, 20:13, 20:15, 20:16, 20:19, 20:24, 20:25, 21:4, 21:12, 21:14, 21:23, 22:12, 22:14, 22:20, 22:23, 31:19, 35:3, 35:5
**invoices** [8] - 24:5, 32:16, 35:18, 36:5, 36:11, 36:16, 36:18
**involved** [50] - 24:19, 43:10, 51:15, 52:15, 52:18, 61:11, 61:16, 61:21, 61:22, 65:2, 65:4, 65:6, 65:7, 68:18, 74:21, 84:21, 112:17, 123:22, 174:21, 185:3, 185:14, 186:5, 186:10, 187:17, 187:19, 187:25, 188:7, 188:21, 189:18, 189:23, 191:4, 194:2, 197:15, 206:16, 207:22, 208:9, 220:6, 227:1, 228:5, 228:12, 232:24, 237:13, 239:2, 240:8, 282:24, 283:18, 283:20, 284:3, 285:16
**involvement** [6] - 53:2, 65:7, 106:20, 112:25, 143:12, 235:7
**involving** [2] - 64:25, 223:10
**IPC** [7] - 20:20, 20:23, 24:10, 30:19, 37:22, 38:6
**irrelevant** [3] - 55:24, 55:25, 150:6
**Irrevocable** [1] - 158:18
**IRS** [7] - 85:12, 86:3, 119:20, 121:5, 121:7, 121:8, 121:12
**ishbay** [1] - 122:5
**Ishbay** [7] - 12:14, 12:15, 82:3, 83:15, 84:7, 84:8, 122:7
**issue** [11] - 57:23, 62:21, 62:22, 183:5, 183:7, 222:7, 224:14, 230:20, 245:6, 268:12, 292:8
**issued** [1] - 90:10
**issues** [3] - 224:21, 242:12, 242:20
**item** [1] - 71:15
**itemize** [1] - 292:22
**items** [4] - 5:14, 5:20, 6:18, 292:16
**itself** [3] - 37:24, 40:15, 265:1
**Ivlis** [1] - 1:18
**IVS** [1] - 125:25

## J


**Jackie** [1] - 150:16
**Jacqueline** [1] - 1:13
**jail** [12] - 54:12, 56:1, 56:2, 56:3, 56:5, 56:22, 58:1, 103:24, 104:5, 165:13, 169:19, 169:24
**jailers** [1] - 57:10
**Jamaica** [1] - 157:3
**Jenna** [2] - 220:25, 221:2
**Jersey** [7] - 171:11, 175:17, 199:9, 199:11, 262:10, 262:11, 262:14
**job** [5] - 80:5, 128:4, 128:22, 128:23, 128:24
**John's** [1] - 268:20
**jointly** [1] - 207:2
**JPRX** [1] - 125:21
**JTP** [1] - 126:2
**judge** [28] - 4:21, 9:15, 33:17, 33:18, 57:1, 57:9, 57:11, 57:14, 58:4, 58:19, 101:12, 101:24, 103:10, 103:12, 103:14, 103:15, 103:23, 104:25, 106:8, 145:12, 145:16, 148:19, 193:17, 225:23, 226:14, 228:10, 264:11, 292:6
**Judge** [16] - 5:24, 12:8, 17:7, 33:1, 33:14, 36:20, 37:23, 41:21, 43:14, 47:6, 47:12, 47:19, 218:15, 288:16, 292:13, 292:15
**JUDGE** [1] - 1:10
**judge's** [1] - 258:10
**juice** [1] - 4:9
**Juluca** [2] - 22:10, 22:11
**July** [23] - 217:19, 219:21, 220:15, 220:16, 221:24, 222:9, 225:11, 225:21, 227:22, 231:1, 231:13, 231:14, 233:4, 233:6, 234:4, 234:6, 236:23, 284:5, 284:7, 284:11, 284:15, 285:2, 285:21
**June** [6] - 145:10, 146:21, 147:20, 219:21, 221:25, 232:17
**jurors** [5] - 4:4, 7:4, 110:18, 166:15, 292:10
**jury** [39] - 7:8, 7:12, 7:25, 25:9, 25:14, 26:5, 26:7, 26:9, 48:5, 48:8, 48:10, 49:6, 55:1, 67:9, 81:20, 109:12, 109:18, 110:4, 110:21, 110:23, 165:20, 165:23, 166:11, 166:18, 166:20, 184:11, 225:24, 226:3, 229:4, 229:14, 229:23, 230:2, 231:14, 260:18, 263:24, 276:5, 286:22, 290:25, 291:7
**JURY** [1] - 1:9
**Jury** [5] - 7:23, 49:4, 166:1, 226:6, 229:25
**just..** [1] - 231:9
**Justice** [1] - 98:24


## K


**K&L** [2] - 131:1, 135:6
**K-H-A-I-M** [1] - 50:12
**K-H-A-I-M-O-V** [1] - 68:22
**keep** [18] - 7:15, 23:9, 23:16, 27:7, 36:3, 36:9, 53:23, 106:1, 159:15, 193:8, 244:23, 251:11, 281:7, 281:15, 281:24, 292:4, 292:10
**keeping** [3] - 151:8, 241:11, 241:12
**keeps** [2] - 159:16, 160:14
**kept** [3] - 49:18, 281:18, 281:22
**khaim** [1] - 53:24
**KHAIM** [2] - 3:3, 8:10
**Khaim** [37] - 4:7, 5:4, 7:18, 8:15, 9:11, 12:14, 15:24, 16:9, 20:6, 25:23, 29:4, 32:1, 34:4, 41:7, 48:20, 50:9, 50:10, 54:12, 55:14, 69:13, 110:1, 158:18, 169:13, 187:22, 189:8, 193:10, 208:1, 208:6, 213:6, 226:12, 229:12, 242:6, 277:1, 277:15, 277:17, 282:18, 291:8
**Khaimov** [2] - 68:22, 106:17
**kickback** [1] - 197:6
**kickbacks** [1] - 194:16
**Kim** [15] - 49:19, 92:10, 92:12, 92:17, 93:3, 93:13, 93:14, 93:21, 93:25, 94:3, 94:18, 95:11, 95:20, 95:23, 105:17
**Kimchi** [37] - 11:22, 14:4, 14:9, 16:9, 32:1, 32:13, 34:15, 35:12, 35:17, 35:23, 36:14, 39:11, 46:14, 46:16, 47:4, 47:9, 47:11, 47:22, 49:22, 50:22, 93:10, 97:4, 213:10, 213:21, 213:22, 213:25, 214:16, 216:8, 216:9, 216:14, 216:20, 249:12, 249:15, 249:20, 250:7, 250:12, 250:16
**kind** [20] - 20:2, 20:13, 20:15, 63:15, 71:18, 121:25, 133:16, 161:11, 178:5, 178:6, 190:4, 191:5, 191:17, 224:5, 227:13, 254:9, 259:22, 262:25, 284:3, 287:7
**King** [24] - 14:4, 14:9, 16:9, 34:15, 34:18, 36:13, 50:22, 93:10, 97:4, 213:10, 213:21, 213:22, 213:24, 214:16, 216:7, 216:9, 216:13, 216:20, 249:12, 249:15, 249:20, 250:6, 250:12, 250:16
**kingpin** [3] - 115:14, 115:21, 117:13
**Kinray** [1] - 126:16
**kitchen** [5] - 149:11, 149:18, 150:25, 151:7, 151:9
**knowing** [3] - 188:7, 216:22, 241:18
**knowledge** [4] - 120:5, 228:13, 270:5
**known** [4] - 54:3, 174:14, 174:16, 174:17
**knows** [5] - 114:24, 114:25, 152:8, 169:9, 228:11
**Kosher** [9] - 4:13, 4:16, 5:7, 6:17, 57:2, 57:10, 57:17, 58:5, 58:23


## L


**labels** [1] - 9:22
**lack** [1] - 45:15
**ladies** [1] - 88:13
**lady** [2] - 88:5, 127:21
**landlord** [4] - 122:10, 122:12, 122:13, 122:16
**language** [3] - 24:16, 56:11, 56:16
**large** [3] - 40:21, 91:4, 91:7
**last** [50] - 47:5, 50:8, 68:7, 68:25, 69:2, 69:4, 69:8, 69:9, 86:15, 86:17, 86:19, 86:21, 88:15, 88:16, 96:19, 113:14, 113:15, 113:18, 113:20, 114:1, 114:6, 114:7, 114:17, 114:24, 115:1, 115:5, 117:23, 117:24, 118:2, 118:3, 118:4, 118:5, 138:13, 142:20, 142:21, 154:2, 154:3, 158:24, 198:12, 213:2, 213:4, 221:13, 273:21, 276:25, 277:5, 277:7, 277:8, 277:9
**late** [4] - 42:19, 42:22, 44:6, 259:12
**latest** [1] - 30:21
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:22, 293:18
**launder** [6] - 130:3, 194:16, 194:18, 195:5, 197:6, 197:8
**laundered** [5] - 106:18, 143:13, 194:15, 197:9, 197:23
**launderer** [1] - 143:15
**laundering** [7] - 64:1, 128:3, 130:8, 135:25, 194:22, 197:2, 197:18
**law** [8] - 23:21, 144:2, 144:4, 144:6, 144:13, 194:19, 195:7, 195:25
**lawsuit** [10] - 87:8, 87:13, 115:14, 115:21, 148:7, 148:10, 148:16, 282:11, 282:16, 283:1
**lawyer** [15] - 4:7, 4:9, 53:23, 101:24, 108:21, 108:23, 145:23, 175:22, 176:11, 192:6, 215:23, 216:2, 240:22, 240:23, 240:25
**lawyer's** [1] - 53:25
**lawyers** [8] - 43:9, 43:12, 100:18, 108:25, 140:23, 141:1, 141:3, 181:5
**Lazaro** [8] - 115:9, 115:11, 115:12, 115:13, 115:16, 115:19, 115:23, 117:13
**lead** [5] - 200:7, 201:11, 201:17, 215:10, 228:23
**leader** [5] - 65:5, 65:6, 65:8, 70:9
**leading** [3] - 33:6, 33:7, 274:24
**learn** [3] - 231:23, 260:10, 277:2
**learned** [6] - 244:15, 244:21, 257:20, 258:16, 279:13, 279:16
**learning** [1] - 186:6
**least** [7] - 139:6, 187:10, 227:13, 228:7, 238:10, 252:9, 260:17
**leave** [1] - 291:21
**left** [5] - 8:17, 38:23, 111:9, 124:5, 292:3
**legal** [4] - 129:2, 179:9, 228:25,

285:22
**legally** [1] - 194:21
**legitimacy** [1] - 78:8
**legitimate** [22] - 17:24, 66:15, 77:25, 78:3, 78:5, 78:14, 78:15, 78:19, 78:20, 79:3, 91:15, 127:20, 129:21, 130:24, 131:18, 132:4, 135:2, 136:7, 136:12, 242:10, 243:8, 243:22
**legs** [1] - 55:20
**lend** [2] - 130:16, 130:18
**lending** [1] - 130:21
**length** [1] - 250:3
**lenient** [1] - 9:12
**less** [3] - 171:22, 173:11, 203:21
**level** [1] - 229:2
**liar** [1] - 120:3
**license** [26] - 14:4, 17:15, 42:22, 43:3, 43:13, 73:22, 79:4, 79:24, 90:18, 91:4, 91:18, 91:20, 91:22, 91:23, 91:24, 127:9, 127:12, 206:15, 208:14, 208:20, 208:25, 209:4, 210:2, 279:12, 279:15, 279:16
**licensed** [1] - 278:22
**licenses** [5] - 79:6, 79:7, 79:9, 79:10, 206:4
**licensing** [2] - 205:23, 254:2
**lie** [32] - 58:8, 58:9, 79:10, 79:12, 79:24, 80:2, 80:8, 80:20, 81:3, 82:15, 92:5, 99:4, 99:5, 99:6, 99:7, 99:9, 101:18, 101:19, 104:1, 139:9, 139:11, 139:14, 139:16, 150:22, 252:11, 252:12, 252:16, 254:15, 254:16, 265:23, 266:1, 273:17
**lied** [2] - 58:22, 80:3
**lien** [1] - 140:20
**liens** [1] - 158:7
**lies** [13] - 138:3, 209:21, 252:25, 253:6, 253:15, 254:7, 254:9, 255:1, 255:5, 286:2, 286:15, 286:22
**life** [6] - 5:14, 60:8, 67:13, 150:7, 154:8, 170:15
**light** [1] - 173:20
**lighter** [1] - 9:25
**likely** [4] - 152:6, 172:1, 173:9, 275:16
**limine** [1] - 116:24
**limit** [4] - 187:4, 187:6, 188:10, 188:13
**limitation** [1] - 191:24
**limitations** [1] - 198:15
**line** [9] - 4:24, 9:4, 16:8, 17:17, 58:14, 101:1, 169:15, 173:19, 209:6
**list** [6] - 13:19, 22:11, 30:24, 98:9, 191:19, 292:23
**listed** [11] - 15:17, 31:14, 39:1, 39:11, 39:15, 39:19, 39:23, 40:1, 40:6, 46:3, 127:5
**listening** [1] - 212:7
**listing** [1] - 21:1
**lists** [2] - 13:3, 21:25
**live** [5] - 100:4, 118:17, 118:19, 118:21, 150:13
**lives** [3] - 100:6, 100:9, 160:3
**LLC** [14] - 12:18, 15:24, 39:5, 82:2, 126:2, 136:17, 157:3, 160:17, 161:17, 161:25, 162:2, 162:4, 162:20, 163:2
**locate** [1] - 5:25
**located** [4] - 15:25, 65:24, 74:5
**logistics** [1] - 264:25
**Look** [1] - 71:16
**look** [20] - 17:24, 20:3, 43:13, 44:7, 77:25, 78:7, 78:14, 78:15, 78:19, 78:20, 79:3, 80:22, 81:19, 149:1, 210:1, 227:8, 256:6, 268:14, 270:9, 289:5
**looked** [9] - 16:10, 18:8, 21:11, 29:1, 30:8, 35:6, 38:16, 78:3, 227:9
**looking** [23] - 13:13, 16:7, 24:13, 26:19, 27:21, 28:20, 30:14, 30:16, 37:7, 40:21, 73:22, 116:13, 145:21, 148:23, 151:24, 152:5, 173:20, 200:19, 219:9, 219:11, 228:16, 235:7, 258:6
**looks** [5] - 18:4, 47:14, 81:22, 85:8, 238:7
**loose** [1] - 62:8
**lost** [1] - 78:2
**love** [4] - 59:8, 59:12, 102:2, 113:17
**low** [2] - 171:18, 171:19
**lower** [3] - 123:8, 123:11, 123:25
**LPM** [2] - 31:9, 125:15
**luck** [1] - 37:15
**lunch** [3] - 96:6, 109:13, 109:16
**lying** [3] - 80:20, 254:13, 254:17

**M**

**M-E-L-L-O-T-T** [1] - 221:13
**machine** [1] - 288:25
**main** [15] - 11:18, 72:11, 78:16, 98:8, 112:7, 112:9, 112:10, 112:12, 210:22, 224:7, 231:6, 232:20, 232:22, 246:1
**maintain** [1] - 189:16
**major** [1] - 191:1
**make-believe** [1] - 82:7
**Malvina** [1] - 126:4
**Manhattan** [1] - 63:19
**Mantilla** [1] - 1:18
**March** [12] - 14:5, 40:25, 42:19, 42:22, 42:23, 44:5, 44:6, 45:18, 96:24, 217:12, 217:13, 286:24
**mark** [1] - 137:5
**marked** [3] - 11:19, 16:3, 19:2
**market** [25] - 111:13, 137:18, 197:7, 197:11, 197:16, 199:10, 210:4, 238:19, 239:11, 239:12, 239:15, 240:2, 241:6, 241:7, 242:9, 243:4, 252:3, 281:15, 281:24, 282:6, 282:25, 283:3, 283:21, 287:14, 287:16
**Marketing** [3] - 135:9, 137:9, 137:19
**marketing** [2] - 135:10, 135:15
**MARSHAL** [5] - 4:13, 5:11, 5:23, 6:5, 7:20
**marshals** [8] - 4:12, 4:19, 5:6, 5:15, 5:17, 57:10, 58:11, 291:10
**massive** [1] - 65:9
**mastermind** [2] - 70:10, 70:14
**matches** [1] - 22:23
**math** [1] - 172:20
**matter** [13] - 75:24, 101:7, 167:10, 169:13, 173:15, 173:16, 221:22, 226:9, 245:4, 264:4, 272:24, 290:14, 293:12
**mattress** [3] - 149:9, 149:11, 149:17
**McKesson** [10] - 266:16, 266:22, 266:24, 267:4, 267:10, 267:16, 267:20, 268:2, 268:23
**meal** [8] - 4:13, 5:7, 5:11, 57:2, 57:10, 57:17, 58:5, 58:23
**meals** [3] - 4:16, 4:19, 6:17
**mean** [26] - 9:21, 19:20, 24:22, 51:1, 51:6, 56:4, 56:5, 64:7, 72:18, 90:17, 93:13, 94:23, 95:5, 107:15, 114:2, 127:18, 133:2, 158:2, 158:4, 168:1, 177:7, 188:25, 189:16, 212:19, 227:24, 280:24
**meaning** [2] - 87:17, 275:12
**means** [10] - 78:5, 78:7, 79:3, 127:19, 129:19, 129:20, 133:3, 136:15, 171:19, 231:9
**meant** [8] - 146:19, 206:1, 242:23, 268:4, 268:6, 268:8, 271:14, 280:19
**mechanisms** [1] - 106:19
**Medicaid** [6] - 145:25, 146:5, 146:17, 146:19, 164:14, 164:24
**medical** [2] - 72:8, 73:2
**Medicare** [9] - 145:19, 145:25, 146:5, 146:17, 146:19, 147:5, 164:13, 164:23, 190:22
**medication** [4] - 71:13, 94:25, 95:4, 251:18
**medications** [16] - 42:8, 111:11, 111:13, 111:14, 112:4, 128:25, 137:18, 197:7, 197:11, 197:15, 197:25, 198:4, 208:12, 222:4, 287:22
**medicine** [16] - 71:18, 73:15, 73:17, 87:9, 87:14, 91:5, 91:8, 91:11, 111:23, 119:7, 119:10, 126:16, 131:17, 144:23, 145:3, 148:9
**medicines** [4] - 45:1, 73:3, 126:14, 151:20
**meet** [7] - 200:14, 212:21, 213:6, 215:6, 215:7
**meeting** [38] - 98:24, 175:24, 176:9, 176:10, 176:12, 176:13, 176:14, 176:20, 177:2, 177:5, 177:8, 177:11, 177:21, 177:25, 179:1, 179:2, 179:6, 179:12, 179:20, 180:12, 180:14, 180:19, 180:21, 183:2, 183:4, 199:9, 199:21, 200:5, 200:24, 202:6, 202:9, 227:6, 263:21, 276:16, 276:17, 276:18, 285:25
**Mellott** [12] - 10:12, 220:25, 221:2,

221:11, 221:13, 221:16, 225:12, 225:15, 225:16, 235:18, 237:15
**members** [10] - 48:5, 109:5, 109:7, 109:12, 163:10, 163:13, 165:20, 196:6, 225:24, 290:25
**members'** [1] - 162:14
**memorandum** [2] - 110:7, 110:8
**memory** [10] - 94:11, 116:14, 116:17, 116:18, 124:22, 125:4, 126:8, 214:13, 246:18
**mention** [1] - 76:18
**mentioned** [2] - 63:12, 135:13
**Mercedes** [1] - 140:8
**Mercedes-Benz** [1] - 140:8
**Merrick** [2] - 125:23, 126:6
**message** [10] - 23:19, 23:24, 24:6, 24:16, 26:22, 35:17, 46:17, 217:14, 249:2, 271:3
**messaged** [1] - 77:8
**messages** [7] - 10:9, 10:22, 16:7, 24:7, 24:13, 30:4, 37:7
**met** [15] - 77:4, 115:16, 115:18, 116:8, 116:10, 175:20, 182:1, 203:15, 212:9, 212:15, 212:23, 260:1, 276:13, 277:11, 286:11
**Miami** [4] - 1:16, 1:19, 103:23, 115:20
**microphone** [8] - 29:7, 29:10, 31:23, 42:5, 130:17, 159:21, 170:11, 170:18
**middle** [7] - 147:2, 147:16, 147:20, 148:8, 228:14, 242:13, 282:19
**might** [13] - 5:1, 9:12, 25:5, 29:6, 38:22, 102:1, 114:10, 124:22, 173:18, 228:16, 228:23, 236:25, 272:22
**Mike** [42] - 10:1, 51:19, 76:17, 90:18, 90:21, 96:10, 96:12, 120:18, 121:23, 123:16, 123:19, 124:5, 124:7, 124:8, 185:15, 206:18, 206:19, 206:25, 207:7, 207:12, 207:19, 213:9, 217:11, 222:23, 223:9, 223:14, 224:1, 224:4, 224:13, 225:7, 225:9, 230:13, 230:19, 231:25, 235:6, 236:23, 237:2, 237:7, 237:15
**million** [52] - 41:24, 44:24, 45:8, 45:11, 61:5, 61:10, 61:15, 61:20, 61:23, 62:1, 62:5, 62:9, 62:11, 62:15, 64:24, 65:9, 70:4, 77:24, 78:13, 85:23, 105:14, 105:17, 105:19, 105:20, 105:22, 106:9, 106:17, 107:3, 107:16, 111:10, 111:17, 111:20, 112:1, 137:11, 137:13, 137:16, 141:20, 145:12, 145:15, 146:24, 147:3, 153:20, 153:23, 156:19, 157:8, 159:1, 159:6, 160:7, 160:9, 198:25, 261:1
**millions** [20] - 85:21, 118:25, 119:1, 119:2, 119:3, 119:5, 119:10, 119:15, 119:22, 119:23, 119:24, 120:6, 120:7, 120:25, 121:11, 139:21, 193:25, 194:1, 211:10
**mind** [12] - 174:8, 194:23, 206:24, 207:23, 207:25, 211:9, 214:25, 252:16, 268:7, 288:2, 288:4
**mindset** [1] - 211:2
**mine** [3] - 136:20, 163:17, 241:8
**minute** [8] - 6:22, 27:24, 165:21, 225:25, 275:14, 288:22, 288:23, 288:24
**minutes** [12] - 4:21, 16:14, 25:10, 25:16, 44:15, 48:8, 48:12, 165:23, 166:3, 225:4, 226:4, 226:8
**mischaracterizing** [1] - 103:11
**misled** [3] - 279:23, 279:25, 280:14
**mispronouncing** [2] - 187:23, 277:18
**miss** [1] - 254:1
**missed** [2] - 254:1, 254:5
**missing** [1] - 4:4
**mistake** [7] - 13:5, 255:19, 256:2, 256:3, 256:5, 256:7, 256:9
**mistreated** [1] - 56:3
**mixed** [2] - 72:24, 161:12
**model** [1] - 232:20
**mom** [1] - 157:12
**Mom** [1] - 158:14
**Monday** [2] - 291:4, 291:10
**Monday's** [1] - 14:22
**money** [131] - 42:14, 59:4, 59:6, 59:8, 59:12, 59:15, 59:16, 59:17, 60:21, 62:14, 64:1, 65:14, 71:7, 71:10, 71:17, 73:7, 80:11, 84:3, 86:2, 86:19, 86:21, 86:22, 86:23, 87:2, 87:4, 105:8, 106:19, 107:9, 109:3, 112:5, 118:22, 120:17, 120:18, 121:14, 122:15, 123:2, 123:7, 123:12, 124:4, 128:3, 128:20, 130:1, 130:3, 130:8, 130:16, 130:18, 130:23, 132:16, 133:7, 133:8, 133:13, 133:18, 135:17, 135:21, 137:17, 139:21, 139:25, 143:13, 143:14, 144:6, 149:19, 149:21, 150:8, 150:14, 154:7, 154:22, 154:24, 158:20, 159:10, 159:12, 164:13, 164:25, 165:5, 165:11, 185:8, 185:11, 185:12, 185:18, 193:8, 193:10, 193:13, 193:14, 193:19, 193:21, 194:5, 194:12, 194:13, 194:15, 194:16, 194:17, 194:18, 194:21, 195:5, 195:6, 195:9, 195:11, 195:19, 195:24, 196:4, 196:5, 196:8, 196:19, 196:25, 197:2, 197:4, 197:6, 197:8, 197:9, 197:18, 197:19, 197:23, 208:2, 208:3, 208:5, 208:7, 211:6, 237:10, 240:20, 245:21, 254:11, 254:13, 254:16, 281:7, 281:15, 281:24, 282:5, 290:4
**monies** [1] - 86:9
**Monopaul** [1] - 125:13
**month** [5] - 14:13, 102:16, 217:16, 282:7
**month-wise** [1] - 217:16
**months** [7] - 14:6, 43:3, 44:4, 45:15, 145:6, 171:7, 236:1
**morning** [12] - 5:16, 5:23, 7:20, 8:15, 8:16, 49:16, 49:17, 57:2, 57:8, 57:14, 58:4, 146:18
**mortgages** [1] - 140:2
**most** [11] - 42:9, 99:16, 112:3, 118:7, 152:6, 208:1, 208:6, 208:8, 275:16, 289:4, 289:8
**mostly** [8] - 11:10, 19:15, 93:10, 118:7, 234:9, 275:23, 281:19, 289:16
**mother** [4] - 157:13, 157:16, 157:19, 163:8
**motion** [1] - 116:24
**motions** [1] - 264:5
**move** [8] - 12:7, 36:5, 52:7, 57:12, 57:20, 59:1, 184:12, 200:5
**moved** [2] - 46:6, 75:6
**movement** [2] - 57:20, 58:12
**moves** [3] - 17:6, 34:9, 57:4
**moving** [5] - 9:3, 191:25, 223:9, 251:21, 278:4
**MR** [530] - 3:3, 3:4, 3:4, 4:6, 4:20, 4:21, 5:1, 7:9, 7:10, 7:11, 7:13, 7:17, 7:19, 8:1, 8:2, 8:3, 8:8, 8:14, 8:24, 9:2, 11:17, 11:21, 12:6, 12:8, 12:9, 12:13, 13:11, 13:12, 13:25, 14:2, 14:17, 14:20, 15:15, 15:16, 15:20, 15:23, 16:2, 16:6, 16:20, 16:22, 17:5, 17:7, 17:8, 17:11, 17:13, 18:11, 18:14, 19:1, 19:4, 19:6, 19:7, 20:1, 20:5, 22:17, 22:21, 23:2, 23:3, 23:9, 23:10, 23:16, 23:17, 25:4, 25:11, 25:13, 25:25, 26:2, 26:3, 26:10, 26:11, 26:12, 26:17, 26:20, 26:24, 26:25, 27:7, 27:10, 27:17, 27:20, 28:5, 28:7, 28:21, 28:24, 29:4, 29:9, 29:12, 29:22, 29:24, 30:9, 30:13, 31:22, 31:25, 32:7, 32:9, 32:11, 32:12, 33:1, 33:4, 33:6, 33:9, 33:14, 33:17, 33:21, 34:1, 34:3, 34:8, 34:10, 34:11, 34:14, 35:8, 35:11, 36:20, 36:23, 36:25, 37:5, 37:23, 38:1, 38:20, 38:25, 39:9, 39:10, 40:11, 40:14, 40:17, 40:20, 41:21, 41:23, 42:4, 43:14, 43:16, 43:18, 43:19, 43:22, 43:25, 44:2, 46:10, 46:13, 46:25, 47:3, 47:6, 47:8, 47:12, 47:15, 47:16, 47:21, 48:3, 48:22, 48:24, 48:25, 49:2, 49:7, 49:8, 49:9, 49:15,

51:9, 51:10, 51:13, 52:3, 52:5, 52:8, 52:21, 52:25, 54:1, 54:17, 54:22, 54:25, 55:4, 55:6, 55:8, 55:16, 56:6, 56:8, 56:10, 56:12, 56:15, 57:3, 57:5, 57:15, 57:16, 58:13, 58:17, 59:2, 59:22, 60:15, 60:17, 60:19, 60:25, 61:4, 63:8, 63:11, 65:19, 65:21, 66:19, 66:21, 66:23, 66:25, 67:8, 67:11, 67:12, 69:21, 69:23, 69:25, 70:11, 70:13, 75:16, 75:18, 76:21, 76:24, 78:9, 78:11, 81:5, 81:7, 81:8, 81:15, 81:19, 81:22, 81:23, 83:3, 83:6, 85:4, 85:6, 88:14, 88:23, 88:25, 92:7, 92:9, 93:16, 93:18, 94:1, 94:4, 94:6, 94:9, 94:13, 94:15, 94:19, 95:7, 95:9, 99:25, 100:3, 100:16, 100:21, 100:25, 101:3, 102:11, 102:14, 103:11, 103:13, 103:15, 103:17, 103:19, 103:21, 106:3, 106:6, 107:14, 109:10, 109:21, 110:5, 110:13, 110:15, 110:16, 110:17, 110:24, 110:25, 111:1, 111:6, 111:7, 112:13, 112:14, 114:8, 114:15, 114:22, 115:3, 116:7, 116:15, 116:20, 116:22, 117:3, 117:14, 117:16, 123:3, 123:5, 124:9, 124:11, 126:24, 126:25, 127:2, 129:4, 129:7, 129:22, 129:24, 131:23, 132:1, 133:10, 133:12, 134:5, 134:7, 134:9, 137:1, 137:2, 137:22, 137:25, 142:3, 142:5, 147:12, 147:15, 147:17, 147:18, 147:19, 150:18, 150:23, 152:7, 152:9, 152:11, 152:13, 152:15, 153:4, 153:6, 153:21, 153:24, 158:11, 158:13, 158:15, 158:17, 159:2, 159:5, 159:8, 159:11, 159:13, 159:18, 160:10, 160:12, 160:16, 165:9, 165:17, 166:12, 166:13, 166:14, 166:21, 166:22, 166:23, 167:3, 167:4, 167:11, 167:13, 169:8, 169:11, 169:14, 169:17, 169:20, 169:22, 170:5, 170:8, 170:18, 170:22, 172:10, 172:14, 174:16, 174:19, 175:9, 175:10, 175:13, 178:23, 181:2, 181:8, 183:20, 183:22, 184:13, 187:12, 187:14, 194:21, 194:25, 196:10, 196:14, 198:19, 198:21, 199:6, 199:8, 200:21, 200:23, 201:3, 201:6, 202:3, 202:5, 202:23, 203:3, 205:4, 205:6, 205:8, 205:14, 205:16, 212:5, 212:8, 212:17, 212:20, 214:11, 216:6, 217:23, 218:2, 218:5, 218:10, 218:15, 218:18, 218:20, 218:23, 219:1, 219:4, 219:5, 219:6, 219:7, 220:12, 220:13, 224:25, 225:3, 225:6, 225:23, 226:9, 226:14, 227:5, 227:18, 227:20, 227:22, 227:24, 228:2, 228:4, 228:9, 228:10, 228:17, 228:23, 229:15, 229:21, 230:3, 230:4, 230:5, 230:10, 230:12, 231:20, 231:22, 234:2, 234:5, 238:11, 238:13, 239:19, 239:21, 240:9, 240:11, 241:2, 242:8, 242:17, 242:22, 243:3, 243:13, 243:18, 244:3, 244:9, 244:14, 244:20, 245:3, 245:13, 246:8, 246:24, 249:22, 249:23, 249:24, 249:25, 250:2, 250:5, 250:8, 250:11, 250:13, 250:15, 253:7, 253:10, 257:3, 257:5, 257:22, 258:1, 258:22, 259:7, 259:11, 260:4, 260:9, 262:8, 262:22, 263:2, 264:17, 265:12, 265:19, 265:21, 268:25, 269:2, 269:5, 269:7, 270:2, 270:4, 271:16, 271:21, 272:2, 272:6, 274:10, 274:11, 274:14, 274:16, 275:1, 275:20, 276:4, 276:8, 280:4, 280:6, 280:16, 280:18, 281:21, 281:25, 282:4, 282:23, 283:24, 284:2, 286:25, 287:2, 288:16, 288:18, 290:24, 291:14, 291:19, 291:23, 292:6, 292:13, 292:14, 292:15, 292:24, 293:4, 293:5

**MRIs** [1] - 71:4

**multiple** [8] - 63:9, 64:25, 140:4, 140:10, 140:12, 203:18, 203:19, 203:20

**mumbled** [1] - 241:14

**must** [3] - 91:18, 91:20

## N

**name** [145] - 39:1, 39:4, 41:14, 49:21, 49:22, 49:23, 49:24, 50:3, 50:5, 50:6, 50:8, 50:13, 51:20, 68:5, 68:7, 68:11, 68:25, 69:2, 69:4, 69:8, 69:9, 69:13, 74:23, 75:19, 76:18, 77:10, 79:22, 80:1, 81:9, 81:11, 82:15, 83:14, 88:6, 88:15, 88:16, 88:17, 88:19, 88:21, 89:21, 92:12, 93:3, 93:13, 93:14, 93:21, 93:25, 94:11, 95:6, 95:10, 95:22, 95:23, 98:14, 98:21, 98:25, 99:2, 99:7, 99:9, 99:10, 99:11, 99:18, 99:20, 99:21, 99:22, 99:24, 100:1, 100:2, 100:23, 113:6, 113:14, 113:20, 114:1, 114:2, 114:6, 114:17, 115:5, 115:19, 115:23, 117:19, 117:23, 117:24, 118:2, 118:3, 118:4, 118:5, 123:21, 138:11, 138:13, 142:20, 142:21, 144:2, 161:6, 162:7, 178:13, 180:25, 182:8, 182:12, 182:25, 183:11, 183:12, 195:20, 195:22, 195:23, 205:1, 205:5, 205:10, 210:1, 213:2, 213:4, 213:6, 213:8, 213:10, 213:22, 214:1, 214:5, 214:16, 214:17, 215:6, 215:10, 216:7, 216:18, 221:9, 221:13, 221:18, 225:12, 237:14, 247:16, 249:20, 249:21, 266:16, 266:17, 266:20, 267:16, 276:20, 276:22, 276:23, 276:25, 277:5, 277:6, 277:7, 277:8, 277:9

**named** [7] - 41:12, 115:20, 117:5, 118:14, 142:17, 180:20, 283:2

**names** [24] - 50:15, 50:17, 50:22, 50:24, 51:11, 51:14, 51:23, 75:20, 75:21, 98:4, 113:15, 113:18, 114:7, 114:14, 114:24, 115:1, 121:20, 124:21, 126:9, 126:17, 162:15, 266:11, 266:12

**Nat** [3] - 88:13, 88:18, 89:21

**nat** [1] - 88:18

**NE** [1] - 1:15

**necessary** [2] - 213:21, 280:10

**need** [38] - 6:21, 14:23, 19:17, 20:11, 20:13, 23:11, 23:21, 23:22, 71:18, 72:9, 72:10, 72:13, 72:20, 73:3, 74:3, 74:25, 77:24, 78:13, 79:3, 90:12, 90:16, 104:16, 116:18, 132:16, 135:20, 170:11, 185:24, 190:9, 190:15, 219:14, 221:18, 222:3, 222:23, 232:2, 236:19, 264:19, 269:23

**needed** [17] - 72:14, 73:10, 132:14, 177:8, 206:14, 224:3, 236:17, 247:7, 250:22, 251:20, 251:22, 256:25, 270:15, 272:19, 272:20, 273:13, 281:12

**needs** [5] - 4:16, 72:12, 72:19, 128:1, 134:3

**negotiating** [1] - 158:2

**Neptune** [9] - 132:2, 135:6, 141:8, 142:6, 142:23, 163:24, 164:2, 164:4, 164:12

**never** [102] - 53:5, 53:7, 60:23, 69:20, 70:5, 72:12, 72:15, 77:2, 77:4, 77:6, 77:8, 89:18, 89:22, 96:4, 101:24, 115:16, 115:24, 118:20, 120:1, 123:19, 139:11,

139:16, 139:17, 144:3, 144:4, 144:7, 145:23, 151:10, 161:15, 192:1, 194:6, 194:7, 209:6, 209:7, 209:8, 211:12, 211:14, 212:9, 212:10, 212:15, 213:5, 213:6, 214:19, 214:21, 214:23, 216:13, 216:15, 216:17, 221:6, 221:15, 221:16, 223:19, 223:21, 224:2, 224:13, 224:16, 234:1, 234:20, 235:9, 235:20, 236:16, 236:21, 237:12, 237:16, 237:18, 237:24, 238:5, 238:9, 238:23, 239:17, 240:1, 240:5, 242:18, 248:21, 249:4, 249:6, 251:15, 254:5, 258:19, 260:7, 260:14, 260:19, 260:21, 260:25, 261:4, 266:17, 267:10, 267:15, 268:1, 268:23, 272:12, 275:8, 275:12, 277:5, 277:7, 278:25, 280:9, 290:20

**New** [64] - 9:8, 9:12, 54:9, 61:8, 63:12, 63:18, 63:19, 63:23, 63:25, 64:6, 64:9, 65:1, 65:10, 65:11, 65:24, 67:2, 70:21, 71:23, 71:24, 73:7, 77:16, 79:7, 80:20, 90:10, 90:13, 91:19, 100:5, 100:9, 102:24, 103:15, 103:22, 103:24, 104:4, 104:25, 106:7, 110:7, 130:13, 132:21, 134:10, 135:5, 135:7, 136:10, 136:11, 145:9, 146:24, 171:11, 175:17, 179:13, 179:14, 191:10, 191:11, 191:23, 197:14, 197:15, 199:9, 199:11, 206:16, 262:10, 262:11, 262:14, 264:10, 264:20, 276:9, 278:22

**new** [7] - 134:14, 134:16, 134:17, 138:11, 244:7, 258:23

**next** [38] - 15:15, 17:12, 39:22, 40:11, 40:12, 40:13, 40:17, 40:18, 47:11, 73:4, 73:12, 142:6, 161:20, 161:21, 161:23, 161:24, 161:25, 162:1, 162:2, 192:10, 242:16, 242:21, 243:2, 244:2, 244:19, 245:2, 246:7, 262:7, 275:19, 276:7, 281:20, 282:22

**nice** [5] - 42:14, 109:16, 194:9, 213:6, 291:5

**nine** [1] - 173:10

**NO** [1] - 1:2

**nobody** [6] - 56:2, 106:16, 138:19, 139:17, 277:5, 277:9

**nominee** [1] - 81:2

**none** [1] - 197:15

**nonlegal** [1] - 288:4

**normal** [4] - 196:24, 277:12, 277:13, 287:24

**notes** [1] - 199:20

**nothing** [20] - 25:15, 25:25, 48:11, 48:22, 109:19, 148:21, 148:24, 166:2, 168:22, 170:5, 178:20, 190:25, 226:7, 226:25, 231:5, 236:1, 236:6, 278:8, 290:3

**notice** [2] - 108:5, 108:18

**November** [2] - 292:6, 292:10

**nowhere** [1] - 22:15

**Number** [25] - 3:9, 112:22, 112:23, 113:6, 113:8, 113:10, 113:22, 114:4, 117:12, 117:17, 117:25, 118:1, 118:7, 118:8, 119:6, 144:24, 200:14, 226:21, 289:5, 289:9

**number** [23] - 21:25, 47:13, 62:13, 63:6, 70:5, 74:23, 84:2, 85:9, 106:15, 118:7, 118:11, 118:13, 120:24, 123:25, 153:19, 155:14, 164:4, 165:8, 173:2, 208:19, 218:24, 234:17

**numbers** [7] - 51:7, 52:6, 84:5, 120:12, 120:22, 173:18, 251:18

**nurses** [1] - 144:21

**NW** [1] - 1:19

## O

**oath** [9] - 5:4, 58:19, 60:14, 64:22, 67:6, 67:9, 110:1, 149:16

**object** [7] - 54:17, 58:13, 110:5, 110:12, 137:1, 137:22, 181:2

**objection** [124] - 12:8, 12:9, 17:7, 17:8, 33:1, 33:5, 33:8, 33:14, 34:10, 34:11, 36:20, 37:23, 41:21, 43:14, 43:19, 46:25, 47:6, 47:12, 47:20, 51:9, 52:3, 52:21, 55:6, 56:6, 56:10, 57:3, 57:15, 60:15, 60:25, 63:8, 65:19, 66:19, 66:23, 67:8, 69:21, 70:11, 75:16, 76:21, 78:9, 81:5, 88:11, 88:23, 93:16, 94:1, 94:6, 94:13, 95:7, 99:25, 100:16, 100:25, 103:11, 103:17, 106:3, 114:14, 114:22, 116:22, 117:14, 123:3, 129:4, 129:22, 131:23, 133:10, 134:5, 142:3, 147:12, 147:17, 150:18, 152:7, 152:13, 153:4, 153:21, 158:11, 158:15, 159:8, 159:13, 159:15, 165:17, 167:11, 169:8, 169:14, 169:20, 172:10, 174:16, 183:20, 187:12, 194:21, 196:10, 198:19, 199:6, 200:21, 201:3, 202:3, 202:23, 205:4, 205:14, 212:17, 231:20, 234:2, 238:11, 239:19, 240:9, 243:13, 244:9, 249:22, 250:2, 250:8, 250:13, 253:7, 257:3, 257:22, 259:7, 260:4, 265:19, 268:25, 269:5, 270:2, 271:16, 274:15, 276:4, 280:4, 280:16, 281:25, 283:24, 286:25

**Objection** [1] - 272:2

**objectionable** [1] - 43:18

**objections** [1] - 160:15

**obligation** [1] - 236:12

**obligations** [2] - 231:8, 232:23

**obvious** [3] - 239:12, 239:14, 239:16

**obviously** [5] - 172:7, 185:6, 215:9, 291:21, 291:23

**occasion** [1] - 259:2

**occurred** [2] - 169:6, 244:17

**October** [29] - 1:5, 14:3, 14:16, 15:14, 16:7, 16:8, 16:9, 16:13, 16:15, 17:1, 17:16, 18:21, 19:9, 27:8, 27:22, 27:24, 28:8, 29:2, 29:14, 30:2, 34:5, 35:13, 37:6, 38:11, 40:24, 259:21, 265:6, 273:8, 274:6

**Odefsey** [1] - 22:1

**OF** [3] - 1:1, 1:4, 1:9

**offense** [1] - 151:19

**offer** [2] - 71:10, 201:11

**offered** [4] - 71:7, 174:1, 174:4, 247:11

**offering** [2] - 174:24, 248:24

**office** [2] - 105:16, 220:6

**OFFICER** [17] - 6:23, 7:22, 25:12, 25:17, 26:6, 48:9, 48:13, 48:16, 49:3, 109:17, 110:20, 165:24, 166:5, 166:17, 226:5, 229:24, 291:6

**officer** [5] - 105:1, 105:3, 107:2, 209:24, 257:16

**officers** [2] - 74:21, 144:16

**offices** [1] - 71:7

**Official** [2] - 2:3, 293:15

**official** [2] - 90:9, 90:13

**old** [1] - 268:8

**once** [11] - 73:2, 133:25, 210:24, 215:23, 248:13, 256:24, 257:8, 258:16, 259:24, 275:13, 276:19

**one** [165] - 6:4, 12:24, 12:25, 13:1, 13:3, 13:19, 16:10, 18:5, 18:16, 20:11, 20:12, 20:24, 22:14, 31:13, 31:15, 31:19, 35:3, 35:5, 39:6, 40:21, 44:9, 47:5, 50:22, 51:20, 51:24, 57:13, 57:20, 61:10, 62:7, 63:7, 63:18, 63:19, 63:22, 68:16, 70:1, 70:23, 73:5, 75:6, 79:9, 80:3, 80:8, 80:19, 80:25, 81:4, 82:10, 84:17, 88:13, 89:14, 90:15, 94:14, 97:10, 98:12, 106:5, 111:9, 112:7, 113:16, 120:4, 120:19, 127:11, 128:16, 128:19, 133:19, 134:1, 136:21, 137:5, 139:5, 139:7, 141:3, 141:5, 141:7, 142:8, 144:3, 144:17, 144:25, 145:2, 147:3, 147:6, 154:1, 159:1, 162:25, 163:12, 163:15, 165:7, 167:16, 167:17, 167:18, 172:4, 173:22, 180:18, 184:24,

186:8, 187:7, 190:6, 190:7, 190:18, 191:13, 191:19, 194:12, 199:24, 200:11, 203:2, 204:13, 206:10, 207:23, 208:19, 209:6, 209:7, 209:8, 210:17, 213:25, 214:6, 215:4, 215:16, 216:5, 223:8, 223:13, 223:19, 224:11, 224:25, 226:21, 226:22, 229:2, 233:5, 233:13, 235:9, 235:24, 238:1, 239:17, 239:25, 244:13, 247:15, 253:12, 255:2, 255:3, 255:7, 255:16, 255:18, 257:7, 257:25, 259:10, 262:21, 263:3, 263:10, 266:23, 267:1, 267:25, 270:19, 272:23, 276:17, 279:7, 283:5, 283:8, 283:9, 283:15, 283:18, 286:8, 287:25, 288:22, 288:23, 288:24, 292:14
**one-day** [1] - 57:13
**one-minute** [3] - 288:22, 288:23, 288:24
**one-on-one** [1] - 70:23
**ones** [6] - 30:24, 32:2, 43:12, 128:24, 190:1, 256:1
**open** [22] - 4:14, 20:2, 24:22, 67:1, 70:2, 75:19, 76:8, 76:11, 78:25, 134:14, 134:21, 134:24, 135:15, 168:13, 189:19, 208:22, 209:5, 209:25, 227:2, 229:22, 233:20, 240:13
**opened** [13] - 67:7, 67:13, 67:22, 70:17, 75:24, 76:6, 80:4, 104:7, 124:18, 124:22, 132:4, 132:10, 211:9
**opening** [2] - 66:3, 134:16
**operate** [1] - 208:17
**operating** [1] - 148:1
**operators** [2] - 74:20, 144:18
**opinion** [3] - 35:24, 287:23, 287:24
**opportunity** [5] - 201:1, 207:21, 208:3, 208:5
**opposed** [1] - 149:20
**opposite** [1] - 188:6
**orange** [1] - 4:9
**Order** [1] - 4:1
**order** [23] - 27:13, 27:14, 71:11, 71:13, 77:24, 78:12, 78:25, 90:14, 93:7, 93:14, 145:15, 145:21, 148:19, 168:9, 169:12, 250:23, 251:15, 251:17, 260:11, 264:18, 292:17, 292:20, 293:3
**ordered** [3] - 145:12, 145:16, 146:23
**ordering** [1] - 114:19
**orders** [4] - 23:12, 148:10, 251:13, 251:17
**ore** [1] - 292:19
**organization** [8] - 79:19, 100:8, 125:7, 126:20, 127:15, 127:22, 138:2, 144:20
**organizations** [1] - 67:25
**organizer** [2] - 65:8, 70:9
**originally** [1] - 57:13
**otherwise** [3] - 6:12, 170:19, 225:4
**ourselves** [2] - 123:25, 227:7
**outside** [2] - 4:17, 195:14
**OV** [1] - 69:10
**overall** [1] - 44:3
**overlap** [1] - 63:16
**overruled** [35] - 51:12, 54:19, 56:7, 58:16, 94:2, 95:8, 133:11, 150:21, 159:3, 159:17, 169:21, 172:12, 175:12, 181:7, 183:21, 194:24, 196:13, 198:20, 201:5, 202:25, 205:15, 212:18, 234:3, 239:20, 243:15, 244:11, 253:9, 257:4, 257:24, 259:9, 260:6, 271:18, 272:3, 282:1, 283:25
**owed** [4] - 42:14, 44:24, 45:7, 245:21
**owing** [1] - 45:10
**own** [19] - 65:23, 87:21, 103:9, 131:8, 135:16, 139:25, 140:17, 141:12, 142:8, 156:20, 156:21, 157:9, 157:13, 181:3, 249:11, 249:18, 269:17, 269:18, 276:5
**owned** [14] - 79:16, 79:18, 79:19, 80:23, 82:11, 82:15, 125:5, 131:10, 135:13, 141:13, 141:14, 142:25, 143:2, 159:23
**owner** [15] - 12:16, 80:5, 80:6, 80:10, 82:2, 82:5, 82:7, 82:9, 82:16, 82:24, 83:17, 157:13, 160:23
**owners** [2] - 80:9, 80:25
**ownership** [1] - 143:17
**owns** [5] - 129:16, 136:21, 160:25, 162:4, 162:22

## P

**P&K** [1] - 135:9
**P-R-O-V-E-N** [1] - 41:15
**p.m** [3] - 16:11, 18:24, 225:11
**page** [37] - 14:19, 15:15, 17:12, 18:13, 18:16, 19:6, 20:24, 22:14, 22:18, 22:20, 26:24, 28:6, 31:19, 35:3, 35:5, 35:10, 37:1, 38:22, 39:9, 39:22, 40:11, 40:12, 40:13, 40:17, 40:18, 85:8, 206:12, 218:23, 220:12, 220:14
**PAGE** [1] - 3:2
**Page** [1] - 3:9
**Pages** [1] - 1:8
**pages** [2] - 35:21, 85:8
**paid** [33] - 28:9, 61:5, 80:6, 83:20, 85:21, 85:23, 86:13, 103:1, 103:3, 120:1, 120:6, 120:13, 120:15, 121:5, 121:22, 122:5, 122:7, 122:8, 122:10, 122:14, 123:16, 123:20, 124:4, 133:15, 134:1, 134:23, 137:11, 141:2, 141:7, 144:8, 190:22, 290:4
**palm** [3] - 171:13, 171:15, 171:16
**Pamper's** [1] - 219:6
**paper** [10] - 12:16, 30:10, 30:17, 66:10, 91:22, 178:16, 178:17, 218:17, 267:13, 267:18
**paperwork** [13] - 13:19, 14:6, 14:14, 15:18, 16:16, 24:8, 24:9, 24:24, 33:24, 85:15, 87:1, 192:2, 232:5
**paragraph** [2] - 37:21, 37:23
**parents** [2] - 109:7, 196:5
**Park** [2] - 162:1, 162:2
**PARL** [1] - 160:17
**part** [35] - 10:6, 14:7, 47:17, 74:6, 74:10, 78:2, 105:19, 105:21, 113:2, 113:4, 122:13, 122:16, 125:6, 125:7, 135:2, 146:5, 147:25, 148:3, 148:4, 148:5, 177:16, 184:15, 188:17, 193:22, 205:21, 211:22, 216:21, 227:17, 227:18, 261:15, 261:16, 263:20, 271:23, 273:17, 273:21
**participant** [1] - 283:2
**participation** [1] - 187:15
**particular** [9] - 51:18, 74:8, 75:22, 106:25, 124:23, 138:23, 181:21, 235:7, 273:13
**particularly** [1] - 235:1
**partner** [3] - 142:14, 142:16
**partnership** [3] - 41:7, 42:2, 44:17
**pass** [2] - 34:24, 269:21
**passed** [1] - 269:19
**past** [2] - 141:14, 244:5
**Pat** [1] - 30:2
**patient** [9] - 9:22, 72:15, 73:13, 73:16, 73:17, 73:24, 74:1, 74:14, 128:22
**patients** [8] - 71:3, 71:17, 72:8, 72:14, 73:2, 73:8, 119:8, 131:17
**PATRICIA** [2] - 2:2, 293:15
**Patrick** [11] - 43:9, 76:16, 76:18, 76:20, 76:25, 77:2, 77:4, 77:6, 77:8, 124:16, 152:21
**PATRICK** [2] - 1:7, 1:17
**pattern** [1] - 40:15
**Paul** [1] - 41:12
**Pause** [1] - 26:4
**pause** [1] - 56:13
**pay** [50] - 19:17, 62:23, 65:17, 71:16, 73:7, 80:2, 86:18, 87:2, 109:3, 118:22, 119:5, 119:14, 119:25, 120:8, 121:14, 121:16, 121:20, 121:24, 122:2, 124:14, 124:16, 133:14, 135:17, 135:18, 135:20, 139:25, 144:6, 144:13, 144:16, 144:18, 144:21, 145:12, 145:17, 145:20, 145:22, 145:23, 145:24, 146:24, 147:3, 147:7, 147:9, 156:18, 164:21, 164:22, 192:14, 219:17, 245:21, 246:5, 246:12
**paying** [7] - 86:1,

120:5, 124:8, 124:12, 130:11, 141:1, 219:10
**payment** [2] - 83:19, 154:25
**payments** [4] - 62:23, 63:1, 63:2, 63:4
**payroll** [2] - 140:24, 140:25
**PDF** [1] - 12:20
**pedigree** [3] - 24:8, 219:1, 232:3
**pedigrees** [14] - 11:8, 11:15, 13:14, 24:2, 24:5, 30:22, 32:1, 32:16, 38:4, 45:15, 47:23, 129:2, 220:3, 247:1
**pending** [2] - 192:19, 228:21
**Pennsylvania** [2] - 171:5, 171:6
**penny** [1] - 86:9
**people** [65] - 20:11, 58:11, 59:16, 60:20, 61:21, 61:22, 72:20, 72:24, 72:25, 74:13, 74:21, 74:24, 79:17, 80:2, 87:17, 87:22, 112:1, 119:6, 122:19, 128:25, 132:6, 132:7, 132:8, 132:10, 133:4, 133:15, 133:21, 133:23, 134:20, 134:24, 135:7, 144:20, 170:20, 171:21, 174:15, 174:21, 174:25, 187:1, 187:4, 187:17, 188:10, 188:13, 190:8, 190:15, 193:17, 197:7, 197:10, 197:25, 208:9, 215:22, 235:1, 237:2, 238:5, 238:8, 240:1, 240:16, 243:7, 254:11, 277:9, 277:12, 281:12, 283:11, 290:14
**people's** [2] - 75:20, 75:21
**percent** [4] - 21:21, 32:23, 112:6, 172:17
**percentage** [4] - 80:7, 82:8, 82:20, 91:12
**perfect** [5] - 27:2, 188:23, 189:14, 189:20, 225:23
**period** [14] - 21:17, 41:10, 41:17, 41:25, 42:23, 67:15, 67:16, 67:17, 173:19, 194:1, 227:20, 227:22, 284:20, 287:3
**permanent** [2] - 133:4, 133:24
**permission** [1] - 292:19
**person** [49] - 57:21, 79:25, 81:13, 82:1, 82:3, 88:3, 88:4, 89:8, 96:10, 96:11, 96:25, 98:8, 106:24, 112:7, 112:9, 112:12, 115:13, 115:17, 115:18, 115:25, 117:9, 133:19, 180:20, 186:6, 196:24, 211:16, 212:9, 212:16, 212:21, 216:10, 221:13, 223:5, 223:14, 223:15, 223:16, 224:4, 224:7, 224:10, 226:18, 231:6, 236:24, 240:20, 249:11, 249:12, 255:4, 277:11, 277:13, 287:24
**person's** [1] - 247:16
**personal** [8] - 139:25, 142:1, 149:19, 149:20, 290:8, 290:9, 292:16, 292:21
**personally** [23] - 70:20, 70:22, 70:23, 72:2, 85:17, 87:16, 87:17, 87:23, 88:3, 90:17, 105:20, 105:22, 106:9, 106:24, 111:12, 121:15, 124:15, 126:15, 196:16, 208:10, 208:11, 227:24, 254:20
**persons** [1] - 247:15
**perspective** [1] - 193:18
**Pete's** [1] - 79:1
**PETER** [2] - 3:3, 8:10
**Peter** [30] - 4:7, 15:24, 16:9, 26:19, 27:11, 28:10, 50:7, 50:8, 93:11, 105:17, 107:3, 159:19, 167:5, 169:13, 187:22, 189:8, 193:10, 208:1, 208:6, 213:6, 213:8, 214:3, 214:7, 214:16, 215:6, 273:8, 276:25, 277:15, 277:17, 280:24
**Peter's** [1] - 252:16
**Ph** [1] - 1:19
**Pharma** [3] - 39:5, 221:8, 221:9
**pharmaceutical** [2] - 206:17, 231:17
**pharmacies** [67] - 10:18, 11:3, 15:10, 24:23, 31:4, 41:3, 42:8, 46:23, 65:24, 66:4, 67:1, 70:2, 70:17, 75:2, 75:5, 75:8, 75:10, 75:19, 75:25, 76:7, 76:9, 77:12, 77:16, 77:22, 78:14, 78:15, 79:16, 79:19, 80:3, 91:11, 104:6, 124:18, 124:21, 124:23, 127:11, 128:14, 128:17, 128:19, 128:21, 129:9, 131:7, 131:11, 134:17, 134:21, 134:24, 134:25, 135:12, 135:13, 135:16, 139:4, 139:7, 190:19, 190:21, 208:13, 209:3, 231:18, 242:11, 242:23, 243:22, 252:7, 252:8, 272:21, 272:25, 273:9, 273:14
**pharmacist** [4] - 126:23, 127:3, 127:4, 127:12
**pharmacist's** [2] - 127:12, 139:19
**pharmacists** [10] - 45:2, 127:14, 127:17, 127:25, 128:16, 139:3, 139:6, 139:9, 139:11, 139:12
**pharmacy** [56] - 21:15, 31:5, 31:13, 31:16, 39:1, 39:4, 42:10, 42:11, 45:1, 46:3, 67:4, 67:6, 67:13, 67:22, 71:5, 73:25, 74:2, 74:9, 75:6, 77:18, 78:25, 79:6, 79:7, 79:10, 80:1, 80:5, 81:1, 90:8, 91:3, 91:4, 91:19, 125:3, 125:5, 126:10, 126:14, 126:15, 126:19, 127:4, 127:6, 127:20, 128:1, 128:2, 139:12, 206:13, 209:25, 210:1, 242:19, 243:24, 246:2, 247:6, 253:17, 254:2, 269:9
**Pharmacy** [23] - 13:20, 15:13, 15:17, 17:17, 21:2, 30:25, 31:17, 32:17, 39:13, 39:20, 39:24, 40:8, 46:2, 79:1, 80:21, 90:10, 90:13, 91:20, 125:9, 125:11, 125:15, 125:25, 126:2
**philanthropic** [3] - 132:22, 132:25, 134:10
**phone** [24] - 16:5, 16:12, 16:15, 19:8, 19:13, 19:22, 29:20, 42:24, 43:1, 44:5, 44:19, 45:6, 45:14, 47:5, 74:23, 99:14, 167:23, 234:9, 248:6, 248:8, 249:3, 275:13
**phones** [2] - 168:2, 248:14
**phonetic)** [1] - 117:20
**phonetically** [1] - 125:13
**phony** [4] - 190:1, 190:2, 190:8, 190:14
**photo** [2] - 15:13, 46:16
**photograph** [1] - 15:22
**PIC** [2] - 126:20, 126:22
**pick** [1] - 42:24
**picking** [2] - 58:11, 248:13
**piece** [1] - 218:17
**pill** [3] - 190:16, 191:2, 191:3
**pills** [24] - 190:2, 190:4, 190:5, 190:8, 190:15, 190:24, 190:25, 191:5, 238:18, 239:11, 240:2, 240:3, 241:6, 241:7, 242:9, 242:10, 243:4, 243:7, 243:8, 243:22, 281:16, 281:24, 282:6
**place** [17] - 27:14, 36:12, 57:20, 80:11, 148:1, 176:9, 176:10, 176:12, 176:15, 198:12, 223:22, 226:17, 245:17, 256:3, 256:10, 289:22
**placed** [2] - 168:15, 266:13
**places** [3] - 93:1, 172:24, 196:8
**plans** [1] - 278:4
**plausible** [1] - 31:10
**plea** [3] - 106:14, 106:24, 108:4
**plead** [3] - 104:23, 107:2, 197:2
**pleading** [1] - 106:15
**pled** [9] - 104:9, 107:25, 108:4, 190:6, 190:14, 191:4, 198:3, 198:6, 198:7
**plural** [3] - 31:6, 84:15, 173:14
**plus** [1] - 60:11
**PM** [7] - 1:6, 109:22, 166:6, 229:8, 293:6
**pocketed** [3] - 105:14, 105:22, 106:17
**pocketing** [1] - 106:9
**POGOZELSKI** [255] - 3:3, 4:6, 4:20, 7:9, 7:13, 7:17, 7:19, 8:1, 8:8, 8:14, 8:24, 9:2, 11:17, 11:21, 12:6, 12:13, 13:11, 13:12, 13:25, 14:2, 14:17, 14:20, 15:15, 15:16, 15:20, 15:23, 16:2, 16:6, 16:20, 16:22, 17:5, 17:11, 17:13, 18:11, 18:14, 19:1, 19:4, 19:6, 19:7, 20:1, 20:5, 22:17, 22:21, 23:2, 23:3, 23:9, 23:10, 23:16, 23:17, 25:4, 25:11, 25:13, 25:25, 26:10,

26:17, 26:20, 26:24, 26:25, 27:7, 27:10, 27:17, 27:20, 28:5, 28:7, 28:21, 28:24, 29:4, 29:9, 29:12, 29:22, 29:24, 30:9, 30:13, 31:22, 31:25, 32:7, 32:9, 32:11, 32:12, 33:9, 33:17, 33:21, 34:1, 34:3, 34:8, 34:14, 35:8, 35:11, 36:23, 36:25, 37:5, 38:1, 38:20, 38:25, 39:9, 39:10, 40:11, 40:14, 40:17, 40:20, 41:23, 42:4, 43:16, 43:18, 43:22, 43:25, 44:2, 46:13, 47:3, 47:8, 47:15, 47:21, 48:3, 48:22, 49:7, 51:9, 52:3, 52:21, 54:17, 55:6, 56:6, 56:10, 57:3, 57:15, 58:13, 60:15, 60:17, 60:25, 63:8, 65:19, 66:19, 66:23, 67:8, 67:11, 69:21, 69:23, 70:11, 75:16, 76:21, 78:9, 81:5, 81:15, 81:19, 88:23, 93:16, 94:1, 94:6, 94:13, 95:7, 99:25, 100:16, 100:25, 103:11, 103:17, 106:3, 110:5, 110:13, 110:15, 110:24, 114:22, 116:22, 117:14, 123:3, 124:9, 129:4, 129:22, 131:23, 133:10, 134:5, 134:7, 137:1, 137:22, 142:3, 147:12, 147:17, 150:18, 152:7, 152:9, 152:13, 153:4, 153:21, 158:11, 158:15, 159:2, 159:8, 159:13, 160:10, 160:12, 165:17, 166:12, 166:21, 167:11, 169:8, 169:14, 169:20, 172:10, 174:16, 175:9, 181:2, 183:20, 187:12, 194:21, 196:10, 198:19, 199:6, 200:21, 201:3, 202:3, 202:23, 205:4, 205:14, 212:17, 227:5, 227:18, 227:20, 227:24, 228:4, 228:9, 229:15, 229:21, 230:3, 231:20, 234:2, 238:11, 239:19, 240:9, 243:13, 244:9, 249:22, 249:24, 250:2, 250:8, 250:13, 253:7, 257:3, 257:22, 259:7, 260:4, 265:19, 268:25, 269:5, 270:2, 271:16, 272:2, 274:10, 274:16, 276:4, 280:4, 280:16, 281:25, 283:24, 286:25, 291:19, 291:23, 292:24

**Pogozelski** [2] - 1:13, 227:4

**point** [28] - 9:17, 9:18, 13:23, 15:5, 24:18, 43:8, 45:14, 75:5, 76:11, 80:3, 157:8, 188:21, 188:23, 189:8, 205:2, 207:23, 207:24, 208:1, 208:6, 223:5, 223:15, 223:16, 223:18, 224:5, 231:23, 237:8, 238:14, 246:25

**pointing** [3] - 14:12, 150:19, 212:11

**points** [1] - 173:17

**police** [2] - 74:21, 144:16

**policies** [1] - 260:8

**policy** [9] - 6:11, 259:21, 259:22, 259:23, 260:5, 260:7, 260:16, 260:18, 260:22

**polling** [6] - 7:25, 26:9, 49:6, 110:23, 166:20, 230:2

**position** [1] - 249:19

**possible** [4] - 10:23, 10:24, 153:13, 278:10

**possibly** [2] - 91:4, 199:1

**potential** [4] - 138:6, 172:23, 201:1, 292:25

**potentially** [3] - 200:6, 201:11, 222:5

**practice** [2] - 260:23, 262:4

**preceded** [1] - 53:3

**preference** [1] - 83:20

**prepaid** [1] - 292:6

**prepare** [1] - 250:23

**preparing** [2] - 250:20, 267:16

**prescribe** [1] - 131:17

**prescribed** [1] - 74:2

**prescription** [5] - 71:4, 72:18, 73:13, 73:24, 74:2

**prescriptions** [15] - 71:3, 71:17, 72:8, 72:11, 72:12, 72:14, 73:2, 73:8, 73:15, 127:21, 190:2, 190:8, 190:15, 190:16, 190:18

**presence** [18] - 7:24, 8:6, 25:9, 26:8, 26:15, 48:7, 49:5, 49:12, 109:14, 110:22, 111:4, 165:22, 166:19, 167:1, 226:2, 230:1, 230:8, 291:3

**present** [20] - 4:3, 7:3, 25:22, 48:19, 100:24, 109:25, 166:9, 205:2, 206:14, 216:18, 227:23, 229:11, 229:12

**presented** [13] - 81:20, 83:9, 88:1, 89:19, 178:5, 205:20, 213:8, 214:1, 259:17, 268:13, 279:6, 279:16, 288:13

**press** [3] - 181:13, 183:5, 183:7

**pressure** [1] - 181:17

**pretending** [1] - 95:20

**pretty** [3] - 61:2, 170:14, 172:20

**prevent** [1] - 189:12

**previous** [3] - 15:1, 126:17, 246:2

**previously** [1] - 83:4

**price** [3] - 21:8, 21:11, 240:17

**pricing** [3] - 21:4, 21:16, 123:9

**Prison** [1] - 175:17

**prison** [30] - 57:13, 96:17, 100:15, 101:4, 101:9, 101:15, 101:21, 102:3, 108:2, 140:22, 140:23, 152:6, 153:12, 153:14, 164:20, 170:24, 171:2, 171:4, 171:8, 171:10, 171:12, 171:19, 171:25, 173:15, 173:18, 173:20, 173:25, 175:7, 284:12

**privacy** [2] - 74:16

**privileged** [2] - 52:22, 196:11

**probation** [4] - 104:25, 105:3, 105:16, 107:2

**problem** [8] - 20:15, 26:23, 32:23, 36:4, 87:6, 208:18, 271:7, 271:8

**problems** [5] - 57:13, 223:23, 268:11, 279:1, 279:3

**Procedure** [1] - 264:6

**procedures** [3] - 144:19, 220:7, 261:4

**proceed** [2] - 49:13, 274:25

**proceeding** [1] - 179:7

**proceedings** [9] - 6:25, 25:19, 26:4, 48:15, 55:24, 109:23, 166:7, 229:9, 293:11

**proceeds** [7] - 86:8, 106:18, 111:10, 135:25, 154:4, 157:17, 157:20

**process** [6] - 42:13, 42:16, 201:23, 205:21, 215:8, 241:5

**processed** [1] - 190:21

**produce** [8] - 236:6, 238:15, 244:16, 244:22, 244:23, 246:11, 247:13, 257:8

**produced** [4] - 234:20, 234:23, 234:25, 245:16

**producing** [5] - 245:6, 245:22, 246:12, 247:1, 259:6

**product** [17] - 29:1, 45:3, 45:4, 45:16, 45:22, 45:24, 46:6, 91:12, 123:9, 232:20, 246:6, 259:24, 261:12, 272:20, 273:13, 273:19, 273:23

**production** [1] - 245:6

**products** [4] - 111:17, 191:6, 273:10, 283:20

**program** [2] - 146:6, 172:24

**programs** [5] - 132:19, 132:20, 132:21, 173:5, 173:7

**promise** [1] - 264:12

**promote** [1] - 243:10

**prompted** [1] - 43:2

**pronounce** [1] - 22:1

**pronounced** [1] - 69:12

**proof** [2] - 148:17, 148:21

**properties** [12] - 140:4, 140:10, 140:14, 157:13, 162:10, 163:4, 163:6, 163:8, 163:10, 163:13, 167:14, 168:9

**property** [13] - 157:16, 159:14, 159:20, 159:23, 159:24, 160:1, 160:3, 160:20, 160:21, 161:4, 161:13, 161:23, 292:21

**prosecutor** [15] - 49:18, 50:2, 63:24, 98:21, 101:6, 101:25, 167:24, 167:25, 182:17, 212:11, 228:11, 228:13, 228:15, 262:16, 275:3

**Prosecutor** [2] - 150:16

**prosecutors** [36] - 54:9, 98:23, 103:9, 103:17, 103:18, 103:22, 103:23, 110:8, 116:8, 116:10, 116:21, 117:4, 117:7, 128:9, 151:8, 167:22, 175:16, 178:6, 179:21, 180:22, 181:10, 182:2, 182:11, 182:20, 183:8, 183:12,

199:16, 200:15, 204:1, 264:4, 264:9, 264:10, 264:18, 264:20, 286:1
**protect** [12] - 183:18, 183:23, 183:25, 184:1, 184:4, 184:5, 184:14, 184:22, 185:2, 186:2, 186:6, 227:13
**protected** [3] - 177:10, 186:9, 186:10
**protecting** [4] - 89:1, 89:2, 89:8, 100:8
**protection** [5] - 177:8, 177:9, 177:12, 178:18, 178:19
**Proven** [4] - 41:15, 41:16, 41:19, 287:25
**provide** [15] - 5:13, 20:18, 23:5, 30:10, 36:1, 37:15, 47:22, 114:10, 202:9, 236:14, 244:5, 251:23, 252:1, 252:2, 292:22
**provided** [13] - 4:13, 4:19, 5:7, 14:6, 14:14, 20:19, 132:5, 204:9, 222:2, 253:14, 259:15, 267:18, 267:22
**provides** [1] - 37:18
**providing** [10] - 20:25, 251:25, 252:24, 253:6, 253:14, 253:24, 254:10, 263:7, 264:2, 269:4
**publicly** [2] - 187:10, 188:1
**pull** [12] - 11:18, 14:17, 15:21, 16:3, 26:18, 28:21, 28:22, 32:7, 35:8, 38:21, 77:24, 78:12
**pulled** [1] - 64:24
**purchase** [15] - 14:13, 17:15, 27:14, 111:11, 126:15, 126:16, 161:8, 161:9, 196:23, 251:13, 251:15, 251:17, 253:16, 260:11
**purchased** [10] - 39:12, 140:10, 154:4, 155:7, 157:14, 157:17, 161:4, 161:6, 162:6, 195:24
**purchases** [2] - 32:15, 33:12
**purchasing** [2] - 126:13, 128:25
**purporting** [1] - 91:8
**purpose** [1] - 102:4
**purposes** [2] - 16:4, 27:19
**pursuant** [2] - 168:9, 264:5
**pursue** [1] - 216:2
**pushing** [1] - 210:23
**Put** [1] - 268:23
**put** [37] - 6:13, 78:25, 83:15, 83:23, 120:10, 137:5, 154:25, 161:6, 162:6, 162:14, 194:18, 196:25, 207:2, 219:6, 230:11, 253:20, 256:11, 266:2, 266:6, 266:11, 266:16, 266:18, 266:20, 267:2, 267:9, 267:10, 267:14, 267:15, 267:19, 268:1, 268:4, 268:6, 268:9, 268:10, 268:12, 269:9
**putting** [2] - 66:7, 196:8

## Q

**Q's** [5] - 98:21, 98:25, 114:17, 117:11, 183:12
**Quan** [2] - 227:9, 227:10
**quantity** [1] - 13:5
**quest** [1] - 59:12
**questioning** [9] - 9:5, 17:14, 17:19, 58:14, 101:1, 150:19, 169:15, 229:18, 262:12
**questions** [23] - 43:24, 48:3, 49:18, 53:24, 53:25, 56:9, 100:18, 102:6, 102:13, 105:4, 105:8, 105:10, 178:7, 181:5, 181:23, 185:23, 185:24, 204:9, 258:10, 274:19, 274:20, 275:3
**Quick** [1] - 39:5
**quicker** [1] - 107:12
**quickly** [3] - 9:3, 46:6, 46:7
**quit** [1] - 134:3
**quite** [1] - 243:4
**quote** [3] - 58:4, 83:17, 179:25
**quote-unquote** [1] - 83:17

## R

**R-A-L-H-A-N** [1] - 237:6
**R2** [1] - 119:25
**raise** [3] - 55:12, 55:14, 173:18
**Ralhan** [7] - 96:25, 121:22, 124:4, 225:12, 237:3, 237:15, 290:21
**range** [1] - 52:6
**RDAP** [1] - 172:24
**Re** [1] - 225:17
**reach** [4] - 225:18, 230:15, 230:19, 233:23
**read** [15] - 23:20, 33:14, 36:20, 116:25, 192:1, 192:5, 192:6, 192:8, 222:8, 230:17, 233:20, 246:15, 264:22, 264:24, 265:3
**reading** [11] - 110:6, 110:9, 116:22, 181:3, 217:24, 217:25, 218:6, 274:17, 274:18, 274:22, 274:23
**ready** [1] - 210:25
**real** [34] - 49:24, 50:6, 50:13, 51:20, 82:7, 88:19, 91:20, 96:10, 96:11, 96:25, 97:24, 98:14, 98:21, 99:2, 99:7, 99:9, 99:24, 195:14, 195:16, 195:17, 195:20, 196:1, 196:20, 196:23, 216:9, 216:18, 241:19, 241:21, 241:22, 241:23, 276:20, 285:10, 285:13
**really** [34] - 36:6, 56:14, 56:18, 56:19, 56:20, 60:6, 60:7, 80:8, 84:9, 97:13, 128:11, 162:17, 162:18, 190:9, 194:14, 195:9, 209:24, 212:24, 213:18, 213:19, 214:16, 215:11, 216:8, 216:24, 217:1, 234:24, 239:3, 239:4, 242:15, 249:21, 252:15, 272:24, 281:17
**reason** [27] - 69:6, 69:7, 69:8, 91:23, 104:15, 162:10, 162:14, 170:17, 181:23, 183:17, 184:14, 193:7, 195:5, 195:23, 207:25, 216:20, 218:13, 231:2, 237:25, 238:4, 239:9, 245:23, 246:1, 250:13, 252:2, 259:15
**reasonable** [1] - 93:24
**reasons** [1] - 25:6
**receivable** [1] - 83:14
**receive** [2] - 9:12, 102:15
**received** [11] - 12:10, 12:11, 17:9, 17:10, 34:12, 34:13, 102:7, 111:11, 112:5, 169:12, 176:3
**receiving** [3] - 14:9, 145:4, 243:8
**recently** [1] - 283:19
**recess** [15] - 6:22, 25:5, 25:7, 25:16, 48:5, 48:12, 109:13, 109:20, 165:21, 166:3, 225:25, 226:8, 229:7, 291:1, 292:12
**recognize** [2] - 83:7, 164:4
**recognizing** [1] - 292:1
**recollection** [3] - 44:9, 145:22, 276:6
**record** [19] - 4:2, 6:24, 7:1, 25:18, 25:21, 48:14, 48:18, 109:22, 109:24, 166:6, 166:8, 188:23, 189:20, 200:2, 218:10, 229:8, 229:10, 271:4, 274:22
**records** [3] - 16:5, 235:22, 251:11
**recover** [1] - 149:8
**reduce** [4] - 9:14, 103:10, 103:24, 264:11
**reduced** [3] - 200:20, 201:2, 201:19
**reduction** [6] - 169:18, 169:23, 170:3, 200:7, 201:12, 264:5
**reductions** [1] - 172:23
**refer** [1] - 49:19
**reference** [1] - 28:16
**referencing** [1] - 36:16
**referral** [2] - 194:17, 241:10
**referring** [5] - 55:1, 67:24, 75:22, 123:13, 161:22
**refine** [1] - 228:2
**reflected** [1] - 30:20
**reflecting** [1] - 274:22
**refresh** [6] - 44:8, 116:14, 116:16, 116:18, 124:22, 145:21
**refreshed** [3] - 125:4, 126:8
**refreshing** [1] - 126:9
**refunded** [1] - 164:13
**refuse** [7] - 37:15, 57:19, 99:24, 100:1, 107:8, 168:13
**refused** [10] - 57:10, 57:17, 89:24, 105:8, 105:11, 105:18, 107:4, 107:15, 167:19
**regarding** [2] - 222:1, 233:22
**regards** [1] - 237:18
**registered** [3] - 90:8, 91:15, 92:1
**Rego** [4] - 161:17, 161:25, 162:4, 163:1
**regular** [5] - 190:23, 190:25, 191:2, 272:17, 272:19
**reject** [3] - 211:1, 229:5, 248:7
**relate** [1] - 220:23
**related** [7] - 15:6, 89:12, 89:14, 138:15, 151:19, 197:18, 220:3
**relates** [2] - 227:2, 227:5
**relating** [3] - 187:7,

226:23, 227:3
**relationship** [4] - 44:3, 45:6, 47:23, 223:8
**relatively** [1] - 41:17
**relatives** [2] - 68:1, 68:18
**Relevance** [2] - 56:6, 169:14
**relevance** [5] - 54:18, 58:14, 110:10, 114:23, 158:15
**relevant** [1] - 114:25
**religious** [3] - 5:13, 5:20, 6:18
**rely** [1] - 276:5
**remain** [1] - 48:13
**remember** [57] - 9:4, 9:9, 18:15, 18:18, 25:7, 28:2, 41:14, 44:5, 48:6, 58:20, 63:6, 86:1, 92:15, 92:16, 94:3, 95:13, 95:14, 95:16, 96:8, 105:6, 109:13, 124:19, 141:19, 142:21, 145:16, 156:15, 158:24, 159:6, 161:11, 165:21, 182:25, 183:3, 190:9, 191:5, 192:22, 195:3, 217:12, 217:15, 220:19, 226:1, 230:23, 234:7, 240:24, 246:22, 258:10, 263:3, 263:18, 265:15, 273:7, 273:11, 286:4, 286:21, 289:17, 289:25, 290:2, 291:2
**remembered** [1] - 85:5
**remind** [1] - 246:18
**reminded** [1] - 58:19
**reminds** [1] - 85:11
**remittance** [1] - 83:19
**renovated** [1] - 140:12
**rent** [4] - 132:9, 132:10, 132:15, 132:16
**repeat** [2] - 245:12, 286:8
**repeatedly** [1] - 150:19
**repeating** [2] - 40:15, 67:8
**rephrase** [1] - 208:22
**report** [6] - 85:11, 116:13, 116:23, 117:1, 181:3, 228:19
**REPORTED** [1] - 2:1
**reported** [2] - 41:19, 119:20
**reporter** [9] - 6:4, 9:1, 29:5, 81:4, 106:5, 165:7, 170:21, 214:6, 215:22
**Reporter** [2] - 2:3, 293:15
**representing** [4] - 4:7, 108:25, 141:3, 200:3
**request** [11] - 4:10, 85:9, 101:24, 102:11, 103:23, 176:19, 222:11, 222:14, 222:15, 238:15, 292:19
**requested** [2] - 176:17, 176:22
**requesting** [1] - 249:6
**requests** [6] - 6:4, 81:4, 106:5, 165:7, 214:6, 222:9
**require** [1] - 222:10
**required** [3] - 36:17, 36:18, 259:25
**requirement** [3] - 23:21, 127:3, 129:2
**requirements** [1] - 37:13
**requires** [2] - 270:2, 280:4
**research** [1] - 183:1
**resell** [1] - 11:3
**reserve** [1] - 45:23
**resolve** [3] - 62:21, 62:22, 62:23
**Resources** [3] - 134:10, 135:7, 136:10
**respectfully** [1] - 99:16
**respond** [5] - 23:7, 27:6, 35:23, 231:8, 248:23
**responds** [1] - 236:22
**response** [14] - 15:3, 23:14, 26:21, 28:12, 32:21, 33:10, 33:22, 35:2, 35:19, 36:10, 36:13, 36:17, 230:13, 281:2
**responsibilities** [3] - 59:20, 60:1, 104:11
**responsibility** [4] - 104:12, 104:15, 104:17, 107:2
**responsible** [1] - 106:9
**rest** [2] - 291:18, 292:2
**restitution** [4] - 145:13, 145:15, 145:21, 146:25
**restricted** [1] - 192:20
**restriction** [2] - 192:22, 192:23
**restrictions** [4] - 191:15, 191:17, 193:4
**resubmit** [1] - 258:23
**result** [4] - 52:17, 53:2, 53:9, 147:23
**resume** [1] - 8:7
**resuming** [1] - 291:24
**retainers** [1] - 141:1
**retrieve** [2] - 218:16, 292:21
**return** [1] - 219:4
**returned** [3] - 53:13, 62:6, 164:24
**returns** [1] - 119:21
**reveal** [7] - 151:11, 214:15, 227:6, 239:9, 241:5, 252:13, 252:14
**revealed** [4] - 226:19, 238:21, 238:23, 276:20
**revealing** [3] - 215:17, 240:13, 241:18
**revised** [1] - 16:16
**revoked** [1] - 91:22
**rid** [1] - 242:24
**rights** [6] - 56:5, 56:20, 56:22, 56:23, 74:16, 74:17
**ring** [2] - 132:2, 161:13
**rip** [1] - 70:3
**rise** [16] - 6:23, 7:22, 25:12, 25:17, 26:6, 48:9, 48:16, 49:3, 109:17, 110:20, 165:24, 166:5, 166:17, 226:5, 229:24, 291:6
**road** [2] - 200:13, 201:17
**Rochester** [6] - 20:23, 29:15, 29:17, 30:1, 30:20, 38:17
**Rockaway** [2] - 140:15, 163:16
**role** [1] - 186:7
**room** [4] - 25:9, 48:8, 165:23, 226:3
**Roselle** [1] - 41:12
**roughly** [2] - 118:24, 156:16
**route** [2] - 211:12, 211:14
**RPR** [2] - 2:2, 293:15
**rude** [1] - 219:8
**rule** [1] - 110:12
**Rule** [2] - 102:18, 103:5
**Rules** [1] - 264:6
**rules** [3] - 23:23, 177:3, 177:5
**run** [2] - 65:24, 229:16
**runner** [7] - 97:14, 97:15, 97:16, 97:19, 97:22, 112:5, 120:16
**Runner** [7] - 113:6, 113:8, 113:10, 117:17, 117:25, 119:6, 144:24
**runners** [13] - 20:12, 20:13, 111:25, 112:2, 112:6, 112:16, 112:17, 112:20, 113:2, 113:4, 119:6, 120:4, 145:4
**running** [1] - 66:3
**runs** [1] - 241:15
**Russia** [9] - 52:10, 53:2, 53:13, 53:15, 53:17, 53:18, 54:2, 54:6
**RX** [4] - 31:8, 125:1, 125:2, 125:23

## S

**Safe** [188] - 9:4, 10:15, 10:17, 11:1, 11:2, 11:18, 11:25, 12:24, 13:4, 15:7, 15:9, 18:1, 21:9, 22:5, 22:8, 24:1, 31:20, 38:3, 39:16, 40:1, 40:7, 40:24, 41:2, 41:8, 42:1, 42:2, 42:10, 42:18, 43:4, 44:3, 44:17, 45:5, 45:7, 45:10, 46:3, 46:20, 46:22, 47:23, 60:11, 83:10, 84:16, 87:8, 88:1, 89:19, 90:11, 90:14, 91:5, 91:7, 91:14, 91:25, 92:24, 92:25, 93:9, 93:10, 93:19, 93:21, 93:25, 94:5, 94:12, 94:20, 94:22, 94:23, 95:5, 95:11, 96:20, 111:15, 111:18, 123:9, 128:12, 128:13, 147:24, 184:18, 184:21, 197:8, 202:7, 204:19, 204:20, 205:2, 205:20, 206:14, 206:15, 209:12, 209:13, 209:18, 210:8, 210:18, 210:20, 213:25, 220:5, 221:20, 223:10, 223:16, 224:5, 224:14, 230:20, 231:4, 232:20, 236:7, 236:22, 237:23, 238:18, 238:21, 238:23, 239:10, 239:18, 240:1, 241:6, 242:18, 243:7, 243:19, 244:4, 244:15, 245:14, 245:15, 245:20, 246:11, 247:5, 247:12, 249:10, 249:15, 250:16, 251:3, 251:5, 251:6, 251:11, 251:16, 251:19, 251:23, 252:4, 252:20, 253:5, 253:8, 253:13, 253:23, 254:4, 254:18, 255:1, 255:6, 255:15, 257:9, 257:14, 257:20, 258:3, 258:16, 259:2, 259:5, 259:6, 259:12, 259:17, 259:20, 259:24, 260:11, 260:18, 261:1, 261:19, 269:15, 270:5, 272:8, 272:10, 272:12, 278:7, 278:9, 278:18, 278:20, 279:5, 279:8, 279:11, 280:1, 280:3, 280:20, 281:4, 281:13, 281:22, 282:6, 282:16, 284:23, 284:25, 285:1, 285:2, 285:8, 286:2, 286:15, 286:16, 286:23, 287:6, 292:15, 292:16
**sale** [4] - 12:23, 13:4, 14:6, 151:19
**Sales** [2] - 221:8, 221:9

**sales** [2] - 147:23, 208:25
**Sameer** [9] - 247:16, 247:19, 247:22, 247:23, 247:24, 247:25, 248:12, 248:24, 249:7
**sat** [1] - 102:22
**satisfied** [2] - 259:5, 259:8
**satisfy** [1] - 257:9
**save** [1] - 150:5
**saved** [1] - 154:22
**savings** [8] - 149:21, 149:22, 149:23, 149:24, 150:2, 150:6, 150:7, 154:8
**saw** [15] - 20:6, 46:2, 72:15, 106:10, 138:24, 204:13, 204:14, 227:9, 234:1, 235:22, 236:16, 246:3, 250:16, 288:13
**scam** [1] - 74:10
**scared** [1] - 89:8
**scenes** [1] - 213:17
**scheduling** [1] - 291:13
**scheme** [4] - 42:13, 64:25, 70:15, 106:18
**schemes** [1] - 194:2
**screen** [3] - 30:16, 37:3, 38:21
**Scripps** [5] - 96:1, 96:2, 96:4, 228:5, 228:6
**scroll** [3] - 23:2, 35:22, 222:21
**scrolling** [2] - 27:7, 36:9
**SDNY** [1] - 227:25
**search** [2] - 148:20, 167:14
**searched** [4] - 167:16, 167:23, 168:1, 168:9
**season** [1] - 6:15
**seated** [3] - 7:2, 25:20, 48:17
**second** [26] - 55:12, 58:22, 68:11, 68:15, 76:4, 78:23, 85:8, 96:7, 133:22, 147:21, 148:3, 148:12, 148:16, 168:3, 168:4, 168:5, 168:8, 207:21, 218:23, 226:22, 227:17, 227:18, 235:3, 262:9, 262:10, 283:15
**seconds** [1] - 36:21
**secret** [3] - 241:11, 241:12, 252:14
**secrets** [1] - 252:13
**secured** [1] - 171:22
**SECURITY** [17] - 6:23, 7:22, 25:12, 25:17, 26:6, 48:9, 48:13, 48:16, 49:3, 109:17, 110:20, 165:24, 166:5, 166:17, 226:5, 229:24, 291:6
**security** [2] - 171:19, 171:21
**see** [74] - 11:22, 12:2, 14:3, 14:7, 14:12, 14:21, 14:25, 15:12, 16:8, 18:20, 18:22, 21:5, 22:18, 22:22, 22:25, 23:4, 23:11, 25:9, 27:11, 27:15, 27:21, 27:23, 29:13, 29:25, 32:13, 32:19, 34:6, 34:18, 34:22, 34:25, 35:12, 36:7, 37:13, 37:19, 39:1, 39:11, 40:15, 44:12, 45:1, 48:7, 54:21, 54:24, 55:1, 55:5, 55:10, 55:11, 55:12, 55:13, 58:15, 66:10, 91:21, 95:19, 106:8, 109:16, 112:15, 124:21, 165:23, 200:15, 215:8, 220:8, 220:14, 220:17, 225:9, 226:3, 232:25, 233:20, 236:16, 237:1, 264:10, 272:22, 273:10, 291:5
**seeing** [2] - 246:17, 246:19
**seem** [1] - 31:9
**seize** [4] - 168:5, 168:7, 168:8, 168:11
**seized** [1] - 167:17
**seizure** [1] - 87:13
**sell** [21] - 15:9, 21:16, 22:10, 37:18, 41:2, 41:9, 91:4, 91:11, 91:12, 123:9, 148:9, 153:11, 153:18, 184:21, 197:7, 208:13, 209:2, 232:20, 239:10, 240:16, 246:4
**seller** [7] - 94:21, 94:23, 94:25, 95:4
**selling** [21] - 9:4, 10:14, 10:17, 24:1, 38:3, 41:8, 43:3, 45:11, 46:19, 46:22, 87:9, 87:13, 92:18, 92:20, 92:21, 144:23, 145:3, 184:18, 240:2, 281:18, 283:14
**send** [19] - 15:5, 16:16, 45:16, 71:3, 71:4, 91:17, 91:18, 210:24, 213:22, 214:7, 249:2, 256:25, 258:4, 269:20, 270:13, 270:25, 275:10
**sending** [10] - 14:22, 15:1, 19:10, 19:14, 30:5, 45:22, 95:21, 238:18, 250:16, 270:9
**sends** [2] - 15:13, 38:2
**sense** [1] - 5:1
**sent** [32] - 11:25, 18:16, 18:20, 19:25, 20:8, 23:24, 24:6, 29:1, 31:19, 34:4, 35:3, 45:1, 46:17, 47:4, 47:17, 95:16, 190:18, 211:25, 215:4, 220:25, 221:2, 225:18, 230:14, 233:23, 246:9, 246:14, 254:3, 255:1, 255:15, 256:13, 257:9, 270:11
**sentence** [17] - 9:12, 9:14, 103:10, 103:24, 108:14, 169:18, 170:3, 170:24, 171:25, 172:8, 200:8, 200:19, 201:1, 201:12, 201:18, 264:5, 264:11
**sentenced** [6] - 65:8, 103:16, 108:1, 145:10, 173:16, 179:22
**sentencing** [4] - 108:8, 110:6, 110:8, 264:4
**separate** [2] - 211:25
**separately** [1] - 10:11
**September** [10] - 170:14, 173:21, 173:25, 174:8, 175:3, 232:15, 259:1, 284:12, 284:17, 285:9
**September/October** [1] - 259:12
**series** [2] - 70:17
**serve** [3] - 172:1, 172:6, 173:9
**Services** [1] - 132:2
**services** [1] - 132:5
**serving** [2] - 170:24, 172:8
**sessions** [2] - 203:25, 226:18
**set** [7] - 74:7, 74:10, 74:13, 74:24, 234:18, 234:19
**seven** [13] - 51:5, 92:19, 108:12, 108:15, 108:16, 112:19, 112:20, 112:21, 120:4, 141:19, 141:20, 141:21, 145:6
**several** [5] - 46:10, 47:1, 47:18, 200:13, 283:2
**SEY** [1] - 125:19
**shackles** [2] - 54:24, 55:2
**shaking** [1] - 180:3
**shanked** [1] - 100:15
**share** [8] - 80:1, 82:17, 82:18, 82:19, 82:20, 144:14, 181:23, 224:12
**sheet** [1] - 288:13
**sheets** [1] - 44:8
**shell** [1] - 136:13
**shelters** [1] - 132:7
**shield** [1] - 162:15
**ship** [3] - 45:2, 45:4, 45:24
**shipment** [2] - 14:22, 290:5
**shipments** [1] - 15:1
**shipped** [1] - 287:21
**shook** [2] - 277:11, 277:15
**shop** [3] - 154:21, 154:24, 155:3
**short** [3] - 41:9, 41:17, 292:20
**shorter** [2] - 41:17, 292:1
**shortly** [1] - 291:18
**shoulder** [1] - 123:16
**shoulders** [1] - 51:17
**show** [9] - 13:25, 16:20, 19:1, 20:12, 20:14, 27:17, 34:1, 55:22, 217:14
**showed** [4] - 175:17, 176:1, 176:4, 204:13
**shown** [6] - 204:3, 204:7, 214:14, 220:10, 220:19, 287:4
**shrugging** [1] - 51:17
**SHUCAROV** [1] - 83:15
**Shuhurov** [1] - 82:3
**Shukurov** [4] - 12:14, 12:15, 83:16, 122:7
**sic** [5] - 12:20, 83:15, 87:2, 103:6, 105:20
**sic]** [2] - 235:13, 238:25
**side** [5] - 19:1, 27:17, 275:23
**side-by-side** [2] - 19:1, 27:17
**Sign** [1] - 143:9
**sign** [8] - 78:25, 106:23, 192:3, 262:13, 262:18, 265:3, 293:3
**signed** [12] - 101:6, 106:14, 178:8, 178:10, 178:16, 178:19, 263:6, 263:11, 263:21, 263:23, 265:13, 265:15
**significant** [3] - 170:14, 170:23, 173:19
**signing** [2] - 192:15, 263:3
**similar** [3] - 23:21, 33:22, 136:11
**similarly** [1] - 39:22
**simple** [3] - 58:2, 185:23, 208:22
**Simultaneous** [1] - 106:4
**sit** [1] - 228:15
**sitting** [2] - 70:1, 218:5
**situation** [3] - 44:21, 123:23, 128:4
**situations** [1] - 25:2
**six** [13] - 14:6, 14:13, 50:24, 51:3, 51:4, 112:19, 112:20, 112:21, 145:6, 156:17, 189:10, 189:22, 287:4
**six-month** [1] - 14:13
**skip** [1] - 225:3

**sleep** [1] - 6:10
**sloppy** [1] - 254:6
**slow** [1] - 98:6
**slowly** [3] - 29:10, 130:20, 286:9
**small** [3] - 80:1, 162:21, 162:22
**Smith** [1] - 5:24
**snapshot** [1] - 20:7
**snippet** [1] - 281:2
**so..** [1] - 98:8
**society** [1] - 133:3
**sold** [40] - 15:7, 21:8, 22:4, 22:7, 22:9, 39:2, 39:20, 40:7, 40:24, 41:25, 42:8, 45:17, 46:3, 111:11, 111:15, 111:17, 141:16, 142:10, 142:13, 153:13, 153:15, 153:16, 154:2, 154:24, 164:9, 184:20, 184:21, 246:2, 246:6, 250:24, 251:2, 251:5, 251:6, 251:8, 251:11, 251:16, 251:19, 261:15
**sold-to** [1] - 39:20
**solely** [1] - 106:9
**solution** [2] - 27:13, 222:24
**Solutions** [7] - 11:1, 11:2, 60:11, 90:11, 123:9, 197:8, 231:4
**someone** [14] - 29:14, 32:13, 41:12, 123:3, 143:14, 174:14, 216:21, 222:1, 222:7, 223:2, 236:25, 237:10, 249:6, 266:17
**sometime** [4] - 221:25, 235:24, 236:7, 244:4
**sometimes** [4] - 73:21, 73:23, 91:21, 289:3
**somewhat** [1] - 173:11
**somewhere** [2] - 13:8, 194:19
**soon** [1] - 6:5
**sorry** [61] - 5:16, 5:18, 22:1, 22:19, 29:22, 31:22, 33:4, 33:17, 33:18, 36:2, 37:2, 38:13, 38:15, 43:25, 54:23, 72:24, 83:5, 85:5, 85:24, 90:15, 96:14, 103:13, 109:6, 113:19, 120:23, 130:20, 134:15, 141:6, 145:1, 146:15, 148:2, 158:22, 163:5, 171:14, 173:6, 177:14, 178:15, 180:7, 190:17, 202:13, 211:13, 218:18, 223:13, 224:20, 225:19, 227:20, 230:15, 230:25, 239:6, 239:13, 241:20, 256:22, 265:25, 270:23, 273:21, 274:14, 275:11, 278:15, 280:12, 282:21, 288:8
**sort** [1] - 9:18
**soul** [1] - 107:1
**sound** [1] - 225:13
**sounds** [3] - 43:15, 152:12, 292:24
**source** [18] - 184:17, 184:22, 184:24, 184:25, 185:1, 185:2, 186:25, 241:17, 241:18, 241:19, 241:21, 241:22, 241:24, 266:24, 287:16, 287:17, 288:5
**sources** [3] - 184:24, 194:17, 273:23
**South** [1] - 100:6
**SOUTHERN** [1] - 1:1
**Southern** [13] - 63:18, 63:22, 64:9, 67:1, 75:23, 105:25, 106:7, 115:20, 146:24, 179:14, 191:10, 197:14, 293:16
**Soviet** [2] - 69:9, 69:11
**space** [1] - 157:6
**speaker** [5] - 6:4, 81:4, 106:5, 165:7, 214:6
**speakers** [1] - 106:4
**speaking** [6] - 10:20, 63:24, 70:25, 217:11, 249:5, 288:24
**speaks** [1] - 37:23
**specific** [2] - 226:14, 228:6
**specifically** [1] - 246:14
**specifics** [1] - 289:25
**specify** [1] - 243:13
**speculation** [5] - 169:9, 238:11, 270:2, 271:17, 280:4
**spell** [4] - 50:11, 68:7, 68:11, 98:11
**spent** [1] - 141:24
**spoken** [3] - 77:2, 221:15, 235:6
**spot** [3] - 109:9, 224:23, 290:23
**spring** [3] - 125:1, 125:2, 279:22
**St** [1] - 268:20
**Stain** [1] - 31:8
**stand** [1] - 4:7
**standing** [1] - 48:13
**stands** [1] - 168:24
**standup** [3] - 174:14, 174:20, 174:24
**Star** [1] - 97:7
**start** [18] - 24:22, 24:24, 25:1, 27:13, 64:8, 67:2, 67:21, 98:9, 113:17, 114:16, 168:16, 172:18, 178:22, 217:7, 217:8, 245:5, 245:22, 247:1
**started** [12] - 42:12, 64:17, 66:13, 67:4, 67:23, 171:25, 178:7, 247:4, 256:24, 257:8, 264:18
**starting** [4] - 67:17, 67:20, 201:17, 217:10
**starts** [3] - 142:21, 240:23, 246:12
**starving** [1] - 7:21
**state** [2] - 139:10, 194:23
**State** [5] - 90:10, 90:13, 91:19, 206:16, 278:22
**statement** [1] - 178:6
**statements** [5] - 116:23, 181:4, 287:6, 287:7, 287:8
**STATES** [3] - 1:1, 1:4, 1:10
**States** [30] - 1:14, 2:4, 52:11, 52:12, 52:13, 52:19, 53:2, 53:4, 53:9, 53:10, 53:13, 53:19, 53:20, 53:21, 54:8, 61:24, 62:2, 62:14, 63:5, 65:10, 65:11, 98:23, 103:9, 138:3, 140:19, 146:3, 195:16, 195:17, 228:16, 293:16
**status** [1] - 52:11
**statute** [1] - 198:15
**stay** [1] - 171:6
**steal** [7] - 59:17, 59:23, 60:2, 65:17, 78:13, 84:23
**stealing** [3] - 61:1, 61:2, 65:14
**STENOGRAPHICAL LY** [1] - 2:1
**step** [4] - 54:25, 73:4, 73:12, 264:19
**Step** [1] - 200:14
**steps** [3] - 189:12, 189:14, 200:13
**Sterling** [1] - 125:17
**stick** [1] - 258:13
**still** [20] - 5:4, 7:4, 37:17, 44:8, 51:22, 61:25, 62:4, 78:1, 91:21, 101:6, 110:1, 140:17, 142:8, 156:20, 156:21, 157:9, 244:23, 245:9, 265:17, 282:24
**stock** [1] - 242:25
**stole** [10] - 60:4, 61:10, 61:14, 62:1, 62:5, 65:9, 105:18, 146:1, 146:9, 164:25
**stolen** [4] - 60:9, 61:19, 62:15, 146:18
**stop** [11] - 27:9, 41:16, 144:23, 145:3, 192:24, 193:4, 193:7, 240:22, 278:18, 278:19, 279:1
**stoppage** [1] - 259:15
**stopped** [11] - 42:14, 96:20, 259:2, 259:12, 278:20, 280:22, 280:23, 281:19, 282:5, 283:14, 288:1
**stopping** [3] - 245:5, 245:8, 282:15
**stops** [1] - 241:1
**story** [2] - 252:9, 252:10
**straight** [1] - 106:1
**strategy** [1] - 62:20
**straw** [1] - 157:13
**street** [14] - 10:15, 12:23, 15:6, 39:24, 40:2, 40:7, 41:3, 87:9, 97:22, 114:3, 119:7, 210:4, 242:3, 243:5
**Street** [5] - 1:15, 1:19, 153:7, 156:1, 157:1
**stuff** [11] - 24:23, 78:17, 149:13, 158:7, 210:6, 266:2, 274:7, 275:5, 285:10, 285:11, 285:12
**stuffed** [1] - 149:8
**stupid** [1] - 188:3
**subject** [4] - 52:19, 116:24, 220:24, 221:22
**submit** [1] - 258:23
**submitted** [7] - 205:24, 210:19, 255:5, 258:17, 278:21, 279:9, 279:23
**submitting** [1] - 209:18
**subpoena** [14] - 42:7, 102:7, 102:8, 102:9, 102:12, 102:15, 176:3, 176:4, 176:6, 176:7, 202:22, 202:24, 279:3, 282:11
**subpoenaed** [1] - 203:4
**subpoenaing** [1] - 44:22
**substance** [1] - 271:25
**successful** [3] - 211:15, 211:17, 211:18
**sudden** [1] - 189:11
**sue** [1] - 148:6
**sued** [3] - 147:21, 147:23, 147:25
**suggest** [3] - 235:4, 236:25, 248:25
**suggestion** [1] - 227:7
**suit** [3] - 148:1, 148:3, 148:12
**suitcase** [1] - 149:8
**summary** [3] - 16:4, 44:7, 288:13
**supervisor** [1] - 127:6
**supplier** [5] - 37:18, 97:12, 97:19, 97:24,

112:12
**suppliers** [4] - 97:10, 97:25, 98:10, 111:25
**support** [5] - 20:25, 21:23, 22:12, 32:25, 34:21
**supporting** [1] - 33:11
**supports** [1] - 32:15
**supposed** [6] - 13:5, 20:25, 102:21, 145:17, 145:22, 256:6
**supposedly** [5] - 22:12, 39:12, 39:23, 258:17, 266:12
**surprise** [2] - 176:1, 176:9
**sustain** [3] - 33:8, 47:20, 160:14
**Sustained** [1] - 69:24
**sustained** [64] - 33:15, 36:22, 37:25, 41:22, 46:12, 47:2, 47:7, 60:16, 60:18, 61:3, 63:10, 65:20, 66:20, 66:24, 67:10, 70:12, 75:17, 76:23, 78:10, 81:6, 88:24, 93:17, 94:8, 101:2, 117:15, 123:4, 124:10, 129:6, 129:23, 131:25, 134:6, 134:8, 137:24, 142:4, 147:14, 152:14, 153:5, 153:22, 158:12, 158:16, 159:9, 160:11, 165:19, 167:12, 169:10, 169:16, 174:18, 187:13, 199:7, 200:22, 202:4, 231:21, 238:12, 240:10, 250:4, 250:10, 250:14, 265:20, 269:1, 269:6, 270:3, 280:5, 280:17, 287:1
**sustaining** [1] - 159:15
**sustains** [2] - 33:17, 33:18
**sworn** [1] - 8:11
**systems** [1] - 168:16

**T**

**T-O-N** [1] - 113:13
**T3** [70] - 11:15, 19:15, 19:18, 22:24, 24:8, 27:2, 28:13, 28:15, 29:15, 30:1, 37:13, 37:14, 37:18, 37:22, 39:6, 40:7, 46:16, 47:9, 47:11, 128:5, 128:9, 128:11, 131:11, 220:24, 222:2, 227:1, 231:12, 231:13, 231:15, 231:24, 232:2, 232:5, 232:6, 232:22, 235:7, 235:8, 246:3, 246:6, 247:8, 247:10, 251:22, 253:20, 256:16, 259:23, 259:25, 260:1, 260:11, 260:15, 262:6, 265:23, 266:2, 266:5, 266:11, 266:20, 267:3, 267:16, 267:20, 268:2, 268:8, 268:9, 268:14, 268:23, 269:10, 270:1, 270:7, 270:24, 271:5, 274:7, 275:4, 290:3
**T3S** [1] - 261:19
**T3s** [114] - 8:19, 11:8, 13:14, 13:17, 14:22, 18:9, 18:17, 21:1, 21:24, 22:13, 24:2, 24:5, 28:3, 30:21, 31:18, 32:1, 32:25, 33:24, 35:25, 37:9, 38:4, 39:7, 40:22, 45:11, 45:15, 46:1, 46:2, 47:22, 48:1, 129:2, 213:17, 216:22, 220:3, 220:8, 221:22, 222:1, 222:3, 222:10, 222:17, 224:3, 224:14, 225:17, 230:20, 231:8, 232:9, 232:18, 232:19, 236:7, 236:14, 236:17, 237:16, 238:4, 238:15, 244:5, 244:16, 244:22, 245:1, 245:6, 245:9, 245:16, 245:22, 246:11, 246:13, 247:1, 247:12, 247:14, 249:7, 249:12, 249:16, 249:21, 250:20, 250:21, 250:23, 251:3, 251:4, 251:6, 252:18, 252:21, 252:24, 253:1, 253:6, 253:14, 253:24, 254:17, 255:5, 255:14, 255:16, 256:25, 257:8, 257:9, 258:3, 258:17, 258:23, 259:17, 260:18, 261:7, 261:9, 261:12, 261:15, 266:18, 266:23, 267:2, 271:10, 275:10, 281:8, 281:11, 289:8, 289:10, 289:12, 289:14, 289:18, 289:20
**Tariq** [4] - 117:20, 117:21, 117:22, 117:23
**Tariq's** [1] - 118:4
**taste** [1] - 142:2
**taught** [1] - 10:1
**tax** [3] - 86:12, 87:2, 119:21
**taxes** [8] - 85:21, 85:23, 86:4, 86:11, 86:13, 86:18, 87:2, 196:23
**taxi** [2] - 154:14, 155:2
**taxpayer** [1] - 85:9
**teach** [3] - 134:24, 134:25, 253:1
**teaching** [1] - 247:9
**teamwork** [1] - 206:21
**telephone** [11] - 167:19, 167:23, 168:6, 168:7, 168:8, 168:11, 168:13, 235:22, 236:3, 248:17, 248:19
**telephones** [1] - 167:17
**ten** [20] - 25:10, 25:16, 48:8, 48:12, 52:14, 52:16, 61:14, 108:12, 155:10, 155:12, 165:21, 165:23, 166:3, 203:20, 203:21, 225:4, 225:25, 226:3, 226:8, 291:1
**ten-minute** [2] - 165:21, 225:25
**tens** [1] - 211:10
**tense** [1] - 141:14
**tenus** [1] - 292:19
**term** [3] - 85:2, 97:19
**terminated** [5] - 281:5, 281:23, 282:6, 282:14, 286:24
**termination** [2] - 226:24, 285:7
**terms** [1] - 97:18
**testified** [22] - 8:12, 9:16, 12:15, 18:16, 31:2, 31:8, 45:7, 45:10, 45:14, 111:10, 111:20, 146:9, 146:18, 155:15, 163:1, 182:11, 182:21, 203:16, 212:2, 223:24, 282:17, 284:12
**testify** [9] - 112:24, 174:15, 174:21, 190:12, 202:22, 203:8, 203:10, 204:10, 285:2
**testifying** [8] - 9:11, 64:21, 102:4, 159:12, 226:18, 260:4, 264:8, 265:17
**testimony** [60] - 6:17, 10:7, 11:18, 102:22, 145:25, 169:24, 176:5, 178:10, 182:6, 185:7, 192:7, 192:13, 197:5, 197:10, 203:25, 207:5, 215:2, 215:12, 215:13, 218:3, 221:17, 226:19, 227:15, 227:16, 228:24, 229:5, 229:6, 231:14, 237:14, 237:17, 238:6, 238:9, 241:7, 241:25, 248:20, 250:1, 252:16, 260:17, 261:5, 263:23, 264:3, 266:18, 268:9, 269:4, 269:8, 270:12, 270:16, 271:9, 271:23, 272:14, 272:15, 276:6, 282:5, 283:22, 285:16, 285:23, 287:4, 291:9, 291:24
**testing** [1] - 71:4
**text** [24] - 10:8, 10:21, 18:12, 19:25, 20:19, 22:17, 23:24, 24:7, 24:13, 24:16, 26:18, 26:22, 28:6, 30:4, 35:6, 35:9, 36:10, 37:7, 46:17, 47:16, 77:8, 217:14, 249:2, 271:3
**texting** [2] - 10:10, 37:12
**texts** [3] - 29:13, 33:22, 35:13
**that..** [1] - 204:2
**THE** [300] - 1:10, 1:13, 4:2, 4:11, 4:13, 4:18, 4:25, 5:3, 5:5, 5:6, 5:8, 5:9, 5:10, 5:11, 5:13, 5:20, 5:21, 5:23, 6:3, 6:5, 6:7, 6:8, 6:16, 6:21, 6:22, 6:23, 7:1, 7:6, 7:7, 7:12, 7:15, 7:18, 7:20, 7:21, 7:22, 7:24, 8:4, 12:10, 17:9, 25:7, 25:12, 25:15, 25:17, 25:20, 26:5, 26:6, 26:8, 26:13, 29:8, 30:12, 33:3, 33:5, 33:7, 33:15, 33:20, 34:12, 36:22, 37:25, 41:22, 43:15, 43:20, 46:12, 47:2, 47:7, 47:13, 47:20, 48:4, 48:9, 48:11, 48:13, 48:16, 48:17, 49:1, 49:3, 49:5, 49:10, 51:12, 52:6, 52:23, 53:23, 54:19, 55:2, 55:7, 55:14, 56:7, 56:13, 58:16, 58:25, 59:18, 60:16, 60:18, 61:2, 63:10, 65:20, 66:20, 66:24, 67:10, 69:24, 70:12, 75:17, 76:23, 78:10, 81:6, 81:18, 81:21, 88:11, 88:24, 93:17, 94:2, 94:8, 94:14, 94:16, 95:8, 100:18, 101:2, 102:13, 103:12, 103:14, 103:18, 107:12, 109:9, 109:11, 109:12, 109:17, 109:19, 109:24, 110:2, 110:3, 110:10, 110:14, 110:18, 110:20, 110:22, 111:2, 114:7, 114:13, 114:24, 116:1, 116:2, 116:4, 116:6, 116:16,

116:25, 117:15, 123:4, 124:10, 129:6, 129:23, 131:25, 133:11, 134:6, 134:8, 137:24, 142:4, 147:14, 150:21, 152:8, 152:14, 153:5, 153:22, 158:12, 158:16, 159:3, 159:9, 159:15, 160:11, 160:14, 165:19, 165:24, 165:25, 166:2, 166:4, 166:5, 166:8, 166:15, 166:17, 166:19, 166:24, 167:12, 169:10, 169:16, 169:21, 170:6, 170:20, 170:21, 172:12, 174:18, 175:12, 178:21, 181:5, 183:21, 184:12, 187:13, 194:23, 196:13, 198:20, 199:7, 200:22, 201:5, 202:4, 202:25, 205:7, 205:15, 212:7, 212:18, 215:20, 217:25, 218:4, 218:7, 218:13, 218:16, 218:19, 218:22, 218:25, 219:3, 224:23, 225:2, 225:24, 226:5, 226:7, 226:11, 227:4, 227:16, 227:19, 228:8, 228:14, 228:18, 229:1, 229:10, 229:19, 229:23, 229:24, 230:1, 230:6, 231:21, 234:3, 238:12, 239:20, 240:10, 240:22, 242:4, 242:7, 242:14, 242:16, 242:21, 243:2, 243:15, 244:2, 244:11, 244:19, 245:2, 245:10, 245:24, 246:7, 246:21, 246:23, 250:4, 250:9, 250:14, 253:9, 257:4, 257:24, 258:20, 259:9, 260:6, 262:7, 262:21, 262:24, 264:14, 265:10, 265:20, 269:1, 269:6, 270:3, 271:18, 272:3, 274:13, 274:15, 274:19, 275:19, 276:5, 280:5, 280:17, 281:20, 282:1, 282:18, 282:21, 282:22, 283:25, 287:1, 288:17, 290:23, 290:25, 291:6, 291:8, 291:12, 291:13, 292:4, 292:9, 293:2

**themselves** [3] - 42:12, 104:3, 183:16
**thereafter** [1] - 291:18
**Thereupon** [1] - 8:9
**thick** [1] - 31:18
**thieved** [1] - 62:2
**thieves** [1] - 85:2
**thinking** [2] - 56:11, 176:18
**third** [1] - 240:20
**thousand** [5] - 122:1, 122:2, 134:2
**thousands** [2] - 121:2, 121:3
**thread** [10] - 10:10, 11:12, 19:25, 20:20, 22:17, 23:25, 26:18, 28:6, 35:6, 35:9
**threads** [1] - 29:1
**threat** [1] - 139:2
**threatened** [1] - 139:1
**three** [14] - 51:16, 51:24, 60:12, 142:13, 143:1, 163:7, 180:4, 180:5, 189:24, 194:2, 284:15, 289:22, 291:25
**throughout** [1] - 150:19
**throwing** [1] - 271:25
**thumb** [1] - 20:7
**timestamp** [1] - 18:24
**today** [37] - 5:15, 6:17, 9:11, 11:18, 28:10, 46:11, 58:23, 81:9, 86:8, 99:3, 102:21, 103:3, 107:20, 108:20, 113:18, 113:20, 114:11, 151:14, 151:21, 164:15, 169:24, 174:6, 174:10, 175:1, 175:3, 179:24, 181:17, 182:11, 182:21, 204:14, 260:18, 265:9, 265:17, 265:24, 266:1, 286:22, 287:4
**today's** [1] - 265:8
**together** [16] - 38:7, 70:25, 90:23, 90:25, 154:25, 206:25, 207:1, 207:2, 212:22, 223:21, 237:7, 254:17, 278:5, 280:11, 280:13
**Tom** [1] - 113:12
**tomorrow** [4] - 28:11, 28:13, 35:24, 102:2
**ton** [3] - 113:11, 117:12, 118:18
**Ton** [3] - 113:13, 118:14, 118:17
**Ton's** [1] - 113:14
**took** [24] - 47:17, 58:10, 59:20, 60:1, 66:8, 70:6, 72:5, 76:8, 76:10, 76:11, 104:11, 105:20, 142:14, 142:15, 172:17, 176:9, 198:12, 210:24, 223:22, 249:18, 256:3, 256:10, 282:15, 289:22
**top** [4] - 6:1, 27:1, 191:19, 219:6
**topic** [2] - 11:18, 289:17
**total** [1] - 28:11
**touch** [1] - 236:20
**Trace** [2] - 289:12, 289:14
**Track** [2] - 289:12, 289:14
**Trading** [1] - 143:25
**traditional** [1] - 234:10
**train** [2] - 225:3, 225:4
**transaction** [6] - 37:14, 37:17, 256:19, 259:25, 260:2, 264:22
**transactional** [4] - 57:4, 57:12, 57:19, 289:12
**transactions** [14] - 34:20, 84:12, 223:9, 244:6, 244:7, 244:16, 245:16, 245:17, 251:24, 252:7, 252:21, 256:23, 264:21, 289:18
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 293:11
**transferred** [2] - 171:8, 171:10
**transition** [2] - 57:23, 57:24
**Transport** [1] - 143:23
**traveling** [1] - 272:24
**travels** [3] - 100:11, 272:21, 273:9
**treatment** [1] - 75:1
**treatments** [1] - 73:3
**trees** [3] - 171:13, 171:15, 171:16
**Trek** [1] - 97:7
**Trial** [1] - 293:6
**TRIAL** [1] - 1:9
**trial** [7] - 104:21, 178:11, 192:19, 202:22, 203:6, 203:8, 228:15
**trick** [2] - 91:14, 91:16
**tried** [3] - 35:25, 37:14, 287:25
**Triumeq** [1] - 22:11
**trouble** [1] - 186:3
**true** [15] - 105:9, 106:22, 131:22, 139:13, 146:10, 162:11, 180:25, 202:12, 202:14, 202:16, 202:17, 256:9, 259:13, 274:3
**True** [1] - 106:21
**Trust** [1] - 158:18
**trust** [4] - 159:7, 159:10, 159:20, 159:23
**truth** [26] - 80:24, 99:19, 99:22, 101:16, 101:17, 101:22, 103:25, 127:21, 136:3, 149:14, 174:7, 178:20, 179:16, 200:17, 202:20, 204:12, 249:4, 249:6, 273:19, 273:24, 273:25, 283:7, 289:22, 289:25
**truthful** [7] - 24:8, 33:24, 47:22, 134:4, 202:15, 202:16, 264:3
**truthfully** [1] - 112:24
**Truvada** [1] - 13:3
**try** [17] - 23:15, 29:9, 31:9, 73:24, 93:2, 93:12, 95:6, 101:4, 101:8, 189:16, 195:11, 195:14, 195:16, 243:19, 256:25, 258:13, 286:9
**trying** [18] - 5:25, 51:22, 62:21, 62:22, 62:23, 62:25, 93:23, 101:9, 101:14, 161:7, 200:2, 232:19, 238:14, 239:10, 256:2, 256:3, 256:24, 261:18
**tubes** [1] - 201:2
**Tuesday** [1] - 156:21
**tuition** [1] - 140:6
**turn** [1] - 11:17
**turned** [2] - 255:18, 285:22
**turns** [1] - 87:7
**twelve** [3] - 155:13, 156:4, 292:4
**twice** [1] - 248:13
**two** [34] - 4:4, 36:20, 51:16, 51:20, 51:24, 57:13, 60:3, 60:9, 61:7, 63:15, 102:16, 108:13, 116:10, 116:21, 117:4, 123:6, 128:8, 141:7, 147:2, 148:8, 154:19, 154:20, 157:8, 163:9, 167:15, 175:16, 200:12, 215:22, 254:9, 264:4, 282:7, 291:25
**two-day** [1] - 57:13
**type** [8] - 24:16, 132:18, 171:12, 191:3, 285:12, 287:11, 287:13

## U

**U.S** [1] - 293:17
**ultimate** [1] - 255:12
**ultimately** [4] - 76:10, 194:5, 200:19, 254:10
**umbrella** [1] - 134:22
**unable** [1] - 32:17
**unacceptable** [2] - 256:13, 256:15
**unburdening** [1] -

101:22
**uncovered** [3] - 257:20, 278:21, 279:11
**under** [33] - 5:4, 21:21, 39:19, 58:19, 60:14, 64:22, 67:6, 67:8, 67:9, 83:14, 89:9, 89:10, 89:23, 90:1, 91:24, 102:9, 110:1, 121:23, 123:16, 134:22, 135:1, 141:1, 149:9, 149:10, 149:16, 149:17, 159:20, 159:23, 168:15, 213:13, 277:23, 278:1
**understandings** [1] - 200:11
**understood** [2] - 4:20, 41:2
**undertake** [2] - 132:23, 133:1
**undetected** [1] - 189:8
**unemployed** [1] - 284:22
**Union** [2] - 69:9, 69:11
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [30] - 1:14, 2:4, 52:11, 52:12, 52:13, 52:19, 53:2, 53:3, 53:9, 53:10, 53:13, 53:19, 53:20, 53:21, 54:8, 61:24, 62:2, 62:14, 63:4, 65:10, 65:11, 98:23, 103:8, 138:3, 140:19, 146:3, 195:16, 195:17, 228:16, 293:16
**unjust** [1] - 108:9
**unlawfully** [1] - 65:23
**unless** [4] - 114:14, 201:10, 214:1, 260:1
**Unless** [1] - 256:18
**unquote** [1] - 83:17
**up** [78] - 9:15, 11:5, 11:19, 14:17, 15:21, 16:3, 22:19, 26:18, 28:21, 28:22, 29:18, 32:7, 34:17, 35:8, 36:2, 38:21, 42:24, 43:13, 46:15, 55:5, 55:12, 55:14, 58:11, 69:18, 70:2, 74:7, 74:10, 74:13, 74:24, 78:25, 82:22, 83:3, 89:22, 90:19, 90:20, 91:1, 96:8, 103:15, 104:25, 124:23, 132:10, 135:15, 145:4, 165:10, 175:17, 176:1, 176:3, 176:4, 181:21, 182:25, 183:15, 188:21, 188:23, 189:8, 189:20, 201:16, 207:2, 209:5, 222:21, 222:22, 230:11, 233:20, 234:18, 234:19, 236:18, 240:13, 248:13, 248:21, 257:1, 258:4, 266:8, 274:7, 274:12, 275:3, 292:11, 293:2
**update** [1] - 108:20
**updated** [4] - 222:3, 261:13, 261:20
**upfront** [1] - 260:15
**upright** [1] - 104:16
**upstairs** [3] - 4:14, 5:9, 5:10
**USSR** [3] - 53:14, 53:16, 54:3
**usual** [1] - 127:24
**Uzbekistan** [1] - 52:10

**V**

**vacation** [1] - 292:7
**value** [3] - 160:1, 160:5, 160:21
**variables** [1] - 172:7
**variety** [1] - 13:13
**various** [4] - 51:14, 51:23, 272:21, 272:25
**vendor** [6] - 83:9, 84:5, 204:19, 210:20, 254:3, 280:2
**verified** [2] - 19:16, 23:22
**verify** [8] - 14:23, 34:20, 35:25, 37:14, 37:17, 91:18, 256:19, 256:24
**Verizon** [1] - 234:11
**version** [14] - 13:22, 20:4, 20:21, 24:11, 29:15, 29:17, 29:18, 30:1, 30:17, 30:19, 30:20, 38:6, 38:17, 47:4
**versions** [2] - 13:14, 13:19
**violate** [1] - 74:16
**violated** [3] - 56:5, 56:22, 56:23
**violation** [1] - 148:10
**vision** [1] - 271:12
**Volume** [1] - 1:7
**volunteered** [1] - 210:6
**volunteering** [1] - 193:22
**vs** [1] - 1:5

**W**

**WAC** [1] - 21:21
**waist** [1] - 55:18
**wait** [16] - 4:5, 8:25, 25:23, 98:6, 133:22, 178:21, 215:20, 216:3, 240:25, 282:18, 291:21
**Wait** [1] - 207:21
**waiting** [3] - 7:4, 48:20, 140:21
**waive** [6] - 7:25, 26:9, 49:6, 110:23, 166:20, 230:2
**walked** [1] - 58:18
**wants** [7] - 5:12, 56:2, 102:3, 162:12, 193:18, 224:14, 274:19
**war** [1] - 54:5
**warm** [1] - 292:4
**watch** [1] - 97:7
**ways** [3] - 119:17, 196:8, 211:8
**wear** [2] - 5:14, 6:9
**wearing** [1] - 55:9
**week** [5] - 139:13, 291:17, 291:18, 292:2, 292:6
**weeks** [2] - 139:14, 221:24
**welcome** [1] - 111:8
**Wellness** [12] - 8:18, 19:14, 21:1, 21:24, 30:25, 31:17, 32:17, 39:13, 39:24, 40:23, 46:2, 126:6
**WhatsApp** [10] - 234:13, 234:16, 234:18, 234:20, 235:4, 235:6, 235:10, 235:14, 235:16, 235:18
**Wheels** [1] - 143:23
**whole** [5] - 142:25, 172:7, 203:15, 203:17, 279:19
**wholesale** [11] - 90:7, 90:18, 206:16, 208:14, 208:19, 208:25, 247:6, 254:2, 278:22, 279:14, 279:16
**wholesaler** [10] - 42:22, 43:3, 43:13, 90:8, 91:8, 91:15, 92:1, 92:4, 266:22, 279:12
**wife** [6] - 150:6, 150:8, 150:10, 150:13, 153:15, 153:16
**WILLIAM** [1] - 1:10
**William** [2] - 1:17, 2:3
**wire** [5] - 28:11, 29:1, 29:13, 30:6, 83:20
**wise** [1] - 217:16
**withdraw** [1] - 205:6
**WITNESS** [25] - 3:2, 5:5, 5:8, 5:10, 5:13, 5:21, 6:3, 6:8, 6:21, 7:21, 29:8, 33:20, 109:11, 110:2, 116:2, 116:6, 165:25, 166:4, 170:20, 212:7, 217:25, 218:7, 242:7, 282:21, 291:12
**witness** [22] - 11:19, 16:20, 27:19, 30:9, 34:1, 54:25, 134:7, 138:6, 138:20, 160:12, 167:9, 203:13, 217:23, 218:3, 218:12, 226:9, 226:16, 228:20, 229:17, 260:5, 291:20, 291:21
**Witness** [2] - 226:13, 291:22
**witness's** [2] - 226:23, 274:20
**witnesses** [4] - 100:19, 291:25, 292:2, 292:25
**woman** [3] - 204:25, 205:11, 205:12
**wonder** [1] - 25:5
**wondering** [2] - 137:13, 164:24
**word** [3] - 93:23, 186:12, 239:17
**words** [3] - 101:7, 199:25, 260:1
**worker** [2] - 65:7
**workers** [1] - 74:21
**works** [9] - 103:6, 139:19, 198:23, 199:2, 264:12, 264:21, 264:24, 264:25
**world** [2] - 66:3, 97:24
**worry** [4] - 170:20, 180:9, 199:3, 219:13
**worth** [6] - 41:25, 111:17, 157:7, 163:20, 163:22, 185:7
**wrap** [1] - 46:15
**wrapped** [1] - 292:11
**write** [20] - 23:14, 23:18, 27:1, 28:12, 32:21, 33:12, 34:15, 35:2, 35:16, 36:10, 36:17, 71:3, 71:17, 72:7, 72:10, 72:11, 73:7, 164:19, 165:12, 165:15
**writes** [8] - 12:20, 22:22, 26:22, 27:3, 27:11, 32:14, 34:18, 37:13
**writing** [5] - 14:3, 14:21, 30:5, 32:24, 72:18
**written** [1] - 190:15
**wrote** [3] - 28:19, 28:25, 110:8
**Wyszynski** [1] - 144:2

**Y**

**yamulke** [2] - 6:19, 6:20
**year** [15] - 54:13, 54:14, 64:11, 86:13, 86:15, 86:17, 86:19, 86:21, 92:13, 116:11, 154:2, 154:3, 154:15, 154:17, 154:18
**years** [31] - 52:14, 52:16, 64:13, 76:11, 77:20, 85:24, 86:25, 108:1, 152:6, 154:18, 154:19, 154:20, 155:5, 155:8, 155:11, 155:12, 155:24, 156:2, 156:3, 156:17, 172:9, 172:17, 189:10, 189:22, 198:12, 198:16, 231:18, 284:15, 289:22
**yes-or-no** [1] - 216:25
**yesterday** [35] - 4:8,

5:15, 8:17, 9:16, 12:15, 13:13, 18:15, 21:12, 21:24, 30:16, 31:2, 31:8, 38:23, 41:24, 45:10, 46:11, 101:5, 102:20, 102:22, 107:21, 108:23, 126:13, 151:14, 204:14, 212:2, 212:12, 214:12, 220:11, 220:19, 221:10, 221:16, 265:13, 265:15, 265:22, 269:8
**York** [51] - 9:8, 9:13, 54:10, 61:8, 63:12, 63:18, 63:20, 63:23, 63:25, 64:6, 64:9, 65:1, 65:10, 65:11, 65:25, 67:2, 70:21, 71:23, 71:24, 73:7, 77:16, 79:7, 80:20, 90:10, 90:13, 91:19, 100:5, 100:9, 102:24, 103:15, 103:22, 103:24, 104:4, 104:25, 106:7, 110:7, 132:21, 145:9, 146:24, 179:13, 179:14, 191:10, 191:11, 191:23, 197:14, 197:15, 206:16, 264:10, 264:20, 276:9, 278:22
**yourself** [14] - 95:11, 101:22, 135:18, 135:20, 167:9, 174:20, 184:3, 187:2, 187:16, 188:6, 189:17, 195:8, 208:18, 233:12

## Z

**Zangari** [41] - 10:1, 51:19, 76:17, 90:18, 90:21, 96:10, 96:12, 120:18, 120:21, 121:23, 122:23, 123:1, 123:6, 123:16, 123:19, 124:2, 185:15, 206:18, 206:19, 206:25, 207:13, 207:19, 213:9, 217:11, 223:9, 223:14, 224:4, 224:13, 225:7, 225:8, 230:13, 230:19, 231:25, 232:9, 232:17, 234:1, 234:8, 235:14, 237:7, 237:15
**Zangari's** [1] - 207:7
**zero** [1] - 272:11
**Zimet** [9] - 1:21, 170:6, 218:17, 224:23, 230:9, 242:5, 274:16, 274:25, 290:23
**ZIMET** [143] - 3:4, 4:21, 5:1, 7:10, 8:2, 12:8, 17:7, 26:2, 26:11, 33:1, 33:4, 33:6, 33:14, 34:10, 36:20, 37:23, 41:21, 43:14, 43:19, 46:10, 46:25, 47:6, 47:12, 47:16, 48:24, 49:8, 110:16, 110:25, 126:24, 166:13, 166:22, 170:8, 170:18, 170:22, 172:14, 174:19, 175:10, 175:13, 178:23, 181:8, 183:22, 184:13, 187:14, 194:25, 196:14, 198:21, 199:8, 200:23, 201:6, 202:5, 203:3, 205:6, 205:8, 205:16, 212:5, 212:8, 212:20, 214:11, 216:6, 218:15, 218:18, 218:20, 218:23, 219:1, 219:4, 219:6, 219:7, 220:12, 220:13, 224:25, 225:3, 225:6, 225:23, 226:9, 226:14, 227:22, 228:2, 228:10, 228:17, 228:23, 230:4, 230:10, 230:12, 231:22, 234:5, 238:13, 239:21, 240:11, 241:2, 242:8, 242:17, 242:22, 243:3, 243:18, 244:3, 244:14, 244:20, 245:3, 245:13, 246:8, 246:24, 249:23, 249:25, 250:5, 250:11, 250:15, 253:10, 257:5, 258:1, 258:22, 259:11, 260:9, 262:8, 262:22, 263:2, 264:17, 265:12, 265:21, 269:2, 269:7, 270:4, 271:21, 272:6, 274:11, 274:14, 275:1, 275:20, 276:8, 280:6, 280:18, 281:21, 282:4, 282:23, 284:2, 287:2, 288:16, 288:18, 290:24, 291:14, 292:6, 292:13, 292:15, 293:4
**Zingo** [4] - 225:7, 225:9, 230:14, 237:2
**Zone** [1] - 125:9